**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

OELRICH CONSTRUCTION, INC.,      )
                                 )
  Plaintiff,                     ) Case No: 1:20cv169
                                 )
          v.                     ) Gainesville, Florida
                                 ) October 25, 2021
PRC PRECAST, LLC,                )
                                 ) 8:58 AM
                                 )
  Defendant/Counter-Plaintiff,)
                                 ) VOLUME I
          v.                     )
OELRICH CONSTRUCTION, INC.,      )
  Counter-Defendant.             )
_____ )

**TRANSCRIPT OF BENCH TRIAL**
**BEFORE THE HONORABLE ROBERT L. HINKLE**
**UNITED STATES DISTRICT JUDGE**
**(Pages 1 through 218)**

*LISA C. SNYDER, RPR, CRR*
**Official United States Court Reporter**
**111 North Adams Street, Tallahassee, FL 32301**
**(850)567-1374 * lisasnydercr@gmail.com**

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

<u>APPEARANCES</u>:


For the Plaintiff:          Warner, Sechrest & Butts, PA
Counter-Defendant           By:  ROBERT PAUL BUTTS, JR.
                                 MICHAEL DUSTIN SECHREST
                                 SEAN GERALD HIPWORTH
                                 Attorneys at Law
                                 RButts@fbswlaw.com
                                 sechrest@fbswlaw.com
                                 shipworth@fbswlaw.com
                            5200 SW 91st Terrace Suite 101
                            Gainesville, Florida 326008


For the Defendant:          Kirwin Norris, PA
Counter-Plaintiff           By:  DAVID JOSEPH DARR
                                 Attorney at Law
                                 djd@kirwinnorris.com
                            15 W. Church Street, Suite 301
                            Orlando, Florida 32801

**P R O C E E D I N G S**

1

2    (Call to Order of the Court at 8:58 AM on Monday, October

3    25, 2021.)

4         THE COURT:  Good morning.  Have a seat, please.

5         Is the plaintiff ready for trial?

6         MR. BUTTS:  Yes, Your Honor.  We are.

7         THE COURT:  Defense ready?

8         MR. DARR:  Yes, Your Honor.

9         THE COURT:  Opening statement for the plaintiff?

10        MR. BUTTS:  Yes, Your Honor.

11        THE COURT:  And the rule on masks when you are

12   speaking and at the lecturn away from everybody else you are

13   welcome to remove your mask to make it a little easier for me to

14   hear and for the court reporter and for everybody else.

15        MR. BUTTS:  Thank you.

16        A contract is a collection of promises.

17        In a construction contract the promises are unique.

18   There is a reason it's unique.  The reason the promises are

19   unique is because unlike many contracts a construction contract

20   has to operate over a duration of time.

21        There are -- construction projects are dynamic, they

22   are not static.  They change.  There are many subcomponents,

23   including subcontractors and vendors that all have to be

24   coordinated in an efficient, effective manner.  And that's why

25   construction contracts are quite often litigated and quite often

1    complex.

2              Included in a construction contract are instructions

3    which are given in the form of a set of plans and usually in the

4    form of specifications that go along with those plans.  And,

5    just generally speaking, the things that can be conveyed in

6    terms of directions for the people who are going to perform the

7    work if they are best presented with pictures and typically

8    those are the plans.

9              And if the requirements for the people who are working

10   are more efficiently and effectively presented by text, those

11   are the specifications, generally speaking.

12             Therefore, the rules that are associated with a

13   construction contract, because of its dynamic nature and

14   complexity and duration, are extra important that the parties

15   follow.  One of the most important things are to adhere to the

16   plans and the specifications.

17             Another rule that's important is communication among

18   the various parties.  And in a construction contract there are,

19   there may be -- there would be an owner.  There would be a

20   contractor.  There may be a subcontractor and sub

21   sub-contractors and vendors to all of those people who are

22   performing the work.

23             The communication is essential among all of that group

24   of people.  There is -- it is essential that what is

25   communicated is reliable information that because, because of

1    the dynamic nature of a construction contract there is

2    information being exchanged, needing to be exchanged all the

3    time.  And the information is understandably relied on by the

4    receiver of the information.

5              It's also important during the course of the

6    construction for there to be reliable assurances given.  In

7    other words, so that people, the sub-contractors and the

8    contractor, and in some cases the owner and vendors can have a

9    clear understanding of what all of the moving parts are doing.

10   This is especially important for the contractor.

11             Not the least of the rules is safety.  Especially on a

12   commercial contract, such as the one at issue, there are

13   significant safety requirements that have to be met by everyone.

14   In this case, it's a federal job so there are additional safety

15   requirements.  And those safety requirements have to be known

16   and documentation has to be submitted and it is imperative that

17   the parties are responsible in that regard.

18             The contract at issue in this case is one between

19   Oelrich Construction and PRC Precast.  Oelrich Construction is

20   actually a subcontractor in this case.  PRC Precast is a sub

21   subcontractor in this case.

22             Oelrich Construction is in a contract with a joint

23   venture called SAW-Greenland.  And SAW-Greenland is in contract

24   with the Veterans Administration.

25             Let me take you back to the beginning.  Steve Realto

1    works for PRC, the defendant in this case.  Mr. Realto receives

2    plans and specifications for this project.  He is asked to

3    provide pricing for this.

4           As a result of his review of the plans and the

5    specifications, PRC issued a proposal to Oelrich Construction

6    for doing a component of the work known as precast.

7           The idea or the rule that controlled the plans and the

8    specs are that this precast is fabricated offsite in Greenville,

9    South Carolina, transported to Gainesville at the VA Hospital,

10   over here.  And installed on the building.

11          There are about 105 panels all together.  Some of the

12   panels are large, maybe 4 feet wide.  I don't know.  20 feet

13   long.  Some of them are caps that go on top of what may be

14   referred to as a parapet wall in this case.

15          And just a parapet wall is simply a wall that sticks

16   up above the roofline, which is a flat roof.  And it, it is --

17   the caps go along the top of that wall around the perimeter.

18          If I may, Your Honor, refer to the photograph to my

19   right?

20          Shall I move it closer?

21          THE COURT:  That would be fine, yeah.  I can see where

22   it is, but closer is always better.  That's good.

23          MR. BUTTS:  This is the building.  It's actually to

24   house boilers, new boilers for the Veterans Administration.  The

25   precast that you'll hear the parties refer to cover structural

1    columns.  And this light tan line is the precast.

2            It goes around the building horizontally at two levels

3    and vertically on the corners.  The caps that I referenced would

4    go on top of this wall all the way around and then on top of

5    this wall back here.

6            THE COURT:  All right.  And this is a standalone

7    boiler building?

8            MR. BUTTS:  Pardon me?

9            THE COURT:  This is a standalone boiler building?  I

10   mean, this is -- it's been a long time since I have been out and

11   seen the VA hospital over there, but this is a separate building

12   that houses the boiler and nothing else?

13           MR. BUTTS:  Yes.  They needed new boilers.  And, so

14   they created a separate building.  I think it probably joins the

15   VA, but I'm not certain of that fact.  We'll have to ask one of

16   the witnesses as we get going.  But, it's to handle those four

17   new boilers.

18           PRC finished the first panel in July of 2019.

19           Through October of 2019, PRC had built about 51 of the

20   panels and they stopped.  51 of the, what appears to be 105,

21   there are some references that there are 105 and at least one

22   reference that there is 115, but it was about that many panels

23   and caps combined.

24           PRC built no more panels or caps until March of 2020

25   when they built 12 more.  And that happened to be actually after

1    they were terminated on March the 17th.

2           On December the 16th, PRC billed for all 105 panels.

3    Completed.  Not installed.  And not necessarily for the freight,

4    although they did bill for the freight, but that was in error

5    and subsequently corrected.  But, on December 16th PRC billed

6    for all of the panels as if they were all fabricated and

7    completed at their site in South Carolina.

8           Also on December 16th, PRC informed

9    Oelrich Construction that it did not have an erector lined up to

10   install panels that Oelrich Construction was seeking to have

11   installed on January the 6th of 2020.

12          On December 30th, 2019, PRC showed a representative

13   of Oelrich Construction around their Greenville facility.  The

14   representative had driven up there specifically for the purpose

15   to assess the quantity of panels that PRC had fabricated at that

16   time.  Reminding the Court that they had billed for a hundred

17   percent.  And there was a concern of whether or not there were a

18   hundred percent of the panels built at that time.

19          At that point, Oelrich Construction had paid

20   PRC Precast almost $110,000 for the panels that PRC had

21   represented were built at that time.

22          On December the 31st, there was dialogue.  And

23   Mr. Forde Davis of PRC was informed that Oelrich Construction

24   had found an erector to put the panels up.

25          It was -- at about that same time it was learned that

1   panels weren't ready to be put up.  But nevertheless,

2   Oelrich Construction had gone out of their way to find an

3   erector.  And then on the 31st of December, Mr. Randall Forde

4   indicated in an email that PRC would in fact be able to install

5   the panels on the 17th day of February.

6            Now, it's important to note that on the visit on the

7   30th.  By the Oelrich representative -- his name is Dana -- when

8   Dana Noyes went to the facility he was shown two areas where

9   there were panels represented to be those of

10  Oelrich Construction.  Mr. Noyes photographed those two areas.

11  One was in a covered area.  And the other was out in the yard.

12  He photographed those areas.  He took 5 photographs, sent them

13  back to Oelrich Construction where they reviewed the photographs

14  and reached the conclusion that instead of there being a hundred

15  percent of the panels completed that there were only 51.

16           Now, I think the testimony may be that they may be off

17  by one or two in either direction, but the point was that there

18  was not a hundred percent of panels completed at that time.

19           On the 4th day of February, about a little over a

20  month later, PRC informed Oelrich Construction that 22 days were

21  needed to finish making the panels.

22           Prior to that, as I noted, PRC had assured

23  Oelrich Construction that they would install on the 17th.

24  Consequently the 17th slipped.

25           On the 20th PRC was informed that they could start

1    installing panels in the northwest corner of the building.  And

2    on a project like this, it's -- what would happen is they would

3    start in one part and work their way around and probably follow

4    other trays around the building.  But they could start -- the

5    plan was for PRC to start in the northwest corner of the

6    building on or about March the 4th.

7              However, on February 26th, 6 days later, PRC informed

8    OCI that the start date had slipped once again and they would

9    not be able to start until March 26th, 2020, at the earliest.

10   And April the 6th at the latest.

11             Subsequently, there was dialogue between PRC and

12   Chris Crehore who was employed by Oelrich Construction at that

13   time as the project manager.

14             During those -- during those conversations it became

15   apparent to Mr. Crehore that PRC had not fabricated any more

16   panels and did not know when it would, in March.

17             Mr. Crehore and Oelrich Construction was left with no

18   choice at that point but to terminate the contract of PRC and

19   find someone else to do it.  They were up against a deadline and

20   ultimately up against liquidated damages.  To be clear, they did

21   not suffer liquidated damages, but that was threatening.

22   Oelrich Construction had to go out and find a new contractor,

23   new subcontractor to replace PRC.

24             PRC never responded to the termination email.  It

25   never acknowledged it.  When Mr. Crehore terminated PRC at the

1    end of the email there was an invitation to come back to

2    Oelrich Construction if they felt like he had a misunderstanding

3    of the facts leading up to that.  And you'll hear Mr. Crehore's

4    testimony of the actual telephone conversation that took place

5    in regard to that termination that led up to it.

6         Oelrich Construction spent more money on the spring

7    precast replacement than they would have planned to spend or

8    they had budgeted to spend with PRC.  It caused a delay and

9    disruption.  Essentially it caused harm to Oelrich Precast in

10   the form of the cost of the extended general conditions that it

11   extended the job to finish it.

12        PRC still has the money $110,000, almost $110,000 that

13   Oelrich Construction paid for the panels and that they received

14   nothing for.

15        We talked about rules.  PRC failed to timely respond

16   to Oelrich Construction's repeated request for assurances that

17   PRC was ready, willing and able to perform the contract.

18        We know that that's the case because of the email

19   dialogue and the telephone dialogue.  And more importantly

20   perhaps, the lack of telephone dialogue and returned calls.

21        The problem here on a job like this, as I mentioned

22   earlier, is that there are a lot of moving parts on a

23   construction contract, on a construction job.  There are -- the

24   amount of money that's being expended in a day is not measured

25   in thousands.  It's easily measured in 10s of thousands.  And,

1   if there is not high quality information being shared, if there
2   is not timely responses to requests for information, it impacts
3   the -- not only the contractor, but the other subcontractors on
4   the job.
5           And in this case, although Oelrich Construction was a
6   subcontractor to the SAW-Greenland contract with the Veterans
7   Administration, SAW-Greenland's role here was to install the
8   boilers.  That's their expertise.  They did not have the
9   expertise to build a building.  So consequently, they
10  subcontracted the entire process to Oelrich Construction.
11          The failure to timely give assurances, it was terribly
12  detrimental to this job.  It caused Oelrich Construction to rely
13  on -- to have to decipher vague assurances, to rely on the
14  assurance that they would, PRC would install panels on the 17th,
15  change the schedule, impacting other subcontractors.  Subsequent
16  to installing the panels there would be brick installed, metal
17  louvers installed, all of which came behind the precast
18  material.
19          What should PRC have done in that situation to
20  alleviate the problem?  Well, one thing they could have done is
21  they could have just built the panels timely.  And if they did
22  not have an erector they could have told that to
23  Oelrich Construction earlier on and Oelrich Construction could
24  have used the erector that they found to install the panels.
25  Oelrich Construction could have made arrangements to have the

1    materials, have the panels brought down on trucks.

2           The other rule that PRC breached is that they did not

3    follow the plans and the specifications.  Specifically, they did

4    not incorporate the specifications of the contract between the

5    VA and SAW-Greenland when they built the panels.  This was not

6    discovered until after.  During the discovery process this was

7    discovered.

8           Another -- that's obviously a problem because had

9    those panels failed, and on the building, that would have been a

10   problem that Oelrich Construction had inherited.  That would

11   probably be the easiest thing.  If they failed and hurt somebody

12   that would be an even larger problem, because these panels are

13   large.  They weigh a lot.  And they are attached to the building

14   in certain ways that it's just too risky.  The plans call for

15   certain components, certain things that were not included in the

16   panels that were actually fabricated.

17          Throughout the project, starting back in probably

18   September of 2019, another rule that PRC violated was safety.

19   They did not provide the requested information that they were

20   obligated to provide pursuant to the contract with the VA.

21   Everybody on that job SAW-Greenland, Oelrich Construction, all

22   the subs, including PRC, were subject to the safety regulations.

23   Specifically, there are OSHA courses that have to be taken, 10

24   hour course for most people.  30 hour courses for the main

25   people.  They did not -- PRC was very slow in complying with

1   that.  Ultimately, did not completely comply with that.

2          Another safety component on a job like this, there has

3   to be a lift plan.  Have to have a place to show where the

4   crane's going to sit, where the precast is going to be, how the

5   crane is going to lift the precast, what it's going to swing it

6   over, what the dangers are associated with that.  And that lift

7   plan was never provided by PRC for this job.

8          Another form of communication that PRC failed to

9   follow in terms of the rules is that they never did tell

10  Oelrich Construction they had stopped fabricating panels in

11  November.  The last ones were fabricated in October.  By the

12  time -- of 2019.  By the time they got to December of 2019, when

13  the job was ready to accept the panels, it was at that last hour

14  that they found that the panels weren't completed.

15         It's important to note that the project was delayed

16  initially.  When, when the -- when Oelrich Construction was

17  given the go ahead to go ahead and begin constructing the

18  building, it was discovered that there were waterlines that were

19  interfering with the location of where this building was going

20  to go.  Those waterlines were not shown on any of the drawings

21  that were provided by the design professionals.

22         There were sewer lines, storm sewer lines that had to

23  be extended.  And those components were made of precast

24  materials.  And the materials were sent out.  Ordered by

25  Oelrich Construction, sent out, as they were ordered.  They were

1    ordered consistent with the plans.  When they arrived at the job

2    they were the wrong size.  Another design professional mistake

3    that was rectified by Oelrich Construction and between SAW and

4    the VA.  But, at the expense of some lost time in the beginning

5    of 2019.

6           Another problem that arose was in those same storm

7    water lines it was discovered that there were bats.  And the

8    bats to be -- there are rules associated with bats that are

9    endangered and they had to be dealt with in a certain way.  And

10   that extended the time for the construction as well.

11          There are times of year when bats can be discouraged

12   from coming back to a certain place.  And there are times of

13   year when they are not allowed to be tampered with.

14          Before we went very far with this case we analyzed the

15   contract carefully.  We noted the termination provision.  We

16   noted the notice language.  We certainly discussed it with our

17   client and we -- it became clear to us that in December of 2019,

18   Mr. Crehore, again who worked for Oelrich Construction at the

19   time as a project manager for this job, he took the freight and

20   the installation out of the contract.  And at that time he

21   expressed that he was going to have to get someone else if PRC

22   did not perform.

23          At the end of January in 2020, this is after it had

24   been discovered that the panels, that only 51 of the panels had

25   been completed so far, Mr. Crehore went to PRC.  So this is the

1   second time a representative of Oelrich Construction went to

2   PRC.

3          At that time there was a meeting taking place between

4   Mr. Forde Davis and Mr. Crehore at which time Mr. Crehore

5   expressed -- requested an assurances from Mr. Davis that they

6   did intend to finish that job and that they would make those

7   panels, with the understanding that if they didn't or couldn't

8   that Mr. Crehore and Oelrich Construction was to have to do

9   something else.

10          We've already discussed the dialogue that took place

11   leading up to the March 17th termination.

12          During that conversation that led up to that, one of

13   them, or at the time when Mr. Crehore expressed to Mr. Davis,

14   Forde Davis that they were going to have to terminate them, he

15   asked Mr. Davis is there anything else we need to talk about.

16   And the answer was, no.

17          He sent the termination letter.  And once again he

18   asked if there is anything else that we need to talk about, let

19   me know.  No response.

20          It was after that, and only after that, that

21   Oelrich Construction made its way to try to find a replacement

22   for PRC Precast.

23          Mr. Crehore also gave thought to the COVID pandemic

24   that was coming on to the country at and around that time when

25   the termination took place, this was March of 2020.  And it's

1   one of the things that as a law firm we had to inquire of or

2   look into, whether there was an impossibility of performance.

3          There is nothing in the communication between the

4   parties that indicates that PRC ever communicated to

5   Oelrich Construction that they were precluded from being able to

6   perform because of COVID.  In fact, in fact, they resumed

7   construction again of the panels in March of 2017.  And they

8   constructed more panels in April of 2017 and some more in May.

9          Payment was an issue that we had to look into as well

10  to determine the extent to which there were any -- was any money

11  owed to PRC.  What we learned is that with each pay request

12  there was a specific form that was to be filled out.  As part of

13  that form there is what is called a schedule of values that

14  shows the amount of money attributed to the contract for various

15  line items.  In this case, since these products were fabricated

16  off-site and paid for prior to delivery while they were

17  fabricated, there were components, such as shop drawings.  When

18  the shop drawings were completed there was payment made.  When

19  materials that would go into the panels were acquired, there was

20  payment requested and payment made.  And each time they would

21  say, the pay request would say what the percentage of completion

22  for that particular line item on the schedule of values was.

23          There was a line item for forming, you know, building

24  the forms that the panels would go into, the molds, if you will.

25          And then finally, there was the line item for the

1  actual produced panels.  And it is that line item that I

2  referenced earlier where payment for 100 percent of the panels

3  was made on December 16th, 2019, when there were only

4  approximately 51 panels made.

5            THE COURT:  Payment was requested or made?

6            MR. BUTTS:  I beg your pardon?

7            THE COURT:  Payment was requested for all of the

8  panels or made?

9            MR. BUTTS:  Payment was requested for all of the

10  panels.  There was communication after, after

11  Oelrich Construction's representative went there on

12  December 30th and realized that there were only about 51 panels

13  made, Oelrich sent out correspondence that said their last two

14  pay applications, number 9 and number 10, were rejected because

15  number 9 had requested payment for over 60 percent of completed

16  panels.  And Oelrich had learned, of course, that less than half

17  were built by the end of December.  Certainly, that

18  Oelrich Construction would not have expected to pay for a

19  hundred percent of the panels.

20            At that time Oelrich Construction had paid

21  approximately $110,000 for the panels that were allegedly built.

22            But, I, I moved off the subject a bit.  On the pay

23  request and the payments, not only is there an updated schedule

24  of values required as part of that, but there is a lien waiver,

25  in this case a bond waiver that's required.

1        There are photographs obviously that are required

2   because remember these are being built in Greenville.  And

3   Oelrich Construction needs assurances that these panels have

4   been built.  And Oelrich Construction is not going to be paid by

5   SAW-Greenland unless they can give SAW-Greenland that assurance,

6   photographs of the panels.  And also, SAW-Greenland is not going

7   to be paid by the VA unless the VA has that assurance.

8        So, while nobody is necessarily checking the panels to

9   make sure they are being built correctly, there needs to be at

10  least photograph evidence evidencing progress in that regard.

11  Some of the earlier photographs were just simply photographs of

12  piles of material that would eventually be mixed and put into

13  these panels.  But all of those components had to be sent with

14  each, with each pay request.

15       In addition to that, once they began to -- once PRC

16  began to bill for actual material, and certainly for completed

17  panels, part of the requirement in the contract was that they

18  would also update their insurance certificate to indicate that

19  they had sufficient insurance in place specifically to pay for

20  the panels that Oelrich Construction had paid for in case there

21  was some sort of a catastrophe and damaged them.  It was part of

22  the contractual obligation.  And, again, that requirement went

23  right up the line to the VA.

24       What happened in reality is that PRC would fail to

25  give all of the information when they made the pay request.

 1    They would leave something off.  And in the end, when they did

 2    give all of the information that was requested, and part of

 3    their contractual obligation to be paid, they were paid for pay

 4    application 7 and 8 in December of 2020.

 5            Oelrich Construction did not pay application 9 or 10

 6    for the reasons that I mentioned a few moments ago.

 7            Another issue that we had to look into before we went

 8    very far with this case, we had to find out about retainage.

 9    Retainage is a term that's used in the construction business.

10    And essentially it's, and if His Honor already knows what that

11    is, I can stop there.

12            THE COURT:  I know what retainage is.

13            MR. BUTTS:  Okay.  So there is a 10 percent retainage

14    that was taken out of payments made to PRC initially.

15            The first pay request, maybe the second, the retainage

16    was taken out.  But, eventually PRC pointed out correctly that

17    they had negotiated a different type of a payment arrangement

18    with Oelrich Construction, that there would be no retainage.

19    And, of course, PRC sought the retainage.  And

20    Oelrich Construction's solution to pay the retainage was to

21    simply request that PRC send another pay request for the

22    retainage.  In this case, actually, it wasn't 10 percent.  I'm

23    wrong about that.  It's 5 percent.  The retainage was 5 percent.

24            So PRC, it was requested by Oelrich that PRC send a

25    pay request separate from everything else because now we're on

1  into, you know, some of the latter pay requests.  And they asked

2  for -- asked PRC to just send a pay request for, I think it was

3  around -- it would be 5 percent of 110.

4        But PRC did not like that idea.  Did not send the pay

5  request.  Oelrich Construction was -- that conversation kind of

6  dribbled off at the end of December of 2020 and moved into the

7  discussions where Randall Forde indicated that they would be

8  installing the panels in February.  And, of course, learning

9  that PRC had not fabricated all of these panels, at that point

10  PRC was ahead of Oelrich Construction even taking out the

11  retainage as an issue.

12        In other words, what I mean by ahead, is Oelrich

13  Construction had paid for more than they had received, than PRC

14  had built.  And PRC did not build any more panels for the rest

15  of -- for January or February or half of March, for that matter.

16        So while it is true that PRC was entitled to

17  retainage, that would only be true if PRC had actually

18  fabricated the panels for which they were asking for retainage.

19        The other component that we had to take a look at, we

20  always have to look at in these construction cases is

21  mitigation.  And, when a subcontractor like in this case is

22  terminated, of course it doesn't give Oelrich Construction a

23  blank check to go find someone else, although they are in a

24  pinch.  They are up against it with SAW-Greenland who is up

25  against it with the VA.  And they have to go find someone.  And

1    they weren't looking prior to terminating PRC.  They wanted PRC

2    to cross the finish line with them because they had $110,000

3    invested and they had nothing to show for it.

4           They had no panels.  They didn't have -- they didn't

5    know -- they were told in March that PRC hadn't made any more

6    panels.  That's the first time they learned of that.  And didn't

7    know when they were going to make them.  So they are back to 51

8    panels that they paid over a hundred thousand dollars for.  And

9    they have to shift gears quickly.

10          They went out into the market.  They solicited

11   bidders.  They received two qualified bids.  And they took the

12   one that I believe was the most price of the two.

13          Having gone through that, we felt that we could be

14   some help to Oelrich Construction in trying to recover damages.

15   And we proceeded.  And the result of this episode and this

16   unfortunate situation is that Oelrich Construction is damaged by

17   PRC's breach, and failure to follow the rules that are implicit

18   in this contract and construction contracts in general.

19          Oelrich Construction paid Spring Precast $44,276 more

20   than they would have had to pay PRC according to that agreement.

21          They had to pay Spring Precast an additional $6,996

22   more than they originally agreed to pay them because Spring

23   Precast had to make extra efforts to match the aggregate on

24   these panels with the existing VA building.  By the aggregate I

25   mean, it's hard to tell looking at this photograph, but it's got

pebbles in it, it's rough.  And, so the texture, the color of

the pebbles, the frequency of the pebbles is unique to that

particular VA building.  So it cost another $6,996 for Spring

Precast to match that.

I mentioned before the money that Oelrich Construction

paid to PRC for which they received nothing.  That is $109,832.

Please keep in mind, that they had to start all over

again, shop drawings, everything with Spring Precast.

There was never an offer to send the panels down that

they had made, that PRC had made.  There was no -- there was

nothing, there was no suggestion that perhaps they could match

the formula that was being used by PRC so that the aggregate and

everything would match, Spring could do it.

There was never an opportunity to just send the panels

down and let Oelrich Construction put them up.

Oelrich Construction had a lot -- there was a lot nearby -- a

space available that they could have been staged and stored,

even if it wasn't ready to put them up.  But the fact is it was

ready to put them up in January of 2020.

There was another $105,000, 105,842 that

Oelrich Construction spent paying superintendents, job trailer,

extended conditions that, for the people they had to leave out

there on the job so they could get this project finished, longer

than they would have needed to.

And there were two trips made by Oelrich

1   representatives to Greenville, South Carolina.  One by

2   Mr. Dana Noyes on December 30th, 2019 and the other one at the

3   end of January by the job project manager, Mr. Chris Crehore.

4           It's for that reason, Your Honor, that

5   Oelrich Construction has found it necessary to sue PRC Precast

6   to recover their damages.  Mr. Ivan Oelrich, who is here with

7   me, who I have the pleasure of representing, is respectfully

8   asking this Court to enter a judgment in his favor for that

9   total amount of money that we discussed.

10          THE COURT:  Thank you.  Mr. Darr?

11          MR. DARR:  Good morning, Your Honor.  May it please

12  the Court, I am Joe Darr.  I'm here on behalf of PRC Precast,

13  LLC.  My client Randall Davis is the principal of PRC Precast,

14  LLC.  And I'm a big fan of less is more.  So, I'm going to go

15  ahead and cut straight to the chase in my opinion as to why I

16  believe PRC Precast should prevail in this case.

17          Primarily, I see there being two significant reasons

18  why PRC should win at the end of this trial.  And, as I

19  mentioned during our last hearing last week, for better or

20  worse, a little background on myself, I'm a board certified

21  construction law attorney.  I don't know how it happened, but

22  somehow this has kind of become my niche, payment disputes on

23  construction projects.

24          And I can tell you that for me one of the types of

25  advice that I give construction participants on projects that

 1   makes me the most nervous when I give the advice is when someone

 2   approaches me, whether it be an owner of a project, a general

 3   contractor, or anyone else involved in constructing a project

 4   and they ask me what should I do with this person or company on

 5   this project that's not living up to their end of the bargain.

 6   Should we terminate them?  Frequently, my advice is, no, because

 7   it always costs more.  Just like in this case, when you bring on

 8   someone new to replace the guy you terminate.  But also it makes

 9   me particularly nervous about giving that advice, especially if

10   they are going to terminate, is that there are special rules

11   that apply in the construction law context to the termination of

12   the contractor on a project.

13          And, many federal courts, all-be-it not Florida state

14   courts or Florida federal courts have held that termination is

15   the most drastic sanction that is available on a construction

16   project.  And, the reason they call it the most drastic

17   sanction, Your Honor, is because there are frequently, and that

18   is the case in this case as well, other whips and carrots so to

19   speak to get your guy to do what you want, including withholding

20   any sort of damages that you think you may be incurring due to

21   some delay that's being caused on the project.

22          Now, as a result, some courts have held that the

23   burden is on the terminating party to justify their termination.

24   As to whether or not that's the case or not under Florida law,

25   who knows.  We don't get a lot of Florida state appellate

1   decisions anymore on construction law issues.  So it's a bit of

2   uncharted territory under Florida law, Your Honor.

3          But with that in mind, the number one reason that PRC

4   should prevail in this case is that they were wrongfully

5   terminated, not just in one manner, but in several regards.

6          In particular, and this is going to make the most

7   common sense I think to everyone in the room, if you are going

8   to terminate a participant in a project for failing to meet a

9   deadline there actually has to be a deadline.

10         Now, the evidence in this case is going to show that

11  originally when the parties entered their contract there was a

12  deadline specified in the contract.  But, as Mr. Butts just

13  suggested, there were some design related errors early on in the

14  project and other delays that occurred that were no fault of

15  PRC, and apparently no fault of Oelrich, that caused PRC's work

16  to ultimately get way behind.  They wouldn't be allowed to start

17  until right around 9 months later than was contemplated in the

18  contract.

19         So that deadline in the contract, that went out the

20  door.  There was no formal deadline at that point.  The parties

21  had to come to a mutually agreeable deadline.  One, the record

22  evidence will reflect a deadline was not agreed upon by the

23  parties.  And ultimately PRC was terminated.

24         THE COURT:  Let me just tell you so that you'll know,

25  I mean, my question about that, I think the contract says PRC

1   will perform when Oelrich says to perform.  So, as you tell me

2   there has to be a mutual agreement, I guess what I'm going to

3   need you to explain to me at some point is why it has to be a

4   mutual agreement if it's not enough just for Oelrich to say here

5   is the date that you have to perform by.

6         MR. DARR:  Sure.  And, I'll go ahead and address it

7   right now then while I'm thinking about it, Your Honor.  That's

8   a good question.

9         Factually the problem here is, and I think you'll see

10   the record evidence, you will not see a single email, a single

11   formal letter, I doubt you're going to hear anyone testify on

12   their side that they ever gave PRC a deadline, what I call a

13   drop dead date to perform their work.  Instead, what you have

14   are two parties trying to figure out how they can get this work

15   done.  But at no point is there any writing anywhere that I've

16   seen where Oelrich said, listen, this date is what we need it

17   by.  You know, we're facing liquidated damages from the general

18   contractor and the owner who are upset that we are behind.  If

19   you guys can't deliver and install by X date your contract may

20   be terminated.

21         I'm going to get into that more in a little bit from

22   the wrongful termination aspect.  But part of it is you got to

23   give the contractor a chance to recure notice to step up and

24   address whatever sort of issue there is, and try to rectify it,

25   before you can terminate that person.

1          And, again, that all ties back to this drastic

2    sanction aspect.  That's why the courts generally require that

3    is to give the other party a chance to step up, rectify it and

4    hopefully continue on.

5          So, point one is, there was no deadline.  The record

6    evidence will reflect there was no line in the sand deadline,

7    drop dead date by which our client, my client had to complete

8    its work.

9          That makes that termination on that basis, which was

10   the sole basis listed in the termination notice in March of

11   2020, was their failure to timely perform.  That makes that

12   termination wrongful, Your Honor.  And there are a few reasons

13   why it's wrongful as well and I'll get to that in a second.

14         Now, again, just to kind of summarize the two main

15   points I want to make at the beginning.  The second reason that

16   PRC should prevail in this case is even if that termination was

17   done properly, they dotted their I's, and crossed their T's,

18   gave them a chance to cure, all of those things, the case should

19   still go in PRC's favor because in this case another unique

20   aspect is this sub-subcontractor it has a specially manufactured

21   product.  These precast panels, not many people do it.  There's

22   only six of them in the southeast, I believe, that do this kind

23   of work.  So they have surprisingly a little bit of bargaining

24   power in this situation.  Usually when I represent lower tier

25   subs like this they just have to accept whatever they get from

 1    above because they want that money and they just go with it and

 2    try to figure out later.

 3            Here, PRC made clear during negotiations before the

 4    contract was signed they needed these additional payment terms.

 5    And, part of those additional payment terms were that they would

 6    be paid net 30 days from the date of the invoice, no retainage

 7    would be held.  And perhaps most importantly, if you do not

 8    timely pay them they have the right, expressly under the

 9    contract, to suspend performance.

10            And, with that in mind, the first -- even if the

11    termination was done properly, which we disagree with, the first

12    material breach here by any means, and I think the record

13    evidence reflects this, is the lack of timely payment to PRC.

14    That's really when the wheels started to come off the bus,

15    Your Honor.

16            THE COURT:  Let me ask you a question about that too.

17    Subcontract, the contract between Oelrich and PRC, says Oelrich

18    doesn't have to pay until it gets paid.

19            If I understand from what you told me, somewhere else

20    there is a supplemented appendix, something that says that term

21    doesn't apply here and, in fact, Oelrich has to pay within 30

22    days from invoice.

23            MR. DARR:  Yeah.  The key language -- the whole

24    payment clause made me smile when I first saw this case a year

25    and a half ago.  But, the key language in that regard that made

1  me smile was that it expressly states that these payment terms

2  supercede all other payment terms in the contract.  And, if we

3  didn't have that language I would be a little less confident in

4  my client's position in this case, but we do.

5         THE COURT:  As you can tell from my question I've read

6  some of this.  I didn't read the whole 1,800 pages of the

7  contract.  And if there is the addendum that you are talking

8  about, I have not read it.  I've read a lot of the exhibits,

9  I've been through a lot, but I have not read every word of all

10  of the thousands of pages of exhibits, so --

11         MR. DARR:  That's understandable.

12         THE COURT:  Just heads up to both sides, I haven't

13  read that part that you're talking about.

14         MR. DARR:  Sure.  And, those additional payment terms

15  are located in the contract between Oelrich and PRC.  I believe

16  it's around the 14th page or so of the subcontract, something

17  like that.  But, we'll definitely get into that once we start

18  asking questions to the witnesses.

19         So, those payment terms, in my mind, make this unique

20  from a construction law payment dispute in the sense of, like I

21  said, usually lower tier subs, guys at the very bottom, they

22  don't normally get terms like this because they just don't have

23  much bargaining power.  You know, typically you have a guy that

24  does drywall, there's a lot of drywall subcontractors out there.

25  So, if he won't take it, I'll just go to some other guy who will

1  sign my form contract and all of those terms will be in my favor

2  and we're good to go.  Well, I just want to point out, that's

3  not the case here.  Here they did have enough bargaining power

4  to negotiate.  And the evidence will show that Oelrich didn't

5  want to agree to those terms initially but eventually relented

6  because they needed PRC to come up with these specially

7  manufactured goods.

8         Now, I also think it's worth noting, sort of a brief

9  chronology of how we got to where we are with regard to the

10  dispute we have here.  So, initially the parties enter into

11  their contract in December of 2018.

12         And as I mentioned earlier in that contract, PRC, and

13  its bid was based on this, was supposed to start work in July of

14  2019 and finish in August of 2019.

15         During the spring and summer of 2019, it appears that

16  the overall project again was delayed for design errors and

17  other things that Oelrich has never alleged was the fault of

18  PRC.  And as a result, the project wasn't ready for PRC's work

19  until at the earliest in the spring of 2020, almost nine or so

20  months after the time period that was originally contemplated

21  for PRC's work under the contract.

22         Now, in April of 2019, which is only 4 or 5 months

23  after the contract was entered into, the record evidence will

24  reflect that they were already having payment issues.  There

25  were at least two payment applications from PRC that were

overdue.  And needless to say, four months into the project,

that's not a good start to Oelrich living up to its primary

obligation under the subcontract which was to make timely

payment.

Slipping into April of 2019, I'm sorry, August of

2019, there were more payment applications that were overdue,

including the May 2019 payment application.  You're going to see

record evidence of PRC's accounting person, Allison Taylor,

sending emails to Oelrich complaining, you guys are overdue,

this one is over two months past due.  This one's one month past

due.  What's going on?  Part of that problem is that the

retainage was withheld on those payments, which we'll get to in

a second.

Then, in October of 2019, keeping in mind, the work

should have been done already for PRC in August of 2019.

October of 2019, project still not ready for PRC's work.  The

work that needed to get done before PRC could put up those

panels on that building, including the structural work, and the

concrete work, hadn't been complete yet.  So, even if the

precast had been ready, all 100 percent of the pieces in October

of 2019, they couldn't even install them at that point.

Now, I did hear Mr. Butts reference that, well, it's a

big project site, you guys could have delivered the panels and

laid down somewhere on the property and we could have taken care

of that later.  But, the reality is, and there will be testimony

1    to this degree, saying that essentially these panels, you can't

2    just unload them, lay them on the ground and let them sit there.

3    They have to be stored in a specific manner, usually on the

4    flatbeds of trucks, with little slots so to speak, where you

5    hold them upright and that way they don't get cracking or

6    anything like that while they are waiting to be stored, which is

7    how they store them at the yard as they make them for clients up

8    at their factory in South Carolina.  So, that's another issue we

9    can get into later.  I'm trying to stay more big picture here.

10          November 20 of '19 more overdue invoices.  And there's

11   plenty of emails about this unfortunately that we're going to

12   have to go through showing PRC was constantly complaining about

13   these invoices.  Still trying to work with Oelrich to get the

14   work done, but at some point there were, by my count, 6 past due

15   invoices in the fall of 2019.

16          Interestingly, during that time, Oelrich admitted that

17   it was improperly withholding retainage.  Part of that is

18   because, at least in the written record, is that they just

19   simply weren't used to not withholding retainage on their subs

20   because typically most subs do have to allow the higher tier

21   contractor to hold usually 5 to 10 percent of whatever they are

22   billing.  And that money is usually intended to make sure the

23   sub completes its work.

24          But again here, this subcontractor negotiated a deal

25   that's different than normal.  It's unique.  Included in that

1   deal was the payment terms that did not allow withholding

2   retainage.

3          So in December 2019, we get to the end of the year,

4   suddenly looks like the project, according to Oelrich, is going

5   to be ready for precast sometime in the near future.  So they

6   come back to PRC and say, hey, let's get it going, we need to

7   get your precast out here.  And the parties engage in a lot of

8   written communications about when they can or can't and when

9   they anticipate they might be able to.  But you won't see any

10  evidence, written record at least, showing that the parties came

11  to an agreement on some sort of deadline for this work to be

12  delivered or even completed.

13         Then January 2020, things start to get a little more

14  serious it seems like.  Suddenly, I believe it was January 8th

15  of 2020, SAW, which is the general contractor for the project,

16  writes a letter to Oelrich pointing the finger at them saying,

17  hey, you guys are delaying the project.  Your various subs are

18  delaying us.  We are going to hold you accountable.  Please be

19  advised we may terminate your contract.  And, oh, by the way,

20  here's what you need to do to cure those deficiencies.  Pretty

21  good cure notice.  So we'll look at it.  It's the way it should

22  look, clearly outlining everything that they needed to do to

23  rectify.  And most importantly, putting them on notice, Oelrich,

24  if they didn't address these issues they might be terminated.

25  So they had the threat of termination looming over them.

1          Now, what's interesting is Oelrich writes back two

2     days later and says, hey, Mr. SAW, general contractor, we are

3     not delaying the project.  And, in particular, the precast,

4     which is PRC's that you claim is delaying the project, it's not

5     on the critical path.

6          And, again, I don't know how much you know about

7     critical path, Your Honor, but basically critical path of a

8     construction project, it's the sequence of events of work that

9     have to happen in a linear fashion to get the project done.

10         So, in other words, if this item doesn't get done, and

11    it's on the critical path, the project can't move any further

12    because you got to get that work done before you can do the next

13    thing.

14         So, for instance here, before PRC could put up its

15    panels you had to have a structure to put them on.  So

16    structural work would have been on the critical path.  Here you

17    got Oelrich saying, no, it's not on the critical path.  The

18    precast work as of January 2020 is not delaying the project.

19         THE COURT:  One thing I'm going to be interested in

20    for each side as you present this, is not whether, not just

21    whether they said to the contractor, it's not in the critical

22    path.  I notice that in your trial brief, and just now, and each

23    time you have addressed this, you've said they said it's not in

24    the critical path.

25         What I don't think I've heard you say is, it wasn't in

1   the critical path.  So, I'll be interested not just in what they

2   said in their letter, and both sides are kind of taking advocacy

3   positions, I'll be interested whether it was in the critical

4   path.  At some point obviously it is in the critical path.

5   Maybe not right then, but at some point you got to have this

6   stuff or you can't keep going.

7           MR. DARR:  Sure.  Absolutely, Your Honor.  And, I

8   guess the only point I was trying to make, is at least as of

9   January 2020 admittedly, from their letter, it was not.

10          So, really, as to when it became a critical path

11  issue, at this point I haven't seen any evidence one way or the

12  other showing when it did or not.  To some degree, another

13  unique aspect of this case, is that we've really had relatively

14  limited discovery with a lot of these issues.  There were only

15  two depositions we took and two that they took.  So, there is

16  going to be some surprises here probably.  And so, to answer

17  your question frankly, I haven't seen any evidence as to when it

18  became a critical path issue.

19          THE COURT:  I'll be interested in that.  And obviously

20  SAW thought it was in the critical path.  They are threatening

21  to terminate.  It will be interesting.  I have presided over

22  lots of federal criminal trials where there have not been any

23  depositions either.  So it will be different for you to be in a

24  trial where nobody knows what the witness is going to say.  I do

25  it on a regular basis.  So we'll just see what they say.

1          MR. DARR:  I wish I was as cool and calm about it as

2    you are, Your Honor.  But, yes, we'll see.

3          THE COURT:  I haven't lost a case since I became a

4    judge so it's easy for me to be calm.

5          MR. DARR:  So, another point about this letter from

6    SAW to Oelrich, the cure notice from SAW saying, hey, listen,

7    you guys are delaying the project, here is what you need to do

8    to cure it.  We might terminate your contract.

9          So, I did note when I was listening to Mr. Butts give

10   his opening, that, you know, he said Oelrich was up against a

11   deadline.  He also noted if that, you know, if there's not

12   information being shared it impacts not only the contractor, but

13   other subcontractors on the job.  And, what's interesting about

14   this SAW letter, among many things, is that it was never sent to

15   PRC.

16         PRC didn't know any of this was going on up top.  They

17   had no idea how serious the issue was at that point.  This

18   letter was never sent to them.  And I've never seen any evidence

19   that Oelrich or anyone there told PRC, hey, just so you guys

20   know they are threatening termination on us from above.  We're

21   serious now guys.  Instead, for whatever reason, that letter was

22   withheld, not provided to PRC.

23         Then, still in January of 2020, I think about two

24   weeks or so after that SAW cure notice to Oelrich, Oelrich's

25   counsel writes a letter to PRC directly.  First paragraph in

1    that letter says, we're not threatening litigation.  We're just

2    trying to work with you basically is the gist of it.  Please

3    contact me or Oelrich before January 31, 2020, so we can make

4    sure we're all on the same page about getting this work done.

5         Interestingly, I think so at least, about 3 days after

6    that letter that said we are not threatening litigation, Oelrich

7    sues PRC in Florida state court.  3 days after that letter.

8    And, does not provide a copy of that complaint to PRC.  PRC

9    wasn't served with a complaint in this case until, I believe it

10   was July of 2020, after the termination.  So, again, that's

11   another thing that was kept from PRC that would have maybe put

12   them on notice that things are serious.  Didn't get the SAW cure

13   notice, didn't get a copy of the state court lawsuit that they

14   not secretly filed, but filed and didn't serve on PRC.

15        Then from January of 2020 to March of 2020, this is

16   the last period of this dispute basically.  Oelrich and PRC are

17   trying to figure out when they can get the work done.  And PRC

18   has, you'll see through the written records of the emails, and,

19   again, unfortunately a lot of emails, showing that they are

20   trying to work with Oelrich to get this work done on a timely

21   basis.

22        Now, apparently, some time in early March of 2020,

23   Oelrich decides no, you know, enough is enough.  We got to get

24   this going, I'm going to send this termination notice and we're

25   terminating your contract and we're going to get someone else to

1    finish it up.  That was March 17, 2020, which is the date of

2    termination notice which I'm sure we'll be looking at during the

3    next 3 to 5 days.

4            So I want to get back to the two points I summarized

5    earlier as to why PRC should prevail in this case.  One is, PRC

6    was wrongfully terminated.

7            Now, another thing that Mr. Butts commented on that I

8    agree with is that in construction there are, I believe he

9    called them special considerations, for certain issues that are

10   unique to the construction industry.

11           One of them is that when you are going to terminate

12   someone else's contract you got to do it right.  Now, the first

13   and most basic thing you have to do to properly terminate a

14   contractor is to look at the party's contract and see what the

15   contract requires you to do to terminate them.

16           Here, the burden for them to terminate them under the

17   contract, at least what was expressly provided, was admittedly

18   pretty minimum because it's their contract.  All it said was

19   they had to provide 24 hours notice that they were going to do

20   it.

21           Instead, here what happened is on March 17, 2020,

22   that's the date that they sent the termination notice, they both

23   notified PRC for the first time in writing that you're in

24   material breach of contract.  And surprisingly, in that very

25   same email, it says consider this notice of said termination.

1          And, I'm sure you already read our motion for partial

2     summary judgment on this.  But, again, they gave notice of the

3     breach and terminated, in our mind, on the same exact day.  So

4     even under that expressed very minimal 24 hour notice provision

5     they didn't even do that.

6          Instead, they did it on the same day.  And that's

7     important because, you know, at a minimum that 24 hour period

8     could have given PRC a chance to know, hey, this is very serious

9     and let me try to rectify it.  And, again, this goes back to the

10    purpose of the cure notice process to terminate someone on a

11    construction project.  It isn't just a procedural mechanism for

12    the guy who gets terminated to go, aha, got yeah, you didn't

13    check all the boxes.  No.

14         It serves a remedial purpose, which is to give that

15    contractor notice that this is above and beyond normal

16    day-to-day squabble about, you know, pay apps and certificates

17    of insurance and safety documentation which is very common on

18    construction projects, constant emails back and forth about

19    relatively trivial issues compared to the main obligations of

20    the parties.

21         Instead, the cure notice gives the person notice, hey,

22    wow, this is significant enough that the other side believes

23    it's a material breach of contract and that they might terminate

24    my contract, which then gives the guy who gets the notice an

25    opportunity to cure whatever deficiencies are in the notice.

1            Now, admittedly, some breaches aren't curable.  One of

2       them, arguably, is if you fail to meet a deadline in your

3       contract.  Well, you've already missed that deadline, can't cure

4       it.  What am I supposed to do?  Send you a cure notice before

5       the deadline saying, hey, looks like you're not going to finish

6       on time, cure this issue.  That seems a little not common sense

7       to me.  But here the key distinction is there was, again, the

8       record is going to reflect, there was no agreed upon deadline.

9            And, it needed to be mutually agreed.  I understand

10      that Your Honor mentioned that the contract said that, you know,

11      the contractor Oelrich could demand performance within a

12      reasonable period or set some sort of deadline.  But, again, the

13      record is going to reflect that there was no deadline set under

14      the threat of termination.  And that threat of termination is

15      key because otherwise the contractor, who is supposedly in

16      default, can't really appreciate the gravity of the situation

17      otherwise and be given a chance to step up to correct it.

18            So here, even if the cure notice that they sent, slash

19      termination notice, complied with the 24 hour requirement it

20      still would be a wrongful termination because our Clint PRC was

21      terminated for not meeting a deadline that was never specified.

22      Especially important in that regard to keep in mind about these

23      other communications, the SAW letter cure notice that Oelrich

24      got that we had no idea about.  I mean, maybe if we had gotten

25      that at least we would know, oh, Oelrich is getting some real

1    pressure from above, they are being threatened to be terminated,

2    maybe we will too.  We never got that letter.  Likewise, we

3    never got the state court lawsuit until after they terminated

4    us.

5             Again, that would have been something that arguably,

6    question of fact, put PRC on notice, oh, they sued us in Florida

7    state court, well, we might be terminated at some point.  We

8    should probably figure out how to get this addressed.

9             So, my second point is, even if that wrongful

10   termination issue didn't exist, they checked all of the boxes,

11   they gave PRC express notice of how they materially breached the

12   contract, they gave PRC a chance to cure those breaches, even if

13   there was no wrongful termination, PRC should still prevail in

14   this matter because, as one of our affirmative defenses, because

15   Oelrich committed the first material breach.  And, again, we had

16   these unique payment terms, which I've addressed most of them

17   and how they got to have those, but key to that was that the

18   invoice would be paid in that 30 days and retainage was

19   expressly not allowed on materials that were created.  And,

20   equally important, the provisions provided that if Oelrich

21   failed to timely make payment under those terms PRC had the

22   express right to suspend production and renegotiate, I'm sorry,

23   and to adjust the schedule by which it would deliver and install

24   its precast materials.  That's key as well.

25             So it expressly contemplated unlikely payment.  And if

1    payment was not forthcoming in a timely fashion they had the

2    right, PRC did, to suspend their work at that point.

3            Now, why did PRC find these provisions to be so

4    important?  Why did they absolutely have to have them for them

5    to want to enter into this contract?  The reason that they

6    needed these is because you have to understand the nature of

7    what PRC does.  PRC primarily is a manufacturer.  They make

8    these architectural precast panels for projects throughout the

9    southeast.  And these panels and other products, precast

10   materials that they make, are almost always unique and designed

11   for one specific project.

12           So, for example, in this case, the materials that they

13   made for Oelrich are still, I believe, sitting in their yard

14   unused, partly because we want to preserve evidence for them to

15   look at if they wanted to, but also because, you know, there is

16   no way to sell them.  They are worth nothing to anyone except

17   the owner of this project, the Veterans Administration.  They

18   are unique to that project, can't be used elsewhere.

19           So, with that in mind, generally all the materials

20   they make are specially manufactured goods.  And I believe the

21   testimony will reflect that in the past they had gotten burned

22   on making these specially manufactured panels for other

23   contractors.  And not getting paid, for whatever reason.  Maybe

24   it's because the owner didn't pay the general contractor so the

25   general contractor didn't want to pay them.

1          Maybe it's because the general contractor, the owner

2    of the funding for the work dried up and they decided to suspend

3    the production or completion of the project that was at hand.

4    And then PRC got left holding the bag.  And these goods that

5    they are making for them, they are worthless.  They can't sell

6    them to anyone else.  So, these provision were very, very

7    material to PRC entering into this contract.  And I believe the

8    evidence will show that PRC would not have entered into this

9    contract without it.

10         The evidence will also show that there were untimely

11   payment issues on this project.  Now, I know that part of

12   Oelrich's, and this is pretty common for higher tier

13   contractors, the defense will be, well, yeah, you submitted a

14   pay application on this date, but you didn't give us the proper

15   lien release on the right form or you didn't give us, I believe,

16   some pictures of the product, you didn't give us an updated

17   certificate of insurance.  But, as you'll see, we'll walk

18   through the progress payment provision in this contract -- which

19   that's what these are, progress payments, not final payment --

20   and you'll see that each payment application, which will be

21   entered into evidence, PRC checked all of the boxes.

22         Moreover, I don't believe Oelrich will assert that

23   there were no untimely payment invoices that were properly

24   submitted.  Admittedly, at least several of them, the early

25   ones, were not timely paid because they were withholding

1    retainage even though all of the proper documentation that they

2    claim needed to be submitted was submitted.

3           And, again, I think part of their defense of that is

4    going to be, well, Your Honor, it's only 5 percent of what PRC

5    billed, we're only talking about $5,800.  It's not material.

6    Well, I think generally, I'm not sure how I would rule on that

7    if I were the Judge, but I will say here it is material because,

8    again, PRC demanded these terms be entered.  They wanted to be

9    paid in full.  Cash flow was important.  And Oelrich agreed to

10   it.  So it is a material breach of contract.  And payment terms,

11   generally, are material terms most courts hold in construction

12   contracts.  That Oelrich violated by not timely paying.  It's

13   their primary obligation under the contract to PRC to pay for

14   the work done, you agreed to do it.  And on that note, they keep

15   saying that PRC, almost as if they didn't do anything for them,

16   well, they were making the panels.  They are just at the yard at

17   PRC in South Carolina.  The contract only contemplates one

18   mobilization fee, which is the fee to freight it down and get

19   going.  They never agreed to have them deliver bit by bit in

20   waives.  It's just inefficient.

21          So, based on those two primary reasons I think that's

22   why PRC needs to prevail in this case.  PRC's damages that they

23   have incurred due to that breach of contract by Oelrich include

24   the unpaid work that they performed that was not done.  As you

25   may or may not know from the filings, that termination notice

1   was not seen by PRC.  And the reason it wasn't seen, the

2   evidence will show, is because rather than sending a formal

3   letter via certified mail, FedEx, something that would verify

4   they got the notice, it was sent via an email.  And the subject

5   line of the email just said the project name.  And it was one of

6   hundreds of emails that my client was getting at the time.  And

7   it was overlooked.

8           In the meantime, PRC was trying to work with them in

9   good faith to keep making that product.  And there were pieces

10  that were never paid for.  Ultimately, when they realized they

11  had been terminated they stopped production, but there was an

12  unpaid amount of work under the project that's around $30,000

13  that they were never paid for.

14          There were also fees associated with the expense of

15  storing these pieces beyond what was originally contemplated in

16  the contract.

17          And, finally, there is going to be a lost profit and

18  disposal fee component to PRC's damages.  They were deprived of

19  their ability to earn the profit they would have made had they

20  been allowed to complete the work, the full project.  And, in

21  addition, these panels now that we're not in discovery anymore

22  are going to have to be destroyed and disposed of.  That has an

23  expense with it as well, to take it somewhere for someone to get

24  rid of them.

25          And, in short, primarily due to the wrongful

 1    termination issue aspect of this case, and then if nothing else,

 2    the first material breach being that lack of timely payment, PRC

 3    should prevail.  And I look forward to proving the case to you,

 4    Your Honor.

 5              THE COURT:  Thank you.  Probably a little early, but a

 6    good time to take the break.  Let's take 10 minutes.  I'm

 7    actually going to, you've all got computers up.  I'm going to go

 8    by the time on the computer rather than the pretty, but

 9    old-fashioned clock, where it's hard to tell what time it

10    actually is.  I've got 10:22.  Let's take til 10:35.  I'll be

11    back in the courtroom at 10:35.

12         (Recess taken 10:22.)

13         (Resumed at 10:35.)

14              THE COURT:  Have a seat, please.

15              Please call your first witness.

16         MR. BUTTS:  Yes, Your Honor.  Plaintiff calls

17    Chris Crehore.

18              THE COURT:  We did not invoke the rule explicitly.

19    Does either side wish to have the rule invoked?

20         MR. DARR:  We were going to, Your Honor.

21              THE COURT:  Each side is responsible for seeing that

22    your witnesses abide by the rule and nobody tells the witness

23    about the testimony in the witness' absence.

24              Come right up here please, sir.

25              MR. DARR:  Mr. Butts, is that one of your witnesses or

Direct Examination - Christopher Crehore

1   is that someone from your firm?

2           (No audible response)

3       **CHRISTOPHER CREHORE, PLAINTIFF WITNESS, DULY SWORN**

4           THE COURTROOM DEPUTY:  For the record, state your name

5   and spell your last name.

6           THE WITNESS:  Christopher Frank Crehore.

7   C-R-E-H-O-R-E.

8           THE COURT:  Mr. Crehore, while you are testifying, if

9   you're comfortable with it, you may take your mask off.

10                      DIRECT EXAMINATION

11  BY MR. BUTTS:

12  Q.   Good morning, Mr. Crehore.  Thank you for joining us.

13       What is your, what was your role on the VA project for the

14  boilers?

15  A.   Project manager, Oelrich Construction.

16  Q.   And, in your role as a project manager, what did you --

17  what were you particularly in charge of?

18  A.   I would have answered for the project.  I would have been

19  in charge of the paperwork side.  I would have been in charge of

20  procuring materials and getting the superintendent in the field

21  what he needed to make the project happen.

22  Q.   And what was -- who was the superintendent in the field in

23  this case?

24  A.   Started out as Miguel Hernandez and then it was Jordan.

25  Q.   And, what was Jordan's last name?

Direct Examination - Christopher Crehore

1    A.    Robinson.

2    Q.    For the Court, can you give a brief description of the

3    project?  I have a drawing here.  Can you see that okay?

4    A.    Yes, sir.

5    Q.    How, is it a, is it a one story project or two?  How was it

6    built?

7    A.    So that's the cover sheet to the project documents that we

8    had for the VA boiler project.  It is a two story cast-in-place

9    concrete skeleton of a building with block in fill.  It's kind

10   of open on the inside with the boilers and associated steel

11   catwalks.  Had a one story, a smaller office area behind it.

12   Exterior was precast metal panel and brick and some store front

13   in place.

14   Q.    I'm going to get into that in a little more detail in a

15   minute.  Thank you though for giving us an overview.

16        In addition to you and Mr. Robinson, who else was on the,

17   let's just call it the management team for the project?

18   A.    There would have been Andy Wilson who was an APM, an

19   assistant project manager.  There was also Jerre Carr who was an

20   intern in the office and then there would have been the field

21   staff, Jordan.

22   Q.    What was -- can you explain Oelrich Construction's role in

23   the hierarchy of the various parties that were involved in this

24   project?

25   A.    Yes, sir.  So, on this particular project Oelrich

Direct Examination - Christopher Crehore

1    Construction was basically a subcontractor.  We were in charge

2    of the shell of the building and the site work, but we answered

3    to the prime contractor who was SAW-Greenland, a joint venture.

4    And then ultimately you would have had the owner, the VA.

5    Q.    And then as the subcontractor, did Oelrich Construction

6    perform work on the job?  Did they actually build things on the

7    job?

8    A.    No, sir.  The majority of the work was subbed out and we

9    were supervision.

10   Q.    And as the project manager, did you have other projects

11   that you were managing in and around this time?

12   A.    Yes, sir.

13   Q.    What was -- about what percentage of your time did it take

14   for you to manage this particular project?

15   A.    I had some other projects going on at the time.  However,

16   this was the big one.  It was probably about half my time.

17   Q.    When you are building a building like this, as a

18   contractor, how do you know what it is you're supposed to build?

19   A.    We build by the project documents, which are the plans and

20   specifications.

21   Q.    And, how do the plans and -- how do the plans relate to the

22   specifications?  Why do you need both?

23   A.    You need both because the project drawings are going to

24   give you an illustration, they are going to give you an overall

25   picture and dimensions.  But I guess if I had to explain it I

Direct Examination - Christopher Crehore

1   would say that if you had a picture of a car on the drawings

2   maybe the specifications would tell you it's going to be a 1960

3   Pontiac GTO, it will be black in color, it will have chrome trim

4   and bucket seating.

5   Q.   Three deuces and four speed?

6   A.   Yes, sir.  If that makes sense.

7   Q.   I understand.  I also wanted one of those.

8   A.   You and me both.

9   Q.   Was PRC Precast one of the subcontractors on this job?

10  A.   Yes, sir.

11  Q.   Did you have interactions with PRC Precast on this job?

12  A.   Yes.

13  Q.   And, did PRC Precast work on the actual job or how did the

14  contractual relationship work with PRC Precast?

15  A.   PRC was going to provide the precast concrete panels on the

16  exterior of the building, but never actually made it to the

17  project.

18  Q.   So, how was it that PRC Precast was building -- doing work

19  for the project but not being at the project?

20  A.   They were supposed to be casting the panels at their

21  facility in, I believe, it was Greenville, South Carolina.

22  Q.   I'm going to ask you if you will look at Exhibit Number 2,

23  please.  And it will come up on your screen in just a moment.

24  A.   Yes, sir.

25  Q.   Can you see that okay?

Direct Examination - Christopher Crehore

1   A.   Yes, sir.

2   Q.   What is this document?

3   A.   It appears to be the contract agreement between Oelrich and

4   PRC.

5        MR. BUTTS:  Your Honor, may I speak with Mr. Darr for

6   just a moment, please?

7        THE COURT:  You may.

8        (Pause in proceeding.)

9        MR. BUTTS:  Your Honor, Mr. Darr and I talked just a

10  moment and we agreed, with the Court's permission, that all of

11  the exhibits that we have both submitted would be automatically

12  deemed admitted except for those that we have expressed

13  objections to, in which case we would either withdraw the

14  objection or raise the objection when the exhibit is brought to

15  the Court's attention.

16       THE COURT:  All right.  The courtroom deputy will want

17  to have a clear indication of which have been admitted and which

18  not.  But let me make sure I understand what you said.  The

19  exhibit lists that were provided in connection to the pretrial

20  process, in this case I think they are actually attached to the

21  pretrial stipulation, all of those exhibits are admitted except

22  to the extent objections are noted there.

23       When you bring an exhibit up during the trial, unless

24  there is an objection articulated at the time, it will be deemed

25  admitted.

Direct Examination - Christopher Crehore

1          MR. BUTTS:  Yes, Your Honor.  I believe that's what

2     Mr. Darr and I agreed to.

3          MR. DARR:  That's right.  And, I just want to make

4     sure it's clear, you know, we only had two objections that we

5     filed to the pretrial list.  But there may be circumstances

6     where an exhibit is introduced that we may object to here.  For

7     example, the project specs with SAW and the VA.  Otherwise, yes,

8     that's fine with us.

9          THE COURT:  They are admitted as we just said.  And if

10    it turns out that you've got some objection that hasn't been

11    made to this point we can always revisit the question.  But,

12    unless it comes back up they are deemed admitted.

13         MR. BUTTS:  Thank you, Your Honor.

14    BY MR. BUTTS:

15    Q.   Mr. Crehore, I direct your attention, if you would, to

16    paragraph 3E.  And this has to do with the schedule?

17    A.   Yes, sir.

18    Q.   Could you see that?

19         In the third line down at, just before the semi-colon it

20    indicates that PRC in this case will diligently and continuously

21    prosecute the work according to the contractor's schedule as

22    amended.  Do you see that?

23    A.   Yes, sir.

24    Q.   Do project schedules such as this one, are they amended on

25    these types of projects?

Direct Examination - Christopher Crehore

1   A.   Yes.

2   Q.   And why is that?

3   A.   A project, a construction project schedule is a dynamic

4   thing.  Some things might take a little longer, some a little

5   less, but they are updated on a regular basis.

6   Q.   Was there a schedule attached to this contract?

7   A.   Yes.

8   Q.   And, was it necessary to amend that schedule from time to

9   time?

10  A.   Yes.

11  Q.   And was -- what was the reason -- was it -- did you

12  experience a delay in the beginning of the project?

13  A.   Yes, we did.  We had several site issues on that project.

14  Q.   Did that require Oelrich Construction to amended the

15  schedule?

16  A.   Yes, sir.

17  Q.   And what was the process for doing that?

18  A.   We would document anything on the schedule.  If it, you

19  know, didn't take as long as it was supposed to, if it took

20  longer, we would enter the actual dates.  And if there were any

21  added activities, issues that arose, like the site work on this

22  job, they would be added to the schedule.

23  Q.   Who among your team was primarily responsible for updating

24  the schedule?

25  A.   Project superintendent, Jordan.

1   Q.   And would he update it -- how often would he update it?

2   A.   Every day to every couple of days.

3   Q.   Would he do it with a bar chart?

4   A.   Yes.  He had an overall project schedule.  And he also had

5   a, what we would call a 2 to 3 week look ahead that was more of

6   a bar chart format.

7   Q.   You mentioned delays in the beginning of the project.  Can

8   you describe what those were?

9   A.   Yes, sir.

10       We actually had several site delays on this job.  One of

11  them was we found several lines in the ground within the project

12  footprint that were not on the project documents.  They were

13  never shown on the drawings.  We had some smaller lines, but all

14  the way up and to we found a pair of 12-inch lines that were not

15  located on the drawings.

16       We also had some other issues.  We had an existing storm

17  sewer line that ran under the corner of the new building that

18  had to be rerouted out from under the footprint of the building.

19  So, when we actually exposed that line we found that we had

20  ordered new line, per the drawings, and that it was incorrect

21  size.  So that material had to be reordered.  And we had to

22  account for that.

23       Another delay that we had was that same storm line had a

24  bat infestation that we had to account for that also.

25  Q.   Were you able to successfully address all of those delays?

Direct Examination - Christopher Crehore

1    A.    Yes, sir.

2    Q.    Did the other subcontractors -- did the subcontractors on

3    the job cooperate with Oelrich Construction in accommodating

4    those delays and adjusting their schedules?

5    A.    They did, with the exception of PRC.

6    Q.    In paragraph 3E, we were talking about that a moment ago,

7    after the semi-colon that we were looking at it says, and to

8    coordinate the work with other work on the project by other

9    trades so that the contractor or owner shall not be delayed by

10   any act or omissions of subcontractor in the completion of the

11   project.  Why is that important to Oelrich Construction on a

12   project like this?

13   A.    It's important because I have to be able to communicate

14   with all of my subcontractors.  I have to take all of the

15   individual sub-scopes of which there are usually 15 to 20 on any

16   project, and I have to dovetail all of those scopes together

17   into one project schedule that everybody can get behind.  And

18   then, because we are not the prime GC, we're a sub on this job,

19   I have to give that schedule to the prime GC.  And then they, in

20   accordance, they take that and they plan their activities with

21   mine.

22   Q.    I want to address your attention, if you would please, to a

23   part of the contract that says, trade specific scope of work

24   structural precast.  And it's several pages back.

25         Item number 13, it appears that Oelrich Construction and

Direct Examination - Christopher Crehore

1   PRC agreed to make a change in paragraph 6A.  And, the change to

2   paragraph 6A was to say -- instead of saying, in the opinion of

3   the contractor, it says if according to the agreed upon schedule

4   the subcontractor falls behind.  Do you see that?

5   A.   Which number are we on?

6   Q.   I'm referring to number 13 and there at the bottom of that

7   paragraph it says 6A.

8   A.   Yes, sir.

9   Q.   And there appears to be an agreement to change the language

10  in paragraph 6A.  Do you see that?

11  A.   Yes, sir.

12  Q.   And I think it's important to focus on the actual language.

13  And then if we can scroll back up to paragraph 6A.  And, this is

14  talking about subcontractor delay paragraph.  And then you can

15  see where the language is changed in the beginning of the second

16  sentence or really the first sentence.  If in the opinion of the

17  contractor, the subcontractor falls behind it's changed to read,

18  if, according to the agreed upon schedule, the subcontractor

19  falls behind.  Do you see that?

20  A.   Yes, sir.

21  Q.   In the progress of the work to be performed the contractor

22  may direct the subcontractor to do certain things.

23       As you amended the schedule from time to time, was there

24  any disagreement expressed to you about the amended schedule

25  that Jordan Robinson sent out?

Direct Examination - Christopher Crehore

1    A.    No.

2    Q.    If we turn back to 6A, please?  I think we are still there.

3    Among the things that it says that Oelrich Construction can do,

4    about four lines down, it says:  And to submit for approval a

5    schedule demonstrated in a manner in which the required way to

6    progress may be regained all without scheduling requests -- all

7    about any additional costs whatsoever to the contractor.

8         Did the schedules that Mr. Robinson used to update the

9    progress of the project with the other subcontractors achieve

10   that?

11   A.    Yes.

12   Q.    Did any other subcontractor on the project object to the

13   need to adjust the schedule as amended in paragraph 3A from time

14   to time?

15   A.    No, sir.

16   Q.    As part of the construction contract, under paragraph 5,

17   there are several paragraphs there that talk about payments.  In

18   addition to the pay request, the request for payment that a

19   subcontractor would get, in this case were there lien waivers

20   required?

21   A.    Yes.

22   Q.    Were there photographs required of the material that had

23   been either purchased or incorporated into panels?

24   A.    Yes.  They would have to provide those in a COI also.

25   Q.    And by COI what do you mean?

Direct Examination – Christopher Crehore

1    A.   Certificate of insurance.

2    Q.   And, why was that important?

3    A.   Billing for stored materials that's held at their facility

4    if anything was to happen.  If it was going to burn to the

5    ground one night or get hit by lightning they would have to have

6    insurance that says that it would be replaced.

7    Q.   In addition to those items, what type of safety

8    requirements were necessary or safety information was necessary

9    in order to safely pursue this project?

10   A.   Information that a subcontractor or PRC would have to

11   provide to the project?

12   Q.   Yes.

13   A.   So, everybody on that job had to have an OSHA 10

14   certification.  All of the contractor foreman had to be OSHA 30

15   certified.  In the case of PRC, as they would have to have a

16   crane to erect the precast, they would have to provide a crane

17   lift plan.  And all of that would be submitted.  And then we

18   were required by spec to have what they call an AHA report or an

19   activity hazard analysis review.

20   Q.   And, did PRC timely provide the OSHA certificates?

21   A.   No, they did not.

22   Q.   Did, to your knowledge did PRC ever provide an OSHA 30

23   certificate for any person?

24   A.   No, they did not.  Forde and I had several discussions

25   about this where he said, yeah, we'll get it to you, you know,

Direct Examination - Christopher Crehore

1   like it wasn't a big deal.  And I would explain to Forde that

2   this is a government project.  There are strict paperwork

3   requirements.  You can't just show up with this and expect to go

4   to work that day.

5        I have to have it.  I have to review it.  Make sure that

6   it's approved.  Then I submit it to the JV.  And they review it

7   and make sure that it's approved before we can schedule our

8   meeting, our activity hazard analysis plan.  If you don't --

9   Q.   Why is that important for the safety of the project?

10  A.   Specifically, a crane lift plan would be important because

11  it would go over certain safety details like how much did the

12  panels weigh, how big is the crane, where is it going to lift

13  from, are there any -- is there anything underground that it

14  can't bear on that might give way, how are you going to pick

15  panels and swing them, are there any overhead lines.  That's

16  where you would identify and address any potential safety

17  issues.

18  Q.   As it pertains to this particular project, what was your

19  experience with the VA and SAW-Greenland in regard to the -- why

20  they needed that information and when they needed the

21  information?

22  A.   They were very strict about that in the project documents.

23  That's why we had to get it in time to go over it and go over it

24  with the JV because if you didn't they would shut you down if

25  you don't show up with it.

Direct Examination - Christopher Crehore

1   Q.   By JV you mean the joint venture between SAW and --

2   A.   Yes, sir.

3   Q.   You mentioned an AHA, what is that, activity --

4   A.   Hazard analysis.

5   Q.   What is that for?

6   A.   It's where you would talk about what you are going to do

7   and identify any potential safety issues.  You just kind of walk

8   through what you were going to do, and go through the whole

9   process and give everybody a chance to take a look at it.

10  Q.   I realize that the only subcontractor who probably needed

11  to use a lift and have a lift plan was PRC.  Were the other

12  subcontractors that you had, did you have any problems getting

13  the OSHA 10 certificates from them?

14  A.   No.

15  Q.   Did you have any trouble getting the OSHA 30?

16  A.   No.

17  Q.   Did you have any problems getting the activity hazard

18  analysis?

19  A.   No.

20  Q.   Turning back to the general scope of work, paragraph 4,

21  please.  It says that, last sentence in that, excuse me, the

22  entire paragraph.  Subcontractor will provide necessary work

23  forces, equipment, and material delivery so that the project is

24  a hundred percent completed per schedule.  Did PRC do that?

25  A.   No.

Direct Examination - Christopher Crehore

1  Q.   Did PRC coordinate its work so as to not hinder other

2  subcontractors' completion dates?

3  A.   No, they did not.

4  Q.   To your knowledge, did PRC ever come to the job site?

5  A.   No.

6  Q.   Did PRC -- I think we've discussed this already but number

7  10, was PRC required to comply with number 10?

8  A.   Yes.

9  Q.   Did they do so?

10  A.   No, they did not.

11  Q.   Were they required -- was PRC required to comply with

12  number 16?

13  A.   No, they did not.

14         THE COURT:  While we're paused, we've got one on each

15  side not wearing your mask properly.  Get your mask up over your

16  nose and keep it there, please.

17  BY MR. BUTTS:

18  Q.   I would like to direct your attention please, Mr. Crehore,

19  to Exhibit 3, Plaintiff's Exhibit 3.  Do you recognize that

20  document?

21  A.   I do.

22  Q.   Was that the, excuse me, tell the Court what it is, please?

23  A.   The contract agreement with the JV, with the joint venture,

24  SAW-Greenland.

25  Q.   Is that contract agreement incorporated into the contract

Direct Examination - Christopher Crehore

1   agreement with PRC?

2   A.   With all of the subcontractors, yes.

3   Q.   And it references in paragraph 2.1 on page 3 the prime

4   contract.  Do you see that?

5   A.   I'm still looking at the coversheet.

6   Q.   Page 3?

7           MR. HIPWORTH:  Okay.  Thanks.

8   BY MR. BUTTS:

9   Q.   2.1 at the top of page 3?

10  A.   Yes.

11  Q.   What is the prime contract in this case?

12  A.   Prime contract would have been the contract between the JV

13  and the VA.

14  Q.   I'll refer you to Exhibit 32.

15          MR. DARR:  Your Honor, just to be clear, so it's on

16  the record, I know we discussed this during our hearing last

17  week.  But PRC does object to the admission of this exhibit as

18  irrelevant because it wasn't fairly contained within the

19  pleadings of Oelrich's claims and defenses in this case.  So, we

20  don't think it should be at issue.  Rather than object every

21  time to evidence offered about this we'll just go ahead and put

22  on the record that it's a continuing objection if that's okay

23  with Your Honor.

24          THE COURT:  It is.  I overruled the objection to the

25  document.  It's plainly admissible.  The real issue goes to

Direct Examination - Christopher Crehore

1   whether they can rely on failure of the product that PRC

2   manufactured to comply with the conditions that are set out in

3   the agreement.

4          And we left that where we did last time, which was not

5   definitively resolved, but in effect that I'll take the

6   testimony and it will either be deemed properly here or deemed

7   the proffer.

8          Mr. Darr, one thing you'll want to address at some

9   point about that, I did notice in going through the various

10  things to prepare first you are correct, it's not in the

11  pleadings.  But, it does seem to me it's referenced in your own

12  26(a)(2) disclosures.  You listed Mr. Davis as an expert, maybe

13  both Mr. Davis' as experts.  And one of the things you said they

14  would testify about was whether PRC materials met the terms of

15  the contract.

16         So, you apparently listed experts to talk about this

17  subject.  Now, I don't know where that leaves us, but that's one

18  of the things you'll want to address when we double back to

19  this.

20         We left it where we did, it's a bench trial so nobody

21  is going to suffer any harm whether this is just proffered or --

22  proffered by the lawyer or proffered through the testimony.

23  Best to do it this way.

24         And, of course, it may or may not make a difference in

25  light of the other rulings in the case.  So I'm certainly not

1   prejudging any of that, but I do recognize it's going to be an

2   issue and we will want to talk about it at the appropriate time.

3          But you have preserved your objection.  You don't need

4   to make it each time.

5          MR. DARR:  Thank you, Your Honor.

6   BY MR. BUTTS:

7   Q.   In looking at Exhibit 32, I'll direct you to section

8   034500, which is on page 286 of 1,899 pages.  Actually, I may be

9   wrong about the page number.  It's section 034500.  Do you

10  recognize this section as the section of specifications

11  pertaining to the precast material?

12  A.   Yes, sir.

13  Q.   The precast material we are referring to is the material

14  being fabricated in Greenville, South Carolina by PRC in this

15  case?

16  A.   Correct.

17  Q.   Was anyone else fabricating precast material on this

18  particular project?

19  A.   No.

20  Q.   I would like to go back to Exhibit 2, please, and reference

21  the schedule.  That is near the back of the contract, please.

22  And I'm referring to the bar chart, specifically line number 97.

23         Do you see that?

24  A.   Yes, sir.

25  Q.   Was the precast material -- what does line number 97 tell

1  us about the precast material?

2  A.    It says, precast panel erection with a 20 day duration was

3  scheduled to start on 7/11.

4  Q.    And, on 7/11, had PRC fabricated all of the panels

5  necessary for the erection?

6  A.    No.

7  Q.    To your recollection, had they fabricated any panels at

8  that time?

9  A.    I do not believe that they had.

10  Q.    What -- what is -- what was your understanding of what,

11  what precast panels are expected to be fabricated and installed

12  on this building?  What do you mean by precast panel?

13  A.    So the exterior precast panels would have been a certain

14  dimension, height, length, thickness.  And they would have been

15  cast in PRC's yard.  They would start off with an empty form,

16  they would lay the rebar in, then they would pour concrete.  And

17  then this particular panel had an exposed aggregate finish.  It

18  had to match the existing VA.

19  Q.    Is there a difference between a panel and a cap?

20  A.    Yes.  The panels would go around the building on the

21  exterior of the building.  The precast caps would go around the

22  top of the parapet wall on the exterior of the building.

23  Q.    And did the -- looking at the rendering, is the light --

24  where is -- what color are the areas where the precast panels

25  are adhered to the building?

Direct Examination - Christopher Crehore

1   A.    It is the light colored area.

2   Q.    And how are those precast panels adhered to the building?

3   A.    They would have been embeds that would have been installed

4   in the cast-in-place concrete before it was poured.  And then

5   there would have been embeds in the panels.  And when the

6   precast panels are picked from the truck by the crane and set on

7   the building, these embeds would be welded together to form the

8   connection that holds the panel.

9   Q.    So you mentioned precast, I think you may have said

10  columns, what do the precast columns sit on in terms of the

11  foundation?

12  A.    Okay.  So, if I said precast columns, that was incorrect.

13  That would have been cast-in-place columns --

14  Q.    Excuse me.

15  A.    -- and beams that would have run down to the foundation of

16  the building.

17  Q.    Can you just describe from a visual perspective what we

18  would see if we were looking at the foundation?

19  A.    Okay.  So the foundation is what spreads the load of the

20  building to the earth beneath it.  If you were -- if you were

21  looking at the foundation, when the building was done you

22  wouldn't see it because it would be underground.  But to

23  construct the foundation you would excavate the area, and either

24  form up a earth form the foundations.  You would put the -- you

25  might have some stone at the bottom for dewatering.  Then you

Direct Examination - Christopher Crehore

1    would have the rebar cage, as it's called, with a dowel sticking

2    up and out that would eventually tie into the column.  And then

3    you would pour the foundation or the column pads.

4    Q.   So is the foundation in this case, could it be described as

5    a trench?

6    A.   Yes.

7    Q.   That goes around the perimeter of the building?

8    A.   Yes.  There was a trench and spread footings.

9    Q.   When you say dowels do you mean re-enforcing rods?

10   A.   Yes.  That come out of one member and go into another.

11   Q.   And then on top of that -- what's a common word used for

12   that foundation?  Do some people call it a footer?

13   A.   Yes.

14   Q.   Would the rods that come up out of the footer, how then do

15   they -- how are the columns cast-in-place to incorporate the

16   rods?

17   A.   So, the first thing that they would do is they would bring

18   in more rebar and they would tie that rebar from the column to

19   the rebar that's exposed from the footer.  And then they would

20   have form work to make the shape of the column.  And then they

21   would pour the column.

22   Q.   And, if I may?  May I?

23           THE COURT:  You may.

24   BY MR. BUTTS:

25   Q.   Are the columns in these areas?

Direct Examination - Christopher Crehore

1   A.   Yes.  The columns would be at all of the corners and then

2   at regular intervals in between.

3   Q.   And then is this -- what is this area called?  How's that

4   built?

5   A.   Those are the precast panels.

6   Q.   I'm sorry.  What's behind them in terms of the structure of

7   the building?

8   A.   You would have the columns.  And then you would have beams

9   that would tie the columns together.  And you would have block

10  in fill.

11  Q.   Is that all cast-in-place, the beams?

12  A.   The beams and columns.  Yes, sir.

13  Q.   And then, it appears that there's another level so that

14  would -- would there be more beams or, excuse me, more columns

15  and then perhaps a beam at the top?

16  A.   Yes.  They would have the foundation.  Then they would do

17  the columns.  Then they would do the first floor beams.  Then

18  they would do the second floor columns.  And then they would do

19  the second floor beams around the top of the perimeter.

20  Q.   Where is the roof?  Is that more or less at the second

21  floor beam level?

22  A.   Yes, it is.

23  Q.   And then do the walls extend up past that?

24  A.   Yes.  That would be the parapet wall, which in this case

25  was block.

Direct Examination - Christopher Crehore

1  Q.   About how tall was that?

2  A.   I think it was maybe 3 feet.  It was a few courses.

3  Q.   And is it on top of the parapet wall that you described

4  where the caps go?

5  A.   Yes.

6  Q.   And then, the precast material do I understand then it

7  goes -- it covers the cast-in-place beams and columns?

8  A.   Yes.

9  Q.   Is that a fair statement?

10 A.   Yes.

11 Q.   Can we look at Exhibit 554, please?

12      Can you turn to the schedule of values portion of that,

13 which is about 3 pages back?

14      Do you see that?

15 A.   Yes.

16 Q.   In column B it discusses a description of work.  Under line

17 number 1 it says, markup samples?

18 A.   Mockup samples.

19 Q.   Mockup samples.  Thank you.

20      And, then as we move from the left to the right it has a

21 schedule, under schedule of values it has $2,800?

22 A.   Yes, sir.

23 Q.   And then moving left to right it -- we learn that there are

24 on this particular pay application, which I believe is number 5,

25 prior to this application there had been $1,200 of work

Direct Examination - Christopher Crehore

1   performed; is that correct?

2   A.   Yes, sir.

3   Q.   And then this period PRC is seeking $1,600 of the $2,800;

4   is that right?

5   A.   Yes, sir.

6   Q.   And then since all of this is being built in Greenville, we

7   have in column G what is being stored in Greenville to date in

8   this case on that first row $2,800 total to date, right?

9   A.   Correct.

10  Q.   Going farther to the right, it indicates that 100 percent

11  of the mockup samples are, in fact, taken care of?

12  A.   Yes, sir.

13  Q.   As we come down that line, the next line of the shop

14  drawings and it appears that on this pay request in May of 2019

15  that all of the shop drawings are completed?

16  A.   Yes, sir.

17  Q.   Line number 3 is for forming re-enforcing steel plates

18  production materials.  And then line number 4 is for the actual

19  production.  Is line 4 for the completed panels and caps?

20  A.   Yes.

21  Q.   And, is line 3 for the material that's needed to form and

22  goes in to mix together to be the precast ultimately?

23  A.   Line 7?

24  Q.   Line 3.

25  A.   Oh, line 3.  Yes.  Forming reinforcing.  Yes.

Direct Examination - Christopher Crehore

1   Q.   So, in May of 2019, PRC is asserting and requesting payment

2   for approximately 18 percent of what it was going to need for

3   the forming, reinforcing steel plates production materials,

4   correct?

5   A.   Yes, sir.

6   Q.   If we look at Exhibit 555, please.  And we go to the

7   schedule of values.  It's kind of light, but can you read what

8   the -- how much of the -- how many -- what percentage of panels

9   had been produced through this pay request which is through work

10  performed in July of 2019?

11  A.   It's hard to read, but it looks like 8 percent.

12  Q.   And that means 8 percent of the panels are completed at

13  that time, right?

14  A.   Yes.

15  Q.   And this is a pay request given by PRC asking to be paid

16  for 8 percent of the panels?

17  A.   Correct.

18  Q.   And, now they are up to one hundred percent of materials

19  and the forms, right?

20  A.   Correct.

21  Q.   And if we look at 556, Exhibit 556, please.  And go to the

22  schedule of values on that one.  Now, this appears to be in

23  September.  And I notice that the application date is in the top

24  right corner and right below it it says period 2.  Do you see

25  that?

Direct Examination - Christopher Crehore

1   A.   Yes, sir.

2   Q.   Do they -- do the subcontractors apply for payment in the

3   middle of the month and are they allowed to project to the end

4   of the month?

5   A.   Correct.

6   Q.   And, in this case, PRC is projecting that it would have

7   53 percent of the panels completed by the end of September,

8   right?

9   A.   Yes.

10  Q.   And in this case, do you recall approximately how many

11  panels there were on this job and caps?

12  A.   Panels and caps, I think there was around high 90's or a

13  hundred for everything.

14  Q.   So, that if it were a hundred, just for easy math, there

15  would be an expectation there would be 53 panels and caps

16  completed through the end of September, right?

17  A.   Yes, sir.

18  Q.   And then I'm going to show you one more that is, excuse me,

19  557.  If we could look at that.  If we could scroll to the -- do

20  I understand correctly this is a pay application being submitted

21  in October for work performed through the end of October,

22  correct?

23  A.   Yes.

24  Q.   And do I understand correctly from this pay application

25  that, again, using the presumption that there are a total of

Direct Examination - Christopher Crehore

1   only one hundred panels and caps that PRC is asserting that they

2   have completed a little over 63 of them; is that right?

3   A.   Yes.

4   Q.   On Exhibit Number 559 is an electronic message from

5   Yosamani Gil to F. Davis.  Can you see that?

6   A.   Yes, sir.

7   Q.   Do you remember anything about the embeds that Mr. Gil is

8   discussing in this email?

9   A.   It looks like we were short on embeds and we were trying to

10  get more.  Needed another 50 delivered.

11  Q.   Do you remember whether or not PRC delivered the embeds?

12  A.   I do not.

13  Q.   In December of 2019, I'm going to show you Exhibit Number

14  24, please.

15       Give you a moment to look through that.  Just glance

16  through it.  It's about 4 pages long.  I mainly would like to

17  focus on two components of it, the second page primarily of the

18  exhibit.

19       Can you see that email, it appears to be from someone named

20  Jerre Carr?

21  A.   Yes, sir.

22  Q.   Is that the same Mr. Carr that you mentioned earlier?

23  A.   Yes, sir.

24  Q.   What is Mr. Carr asking for in this email?

25  A.   He's looking for the same items that we discussed earlier

Direct Examination - Christopher Crehore

1  that we were still trying to get out of PRC, the safety

2  information.

3  Q.   So even in November of 2019, PRC has still not submitted

4  this information?

5  A.   That's correct.  I don't believe that they ever did.

6  Q.   And then if we could turn to the next page, please.  This

7  appears to be a letter from Mr. Wilson to Mr. Davis dated

8  December 12, 2019.  Do you recognize that?

9  A.   Yes, sir.

10  Q.   Do you remember the circumstances surrounding that letter?

11  A.   Again, we were trying to get PRC to understand that you

12  can't just show up with this information.  That it's got to be

13  reviewed and approved or you are not going to be allowed to

14  work.  It's important that we get this in.

15  Q.   In the first paragraph it starts off by saying, on

16  September 19th, Jordan Robinson made all subcontractors aware of

17  safety documentation.  Do you see that?

18  A.   Yes, sir.

19  Q.   Do you have any reason to believe that he did not make all

20  of the subcontractors aware of that?

21  A.   No, sir.

22  Q.   Is this -- what is Mr. -- what is the point that Mr., as

23  you understand it to be that Mr. Wilson is making in the second

24  paragraph?

25  A.   I think Andy is expressing some frustration that we can't

Direct Examination - Christopher Crehore

1    get any reply from PRC or we can't get any communication from

2    this, the items that we need to be able to get the work done.

3    Q.   And, do you have any reason to believe that Mr. Gil was not

4    trying to do that on October 29th?

5    A.   No, I do not.

6    Q.   And the information he's asking for, the things we have

7    discussed already in items 1, 2 and 3?

8    A.   No, sir, I do not.  I tried to explain to Forde when I

9    could get him on the phone that the OSHA 30 is not something

10   that you are going to take in a couple of days and get it behind

11   you.  It takes a lot longer than that.

12   Q.   What do you mean by OSHA 30?  What is that?

13   A.   So, all of the workers on the job had to have an OSHA 10

14   safety program.  But, the foreman for all of the subcontractors

15   had to have what they call an OSHA 30, which is a much more

16   in-depth detailed safety training.

17   Q.   Why do they call it OSHA 30?

18   A.   It's a 30 hour course.

19   Q.   Do you have any reason to believe, going down below 1, 2

20   and 3 that Mr. Carr was not trying to acquire this same

21   information on November the 14th?

22   A.   No, sir.

23   Q.   And, did PRC provide this information for what's referenced

24   as the preparatory phase meeting on December 20th, 2019?

25   A.   No, sir.  They did not.

Direct Examination - Christopher Crehore

1    Q.   Did they attend it?

2    A.   I believe that we only got a small amount of the paperwork

3    that we were looking for from PRC.  And what we did get was

4    incomplete.

5    Q.   Were you able to have the preparatory phase meeting?

6    A.   No, sir.  We can't schedule it without the paperwork.

7    Q.   Was this going to hold up the job?

8    A.   Yes, sir.

9    Q.   Did you express this to anyone from PRC?

10   A.   I did.  To Forde.

11   Q.   Did you do it more than one time?

12   A.   I did it repeatedly.

13   Q.   Did you -- how did you do it?

14   A.   I would have to call Forde and email him several times to

15   get any communication from him.  As their anticipated date got

16   closer I would have to call more and more to try and get him on

17   the phone and impressed upon him how important it was to get

18   this information.  We can't -- the VA will not let you start

19   without it.

20   Q.   Did you have any trouble reaching Forde Davis on the -- by

21   telephone?

22   A.   Yes, I did.

23   Q.   Did you try his cellphone number?

24   A.   I did.

25   Q.   Did you try --

Direct Examination - Christopher Crehore

1   A.   Repeatedly.

2   Q.   Did you have any other numbers to try?

3   A.   I had the office number that I would call and not get an

4   answer.

5   Q.   It appears that Mr. Wilson is asking for this information

6   no later than 3 on 12/13/2019.  Am I correct in understanding

7   then it was not received timely?

8   A.   Correct.

9   Q.   As we scroll down to the bottom, where it appears

10  Mr. Wilson is quoting paragraph 6A of the contract, did you --

11  did you have an opportunity -- did, excuse me.

12      Did Mr. Forde Davis ever respond to this letter in regard

13  to Mr. Wilson's claim, I mean his claims and disputes issue that

14  he's raising quoting the contract?

15  A.   No, sir.

16  Q.   Do you know whether Mr. Davis responded to anybody else at

17  Oelrich Construction when Mr. Wilson expressed to him that he

18  was contemplating or when he was quoting this contract clause?

19  A.   No, sir.

20  Q.   Did he express to you -- did he give you any response to

21  Mr. Wilson's assertion that if there were additional costs

22  associated with the delay that Mr. Wilson and

23  Oelrich Construction was going to assess them against PRC?

24  A.   No.

25  Q.   Did the other subs comply -- had the other subs already

Direct Examination - Christopher Crehore

1    complied with all of this?

2    A.   Yes.

3    Q.   Every one of them?

4    A.   Yes.

5    Q.   If we could turn to Exhibit 563, please.  I'll give you a

6    moment to review this email chain.  Just generally, and I'll

7    direct you to specific things.

8         This goes back little further in time.  And there's some

9    overlap, and I apologize for that.  We see in the beginning

10   where at the very first email on November 20th, the one we've

11   discussed, Mr. Carr, Jerre Carr asking for lift plan and AHA

12   activity hazard analysis.

13   A.   Yes, sir.

14   Q.   The next email Mr. Davis is acknowledging that he knew

15   about the OSHA requirements at bid time.  But he still hadn't

16   given them to you, had he?

17   A.   No.

18   Q.   And, he's saying this is the first time that he's heard of

19   the activity hazard analysis.  Did any of the other

20   subcontractors express to you that they were unaware that they

21   had to turn in an activity hazard analysis?

22   A.   No.

23   Q.   I'm moving up that page to the top.  It appears that you

24   are sending an email on December the 12th, no, excuse me.  It

25   appears that Mr. Wilson is sending an email on December 12th.

1   And he's just reiterating that he's looking for the documents.

2   But then that's the same day that he also sent the letter that

3   we just went over in some detail.

4     Then on the 16th, this is following Mr. Wilson's letter,

5   you write to both Forde and Randall Davis.  Do you see that?

6   A.   Yes, sir.

7   Q.   And tell me about the conversation, if you can recall it,

8   that you had with one or the other or both, the previous Friday?

9   A.   So, I've never talked to Randall.  I never got any return

10  phone calls from him over the course of the project.  The one

11  time that I was able to get Forde on the phone and talk to him

12  about the OSHA certificates, about those specifically, he said

13  that he had a foreman that was -- he was going to knock the OSHA

14  30 out in a couple of days when he was done with the current

15  project is the way that he put it.  I tried to explain to him

16  that, Forde, that sounds great, but it's not going to happen

17  that way.  The majority of people that take that class it takes

18  them a lot longer.

19  Q.   And then you go on to indicate that you still needed the

20  lift plan, right?

21  A.   Correct.  I told him a couple of times.  At least get me

22  what you can get me now so I can get started with the process.

23  Any crane company ought to be able to give you a lift plan in a

24  little less than an hour.  It's a standard thing for every

25  project they do.

Direct Examination - Christopher Crehore

1    Q.    And then at the bottom it appears that the last line you

2    are asking a question, two questions.  Do you see that?

3    A.    Yes, I do.

4    Q.    Did he ever respond to you?  Did he ever answer the first

5    question?

6    A.    No.

7    Q.    Did he ever answer the second question?

8    A.    No.

9    Q.    Did he give you any level of assurance that at that time,

10   that he was going to do the project?

11   A.    Zero.

12   Q.    Did he give you any level of assurance that he was going to

13   cooperate so that you could have the preparatory phase meeting?

14   A.    No.

15   Q.    Did he indicate to you that he -- did he even acknowledge

16   that you wanted him to be there on the 6th of January and

17   install material?

18   A.    Not until it was apparent that we weren't going to make the

19   date.

20   Q.    Did he tell you that he hadn't built anything in terms of

21   material --

22   A.    No, he did not.

23   Q.    -- since he billed you for 63 percent of the material in

24   October?

25   A.    No, sir.

1    Q.    I want to go to the next email, which is the 16th of

2    December.  And here, it appears Forde Davis is communicating

3    with you that he hasn't been paid for 3 pay requests, 3 previous

4    pay requests.  Do you see that?

5    A.    Yes, sir.

6    Q.    And he raises concerns about that.  He's telling you that

7    he's billed for all of the production, not just 63 percent, but

8    a hundred percent, right?  And he's not going to ship anything

9    until you pay it all, right?

10   A.    Correct.  I believe he had some pay applications that had

11   not been fully paid by OCI because he hadn't turned in all of

12   the paperwork that was required to get it paid.

13   Q.    And at the time that he is asking for full payment, he,

14   even by his own pay requests, he had only produced 63 percent of

15   the panels?

16   A.    Correct.

17   Q.    Number 2, he indicates that he is not going to be able to

18   perform on January the 6th, correct?

19   A.    Yes.

20   Q.    And in the last sentence he is indicating that he's working

21   on the OSHA 30 documents and the lift plan.  Do you see that?

22   A.    I do.

23   Q.    So, he did get back to you a couple of days later or

24   actually on the same day and indicated that he was working on

25   it, but he wasn't going to be able to do anything on the 6th?

Direct Examination - Christopher Crehore

1    A.   Right.

2    Q.   Did you need him to be there on the 6th?

3    A.   I did.

4    Q.   Were you ready for him on the 6th?

5    A.   Yes.

6    Q.   What did you have to have done on the building in terms of

7    the work that preceded the precast in order for him to be able

8    to begin hanging precast on the 6th of January?

9    A.   You would have to have the cast-in-place, concrete, columns

10   and beams done with embeds.  You would have to have the majority

11   of the block work done.  And you would have to have

12   waterproofing done.

13   Q.   What was the last thing?

14   A.   The waterproofing.

15   Q.   Oh.  Excuse me.  I'm sorry.  I just had a little trouble

16   hearing you.

17        You mentioned block.  May I?  It appears when I look at

18   this that there is some areas with some bricks; is that right?

19   A.   Yes, sir.  There was exterior brick veneer on the job.

20   Q.   Where do the blocks go on the building?

21   A.   The block-in-fill would have been behind the brick.

22   Q.   And, would there be some that goes behind the precast?

23   A.   Yes.

24   Q.   And, some up at the parapet wall?

25   A.   Yes.

Direct Examination - Christopher Crehore

1   Q.   So is that why you had to have the block because you were

2   going to cover it up?

3   A.   Yes.

4   Q.   So the precast covered up not only the cast-in-place

5   column, but it also stuck out far enough on each side that it

6   covered up some block?

7   A.   Correct.

8   Q.   The project was to that point where they could have started

9   installing the precast on the 6th day of January?

10  A.   Yes.

11  Q.   What, on the -- then you write Forde Davis back on December

12  the 18th, a couple days later.  And I think -- what is the gist

13  of the email that you are sending?  Or why are you sending that

14  email, I should ask it?

15  A.   It looks like I'm telling him that the check or the funds

16  went out for the 2 pay applications 7 and 8 because we just got

17  the material or we just got the paperwork that accounting,

18  Christina was looking for to be able to release those funds.

19  Q.   And had PROLS, is that lien?

20  A.   Release of lien.

21  Q.   Partial?

22  A.   Yes, sir.

23  Q.   Is that the P?

24  A.   Yes, sir.

25  Q.   And at that point are you expressing concern about the

Direct Examination - Christopher Crehore

1  January 6th date?

2  A.   Yes, sir.  At this point I've got, you know, the JV on my

3  butt.  I am not the boss of that project.  I have to tell these

4  guys when things are going to happen.

5  Q.   When you say in the last, the last sentence of that one

6  paragraph there, it says, this is the date we had been talking

7  about.  Who had you been talking about that date with?

8  A.   Forde.

9  Q.   So Forde knew you needed it on the 6th?

10  A.   Forde is the only one that I could communicate with.

11  Q.   Based on -- did Forde give you any indication that he was

12  not going to be able to do it on the 6th up until the email that

13  he sent you on the 16th of December?

14  A.   No.  No, sir.

15  Q.   Were you corresponding with him prior to that date, prior

16  to the 16th of December?

17  A.   Yes.  Trying to get all of the other paperwork so we could

18  get it approved in time to start.

19  Q.   Prior to the 16th of December, had you made -- had you made

20  Forde aware that you had a target date of January the 6th?

21  A.   Yes.

22  Q.   Is Forde Davis -- is it the first time that you learned

23  that he was not going to do it on the 6th, the email that you

24  see here dated December 16th at the bottom of that page?

25  A.   I believe it was.  Yes.

Direct Examination - Christopher Crehore

1    Q.   You mentioned that the job was ready on January 6th.  I

2    would like you to look at Exhibit 11, please.  Do you recognize

3    this letter?

4    A.   Yes, I do.

5    Q.   The components of the job that were masonry, did that

6    include bricks?

7    A.   There was brick on the project, but that wouldn't be done

8    until later.

9    Q.   Right.  So, what is the -- what are the concerns being

10   raised by SAW as it pertains to precast?

11   A.   So, they are asking me where the paperwork is.  And I don't

12   have anything to give them.

13   Q.   Is there any reason that SAW sending this letter out would

14   be -- would SAW send this letter out to you, demanding that the

15   precast and, be installed or inquiring as to why it isn't being

16   installed, if you weren't ready for it?

17   A.   I'm sorry, I don't understand the question.  Would they

18   send it out if?

19   Q.   The letter seems to indicate that SAW thinks that you

20   should be installing precast?

21   A.   Yes, sir.  January the 8th would have been 2 days after we

22   were set to start.  And they don't have paperwork yet.

23   Q.   Is there any -- do you know of any reason why SAW would be

24   asking you why you are not installing precast if you weren't

25   ready to install precast?

Direct Examination - Christopher Crehore

1  A.   Because we're -- we haven't given them any of the paperwork

2  to be able to get started.  They know we're not going to start

3  soon, as we indicated.

4  Q.   Let's look at Exhibit 13.  Do you see at the bottom where

5  it says, masonry on that first page?

6  A.   Yes, sir.

7  Q.   And, this letter, if I'm understanding, is written in

8  response to the SAW letter?

9  A.   Yes, it is.

10  Q.   Written by Andy Wilson two days later?

11  A.   Yes.

12  Q.   Do you see where Mr. Wilson says under masonry, when they

13  started the CMU block walls?

14  A.   On 11/18.

15  Q.   Do you have any reason to think that Mr. Wilson was not

16  accurate when he expressed that the walls had started on

17  November the 18th?

18  A.   No, I do not.

19  Q.   Is that consistent with your recollection of the status of

20  the project that they started the block walls on November the

21  18th?

22  A.   Yes.

23  Q.   And these are the block walls that you noted are necessary

24  in order to install the precast on January the 6th, correct?

25  A.   Yes.

1   Q.   And, do you have any reason to think that the blocks would

2   not be fully installed on the 13th of January?

3   A.   No.

4   Q.   And, do you have any reason to think that the second floor

5   wouldn't be fully completed or wasn't fully completed by the

6   17th of January?

7   A.   No, sir.

8   Q.   If Mr. Wilson's recollection of the status of this project

9   was insistent with Mr. Robinson's schedule, would there be an

10   explanation for that?

11   A.   If the dates in the letter didn't match Jordan's schedule,

12   I don't know unless he might have forgot to update part of it.

13   Q.   Unless who forgot to update?

14   A.   Unless Jordan didn't update a part of it.

15   Q.   On the second page of that letter, do you know where

16   Mr. Wilson got the information from that says that precast was

17   starting on the 17th of February?

18   A.   I believe that that start date came from PRC.  That's when

19   they said they could start erection.

20   Q.   I would like to take a look for a minute at Exhibit 558,

21   please.

22        Do you recognize that document?

23   A.   Looks like a December pay application from PRC.

24   Q.   If we could go back to the schedule of values, do you see

25   the date of the application?

1   A.   12/16.

2   Q.   And this is application number 10, isn't it?

3   A.   Correct.

4   Q.   This is the last one that was submitted, correct?

5   A.   Correct.

6   Q.   And, it's for work projected to be performed through the

7   31st of December?

8   A.   Through the end of the year, yes.

9   Q.   And, can we tell what percentage of work PRC is asserting

10  is completed on line number 4, production, at that time?

11  A.   A hundred percent.

12  Q.   And, on the next line it says, freight, doesn't it?

13  A.   Yes.

14  Q.   On this particular application PRC has asked to be paid a

15  hundred percent for the freight as well?

16  A.   Yes.

17  Q.   But, in fairness to PRC, that freight request for payment

18  was withdrawn.

19       Do you recall that to be true?

20  A.   I believe so.

21  Q.   But there was no withdrawal of the hundred percent for the

22  production, was there?

23  A.   No.

24  Q.   And, at that time, they were being asked for $27,538,

25  weren't they?  No.  Excuse me.  I'm sorry.  $15,899, right?

Direct Examination - Christopher Crehore

1    A.    Correct, per line item 4 for the hundred percent.

2    Q.    Did anybody from PRC ever say to you, or anyone else that

3    you know of at Oelrich Construction, we're going to bill you for

4    a hundred percent, but you don't have to pay it until we ship

5    it?

6    A.    No.

7    Q.    Do you recall anyone from PRC ever saying anything remotely

8    like that to you?

9    A.    I do not.

10   Q.    Do you recall anyone at Oelrich Construction ever

11   expressing that they had heard anyone at PRC say that, although

12   they were asking for a hundred percent payment that

13   Oelrich Construction really didn't have to pay it at this time?

14   A.    I do not.

15   Q.    If we could look at Number 571, please.

16         This is another email chain.  And, if we could go to the

17   end and we'll work our way back.  I'm trying to stay

18   chronologically consistent, but with the chains I sometimes have

19   to double back and I apologize for that.

20         On December 23rd, there's an email from Andy Wilson to

21   Forde Davis.  What are piece detail cut sheets?

22   A.    So a piece detail or cut sheet would be for every different

23   precast panel there would be an individual cut sheet that gave

24   you overall dimensions, that type of material, for each of the

25   different, each of the different pieces.

Direct Examination - Christopher Crehore

1  Q.   Why is that important?

2  A.   At one time when Forde had said that his erector couldn't

3  be there when we needed him we went out and found him one.  We

4  had -- I'm trying to remember, I think we found him through --

5  he had some erection work for W.W. Gay at one point.  So we

6  reached out to him, sent him the drawing specifications, got a

7  price.  And said, okay, Forde, you can't get an erector, here we

8  got you one.

9  Q.   But you still needed the panels?

10 A.   Yes.

11 Q.   It looks to me as if the next email in the chain is from

12 you to Forde.  It appears that you are following up on what

13 Mr. Wilson had asked for, correct?

14 A.   Yes.

15 Q.   Did you, in fact, leave a voice mail that day?

16 A.   I left several.  I would always try and call first, but

17 when I wouldn't get an answer I would go back in and send an

18 email.

19 Q.   And, it appears that you are at this point, which is on the

20 23rd of December, that you are, you're still hoping that you can

21 erect on the 6th.  And, did you, in fact, lose your slot?

22 A.   Yes.

23 Q.   And did -- I'm going to move over to the email from

24 Forde Davis to you.  About halfway up on page 3.  And, what is,

25 what is your understanding of what Mr. Davis is asking for or

1   communicating to you about piece sheets?

2   A.   Our production tickets or piece sheets are for in-house

3   only and not distribution.  What specifically do you need to

4   know about the pieces.

5   Q.   Had you -- was that -- were you expecting to receive that

6   type of response?

7   A.   No.  I was expecting to get a copy of the sheets.

8   Q.   And then, going up a little bit higher at 157, Mr. Wilson

9   seems to express what he is looking for.  Is that everything you

10  needed?

11  A.   Overall dimensions, weight, embed location for each piece,

12  type.

13  Q.   Then it seems that Mr. Davis responds at 2:06 and says he

14  will get a spreadsheet to you.  Do you see that?

15  A.   Yes.

16  Q.   And, Mr. Wilson at 2:21 asks if he can get the spreadsheet

17  today?

18  A.   Correct.

19  Q.   Do you recall getting the spreadsheet?

20  A.   I do not.

21  Q.   Ever?

22  A.   No.

23  Q.   Instead, or what is the tip that Mr. Davis is referencing

24  to you?

25  A.   He gives us a weight per cubic foot for concrete.

1    Q.   Did that take care of the information that you needed to

2    have to be able to satisfy the VA and all of the requirements

3    for installing the precast?

4    A.   No.

5    Q.   Is that why you wrote him back at 3:08, at the top of that

6    page 2?

7    A.   Right.  I'm expressing to him, you know, we're paying for

8    the product and we can't seem to get any information on it.  I

9    would have been looking for embed locations, that type of thing,

10   for the erector at that point.

11   Q.   In this email here and your telephone conversation where

12   you are able to reach Forde Davis to whatever extent that is

13   during this time is it -- to what extent do you make it clear

14   that you have concerns about this project and about PRC in

15   particular?

16   A.   Right here, you know, when I told him there is going to be

17   a cost associated with it.

18   Q.   What did you mean by, PRC is not leaving us options?

19   A.   Means I can't seem to get any feedback or I can't get any

20   communication, I can't get the paperwork I need to get the job

21   done.  At this point I'm wondering if they are going to do it at

22   all.

23   Q.   In the end you asked him to call you.  And, do you recall

24   whether he did?

25   A.   He did not.  I keep trying to set up a plan, set up a

1   schedule that they will get behind and buy into the project.

2   And I don't get any communication.

3   Q.   Now, he does respond to you though later in the evening.

4   And he indicates in the last sentence that he's trying to get

5   on-site and for installation as soon as possible.  Was that

6   information helpful to you?

7   A.   No.  I can't go back to the JV and tell them that we're

8   going to do it as soon as possible.  I have to be able to tell

9   them when it's going to happen.

10  Q.   In your telephone conversations when you are able to reach

11  Forde Davis, did you make sure he understood that?

12  A.   Yes.

13  Q.   He indicates in the second paragraph that he's notifying

14  his erector that it would be in or that he has notified his

15  erector that he's -- that it would be in January, later in

16  January or, excuse me, be in January.  But, he said that wasn't

17  set in stone.

18       Had you made it clear to him that he did have a drop dead

19  date January 6th?

20  A.   It was always going to be January 6th.

21  Q.   Now, in the last email in that chain in that exhibit on

22  December 27th, about lunch time, near the end of the first

23  paragraph, what are you -- why are you telling him you are going

24  to pull the transport, that you're pulling the transport and

25  erection out of his scope?

1   A.   Because he told me that his erector couldn't make the date.

2   So, that's when we went out and found him one.  And, you know,

3   if you can't arrange for shipping either we'll find a trucking

4   company.  I mean, at this point we are committed, we've made,

5   you've made precast, we paid for some of it.  We can't go get it

6   somewhere else because it's never going to match the exposed

7   aggregate.  So, we're going to incur a heavy cost and have to

8   repay all of it, so give me the rest of the precast and I'll pay

9   you, I'll make sure you get paid for it and we'll finish the

10  job.

11  Q.   Did he ever give you any assurance that -- did Forde Davis

12  ever give you any assurance that he was going to finish that

13  job?

14  A.   No.  When, when I went up to see Forde, you know, I went up

15  there to be able to sit across the table from him and ask him if

16  he was going to finish the job.  And he said that he wanted to.

17  However, they didn't make the January 6th date.  I think the

18  next date that we got from PRC was the 2/17 date that came from

19  Randall.

20  Q.   That came from Randall when he assured you that it would be

21  done on 2/17?

22  A.   I think he said he was going to start erection on 2/17.

23  And that was -- he sent that information after Dana's site

24  visit.

25  Q.   I see.  Did he ever give you the contact information for

1  the shipping company?  I'm speaking of Forde Davis.

2  A.   I don't believe so.

3  Q.   Did he call you immediately after your email on

4  December 27th at 11:46?

5  A.   No, sir.

6  Q.   Did he respond to your assertion that the associated costs

7  for the delay were going to be his responsibility?

8  A.   No, sir.

9  Q.   You spoke about Dana's visit toward the end of the month, a

10  couple days later, a few days later, what transpired to cause

11  Dana Noyes to go to PRC's facility?

12  A.   PRC was billing out material and we wanted to know if they

13  had it because we couldn't get any communication from them.  So,

14  we asked Dana to go up and take a look at it.

15  Q.   Did Dana work for Oelrich Construction at that time?

16  A.   Yes, sir.

17  Q.   And, did he go up there?

18  A.   He did.

19  Q.   And, did he report back?

20  A.   He did.

21  Q.   Did he take some photographs?

22  A.   Yes.

23  Q.   And, what was your impression of whether or not PRC had

24  built a hundred percent of the materials?

25  A.   It looked like they had made some of the materials.  It

Direct Examination - Christopher Crehore

1   was -- it wasn't organized very well.  But from what we could

2   tell by looking at the pictures and counting the pieces it

3   looked like they had made maybe just over half of the material.

4   Q.   I'm going to refer you to Exhibit 10, please.

5        I'm going to go to the back of page, 10 -- I mean Exhibit

6   10 -- and there are some photographs back there.

7        Can you see those?

8   A.   Yes.

9   Q.   Are those the photographs that you recall that Mr. Noyes

10  took on his trip?

11  A.   Yes.

12  Q.   And do you recall what the numbers are on the photographs?

13  A.   It looks to be where we were adding up the panels to see

14  how many had been made.

15  Q.   I'm working my way backwards on that exhibit on some of

16  these, once again, because it's a chain, are duplicates.  So, I

17  think we've already gone over everything on page 4 of the

18  exhibit in working backwards.  We've covered everything on page

19  3.  And now I'm going back to the very first page.

20       At the bottom on December 27th at 11:46 -- actually, I'm

21  sorry, we already went over that one.  The top of the page.

22  This is on December 31st.  So this is the day after Mr. Noyes

23  must have gone to PRC's facility.  And this is from you to

24  Randall Forde, Randall Davis?  Excuse me.

25  A.   Yes, sir.

Direct Examination - Christopher Crehore

1   Q.   And, in this email explain what you're communicating to

2   Randall Davis in this email?

3   A.   Said that I had just tried to call him based on Forde's

4   email from the erector not being able to make the 1/6 start

5   date.  We went out and spent a lot of time and effort to find

6   another erector that could make the date.

7        However, per the attached site pictures from yesterday it

8   appears that it's not all ready.  It looks like we've got about

9   half of it ready.  Please confirm, is your December payout bill

10  production and delivery at a hundred percent.

11  Q.   When you tried to call him what did you get?

12  A.   I left a message like I always did.

13  Q.   Did he call you back?

14  A.   No.  I don't think I've ever talked to Randall.

15  Q.   Based on the calculations and the red marks on the pictures

16  that are part of this Exhibit Number 10, there were 51,

17  approximately 51 of 105 panels.  Does that refresh your

18  recollection as to how many there were?

19  A.   Yes.

20  Q.   And, the folks within Oelrich Construction, who put that

21  information together about the 51, are you comfortable that they

22  were diligent in their effort to try to determine how many

23  panels were there?

24  A.   I am.

25  Q.   Do you have any, any way to reconcile that only 51 panels

Direct Examination - Christopher Crehore

1   were completed but PRC had asked for payment for 63 percent of

2   the panels in October of 2019?

3   A.   I do not.

4   Q.   Did Forde Davis or his dad, Randall Davis, ever attempt to

5   reconcile that difference with you?

6   A.   No.

7   Q.   If PRC had all of the panels on December the 30th, when

8   Dana Noyes went there, were you ready to have them installed if

9   you had an erector, on January the 6th?

10  A.   Yes.

11  Q.   And, tell me more about this erector and why you didn't

12  ultimately just simply go up there and get the panels and put

13  them up?

14  A.   Because when PRC changed the date he walked.

15  Q.   What do you mean, changed the date?

16  A.   When they said that we were not going to be ready on 1/6

17  that the date changed to 2/17, he's not going to wait around.

18  He's not going to continue to change the date.  He was done.  He

19  left.  He backed out.

20  Q.   So you lost the erector?

21  A.   Yes.

22  Q.   If PRC, if PRC had 105 panels all ready to go when

23  Dana Noyes went up there, and you needed to have a place, would

24  have been able to make arrangements to get them down to

25  Gainesville?

Direct Examination - Christopher Crehore

1   A.   To find a trucking company?

2   Q.   Yes.

3   A.   Yes.

4   Q.   Even though no one from PRC gave you the information of the

5   company who they indicated they were going to use?

6   A.   It would have been a lot of work to find a trucking company

7   to do that, just like it was to find an erector, but, yes.

8   Q.   And, if you were able to bring those panels down to

9   Gainesville somehow, and if you lost the erector because you

10  couldn't get them here before the 6th day of January, what would

11  you have done with the panels?

12  A.   I would have found a storage lot.

13  Q.   Did you have one available?

14  A.   We have -- there was a couple of different areas that, in

15  that close proximity to the project that we've used for storage

16  lots before.  I think the closest one was over on Main Street by

17  the Winn-Dixie.

18  Q.   Did you have any other options offsite or farther away from

19  the property?

20  A.   There was one off 34th Street, by the UF Hilton that we've

21  used for storage before.

22  Q.   Do you know whether Mr. Oelrich has any property that would

23  be sufficient to store them?

24  A.   I believe he does.

25  Q.   Do you think that you could have made arrangements to store

Direct Examination - Christopher Crehore

1    the panels in a manner that is as sufficient as we see them

2    being stored in the 5 photographs there at the back of Exhibit

3    10?

4    A.   I think we could figure something out.  We just have to get

5    the material.

6    Q.   In this first photograph, would you have been able to

7    duplicate that storage method?

8    A.   Yes.

9    Q.   And then, can we look at the second photograph?  Would you

10   have been able to store them in a manner that was better than

11   that?

12   A.   Hopefully, yes, sir.

13   Q.   Let's go to the next one.  Could you have stacked them up

14   just like that?

15   A.   Yes.

16   Q.   Let's go to the next one.  Could you have arranged them

17   something like we're seeing here with the 8 panels?

18   A.   We could have found some place to put them.

19   Q.   And the last one, is there anything complicated about that

20   photograph and how those panels are being stored at PRC's

21   facility that you couldn't duplicate in Gainesville?

22   A.   It looks like they've got them stacked up on some dunnage,

23   some timber material.

24   Q.   Was there any shortage of dunnage at that job?

25   A.   No.

Direct Examination - Christopher Crehore

1    Q.   Why, why were you trying so hard to try to accommodate PRC

2    and find a crane and take over the freight?  What was the

3    motivation or the incentive for Oelrich Construction to continue

4    to try to work things out with PRC at that point?

5    A.   Because of the time we are already committed.  We had paid

6    for a certain amount of material.  And we can't go out and get

7    it somewhere else unless we pay for it all over again.  The

8    exposed aggregate would never match.

9    Q.   Did anyone from PRC ever suggest that you do that and offer

10   the formula that they had used?

11   A.   No.

12   Q.   Did anyone from PRC ever object to you taking over the

13   freight and the installation of the panels?

14   A.   No, sir.

15   Q.   I would like to look at Exhibit 14, please.

16        Do you recognize that email?

17   A.   Yes.

18   Q.   Not the one at the top.  I'm talking about Randall Davis to

19   Dana Noyes?

20   A.   Yes.  I believe this is where we came up with the next

21   erection date of 2/17.

22   Q.   Why is it that Mr. Oelrich is emailing this email to you?

23   A.   Because nobody from -- it doesn't look like anybody from

24   PRC sent it to me.  It looks like Randall sent it to Dana.

25   Q.   Do you think that maybe Mr. Noyes was not working there at

Direct Examination - Christopher Crehore

1   that time?

2   A.   I would imagine yes, that that's why he sent it to Ivan.

3   Q.   Well, focusing on the main email, the one where Mr. Davis

4   is reaching out to Dana, is this -- you have -- you've mentioned

5   February the 17th in some level of assurances that PRC was going

6   to, in fact, start to install panels on February 17th.  Is this

7   email the email that you have been talking about this morning?

8   A.   Yes.

9   Q.   This is the type of communication that contractors and

10  subcontractors have with one another in order to facilitate the

11  smooth construction and cooperation during a complex job like

12  this?

13  A.   No, it is not.  I need to be able to get somebody on the

14  phone to walk through the process of what we are going to do and

15  how we are going to do it.

16  Q.   Did he ever -- did Randall Davis -- did you try to reach

17  Randall Davis in response to this?

18  A.   I tried to reach Randall Davis several times and never got

19  a phone call back.

20  Q.   But what is your understanding of this email in regard to

21  February the 17th?

22  A.   He is giving an anticipated start date of 2/17.

23  Q.   Did you rely on that?

24  A.   I did.

25  Q.   And, what did you do in reliance on this email?

Direct Examination - Christopher Crehore

1    A.   We rescheduled the precast panel erection for the 2/17 date

2    that he gave in the email.

3    Q.   Now, at this time, during January or late December of 2019

4    and beginning of '20, was the installation of the precast on the

5    critical path for this project?

6    A.   No, it would not have been at that point.

7    Q.   If we could turn to Exhibit 43, please?

8         At the bottom of the page you're writing an email to

9    Forde Davis and Randall Davis.  And this is on January the 6th.

10   Now, this was the day that you had hoped to install before,

11   right?

12   A.   Yes.

13   Q.   Is it true that at this time you still don't have a lift

14   plan?

15   A.   Correct.  I'm asking for it again.

16   Q.   And, is it true that you don't have the OSHA certs and 10,

17   30's for everybody you need it for?

18   A.   Correct.

19   Q.   Up at the top, on January the 7th, you are asking for a

20   phone call.  Did you receive one back?

21   A.   No.

22   Q.   Did you receive a phone call back in response to your

23   request on the 10th?

24   A.   No, sir.

25   Q.   Did you receive a response to your question in the first

1  sentence of your email at the bottom of the page, if we are

2  going to start on February 17th, when are we going to be done

3  with production.  Did you get a response to that?

4  A.   No.

5  Q.   May we look at Exhibit 517, please?

6       At the top of the page, page 1, what is, -- do you recall

7  the circumstances surrounding Mr. Wilson's email to

8  Allison Taylor and Forde Davis on January 14th?

9  A.   It looks like he's rejecting pay app 9 and 10 because they

10 haven't produced all of the material that they are billing for.

11 Q.   Mr. Wilson is making the assertion that PRC had only

12 completed 53 percent of the precast production.  Do you have any

13 reason to disagree with that?

14 A.   No.

15 Q.   Does it surprise you in the beginning of the second

16 paragraph that he indicates that he has tried several times to

17 discuss all matters related to this situation but never received

18 a call back?  Does that surprise you?

19 A.   It does not.

20 Q.   Does he seem to anticipate that they may start producing

21 again and that Oelrich Construction will pay for what they

22 produce and send photographs of?

23 A.   We would love to pay for the material and get it and finish

24 the job.

25 Q.   Now, you mentioned earlier today that you took a trip up to

Direct Examination - Christopher Crehore

1    PRC's facility.

2    A.   Yes, sir, I did.  At the end of January.

3    Q.   And what, tell us again what the purpose of your decision

4    to go to PRC at the end of January was?

5    A.   I flew up there and went to their facility in Greenville to

6    be able to talk to Randall or Forde, either one of them, and to

7    be able to sit at the table and see if I could get any

8    reassurance that they were going to finish the job.

9    Q.   Did you have an appointment?

10   A.   No, I did not.  I couldn't get anybody to answer the phone.

11   Q.   So you tried to make one?

12   A.   I did.

13   Q.   And, when you got there, what, did you meet with anybody?

14   A.   I talked to the person in the front office and then I

15   talked to Forde.

16   Q.   And, do you recall what you talked about with Forde?

17   A.   Yes.  Forde and I sat down in a little conference room off

18   to the side of the front entry.  And I said, Forde, this doesn't

19   work.  We can't build a project like this.  I have to be able to

20   communicate with you.  I have to, I've got to be able to, you

21   know, to call you and you pick up the phone.  I came, I took a

22   day out of my life and I came all the way up here just to sit

23   down across the table with you and, you know, look you in the

24   eye and find out if we're going to finish this job.  Do you want

25   to finish this project.

Direct Examination - Christopher Crehore

1    Q.   Did you discuss an alternative?

2    A.   No.  Forde told me that he wanted to finish the project.

3    That he wanted to get it done.

4    Q.   And, did you rely on that assurance?

5    A.    I did.  You know, I was hopeful that they realized that me

6    coming all the way up there, you know, they could tell that

7    we're serious to finish the job.

8    Q.   Did you have -- at that point were you still contemplating

9    working under the presumption that you would be installing

10   precast beginning on February the 17th?

11   A.   Yes.

12   Q.   Did Forde Davis indicate to you otherwise?

13   A.    I don't remember.  I think it was in another email that

14   they said -- that Forde said that we weren't going to be able to

15   make the date that Randall had given us of 2/17.

16   Q.   But, at the time that you met with Forde he didn't tell you

17   that, did he?

18   A.   No, sir.

19   Q.   He told you he wanted to finish the job, gave you every

20   indication and assurance that he would do that, right?

21   A.   Yes.

22   Q.   And when you left that, excuse me.  Were you shown any of

23   the material?

24   A.   No, I was not.

25   Q.   Did you ask to see it?

Direct Examination - Christopher Crehore

1  A.   Before I could ask, Forde told me that they were actually

2  in the middle of some type of move and that it wasn't available

3  to be seen.  That they were, they were moving offices, that they

4  were moving yards.

5  Q.   Did he tell you, at that time, that they had not

6  manufactured any panels since October?

7  A.   No.

8  Q.   None in November, none in December, none in January?

9  A.   No.

10  Q.   Did he tell you that they weren't going to manufacture them

11  in February either?

12  A.   No.

13  Q.   Did he lead you to believe that they were going to finish

14  all of the panels or they were already finished and that they

15  were going to all be available and installed in Gainesville on

16  the 17th of February when you left his office that day?

17  A.   Yes, yes, sir.

18        THE COURT:  Let me ask a question about that before we

19  leave it.  The question was, did he lead you to believe that

20  they were going to do it by February 17th.  I've got a more

21  specific question.  Did he say that?

22        THE WITNESS:  No, sir.  What he told me was that they

23  wanted to finish the job.  That they wanted to get it behind

24  them.

25  BY MR. BUTTS:

Direct Examination - Christopher Crehore

1  Q.   Did you talk to him about when they would do it?

2  A.   We didn't talk about the specific date that day.  It was

3  more of trying to get, trying to get communication, trying to

4  get talking established so we could work towards the erection.

5  Trying to be able to, you know, say, hey, man, when I call you,

6  you've got to pick up the phone.

7           THE COURT:  I get it.  I understand why you would want

8  to look him in the eye and say you've got to return my phone

9  calls, when I need to talk to you I need to talk to you.  I get

10 that.  And, I understand you looking him in the eye and saying,

11 do you want to finish this project or not.  I get that.

12          THE WITNESS:  Yes, sir.

13          THE COURT:  You are all the way up there in

14 Greenville.  I take it you changed planes to get there from

15 Gainesville?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  You are already there, you are all the way

18 there.  You are sitting down talking to him and you didn't say

19 February 17th we've got to have this done?  You didn't talk

20 about the date?

21          THE WITNESS:  I don't remember talking about the exact

22 date.

23          THE COURT:  All right.  Fair enough.

24 BY MR. BUTTS:

25 Q.   I would like to look at Exhibit 41, please.  At the bottom

1   of that exhibit there is an email from Forde Davis to you.  This

2   is 6 days after you were there, 7 days, more or less.  February

3   4th.  In this email he appears to be giving you some sort of an

4   update on how many panels he's made.  Do you see that?

5   A.   Yes, sir.

6   Q.   Do you know why he would say that he had only made 19 of 53

7   instead of 51 of a 105?

8   A.   I do not unless he's not counting the precast caps.  Maybe

9   he's just talking about the spandrel panels.

10  Q.   So, at this point down toward the bottom of that first

11  paragraph it appears he's indicating to you on the 4th of

12  February that it's going to take him 22 days to finish making

13  these panels during the month of February, right?

14  A.   Yes.

15  Q.   And that would put him out to somewhere around 22 plus

16  February 4th would put him out toward the end of February,

17  correct?

18  A.   Yes.

19  Q.   Do you happen to recall, excuse me.  Let me continue to

20  refer to the email.

21      In the second paragraph it says, I know that it is further

22  out than what we originally said.  Is what he originally said

23  the 2/17 date that his dad said?

24  A.   Yes.

25  Q.   He assures you that he wants to do the project.  And he

1    says, he will have the OSHA certs, at the bottom of the last

2    sentence, and crane plans at least two weeks before he is going

3    to do it.  Did you ever get all of the OSHA certs?

4    A.   No, no, sir.

5    Q.   Did you ever get the lift plan?

6    A.   No.

7    Q.   You respond to him later that afternoon.  And, you did some

8    calculations, that it appears that the date now has shifted from

9    February the 17th to March the 4th.  And, you asked to confirm

10   that that is the date.  Did you receive any confirmation that

11   that would be the date?

12   A.   No.

13   Q.   Did you receive any indication that that would not be the

14   date?

15   A.   No.

16   Q.   I would like to refer to Exhibit 522, please.  This is

17   another email chain, but I mainly want to focus on the email on

18   February 6th at the bottom.

19        This is 2 days after you asked Forde Davis to -- if March

20   the 4th is when he is talking about being on-site and is your

21   erector on board with that.  Two days later, February 6th, the

22   bottom of Exhibit 522, it appears that you left Forde Davis a

23   message.

24   A.   Yes.

25   Q.   And, did he return that call to you?

Direct Examination - Christopher Crehore

1   A.   No.

2   Q.   And then on February the 10th, 4 more days later, it

3   appears that you tried to call him back or call him again.  Did

4   he call you back --

5   A.   No.

6   Q.   -- in that regard?

7   A.   No, sir.

8   Q.   Did you have any information that you could give the JV,

9   according to the second sentence in your email, on February the

10  10th?

11  A.   The only information I had was when he said it was going to

12  be the added 20 days.  I was trying to get him to confirm and

13  not me assume what day that was going to be to get him to point

14  to a day on the calendar and say this is the day that we're

15  going to be erecting.  And I couldn't do that.

16  Q.   Then you sent him an email 10 days later.  Do you recall

17  whether or not you had any dialogue in those 10 days with

18  Forde Davis or anyone from PRC?

19  A.   No, I don't believe that I did.

20  Q.   The conversation that you reference in the second sentence,

21  do you know when that took place?

22       (Witness reading.)

23       THE COURT:  Mr. Crehore, I need you to either speak

24  loudly or read to yourself.  In between makes it hard for all of

25  us.

1          THE WITNESS:  Yes, sir.  Understood.  Based on this

2     email, we might have talked.  I guess we did.

3     BY MR. BUTTS:

4     Q.   And, what, why are you talking about where Jordan wants to

5     start the installation?

6     A.   We're trying to work towards being ready for them.  So

7     Jordan is -- he's saying what area of the building that he wants

8     to start on and then go around for the erection sequence.

9     Q.   If we could go to Exhibit 562, please.  Just focusing on

10    the very last email, the one at the top of the chain.

11          This conversation is taking place 6 days later in February.

12    Do you know if the starting of the precast is on the critical

13    path yet, at this time?

14    A.   No.  It would not have been on the critical path at that

15    point.

16    Q.   It appears that you and Mr. Davis had had a conversation,

17    maybe it's the same one or a new one, and you're trying to put

18    together some dates.  The last sentence in that first paragraph

19    asks for a list of the panels that have already been cast.  Did

20    you ever get that list?

21    A.   No.

22    Q.   It appears that you've been told that the erector will be

23    available after 3/16, but that he hasn't started his OSHA.  Now,

24    this erector is going to need the OSHA 30, isn't he?

25    A.   The foreman for PRC would need it, yes.

Direct Examination - Christopher Crehore

1    Q.    And so, it appears to be you're allocating a week to take

2    the class and try to estimate when the start date is going to

3    be.  Is that a fair assessment of the email?

4    A.    Yes.

5    Q.    Do you recall doing that?

6    A.    I do.

7    Q.    Do you recall discussing the idea that it's going -- you're

8    contemplating this thing starting on the -- the installation

9    beginning on the 23rd?

10   A.    Yes.

11   Q.    Was there an agreement to that by --

12   A.    Yes.

13   Q.    -- Forde Davis to start on the 23rd?

14   A.    Yes.

15   Q.    Or the 6th?

16   A.    Yes.  We had talked about doing that class in a week would

17   be a lot.  That would have to be the only thing that he did.

18   Q.    Is that what accounts for the range between the 23rd and

19   the 6th?

20   A.    I believe so.

21   Q.    And then was Mr. Davis on board with that?

22   A.    Yes.

23   Q.    Did he give you a level of assurances that they were going

24   to finish making all of the panels and have them ready to

25   install by that time?

Direct Examination - Christopher Crehore

1   A.   He did.

2   Q.   Did you ever receive the lift plan?

3   A.   No.

4   Q.   Did you ever receive the operator OSHA 30 cert?

5   A.   No.

6   Q.   At that time, did Mr. Davis tell you that they had not

7   fabricated any panels since October?

8   A.   No.

9   Q.   Did he tell you that they had not fabricated any panels

10  since Dana Noyes went there on December the 30th?

11  A.   No.

12  Q.   Did he tell you that they had not fabricated any panels

13  since his father assured you that they were going to install all

14  the panels beginning on February the 17th?

15  A.   No.

16  Q.   Let's go to Exhibit Number 15, please.

17       Before we look at this, can you just explain to us what,

18  practically speaking, was all of this, all of this dialogue and

19  assurances and changes and date slipping, how did this affect

20  this job?

21  A.   It, it pushed out the end date of the job because we

22  couldn't finish on time.

23  Q.   Was it hard to deal with it in terms of the other subs, the

24  masonry subs?

25  A.   It is when you have somebody that's not keeping up their

Direct Examination - Christopher Crehore

1   end of the deal.

2   Q.   Masonry subs, were they going to -- did the mason, were

3   they installing concrete blocks and bricks?

4   A.   Yes.

5   Q.   Did you have an opportunity to review any of the bills or

6   anything the masons submitted?

7   A.   Yes.

8   Q.   And, what is your recollection of the percentage of

9   completion that the mason was at the end of December, on the

10  concrete, just the blocks?

11  A.   I believe he was 85 percent complete.

12  Q.   Now, in terms of the sequence of events the -- am I correct

13  that sequence is blocks, precast then brick?

14  A.   Yes.  You can't put the brick in until the precast is

15  completed.

16  Q.   Why is that?

17  A.   Because the brick butts up to the precast.  There's a joint

18  in between.

19  Q.   And, is that -- is it fair to say that the face of the

20  brick is on the same plain as the face of the precast?

21  A.   Yes.

22  Q.   So they could just put a line block on the precast and run

23  a string across and lay to the string?

24  A.   Yes.

25  Q.   And practically speaking, how would that, what type of

Direct Examination - Christopher Crehore

1   complication would have been caused if you had tried to go ahead
2   and install the brick before the precast?
3   A.   You can't do it efficiently.
4   Q.   Going to Exhibit 15.  This email chain goes back, covers
5   most all of them that we've discussed already going back to
6   February the 4th.
7        And it includes the one on February the 20th where you're
8   communicating to Forde Davis that you're going to -- that Jordan
9   Robinson wants to start in the northwest corner.
10       It includes the one we just talked about on February 26th.
11  So here we are, on March the 17th, 2020.  What is this email
12  that we're looking at here?
13  A.   This is referencing a conversation that I had with Forde.
14  I actually, I was on the phone with Forde.  I'm explaining to
15  him that I still need to get your paperwork.  I've got to have
16  it in.  And I'm explaining why, why it's important so we can get
17  it in to get it approved to be able to move forward on the job.
18       At this point, I realize that I'm not getting any feedback.
19  I'm not getting any input from Forde.  So, there's nothing but
20  silence.  So I stop and I say, Forde, are you making panels?
21       And he paused and he said, no.  And I said, Forde, can you
22  tell me when you are going to be making panels?  And he said,
23  no.
24       So I said, Forde, this isn't working.  I can't make a
25  schedule around this.  And I definitely can't build a building

1    around this.  You have got to be able to tell me when you're

2    going to make panels.  Can you do that?  And he said, no.

3         At that time, I told Forde, I'm terminating your contract

4    and I'm going to go find somebody else to make this precast.

5         I said, again, can you tell me when you can make panels?

6    And he said, no.

7         I said, okay.  Then we're done.  Do we have anything else

8    to talk about?  And he said, no.

9    Q.   At the time that you sent this email on March 17th, had you

10   made any effort to find another pre-caster to replace PRC?

11   A.   No, sir.

12   Q.   The last sentence of your email invites Forde Davis to

13   notify you immediately if there is anything about your email

14   that you got wrong, or I think the words were -- if your

15   understanding of what led up to this was not correct?

16   A.   Yes.

17   Q.   Did you receive any indication from anyone at PRC that your

18   understanding of the situation was incorrect?

19   A.   No.

20   Q.   Did you receive any communication from PRC whatsoever,

21   after you sent this electronic message?

22   A.   No.

23   Q.   Did you send it to the same email address that you always

24   sent your correspondence to Forde Davis?

25   A.   I did.

1    Q.    I would like to turn to Exhibit 138, please?

2              THE COURT:  Tell me where we stand at some point.

3              MR. BUTTS:  Almost finished.

4              THE COURT:  All right.  Let's finish up then before we

5    take the lunch break.

6    BY MR. BUTTS:

7    Q.    Do you recognize this email?

8    A.    I do.

9    Q.    Is this the first correspondence that you had with

10   Chris Carawan?

11   A.    The first correspondence since when?

12   Q.    Okay.  I'm sorry.  Chris Carawan is the person from SAW?

13   A.    Correct.

14   Q.    Okay.  And this is your conversation with or, excuse me,

15   your email to Mr. Davis is at 6:18 it seems on the same date

16   Mr. Carawan is reaching out to you earlier in that afternoon.

17   Do you see that in the last --

18   A.    Yes.

19   Q.    -- the bottom of that?

20         Did this letter that you are receiving from Chris Carawan

21   of SAW influence the decision that you made to terminate PRC?

22   A.    No.  What the deciding factor in my mind was, was when I'm

23   talking to Forde.  And, again, we're talking about another date

24   that's not going to be met.  That you can't tell me when you're

25   going to be making panels.  At that point, it was clear to me

Direct Examination - Christopher Crehore

1   that they didn't have any intentions of completing the project.

2   Q.   If we go up on that email a little bit, on the 19th it

3   appears that you're communicating to Mr. Carawan that you've

4   terminated the contract with PRC?

5   A.   Yes.

6   Q.   And, what was his response to that?

7   A.   His response was he wanted to know how we were going to

8   provide the precast now.  Where do we go from here.

9   Q.   When you indicate in this email that he couldn't tell you

10  when he was going to start making panels without coordinating

11  with his team and that he was supposed to do that and get back

12  with you, and did, and he didn't get back with you?

13  A.   No.

14  Q.   So you gave him the opportunity -- did you give him the

15  opportunity to get with his team and get back with you on when

16  they were going to make panels?

17  A.   Yes.

18  Q.   And is that when you had to terminate him?

19  A.   Yes.

20  Q.   Was he aware -- did you make him aware, prior to that time

21  that the termination was imminent?

22  A.   When we talked.

23  Q.   Did you do a calculation to determine when the last day was

24  that PRC could have started installing these panels and not

25  delayed the job?

Direct Examination - Christopher Crehore

1   A.    Yes.

2   Q.    What did you determine?

3   A.    It would have been in early, around the 9th or the 10th of

4   the month.

5   Q.    Of which month?

6   A.    Of March.

7              MR. BUTTS:  Thank you, Mr. Crehore.

8              THE WITNESS:  Yes, sir.  Thank you.

9              THE COURT:  That makes this a convenient time to break

10   for lunch.  Let's take an hour, we'll start back 10 minutes

11   after 2.  We're adjourned until then.

12        (Recess taken 1:09.)

13        (Resumed at 2:12.)

14              THE COURT:  We can get Mr. Crehore back on the witness

15   stand.  Mr. Crehore, you may be seated.  You are still under

16   oath.  Mr. Darr, you may proceed.

17              MR. DARR:  Thank you, Your Honor.

18              THE COURT:  While you work on the equipment I did have

19   one question I wanted to ask Mr. Crehore, and now probably

20   works.

21              One of the exhibits you were shown referred to there

22   being 53 panels remaining.  And Mr. Davis was given a schedule

23   as to how many days it would take and so forth.  Do you recall

24   that?

25              THE WITNESS:  Yes, sir.

1          THE COURT:  And, Mr. Butts asked you about why 53 and

2    not 105, and one of the things was maybe that's panels and not

3    caps?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  The other possibility that occurred to me

6    was that that was the 53 that had not yet been manufactured.

7    Those numbers don't work exactly, but they are pretty close if

8    you take 105 and subtract out the ones that you had counted as

9    being manufactured.

10          THE WITNESS:  Yes, sir.

11          THE COURT:  I was going to see if you could give us

12    any more help in figuring out which of those it was a reference

13    to.  And, in particular, did 53 panels match up to how many

14    panels as opposed to caps there might be?

15          THE WITNESS:  Well, honestly, that was always a

16    question of mine because in the pictures that we took we had

17    asked how many had been completed, but we were never given an

18    answer.  So, it was our interpretation of counting of what we

19    thought we saw in the pictures.  So, I wasn't a hundred percent

20    sure.

21          THE COURT:  Right.  But, 53 remaining.  And he's

22    talking about how long it would take to manufacture 53.  And, of

23    course, there wouldn't be any reason to be talking about how

24    many had already been manufactured.  It was the time it would

25    take to do the ones going forward.  That's why it occurred to me

Direct Examination - Christopher Crehore

1    maybe it was 53 that hadn't been manufactured yet.

2            THE WITNESS:  Yes, sir.  It could be.  I just thought

3    it might be the precast caps because there was a bigger number

4    of those going around the perimeter of the building.

5            THE COURT:  All right.  But you hadn't gone back and

6    actually done a count to see if that matched up?

7            THE WITNESS:  No, sir.

8            THE COURT:  Just not sure?  Fair enough.

9            Did we get the electronics done?  We're working on it.

10   All right.  We can be at ease while we try to get the

11   electronics working.

12           MR. HIPWORTH:  Your Honor, while we are waiting,

13   Ms. Markley had emailed us and pointed out that we had used

14   Exhibit 41.  On our exhibit list that was intentionally admitted

15   but that's because it's a duplicate.  Exhibit 521 is the same

16   exhibit as 41.  We just went through and removed duplicates we

17   could identify.

18           THE COURT:  All right.  So the reference on the record

19   to 41 really means 521?

20           MR. HIPWORTH:  Yes, Your Honor.

21           THE COURT:  All right.  And, the courtroom deputy also

22   tells me that there was a reference to Exhibit 138 and she

23   thinks that means Defense Exhibit 138.

24           MR. HIPWORTH:  Yes, Your Honor.  We determined that

25   that was one of PRC's exhibits.

1          THE COURT:  All right.  So, the reference to 138 was a

2     reference to Defendant's 138.

3                          CROSS-EXAMINATION

4     BY MR. DARR:

5     Q.   Can you pull up Plaintiff Exhibit 2, please?

6          Good afternoon, Mr. Crehore.

7     A.   Mr. Darr.

8     Q.   Good to see you again.

9     A.   How are you?

10    Q.   Good.  Thanks.  Got a few questions for you before we can

11    let you go and you can get back to your normal life.

12         If you can see on your screen there we've got Plaintiff's

13    Exhibit 2 up.  That's the original contract between PRC and

14    Oelrich; is that right?

15    A.   Correct.

16    Q.   And, if you could do me a favor, if you need to look at the

17    contract to answer any of these questions feel free to let me

18    know and we can turn to the page that you're looking for.

19    A.   Okay.

20    Q.   As far as I can tell, and we went through some of these

21    questions during your last deposition we had of you, as of the

22    date this contract was signed the original deadline by which PRC

23    had to deliver and install the precast materials was August 7,

24    2019; is that right?

25    A.   I would have to take a look at the end of the contract.  I

1    think in the bottom of the scope that Forde and I generated a

2    little schedule template of our intentions at the time.

3    Q.    Okay.  If you could turn to page 20, please.  And, if you

4    could make this a little bit bigger?  And, Mr. Crehore if you

5    could take a look at ID 97 there that reads, precast panel

6    erection 20 days.  What are the dates that you see that are

7    indicated for that scope?

8    A.    7/11 to 8/7.

9    Q.    So, that would indicate that the precast materials were

10   originally scheduled to be installed no later than August 7,

11   2019, right?

12   A.    Originally scheduled, yes.

13   Q.    And, if you would turn to page 19, please?  And, I'm

14   looking at item 71 there, Mr. Crehore.  It's blow down and fuel

15   oil pit?

16   A.    Yes.

17   Q.    Right there.  And, I think you testified about this during

18   your deposition, but I just want to confirm so the Court can

19   hear that the concrete for this building that you guys were

20   constructing was supposed to start originally on March 12, 2019;

21   is that right?

22   A.    It looks like we had a schedule for the pit area, for the

23   blow down pit, yes.

24   Q.    And, that's the first item of work for the concrete for the

25   building built, correct?

Cross-Examination – Christopher Crehore

1   A.   Yes.

2   Q.   And then --

3   A.   I believe so, yes.  We would have done the lowest numbers

4   first.

5   Q.   And then if you take a look at item 84 there, if you could

6   scroll down a little bit, Caitlin.  Thank you.

7        That is the bar and joist decking item; is that correct?

8   A.   Yes.

9   Q.   And, as far as you could tell, that's the first item of

10  steel work that you had to do for the building; is that right?

11  A.   I believe so.

12  Q.   And that work was supposed to be originally started on

13  June 27, 2019?

14  A.   Correct.

15  Q.   And one of my favorite questions in the case is the

16  following:  When was Oelrich ready to set PRC's precast panels?

17  A.   1/6.

18  Q.   So, it's your testimony that as of January 6, 2020, you

19  were all ready to let PRC start installing the panels at the

20  project; is that correct?

21  A.   Yes.

22  Q.   And, if Mr. Ivan Oelrich had an opinion that the panels

23  weren't ready to be installed in the project until March 10,

24  2020, I take you would disagree with that opinion then?

25  A.   Yes.

Cross-Examination – Christopher Crehore

1   Q.   And, how do you know the panels were ready to be installed
2   at the project as of January 6, 2020?
3   A.   That's what we had been -- that's what we had scheduled.
4   Q.   So the basis for your opinion that it was ready as of
5   January 6, 2020 is that's what Oelrich's internal schedules
6   indicated; is that right?
7   A.   And that we had -- we were working on completing the items
8   that preceded the precast, like the block and the waterproofing.
9   Q.   Just so I'm clear, those items did need to be completed
10  prior to PRC being able to install their panels at the project?
11  A.   We wouldn't have had the block a hundred percent completed,
12  but the majority of it would have been needed to be completed,
13  yes.  So, they would be wrapping up the block as we started the
14  precast on the other side.
15  Q.   And, you don't currently work for Oelrich right now, do
16  you?
17  A.   No, I do not.
18  Q.   You were terminated from Oelrich?
19  A.   Correct.
20  Q.   And, do you remember the date that you were terminated from
21  Oelrich?
22  A.   4/15.
23  Q.   And, the project wasn't complete as of April 15th, 2020 --
24  I should back up one spot.  You were terminated on April 15th,
25  2020, is that what you meant when you said 4/15?

1   A.    Yes.

2   Q.    And, the project wasn't completed as of April 15, 2020; is

3   that right?

4   A.    No.

5   Q.    So, you weren't there to witness the completion of the

6   project, correct?

7   A.    No.

8   Q.    Why were you terminated from Oelrich Construction?

9   A.    Performance.

10  Q.    What, in particular, about your performance resulted in

11  your termination from Oelrich?

12  A.    I would imagine that it had something to do with the VA

13  project.

14  Q.    What, in particular, about the VA -- you said I imagine it

15  would.  Do you know specifically what about your performance

16  with the VA project led to your termination?

17  A.    Precast.

18  Q.    What about the precast?

19  A.    Not being complete.

20  Q.    And, were there any other reasons that your employment from

21  Oelrich was terminated?

22  A.    Not that I know of.

23  Q.    So, you were terminated because the precast wasn't

24  complete.  And I guess, for lack of a better way to phrase it,

25  you were the person who had to take responsibility for that; is

Cross-Examination – Christopher Crehore

1  that right?

2  A.   Yes.

3  Q.   And, did anyone tell you at Oelrich what you should have

4  done differently?

5  A.   No.

6  Q.   Who told you why you were terminated?

7  A.   Ivan.

8  Q.   And, do you recall anything that Ivan told you specifically

9  about why you were terminated other than just generally the

10 precast?

11 A.   No, I do not.

12 Q.   Did Ivan have any critiques for you regarding how you

13 should have managed that scope of work differently?

14 A.   Not that I remember, no.

15 Q.   With regard to the follow on subcontractor that Oelrich

16 ultimately hired to complete PRC's work, that was

17 Spring Precast; is that right?

18 A.   I believe that's who it was.

19 Q.   Were you the one that found Spring Precast?

20 A.   I believe that I had started the initial conversations to

21 find them, but didn't actually move into contract with them.

22 Q.   And, did you seek bids from any other subcontractors other

23 than Spring Precast to complete PRC's work?

24 A.   Yes.

25 Q.   And, how many bids did you seek?

1  A.   I believe there were 6 RFQ's sent out, give or take one.

2  Q.   And, do you recall the names of any of those other

3  sub-contractors that you solicited bids from?

4  A.   No, I do not.

5  Q.   And, how many responses did you get to those requests for

6  proposals?

7  A.   I'm not sure.  I did that in conjunction with

8  pre-construction department.

9  Q.   And, who in the pre-construction department would you have

10 worked with on that issue?

11 A.   Matt Marino.

12 Q.   I think you just mentioned it, but you weren't still with

13 Oelrich once the contract with Spring was signed, correct?

14 A.   No.

15 Q.   Did you negotiate that contract with Spring?

16 A.   I don't know.  I think it was sometime around that area

17 when I left.

18 Q.   And, if you could pull up Plaintiff's Exhibit 11, please?

19      And, I think Mr. Butts went over this letter with you while

20 he was asking you some questions.  This is the cure notice that

21 Oelrich got from the general contractor on the project SAW; is

22 that right?

23 A.   Correct.

24 Q.   And, if you want to take a look at it real quick that's

25 fine, but in your opinion SAW gave clear notice why SAW thought

1  Oelrich was in default of the contract between those two

2  parties, didn't they?

3  A.   They reference masonry, precast and steel and roof systems.

4  Q.   So, they specified right there in the first paragraph why

5  they thought Oelrich was in default of the contract, right?

6  A.   Yes.

7  Q.   And, is it fair to say that SAW gave Oelrich notice that it

8  was considering terminating the contract between SAW and

9  Oelrich?

10  A.   It says they might do that in paragraph 2.

11  Q.   So, that's yes, they did give you clear notice that they

12  were considering terminating the contract?

13  A.   Yes.

14  Q.   And, is it also fair to say that SAW notified Oelrich what

15  it needed to do to cure its alleged default?

16  A.   So, they are looking for a recovery plan to start and

17  finish dates for the items listed.

18  Q.   Yes.  Right here in 1 and 2 they specified what Oelrich

19  needed to do to cure what they felt was a default, right?

20  A.   Yes.

21  Q.   And, did you ever send this SAW cure notice to PRC?

22  A.   I don't believe so.

23  Q.   Are you aware of anyone from Oelrich having sent this SAW

24  cure notice to PRC?

25  A.   No.

Cross-Examination - Christopher Crehore

1    Q.    Can I ask, why didn't you send this to PRC?

2    A.    At the time I didn't think that PRC, you know, would need

3    it.

4    Q.    Why is that?

5    A.    I'm not sure.  I'm not sure why they would.

6    Q.    Well, I mean, one need would be to let PRC know that you

7    guys were being threatened by the general contractor with

8    termination and their scope of work is included as -- PRC's

9    scope of work is included as part of the reason that the general

10   contractor SAW thought that you guys were in breach of contract,

11   that's right, isn't it?

12   A.    Yes.

13   Q.    So, given that you're trying, through all of these emails

14   you guys were just talking about, to get PRC to timely deliver

15   their product and install it at the project, don't you think

16   that's the sort of thing PRC should have known about that may

17   have gotten their attention to know things are very serious?

18   A.    That's one point.  I mean, these are things that I talked

19   to Forde about on the phone when I could get him on the phone.

20   But, no, I don't think I sent him the letter.

21   Q.    If you could pull up Defense 137, please?

22         This is the termination notice that you issued PRC on

23   March 17, 2020; is that right?

24   A.    Yes.

25   Q.    And, through this email, and feel free to read it again if

1    you need to, Oelrich terminated PRC's contract as of the date of

2    this email March 17, 2020, correct?

3    A.    Yes.

4    Q.    And in that same email, Oelrich had declared the contract

5    to have been breached by PRC, that's right, correct?

6    A.    Yes.

7    Q.    Now, I think I heard you testify earlier that you had had,

8    I believe, it was a phone call with Mr. Forde Davis in March of

9    2020 prior to sending this email regarding termination?

10   A.    Yes.

11   Q.    But, you don't remember whether or not during that phone

12   call you gave PRC a chance to cure any perceived breach of the

13   contract; is that right?

14   A.    I believe I did.

15   Q.    And, how did you do that?

16   A.    After we had talked about it and I said, Forde, I'm

17   terminating your contract, can you tell me when you will be

18   making panels.  And he said, no.  Did I use the term notice to

19   cure?  No.

20   Q.    And, do you know the date when you made this phone call to

21   Forde Davis?

22   A.    I believe it was that day.

23   Q.    March 17, 2020?

24   A.    Yes.

25   Q.    But, you're not sure?

1   A.   It was, it was the 17th.

2   Q.   And, how do you know that?

3   A.   Because I had the conversation with Forde and then went in

4   and sent the email.

5   Q.   Other than that conversation on March 17, 2020, that you

6   have testified you had with Forde, did you ever mention

7   termination to PRC?

8   A.   Yes.

9   Q.   And, when was that?

10  A.   It was during my conversation with Forde during the site

11  visit at the end of January.  And, also in one of the emails

12  that I believe that we looked at.

13  Q.   And, okay.  So I just want to make sure we are all clear

14  here.  You told him -- you mentioned termination on March 17,

15  2020 during a phone call to Mr. Davis, right?

16  A.   Yes.

17  Q.   And, your testimony is that you mentioned termination

18  during your site visit in January 2020?

19  A.   Yes.

20  Q.   And those are only two times?

21  A.   I believe there was another email.

22  Q.   There was an email where you had mentioned you may be

23  terminated?

24  A.   Yes.

25  Q.   If we could please see Defendant Exhibit 21, please?

Cross-Examination – Christopher Crehore

1          If you could scroll down just a little bit, please.  That's

2     good.

3          Do you see this email right here dated February 22, 2019,

4     Mr. Crehore?

5     A.    I do.

6     Q.    And, you said, Forde, I just left you a message.  Please

7     give me a call so we can talk about that.  Do you see that?

8     A.    Yes.

9     Q.    Can we take a look at Defendant Exhibit 108, please?

10         This is another email of the many we've been looking at

11    between yourself and Mr. Davis.  December 18, 2019, similar

12    situation.  Forde, I just left you a voice mail.  Do you see

13    that?

14    A.    I do.

15    Q.    Can you take a look at Defendant Exhibit 115, please?

16         This is an email dated December 23, 2019.  And, this is

17    another one.  Actually, if we could scroll down a little bit.

18    That's not the correct one.  There we go.  December 23, 2019.

19    This one is from you, Mr. Crehore, to Forde Davis.  Similar

20    language, again.  I just tried to call you again.  Do you see

21    that language?

22    A.    Yes.

23    Q.    And, let's take a look at one more.  Defendant Exhibit 121,

24    please?

25         Another email from yourself, Mr. Crehore, to, this time,

1   Randall Davis, Forde Davis, Ivan Oelrich, and Dana Noyes dated

2   January 7, 2020.  Do you see that?

3   A.    The one at --

4   Q.    It's the very top one there.

5   A.    Yes.

6   Q.    You said, Forde, Randall, I just called and texted both of

7   you.  Do you see that language?

8   A.    I do.

9   Q.    Well, I don't want to annoy the Court, but is it fair to

10  say that generally would you be of the opinion that you did a

11  pretty good job of documenting when you called or texted

12  Mr. Davis, Randall or Forde?

13  A.    I don't think it was every time that I tried.

14  Q.    But, it's fair to say you did a pretty good job of

15  documenting when you called them, right?

16  A.    I tried.

17  Q.    But, when it comes to documenting calls about potentially

18  terminating their contract, would you be surprised if we didn't

19  see any emails that documented a call in that regard?

20  A.    I think there was the one email.

21  Q.    Which should have been produced in this case if it exists,

22  you would think, right?

23  A.    I thought that we had looked at it.  Maybe we hadn't.

24  Q.    And, if that email exists where you had mentioned

25  termination to PRC, do you have any idea what the date of that

Cross-Examination – Christopher Crehore

1  email would be?

2  A.   I do not.

3  Q.   So, your testimony is that you did discuss termination with

4  Forde Davis at least twice, once during your site visit in

5  January 2020 and once in the termination notice of March 17,

6  2020.  And I understand that you believe you discussed

7  termination generally with him.  But, did you ever inform anyone

8  with PRC that if they did not start to install their product at

9  the job site by a specific date their contract may be

10  terminated?

11  A.   Only in the conversation on the 17th with Forde when he

12  said he wasn't going to make the next date.

13  Q.   And, what specifically did you tell him regarding his

14  failure to meet a specific date would result in termination?

15  A.   I asked Forde if he was making panels.  And he said, no.

16  And I asked him if he could tell me when he was going to be

17  making panels.  And he said, no; I told you, I'm terminating

18  your contract.

19  Q.   Are you aware of anyone else from Oelrich Construction

20  telling anyone at PRC that if they failed to deliver and install

21  their precast materials by a specific date their contract may be

22  terminated?

23  A.   No.

24  Q.   And, we discussed this at your deposition, but how many

25  years in the construction industry have you been working in this

Cross-Examination – Christopher Crehore

1   industry?

2   A.   Commercial construction since '02.

3   Q.   So we're looking at about 20 years of commercial

4   construction experience?

5   A.   Yes.

6   Q.   And, how many jobs have you managed as a project manager

7   during that time, approximately?

8   A.   A lot.

9   Q.   Over a hundred?

10  A.   Maybe 40 to 50.

11  Q.   And, I asked you this question during your deposition.  I

12  just want to make sure we're still on the same page.  Would you

13  agree that as a general principle, if a construction contractor

14  is terminated from the project the terminated contractor should

15  be notified that it's being terminated?

16  A.   I think I did that in the email and the phone call.

17  Q.   But, would you agree, that as a general principle, they

18  should be notified they are actually being terminated, correct?

19  A.   They should be notified, yes.

20  Q.   And, other than this termination notice that we have in

21  writing dated March 17, 2020, the only other attempt that you

22  made to inform PRC that they were terminated were through the

23  phone call you're talking about on March 17, 2020, with Forde

24  Davis; is that right?

25  A.   And face-to-face conversation we had at his office and the

Cross-Examination – Christopher Crehore

1  email that we talked about.

2  Q.   And, I asked you this during your deposition as well.  And,

3  I just want to make sure we are still on the same page.  Do you

4  agree that termination is a significant deal in the construction

5  industry?

6  A.   I do.

7  Q.   And, with regard to the email and the form of the

8  termination notice, did you ever consider sending a formal

9  letter on Oelrich letterhead to PRC notifying them that they had

10 been terminated?

11 A.   At the time I was using the email string to tie it back to

12 dates that didn't happen.

13 Q.   But, did you ever consider sending a formal letter on

14 letterhead to PRC?

15 A.   I don't think I sent them a letter, no.

16 Q.   Can you pull up Defendant Exhibit 285, please?

17      Mr. Crehore, if you could take a look at this exhibit?

18 Could you please tell me what you're looking at?

19 A.   Looks like a letter on OCI letterhead directed to PRC.

20 Q.   And, if you could scroll down just a little bit?

21      If you read through the contents of that letter is it

22 identical or close to it, to the termination notice that you

23 emailed on March 17, 2020?

24 A.   Yes, it appears to be.

25 Q.   And, if you could scroll down just a little bit more?

1        And, it's signed -- the signature block at least is set up

2   for you to sign; is that correct?

3   A.   Yes.

4   Q.   So it appears that you did consider sending a formal letter

5   to PRC regarding termination, but you didn't, right?

6   A.   At least I didn't sign the letter, no.

7   Q.   And, did you consider not only sending this formal letter

8   to PRC, but also sending it through some means by which you

9   could confirm that PRC actually got it?

10  A.   I don't think I ever sent them a letter, so, no.

11  Q.   Well now, I'm saying did you consider sending this

12  termination notice via a means by which you could determine they

13  actually got the notice?  For example, FedEx?

14  A.   I don't, I don't remember sending it to them, so, no.

15  Q.   Did you write the contents of this letter?

16  A.   I'm not sure.

17  Q.   Who else would have done it?

18  A.   That's a good question.  I think if I had written it I

19  would have sent it.

20  Q.   But you are not sure who drafted it?

21  A.   I am not.

22  Q.   I would like to change gears just a little bit into the

23  typical process for how you figure out how to subcontract work

24  out to individuals under you to complete a project, generally.

25       Typically, in your experience, 20 years doing commercial

1    construction, how do you go about finding subcontractors to

2    perform your scope of work when you are the PM for the sub above

3    them or the general contractor?

4    A.    We would send out a request for bids.

5    Q.    And how do subcontractors or -- strike that.

6          What documents do you usually get from subcontractors to

7    show they are responding to your request for bids?

8    A.    We get a bid proposal.

9    Q.    And, do you ever get quotes from subcontractors for the

10   work that they are going to do for you?

11   A.    Yes.

12   Q.    Could you please pull up Defendant Exhibit 274?  If you

13   could do me a favor, Mr. Crehore, and take a look at this

14   document.  And could you describe to me what this document

15   appears to be?

16   A.    It looks like a quote or a bid from PRC.

17   Q.    And, if you want to take a look at it a little closer.

18   Best you can tell this is for the project that's at issue in

19   this lawsuit today?

20   A.    That's the project name, yes.

21   Q.    And this is dated 10/31/18; is that right?

22   A.    Yes.

23   Q.    And did you ever see this document before today?

24   A.    I don't know.

25   Q.    Could you scroll down a little bit, please?

1        And, you've got two sections here we're looking at on this

2   PRC quote.  You got inclusions and exclusions.  Do you see that,

3   Mr. Crehore?

4   A.    I do.

5   Q.    And, generally, when subcontractors give quotes like this

6   on a commercial project or a government project, what do

7   inclusions and exclusions typically mean?

8   A.    Inclusions are what they have included in their number and

9   exclusions are not.

10  Q.    Makes sense.  And, if you look at the exclusions section,

11  in particular, this quote from PRC mentions there on number 8,

12  if you can see it.  Do you see that?

13  A.    I do.

14  Q.    And, what does number 8 say?

15  A.    It says they have excluded acid edged finish.

16  Q.    If you could scroll down a little bit more, please?

17       Do you see -- what is this logo up here in the upper

18  right-hand corner of PRC's quote for its work on this project?

19  A.    APA certified.

20  Q.    And, what did, if you recall, what did the specifications

21  between the VA and SAW require for certification for the precast

22  contractor on this project?

23  A.    I remember that they called for a certification, but I do

24  not remember which one.

25  Q.    Is it fair to say that if you had seen this document you

1    would have realized that PRC is an APA certified plant as

2    opposed to some other certified plant?

3    A.    Again, I'm not, I don't remember what certification was

4    called for on the job.  So I don't know if it would have jumped

5    out at me or it would have registered.

6    Q.    And, do you have any reason to doubt that Oelrich got a

7    copy of this quote before it signed its subcontract with PRC?

8    A.    I don't.  No, I'm sure they got a quote at some point.

9    Q.    Did there, just try to get your view on this, is there any

10   reason that you have to doubt that this document was received by

11   Oelrich?

12   A.    No.  The things that I remember negotiating with Forde were

13   incorporated into our contract scope.  Those are the things that

14   he and I talked about.

15   Q.    And, before you would have entered into a contract with PRC

16   you would have gotten some sort of quote from them prior to

17   signing the contract, right?

18   A.    Yes.

19   Q.    And, if you could please pull up Plaintiff's Exhibit 2?

20   And then page 5 please, Caitlin.

21        And, I think Mr. Butts mentioned this briefly with you, but

22   I just want to make sure I'm on the same page.  This section

23   right here regarding subcontractor delay, this sentence in

24   particular, if in the opinion of the contractor the

25   subcontractor falls behind in the progress of the work to be

1   performed, that language was modified through an amendment; is

2   that right?

3   A.   I believe so, yes.  I'd have to look at the contract.

4   Q.   If you could go to page 16, please, Caitlin?  Scroll down

5   to the bottom.

6        Then, maybe this will help you answer the question, but

7   this was the modification that was made to that last provision

8   that we looked at; is that right?

9   A.   Yes.

10  Q.   So now, instead of it being if in the opinion of Oelrich

11  PRC was behind and delaying the project it now says if they are

12  behind according to the agreed upon schedule then that's when

13  you guys could exercise those rights.  My question is, what was

14  the agreed upon schedule that PRC had with Oelrich?

15  A.   It would have been the original schedule as amended.

16  Q.   And, was PRC -- strike that.

17       So, the person who was responsible at Oelrich for keeping

18  the internal schedule that Oelrich maintained for the project

19  updated was Jordan Robinson, the superintendent for the project;

20  is that right?

21  A.   Yes.

22  Q.   And you had no responsibility for updating that schedule,

23  correct?

24  A.   No.  It would have been Jordan that updated the schedule.

25  Q.   Is there anybody else at Oelrich that would have been

1  responsible for ensuring the schedule that Oelrich maintained

2  for the project was accurate?

3  A.   Before Jordan it would have been Miguel who was the project

4  super.

5  Q.   Anybody else?

6  A.   No.

7  Q.   Do you know whether Miguel is still employed by Oelrich?

8  A.   He is not.

9  Q.   Was Miguel terminated?

10  A.   No.

11  Q.   And, I believe you testified about this when Mr. Butts was

12  asking you some questions.  But, generally, did Mr. Robinson

13  email out those schedules that he kept for the project to all

14  the subcontractors?

15  A.   Yes.

16  Q.   And, roughly, how often did he do that?

17  A.   Probably once a month.  But, he would have sent out

18  supplementals in the between in the form of the bar chart the

19  look ahead that he kept.

20  Q.   And, how do you know whether or not the dates that

21  Mr. Robinson listed on the schedules he maintained were

22  accurate?

23  A.   Because he would have updated them per what happened in the

24  field.

25  Q.   And, were you reviewing those schedules on a monthly basis

1  to ensure that the schedules he maintained actually reflected

2  what was being built at the job site?

3  A.   Yes.  I would go over the schedule.

4  Q.   How would you know one way or the other whether it was

5  accurate?

6  A.   By what happened in the field.  By the work that was in

7  progress.

8  Q.   And, in your experience, 20 years experience as a

9  commercial construction guy, is it fair to say that sometimes

10  contractors don't maintain schedules that actually reflect

11  what's going on at the job?

12  A.   I'm sure it happens.  I would like to think Jordan was a

13  little better than that.

14  Q.   Could you go to page 4, please, of this exhibit?

15       If you could do me a favor Mr. Crehore and turn your

16  attention to paragraph 5 there?

17       And, what is paragraph 5 labeled as in bold there?

18  A.   Payment.

19  Q.   So, is it fair to say this is a payment term section of the

20  contract?

21  A.   Yes.

22  Q.   And, if you take a look at 5B there, what is that

23  sub-paragraph entitled?

24  A.   Progress payments.

25  Q.   And, this is the part of the contract that potentially

1  could have governed what PRC had to do to obtain progress

2  payments while it was building the materials for Oelrich; is

3  that right?

4  A.   Yes.

5  Q.   And, one of the things that PRC had to submit under this

6  clause was a schedule of values; is that right?  I'll help you

7  out here a little bit.  I think it's in that bold area.

8  A.   Yes.  With a schedule of values.

9  Q.   Is that what you're looking at right there, where it says

10  schedule of values?

11  A.   Yes.

12  Q.   Another thing they had to submit, lien waivers, right?

13  A.   Yes.

14  Q.   And then other than those two items, can you tell me where

15  in here that updated certificates of insurance were required?

16  A.   I'm not sure if it does.  I think an updated COI is a

17  standard thing to be submitted with a pay application, but I'd

18  have to read it.

19  Q.   Sure.  And, if you want, feel free to read this progress

20  payment section I'm talking to you about, 5B.  But, based on

21  your review of it as you sit here today, do you see anywhere in

22  there where updated certificates of insurance were required to

23  obtain a progress payment?

24  A.   No.

25  Q.   Likewise, do you see anywhere in the section 5B of the

Cross-Examination - Christopher Crehore

1   subcontract, a requirement that PRC submit pictures of the

2   product that they were making for Oelrich?

3   A.   No.  I think submitting pictures would be standard with

4   billing for stored materials.  But, no, I don't see it listed.

5   Q.   And, we were talking about these safety documents a lot.

6   And, when I refer to safety documents, in particular I'm talking

7   about the infamous OSHA 10 and OSHA 30 documents.  Do you

8   understand that?

9   A.   Yes.

10  Q.   And I think I heard you testify earlier that you said you

11  had no trouble getting those documents from the other

12  subcontractors on this job?

13  A.   No.

14  Q.   And, can you tell me, who are the other subcontractors that

15  submitted those documents to you?

16  A.   That would have been all the other trades on the project

17  starting off with site work, landscaping, concrete, metals,

18  moving into finishes, paint, millwork.  That type of thing.

19  Q.   And, in terms of all of the subcontractors that you

20  received these safety documents from, were they already on the

21  project site?

22  A.   No, they had to turn the paperwork in prior to being

23  on-site.

24  Q.   But, of the ones that turned in the safety paperwork, those

25  that had submitted them were already on the site or had been on

1   the site after they submitted the safety documents, right?

2   A.   I'm not sure I understand the question.  Is it that the --

3   Q.   Let me try to make it clear.  That's fair.

4        Were there any subcontractors that submitted these safety

5   documents to you that were not on the project site as of

6   January 2020?

7   A.   As if they would do the work prior to turning the paperwork

8   in?

9   Q.   Well, I guess, let's back up a step.

10       You can't go on the job site to do your scope until you

11  submit these safety documents, correct?

12  A.   Correct.

13  Q.   So did anybody, any of the subcontractors to Oelrich submit

14  the safety documents that were not yet needed to be on the job

15  site as of January 2020?

16  A.   Yes.

17  Q.   And, what subcontractors were those?

18  A.   I don't remember.  But, we would typically, as soon as we

19  get you signed up and on board, they get your paperwork in, you

20  know, let's go ahead and get it approved and get it behind us.

21  But, no, I don't remember a specific one.

22  Q.   And, it was your testimony earlier that PRC never made it

23  to the job site; is that right?

24  A.   Correct.

25  Q.   Let me ask you this, did PRC need to have those safety

1   documents submitted in order to start manufacturing the

2   materials?

3   A.    No.

4   Q.    And those OSHA 10 and OSHA 30 safety documents, those would

5   have come from the erector that would have actually put up the

6   precast panels at the project, right?

7   A.    Should have come from anybody that was going to be on the

8   job, the erector and/or PRC if they were going to have anybody

9   there.

10  Q.    Is it fair to say that as of the spring of 2020 it was

11  pretty difficult to find an erector to put up those panels?

12  A.    That's what Forde had said.  That's when we went out and

13  found one for them.

14  Q.    Earlier, when Mr. Butts was asking you questions, he asked

15  you about, I believe, it was payment application 10.  And I

16  believe that was one that was submitted towards the end of 2019.

17  And, you had testified that PRC in that pay app had billed for

18  one hundred percent of the precast materials; is that correct?

19  A.    I think it is that they had billed for a hundred percent

20  through the end of the year.

21  Q.    And, did anyone from PRC ever tell you that they had

22  completed one hundred percent of the precast materials?

23  A.    On the pay application, yes.

24  Q.    But other than the payment application, no one from PRC

25  ever told you that they had completed one hundred percent of the

1  precast materials?

2  A.   Just in the pay application.

3  Q.   Did anyone from PRC ever explain to you why they had put

4  the one hundred percent indication of billed on that pay app 10?

5  A.   No.

6  Q.   And, earlier you testified that at some point you had given

7  PRC a deadline of January 6, 2020 to begin installing their

8  materials; is that right?

9  A.   Yes, that was the first date.

10  Q.   But, as far as you can recall there sitting there today,

11  you don't recall writing to anyone at PRC saying that if they

12  don't start installation by January 6, 2020 their contract may

13  be terminated, right?

14  A.   No.

15  Q.   And, I recall you testifying that in January of 2020, you

16  had done them the favor of going to find PRC an erector to put

17  up their materials; is that correct?

18  A.   Yes.  We found them an erector when Forde said that theirs

19  couldn't make the date.

20  Q.   And, who was that erector?  What was the name of the

21  company?

22  A.   I do not remember.

23  Q.   Do you remember how you got their information?

24  A.   Yes.

25  Q.   How did you obtain that information?

1   A.   I believe that they had -- they had done some erection for

2   somebody that we work with.  And we were able to, we were able

3   to contact them and get the information, the contact information

4   for the erector.

5   Q.   And, if you had provided that contact information to PRC we

6   would see that in an email, correct?

7   A.   I guess.  If I had sent it to them, yes.

8   Q.   And then, during your testimony, Mr. Butts was asking you

9   questions about shipping the panels to the project and options

10  for storing them somewhere in or around Gainesville, Florida.

11  Do you recall that, Mr. Crehore?

12  A.   Yes.

13  Q.   And, let me ask you this, did you ever ask anyone at PRC to

14  ship the panels that were already made?

15  A.   I don't remember.  I don't think having some of them and

16  not all of them would have helped.

17  Q.   Well, earlier you testified that they could have started

18  installation of the product some time in January of 2020 even

19  though you guys weren't done with all of the predecessor work

20  completely; is that correct?

21  A.   Yes.

22  Q.   So, if they had to deliver them on an interim basis in

23  January 2020, which is roughly the date you said the project was

24  ready for precast, couldn't you have started to take what was

25  already there and install the project according to the date that

Cross-Examination – Christopher Crehore

1  you say the project was ready for the product?

2  A.   We could have started, yes.

3  Q.   Now, you testified that PRC's delay on the project pushed

4  out the end date of the job.  Do you recall that?

5  A.   Yes.

6  Q.   And let me ask you, how do you know that?

7  A.   By tracing the path of the critical path work.

8  Q.   But you were terminated on April 15, 2020, right?

9  A.   Yes.

10  Q.   And the job finished after that date, correct?

11  A.   Correct.

12  Q.   Do you know what date the job, the project actually was

13  finished?

14  A.   I know when it was scheduled to be finished.

15  Q.   But, since you weren't there when the work was done you

16  don't know what date it actually finished, right?

17  A.   No, I do not.

18  Q.   Do you know when Spring Precast completed its work as the

19  follow on contractor?

20  A.   I do not.

21  Q.   And I recall you testifying that you had performed a

22  calculation saying that March 10th, 2020 was the last day that

23  PRC could start installing the panels without delaying the job;

24  is that right?

25  A.   Yes, it was around there.

Cross-Examination – Christopher Crehore

1   Q.   And, was this calculation in writing?

2   A.   No, I think we would have taken the duration of the precast

3   direction and added it to the duration of the subsequent

4   activities, being the metal panels and the brick work.  And then

5   taken that total duration and subtracted it from the end of the

6   job to know when we needed to start to finish on time.

7   Q.   And, did you ever provide your calculation to PRC?

8   A.   I don't know.

9   Q.   Do you recall whether you ever told PRC in writing that,

10  hey, if you don't deliver and install your precast materials by

11  March 10, 2020 you're going to delay the job?

12  A.   No, I don't recall if I put that in writing.

13  Q.   And, did you ever tell anyone at PRC that if they don't

14  start installing their materials by March 10, 2020 they are

15  going to delay the job?

16  A.   Yes.

17  Q.   And, who did you tell that to?

18  A.   Forde.

19  Q.   What date was that?

20  A.   I'm not sure.  It would have been one of the conversations

21  I had with him when the date continued to slip.

22  Q.   But you're not sure which conversation that was, right?

23  A.   No, I'm not.

24          MR. DARR:  Thanks for your time, Mr. Crehore.

25          THE COURT:  Redirect?

1                       REDIRECT EXAMINATION

2     BY MR. BUTTS:

3     Q.   Mr. Crehore, the metal contractor on the job, did they come

4     after the precast was to be installed?

5     A.   These were for the exterior metal panels?

6     Q.   Yes.

7     A.   Yes, they would have been after.

8     Q.   And, was the brick on the job performed by -- or performed

9     subsequent to installation of the metal panels?

10    A.   Yes, they would have been installed after.

11    Q.   And, did the mason and the metal subcontractor cooperate by

12    turning in their OSHA certificates and the activity hazard

13    analysis timely?

14    A.   Yes.

15    Q.   And, did they turn them in when they were requested by

16    Jordan Robinson back in September of 2019, at or about that

17    time, if you recall?

18    A.   Yes.

19              MR. BUTTS:  I don't have any other questions.

20              Thank you.

21              THE COURT:  Thank you.

22              Mr. Crehore, you may step down.

23              THE WITNESS:  Thank you, sir.

24              THE COURT:  Please call your next witness.

25              MR. BUTTS:  Your Honor, the next witness is

1   Dana Noyes.

2                  **DANA NOYES, PLAINTIFF WITNESS, DULY SWORN**

3            THE COURTROOM DEPUTY:  For the record, state your full

4   name and spell your last name.

5            THE WITNESS:  Dana Arthur Noyes.  N-O-Y-E-S.

6            THE COURT:  Mr. Noyes, you may be seated.  While you

7   are testifying there if you're comfortable you may remove your

8   mask.

9            THE WITNESS:  Thank you, sir.

10                        DIRECT EXAMINATION

11  BY MR. BUTTS:

12  Q.   Good afternoon, Mr. Noyes.

13       Are you familiar with a project to build a building and

14  replace the boilers at the Malcolm Randall Veterans Affairs

15  Medical Building?

16  A.   Yes, I am.

17  Q.   Are you, were you in the employ of Oelrich Construction

18  during the time that this building was being built?

19  A.   For part of it.  Yes, sir.

20  Q.   And, when was your last day with Oelrich Construction?

21  A.   I don't remember the exact date.  It was early November of

22  2019.

23  Q.   And, what was your role with Oelrich Construction during

24  the time that you were employed there while the building was

25  being built?

Direct Examination - Dana Noyes

1   A.   I was hired to be the director of operations.

2   Q.   And, as the director of operations what was your -- what

3   did you do?

4   A.   I supervised all the staff.  I reported directly to

5   Mr. Oelrich, the owner.  I was out in the field on pretty much a

6   daily basis to try to get around to review all the projects.  I

7   was there to run interference.  I was there to be, in so many

8   words, the bad guy if I needed to be so everybody else could

9   maintain good rapport, provide the best customer service

10  possible, which was also my intent.

11  Q.   Did you find yourself in that role on the VA project?

12  A.   Yes, sir.  I was there pretty much on a daily basis.  I

13  didn't stay all day.  I mean, in and out.  But we had 20 some

14  odd projects going at a time.  Can't be in one place too long.

15  Q.   After your employment was or during the time that you were

16  there, did you have any dealings that pertained to, excuse me,

17  during the time that you were working there, up until the early

18  part of November, did you have dealings or any familiarity with

19  PRC Precast for that particular project?

20  A.   No, sir.

21  Q.   After you were there, did you have an occasion to --

22  A.   May I correct, may I correct myself?

23       I don't remember having any dealings with PRC while I was

24  there.

25       It seemed like to me Mr. Crehore would have discussed

1    things with me somewhere along the line of things that we're

2    waiting on, inventory that hadn't arrived.  The project itself

3    was, had a number of delays due to information that wasn't

4    always timely.  But, I honestly do not remember having any

5    dealings with PRC while I was employed at, directly with

6    Oelrich.

7    Q.   Did you ever have any dealings with PRC after you were

8    employed?

9    A.   Yes, sir.

10   Q.   When, give me, describe the nature of that involvement?

11   A.   Well, the entire time I was director was always my mantra

12   to make sure that everybody understood you could call me at a

13   moments notice and I was going to be wherever you needed me to

14   help.  Well, now I'm no longer at Oelrich, but Mr. Crehore

15   called me and said, Dana, I'm at my wits end.  I'm trying to get

16   information.  We're missing the panels.  And he gave me a brief

17   discussion.  And it -- I don't know which one of us suggested

18   that I might take a road trip up to PRC and verify that the

19   panels that were being requested to be paid for, the work was

20   there, ready to go.  Was it a transportation problem, what was

21   the difficulty not being able to get the panels to the site.

22   And, Chris told me go, keep your receipts, we'll pay you when

23   you get back and give us a report.

24   Q.   And, did you go?

25   A.   I did.

Direct Examination - Dana Noyes

1   Q.   And, was it -- do you recall the date that you went?

2   A.   It was in December.  I don't remember the exact date.

3   Maybe you could refresh me.

4   Q.   If it were -- would you have any reason to believe that it

5   was not December the 30th?

6   A.   No.

7        MR. DARR:  Your Honor, I know it's a bench trial.

8   We'll let things slide a little bit here and there primarily

9   because I know you're going to be able to rely on admissible

10  evidence.  But, I would like to object and say a little less

11  leading, please.

12       THE COURT:  I got it.  Mr. Noyes doesn't know what day

13  he was there.  I assume somebody has got a record and if it

14  matters somebody will be able to prove the exact date.  I have

15  it, Mr. Noyes doesn't remember.  And for what it's worth,

16  getting a witness to say they have no information inconsistent

17  with something proves nothing.

18  BY MR. BUTTS:

19  Q.   What was the purpose of your visit to PRC?

20  A.   Chris had described difficulty getting finite information

21  from PRC.  And, by that I mean I was unaware that not -- please

22  understand, I've been gone for probably a month and a half.  A

23  lot happens in construction in a month and a half.  I don't know

24  if there were pictures provided for inventory that was to be

25  paid for prior to me going.  But, my goal was to support

1   Chris Crehore, take photos of inventory that was to be paid for,

2   and evaluate its condition and hopefully come back and go, hey,

3   it's all there and it's ready to go, they're waiting on

4   transport, they are waiting on you Chris.  You know, what's the

5   status of the project because they are -- I wasn't led to

6   believe that there was tangible photos, a QC record that says

7   we've produced these catalog numbers for panels.  Typically,

8   it's, you know, panels are numbered based on shop drawings.  And

9   with this pay app you've produced X number of panels based on

10  the numbers and nobody's going to question it.  But I hadn't

11  seen any of that.

12  Q.   What did you do when you first got to Greenville, South

13  Carolina?

14  A.   I actually arrived the evening before so that I could get a

15  decent night's rest.  It was a, you know, a hike up there.  And,

16  so I got myself a hotel room and I spent the night.  I got up in

17  the morning.  I fed myself and I went to PRC.

18  Q.   And when you arrived at PRC, what did you do?

19  A.   Parked my truck.  And, proceeded to find the customer

20  entrance.  I identified who I was and that I would like to talk

21  to someone there about the status of the Oelrich project.

22  Q.   And, the person who you spoke with, what did they do to

23  enable that?

24  A.   I hope I've got this right.  I'm not trying to

25  misrepresent.  It seemed like to me there was somebody out

Direct Examination - Dana Noyes

1  front.  And then they said they were going to get a member of

2  management to come and see me, just stand by.  A member

3  representing themselves as management, I can't remember if it

4  was an older man or younger man.  But, at any rate, a gentleman

5  came out very polite, took me to the conference room and asked

6  me to have a seat, that someone else would come and be with me.

7      And so, I sat in the conference room for 10, 15 minutes.

8  And, I didn't find that extraordinary because I was there

9  unannounced.  I just drove up.  And, based on Chris' information

10  to me that communication had been good at times and then poor of

11  late, and that's why I took the road trip.  But, so I sat and

12  waited.

13  Q.   And, did someone else come and join you?

14  A.   Yes.  A representative from PRC came.  And I explained who

15  I was, that I was from Oelrich.  And he explained to me rather

16  colorfully that he didn't appreciate the fact that I was there

17  unannounced.  And I sat there as a professional and listened.

18  We would get people unannounced at Oelrich.  I was expected to

19  take them to the conference room and sit down and listen.

20  Didn't always fit the schedule, but that's customer service,

21  that's what you do.

22  Q.   What did you say -- what did you say to the representative

23  from PRC?

24  A.   Explained that I was there because there didn't seem to be

25  the level of communication back to Mr. Crehore, the project

1   manager.  I was told that there was multiple communications with

2   Oelrich Construction with multiple people.  And they didn't

3   really understand why I felt the need to drive up and see them.

4   Q.   Aside from the colorful language, was the person otherwise

5   polite?

6   A.   Yeah, we had -- that color didn't last long.  It was like,

7   it was a venting.  It was, let me -- he let me know he wasn't

8   pleased that I was there without an appointment.  And I

9   understood that.  And, then after that it was a reasonable

10  dialogue.  Yes, sir.

11  Q.   And then what happened next?

12  A.   I think at some point I offered to call back down to say,

13  somebody here isn't telling me what I am wanting to hear.  And I

14  offered to call and get Chris on the phone because PRC was

15  saying we've done everything correctly and Mr. Crehore had

16  explained to me that -- he didn't reach out to me because

17  everything was going well, somebody who no longer was employed

18  there.  But he knew I would help him out.

19        And so, I offered to call down and I was told, no, you

20  don't need to do that.  And I said, okay, that's fine.  I'm

21  trying to get to the bottom.  And then it was agreed that we

22  would go out and actually look at the product that was made for

23  Oelrich for the VA project.

24  Q.   And did you do that?

25  A.   We did.

1  Q.   And what did you see or what were you shown?

2  A.   When we walked out and I don't, I couldn't draw you a

3  diagram at the moment, but we left the conference area and we

4  went out into what I would call the covered warehouse area.

5  This was an area where there was a lot of material in an area

6  that was, if I had to guess probably, I don't know, 150, 200

7  feet deep, 300 feet wide.  And there were panels in there.  And

8  I don't know whether I asked first or whether the PRC

9  representative offered first, but I was shown panels in front of

10  me and said these are your panels.

11       And so, I got my iPhone out, that was a camera that I had,

12  and I took pictures of what was pointed to in front of us.  And

13  he said, these are your panels.  So I took pictures.

14  Q.   Can we look at Exhibit Number 10, please?  Exhibit Number

15  10 has 5 photographs attached to it at the end.  I'm going to

16  ask you to look through, scroll through the 5 photographs and

17  ask if you, if they look like any of the photographs or look

18  like the photographs that you took when you went to PRC.

19  A.   Photo 1 is mine.  Photo 2 is a mine outside.

20       Photo 3 is mine.  Yep, 4 is mine.  Yep, 5 is mine.

21       There is red writing on these.  I don't, I wouldn't, I

22  didn't do that.  I would have to have somebody insert that kind

23  of stuff.  I'm not super tech-savvy.

24  Q.   Did you say you did not do that red writing?

25  A.   I did.  There is a red X back a few photos.  I didn't put

1    the red X in there.  Anything that's red on those are an add to

2    the photo that's not me.

3    Q.   Do these represent all of the photos that you took at the

4    PRC site that day?

5    A.   Yes, sir.  Yeah, that's it.

6    Q.   And, we're on number 5.  Is that one of the photos that was

7    taken inside the covered area?

8    A.   Yes, sir.  Yes, sir.  I think there's, I think there's only

9    2 of the 5 are outside.  I think the others are inside.

10   Q.   I see.

11   A.   This one definitely, yes, sir.

12   Q.   And, if we can just scroll back through the photographs and

13   if you can identify the ones that were taken inside the covered

14   area, please?

15   A.   So, 1, 5 and 3 I can be pretty solid that they are inside.

16   2 and 4 are obviously outside.  The lighting is obviously

17   different.  There are trees.

18   Q.   And, when you were with the representative from PRC, and

19   the representative pointed out the panels that were inside as

20   belonging to Oelrich Construction, do the 3 photographs that

21   you've referenced take in all of the panels that PRC represented

22   to you under the cover belonged to Oelrich Construction?

23   A.   That's what I understood.  Yeah.  I specifically asked

24   where the Oelrich material was.  And I was shown the area.  Now,

25   as I don't -- at the time I did not know, nor did I really want

1  to know, how many panels I was looking for.  I went to see -- I

2  went to have PRC be proud to show me here is everything racked

3  and stacked, here is everything cataloged, we don't know what

4  your problem is.  That would have made me very happy.  So I took

5  photos where I was directed to take photos as these are your

6  panels.

7  Q.   Did you find the panels racked and stacked, as you

8  mentioned?

9  A.   You can look at the photos and say, they are, they are

10  stored with spacers.  They are stored so they can be picked up

11  and moved.  Again, I had, I had an idea in my head having looked

12  at the drawings a number of times from the beginning of the

13  project as to where we were headed, that there was probably

14  somewhere in the neighborhood, now granted, I hadn't seen the

15  drawings in a number of months, that there were somewhere

16  between a hundred and 150 panels.  And that's what I came to

17  see.  And my pictures -- I didn't see a hundred to a 150 panels.

18  But, nor did I note that I -- I didn't see catalog stamping on

19  the end or on the back or spray paint, you know, 1 of a 150, 2

20  of a 150, 3 of a 150.  So, I took pictures where I was directed

21  this is your product, this is your inventory.

22  Q.   Can we go to photograph 3, please?  Is this just another

23  photograph of panels that were under the cover?

24  A.   Yes, sir.  I am deducing the fact that there is a cardboard

25  box that's been Xed out.  It's not weather damaged.  I'm

1    assuming, yeah, this is inside.  I don't have any perspective to

2    relate it to.

3    Q.    And, if we look at the 5th photograph.

4    A.    Inside.

5    Q.    And I know I've asked this question in a different way, but

6    I just want to make sure.  The 3 photographs you took represent

7    all of the panels that were made for Oelrich Construction that

8    were inside the building, right?

9    A.    3 of the 5 are inside and represented to be the panels for

10   Oelrich.

11   Q.    Were there any panels that were represented to be Oelrich's

12   panels inside the building that you did not have an opportunity

13   to photograph?

14   A.    Sir, I wouldn't have known.  I couldn't have known that.

15   Q.    Did you photograph all of those panels that you were told

16   were Oelrich's?

17   A.    Yes, sir, I did.

18   Q.    Can we look at number 2, please?  After you photographed

19   the panels that were inside the building, was the PRC

20   representative still with you?

21   A.    Yes, sir.

22   Q.    And what happened next?

23   A.    I may have asked -- I think I asked is this it.  And he

24   said, no we have some out in the yard.

25   Q.    And then how did you know which panels in the yard were

Direct Examination – Dana Noyes

1   Oelrich's panels?

2   A.   Because he pointed in the direction.  And, I took the photo

3   in the -- I took the photo in the direction that they pointed.

4   And, the, I would have assumed from the photo, and you can see

5   my shadow there holding the camera up to photo, that I wasn't

6   that far away from them.  But there was no red X out in the

7   field.  All right.

8        So my assumption was the flat panel laying on the ground

9   and the panels behind were Oelrich panels.  There was no

10  indicator.  There was no more indication out there that they

11  were Oelrich's panels than were inside.  So, when the gentleman

12  was kind enough to point out those are your panels over there,

13  and an S, it was plural, I took a photo.  You can clearly see my

14  shadow taking the photo.

15  Q.   Did the gentleman stay with you when you were taking this

16  photo?

17  A.   He was there for -- he was there, but then he said, well,

18  I've got to go.  You can -- I believe he gave me permission to

19  walk around.  But I was left with the impression that we had

20  seen our photos.  So after that I mean, I don't have an escort,

21  I don't really want to be on his property and fall.  And I

22  don't, he doesn't need me out there as a liability.  And I left.

23  I made 5 photos.

24  Q.   If we can look at number 4, please?

25       Do you recognize this photograph?

1  A.   It's mine.  And it's -- Mr. Butts, it's possible that he

2  also -- I took that photo.  And the only photos that I took were

3  photos that represented product that they pointed to.  So, I

4  don't want to slight them and say he left me at the previous

5  photo.  He must have shown me these as well.  All right.  And so

6  I took pictures.  Again, the red X is not mine.  I may -- the

7  reason I took it was to show the panels pointed to and the

8  panels in the general area.  They could have just as easily have

9  been for Oelrich.  I didn't have shop drawings with me to

10  inspect that closely.

11  Q.   Were you shown any other panels represented to belong to

12  Oelrich Construction that you did not photograph?

13  A.   No, sir, no.

14  Q.   What did you do after you finished photographing the

15  panels?

16  A.   I made my way off the property.

17  Q.   What did you do with the photographs?

18  A.   I would like to say that before I got out of the immediate

19  area that I had transmitted them to Mr. Crehore.  It could have

20  been that evening.  You would have to look at Mr. Crehore's

21  email record to find out when I actually sent him these.  I'm

22  pretty confident though they were the same day because I wanted

23  him to see what was going on.  At that time I no longer had

24  access to any Oelrich email.

25  Q.   Did you discuss a schedule with the gentleman who was

Direct Examination - Dana Noyes

1    escorting you?

2    A.   Yes.  Chris had asked me to try to verify when the panels

3    might be delivered.  And I believe that was the request was when

4    can the work be on the job site because we were already -- they

5    were already needing it.  They were ready to accept it.  They

6    were working on cranes and folks to hang it down there.  I

7    believe that PRC was only going to be responsible for getting

8    the panels from their facility to the job site.

9         And, the gentleman was very polite.  And I wasn't

10   expecting a schedule before I left.  I was like, you know, let's

11   all be courteous.  You didn't know I was coming.  And he said,

12   I'll get it to you tomorrow.  Even if he had gotten it within a

13   week we were -- that was fine.  Just let's get Chris a schedule

14   so he has something to count on.  And he, he agreed to do that.

15   Q.   Did the gentleman who was with you ever mention to you that

16   PRC had billed Oelrich Construction for all of the panels that

17   they were to produce but that Oelrich Construction was not

18   expected or required to pay for them at that time?

19   A.   I don't remember any conversation like that.  Am I allowed

20   to -- never mind.  I'll just --

21   Q.   You should say whatever --

22   A.   Any time we received a request for payment, I would have

23   found it quite rare to have someone say, we're billing you a

24   hundred percent but you don't have to pay us.  Every pay request

25   was sent to the VA promptly for payment.

Direct Examination - Dana Noyes

1  Q.   And, when you left the premises out there in Greenville,

2  what was your impression as to whether or not you had been shown

3  all of the panels that PRC had fabricated at that time for

4  Oelrich Construction?

5  A.   Well, maybe I'm a little naive, Mr. Butts.  But if a fellow

6  professional tells me these are your panels, this is it, and

7  you're billing for a hundred percent then I've got to take the

8  man or woman at their word.

9  Q.   So, are you satisfied that you saw all of the panels that

10 were fabricated at that time at PRC for Oelrich Construction?

11 A.   I saw all the panels that were represented by PRC to be for

12 Oelrich and I photographed the same.

13 Q.   What was your impression of the quality of the storage and

14 cataloging and things of nature that you saw?

15 A.   Mr. Butts, I'm not a precast concrete expert by any stretch

16 of the imagination.  I have had wonderful opportunities in my

17 career to see a number of other large panel operations.  My

18 biggest concern was that the panels would get to Gainesville

19 intact and we wouldn't have to manufacture any other panels.

20     I was concerned for their -- we had had enough delays.  We

21 didn't need any fractured panels or -- I don't know that I'm

22 really an expert in precast concrete.  I've seen other

23 operations.  This operation is unique and it's different than

24 the others I've seen.

25 Q.   Thank you.

1    A.   Yes, sir.

2              THE COURT:  Cross examine?

3              MR. DARR:  Just a few questions, Your Honor.

4                      CROSS-EXAMINATION

5    BY MR. DARR:

6    Q.   Good afternoon, Mr. Noyes.

7    A.   Yes, sir.

8    Q.   I just have a few questions for you.  It sounds like your

9    involvement with the project was fairly limited.  Is that fair

10   to say?

11        Let me ask a different question.  I'll ask you a specific

12   question.  I apologize.  What was your involvement with the

13   project other than making this site visit to PRC's facilities in

14   December of 2019?

15   A.   Well, prior to leaving I was there on the first day that

16   trucks mobilized into the asphalt area that was to have turned

17   into the image you see on the cover page of the drawing set.

18        At that time there were concrete parking bumpers, street

19   lights, and everything else that you can imagine in this area.

20   So, I was on-site at the time the first shovel went in the

21   ground.

22        I was there when we had to have a second ground penetrating

23   radar study done because the first one was inadequate.

24        I was there every time we found something else below grade

25   that impeded the project.  I was there when we had to reroute

1   around live power and live pressure water for storm.  I was

2   there when we had delays due to bats.  So, I was there from the

3   beginning and I was there frequently.

4   Q.   So --

5   A.   I was there at night.

6   Q.   I apologize, go ahead.

7   A.   Go ahead.

8   Q.   So, you were involved or aware of some of the delays to the

9   project that were occurring from what it sounds like early 2019

10  through October of 2019.  Is that fair to say?

11  A.   It is.

12  Q.   And, in your opinion, were any of those delays attributable

13  during that time period to PRC?

14  A.   No.

15  Q.   And, when you visited PRC's site up in Greenville, South

16  Carolina, are you confident that you saw all of PRC's

17  facilities?

18  A.   I'm sorry, your last name?

19  Q.   Mr. Darr.

20  A.   Darr?

21  Q.   Yes.

22  A.   Mr. Darr, I was not given a, we are proud of our facility,

23  we are going to take you on a tour first and show you every

24  square inch of the place and then we're going to show you your

25  work because it's outside and it's racked and stacked.  No.  I

1   left the conference, which was comfortable.  We walked out into

2   the covered work or storage space.  We walked out of that.  If I

3   remember correctly, towards the left of the building facing it

4   from the parking lot out front.  And I was shown that area.  And

5   I left.  So, I did not -- I couldn't tell you if there's an

6   upstairs.  I couldn't tell you anything other than the main

7   entry, the conference room, the storage area and covered storage

8   area and then the area that's in the two outside photos I

9   believe I took.

10  Q.   I believe you testified at the time that you went to PRC's

11  facilities in December of 2019 you were no longer employed by

12  Oelrich; is that correct?

13  A.   That's correct.

14  Q.   Were you compensated for your time for going up there to

15  make the site visit?

16  A.   Mr. Crehore told me to keep my receipts.  If you were to

17  question Mr. Oelrich I was pretty damn independent while I was

18  there and I didn't bill the company for much of anything.  And

19  so, I chose to enjoy some of the sights up there and made it to

20  my benefit on the way back.  And I didn't feel it was

21  appropriate.  So, no, sir, I did not bill Oelrich Construction.

22  And Mr. Oelrich would not find that surprising.

23  Q.   So, just so I can make sure I'm clear, you weren't

24  compensated for your time up there to go make the site

25  inspection, so to speak?

Cross-Examination - Dana Noyes

1    A.    No, sir, I was not.

2    Q.    When you visited PRC's facilities in December of 2019, did

3    you represent to PRC that you were a current Oelrich employee?

4    A.    No.  I told them that I was the director of operations,

5    which is what I had been.  And I was there in that capacity.  I

6    didn't make any representation as employed, not employed.  I

7    told them I was there representing Oelrich Construction.

8    Q.    But at that time you weren't really the director of

9    operations though because --

10   A.    No.

11   Q.    Correct?

12   A.    Correct.

13   Q.    And, beyond the pictures that we just saw that Mr. Butts

14   ran you through, were there other panels that you saw while you

15   visited PRC's facility?

16   A.    There was -- I'm sure there were other -- that facility

17   could not possibly have just had Oelrich panels there.  I think

18   in the periphery of my photos it shows there are other sections.

19   Clearly, the one photo, is it photo 2, has a big red X on it.

20   It's an outside photo.  Those panels were back there, but

21   apparently someone determined that they weren't Oelrich panels.

22   So, yeah, there were other things laying around.

23   Q.    And, I recall you testified that PRC pointed out these

24   panels and said these are your panels or something to that

25   effect?

1   A.   Yes, sir.

2   Q.   Is that right?

3   A.   General, yes, sir.

4   Q.   And, I recall you testifying that you thought you asked is

5   that it; is that right?

6   A.   Yes, sir.

7   Q.   But, did anybody from PRC say, yes, this is all of

8   Oelrich's product that we have at our facilities?

9   A.   Don't think I could say with confidence that the statement

10  that you worded it was said.

11  Q.   Just to be clear, those red edits we saw, I think you

12  testified those weren't your edits, you didn't put those on

13  there?

14  A.   No.

15  Q.   Do you know who did?

16  A.   I do not.

17  Q.   Maybe I zoned out at the beginning of your testimony.  We

18  kept talking about the gentleman that was escorting you.  Does

19  that testimony sound familiar?

20  A.   Yes.

21  Q.   Who was that?  Do you know who that was?

22  A.   I'm, I'm -- there was represent, and please, it's been

23  awhile.  There was a younger man and an older man.  And, I think

24  the older man -- I wasn't there to worry about, just who.  I was

25  there -- and I didn't sit there taking copious notes.  I figured

1    if I left with photos and my word was going to be good enough

2    back to Chris.  So, I really wasn't too worried, other than the

3    fact they told me they were management at PRC.

4    Q.   But as you sit there today, you don't remember the names of

5    those people; is that correct?

6    A.   Randall and Forde Davis, I think their last name is Davis.

7    Q.   Those are the two guys that you spoke with while you made

8    your visit?

9    A.   Yes, sir.

10   Q.   And, at any point during -- let me back up one step.

11        Other than that site visit you made to South Carolina at

12   PRC's facility, had you ever had any other interactions with

13   anyone from PRC directly?

14   A.   No, sir.

15   Q.   And, during your visit to their facility, in December of

16   2019, did you ever say to anyone at PRC, hey, your contract may

17   be terminated?

18   A.   No, that wasn't my job.  I was there to find out what

19   material was available.  No, I wouldn't have been able to make

20   that call.

21             MR. DARR:  Thank you for your time.  Appreciate it.

22             THE COURT:  Redirect?

23                       REDIRECT EXAMINATION

24   BY MR. BUTTS:

25   Q.   Mr. Noyes, when you went to the facility and you met with

Redirect Examination - Dana Noyes

1  the gentleman who took you outside and showed you the panels,

2  did you request to see all of the panels for

3  Oelrich Construction?

4  A.   Yes, sir.  That's why I was there.  They wanted to bill for

5  a hundred percent.  I'm there to see a hundred percent panels.

6  Now, may I say -- may I speak?

7  Q.   Sure.  Of course.

8  A.   If they had shown and said, the shop drawings and here's

9  the catalog, and I'm going to round down for ease of my

10  discussion, we were contracted to build a hundred panels.  We

11  have 90 of them built and we're billing for a hundred percent,

12  by the time you pay us, that's a practice that is accepted to

13  bill ahead because you know that 30, 60, 90 days later, by the

14  time you get paid, you'll have the panels built.  That would

15  have been fine.  So, I was there, I was there in an openminded

16  capacity.  I didn't, I didn't have any hidden agenda.  I just

17  wanted to see the product and be able to tell Chris, you know,

18  you're okay, it's there and they are ready to ship.

19  Q.   In your career, have you had occasions where products are

20  fabricated off-site?

21  A.   Yes.

22  Q.   What is the method that is typically used to demonstrate

23  that product is actually being fabricated when the person

24  fabricating the product is seeking to be paid?

25  A.   Typically, there's, you have shop drawings.  And each item

Redirect Examination – Dana Noyes

1  that has to be, let's take a steel erector, you may have 135

2  pieces that have to be manufactured and they all come together

3  to build the product and those are manufactured off-site and

4  they are hauled in.  As they are built, if they say they are

5  20 percent done, they can typically show you that they have

6  catalog number 1 through whatever that would make 20 percent and

7  they provide you with photos and say this is it, and you pay

8  20 percent.

9  Q.   So, it's reasonable for the contractor to request

10 photographs of stored materials?

11 A.   Yes, it is.

12 Q.   Is it also reasonable for the contractor to ask the person

13 that is storing the materials to make sure that they have

14 sufficient insurance in case something happens at their facility

15 that damages the materials?

16 A.   Yes.

17 Q.   Thank you.

18 A.   That's all in the boilerplate in the contract document.

19 It's standard procedure.

20      MR. BUTTS:  Thank you.  I don't have any other

21 questions.

22      THE WITNESS:  Yes, sir.

23      MR. BUTTS:  Thank you, Mr. Noyes.

24      THE COURT:  Mr. Noyes?

25      THE WITNESS:  Yes, sir.

1          THE COURT:  The gentleman over there at that table

2     sitting farthest away from, with the light blue mask, do you

3     recognize him?  Maybe not with the mask.  Take your mask off

4     momentarily.

5          THE WITNESS:  Yes, sir.  He was there.

6          THE COURT:  He was one of the ones you talked to?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  Thank you.

9          Mr. Darr asked you about the delays early in the

10    project.

11         THE WITNESS:  Yes, sir.

12         THE COURT:  The bats, the pipes, the water, the

13    whatever.  And one of the things he asked was, was any of that

14    attributable to PRC.  And you said no.  Was any of the delay

15    attributable to Oelrich?

16         THE WITNESS:  No, sir.  We didn't -- I want to be

17    respectful.

18         THE COURT:  Yeah.  I know you didn't put the bats

19    there.  I'm not talking about --

20         THE WITNESS:  The drawings were, so by example,

21    everything that was underground initially that caused delays,

22    the Veterans Administration had no idea what was underground.

23    They said they did, but they didn't.  And we kept backing up

24    more often than not.

25         THE COURT:  I wasn't limiting it just to the things,

Redirect Examination - Dana Noyes

1  the specific things we mentioned, but of anything that caused

2  delay in the first part of the project, was anything a cause of

3  delay that was attributable to Oelrich?

4          THE WITNESS:  No, sir.  We provide management.  We

5  don't provide labor and services.

6          THE COURT:  Either side have questions just to follow

7  up on my questions?

8          MR. BUTTS:  No thank you, Your Honor.

9          MR. DARR:  No thank you, Your Honor.

10         THE COURT:  Thank you.  Mr. Noyes, you may step down.

11         THE WITNESS:  Yes, sir.

12         THE COURT:  Let's take the afternoon break.  Let's

13  take, I've got 3:58.  Let's take til 4:10 and we'll start back

14  up.  And you can have your next witness on the stand ready to

15  go.

16         MR. BUTTS:  How long would you like for us to go

17  today?

18         THE COURT:  Who is the next witness?

19         MR. BUTTS:  Mr. Oelrich.

20         THE COURT:  Let's at least get him on and off.  I

21  don't know how long you're going to be with Mr. Oelrich.  This

22  is the --

23         MR. BUTTS:  I should -- I'm not sure.  Probably an

24  hour or so.  Not as long as Mr. Crehore.

25         THE COURT:  Yeah.  Let's see if we can't finish with

Direct Examination - Ivan Oelrich

1    Mr. Oelrich and plan to stop at that point.  This is the point

2    in every trial where I tell people, look, I really am paying

3    attention.  So I know Mr. Noyes said about 5 times that he saw

4    what they told him was his product and he didn't see anything

5    else.  But I got it the first time.  So, I didn't need it all of

6    those times, but I got it.  4:10.

7          (Recess taken 3:59.)

8          (Resumed at 4:10.)

9               THE COURT:  Have a seat, please.

10              MR. DARR:  Your Honor, a little bit of an unusual

11   request, but we are trying to go see if we could get some

12   bottles of water in here.  The marshals told us we would have to

13   get your approval.

14              THE COURT:  Bottles of water are fine with me.

15              MR. DARR:  Thank you very much.

16              MR. BUTTS:  Good afternoon, Mr. Oelrich.

17              THE COURT:  Wait, wait, wait.  We haven't sworn him.

18        **IVAN OELRICH, PLAINTIFF WITNESS, DULY SWORN**

19              THE COURTROOM DEPUTY:  For the record, state your full

20   name and spell your last name for the record.

21              THE WITNESS:  Ivan Alexander Oelrich.  O-E-L-R-I-C-H.

22                    DIRECT EXAMINATION

23   BY MR. BUTTS:

24   Q.   Good afternoon, Mr. Oelrich.

25        Are you also familiar with the project that's the VA that

Direct Examination - Ivan Oelrich

1    we've been discussing all day?

2    A.   Yes, sir.

3    Q.   And, what is your role with Oelrich Construction, the

4    plaintiff in this case?

5    A.   I'm the president of Oelrich Construction.  So, my role is

6    oversight of the company, management of the company, making sure

7    that we are, you know, in the end giving customer service and

8    taking care of our clients and making sure we have the resources

9    in place to do those kinds of things.

10   Q.   Do you, this particular project involved boilers, as I

11   understand it.  What is the relationship as you describe it

12   between Oelrich Construction and SAW-Greenland, the JV?

13   A.   They were their subcontractor.  They were the prime

14   contractor, we were a sub.

15   Q.   Going beyond that, why did you, why did SAW-Greenland need

16   you?

17   A.   They needed a local contractor that could use local folks

18   generally to build the building.  They had expertise over the

19   boilers and the mechanical portions of that.  That's some heavy

20   mechanical type work.  Of course, we've built lots of buildings

21   around this area so it seemed like a good fit as subcontractor

22   just to build the building.  It's a simple building so it's

23   pretty straight forward.

24   Q.   Describe how the process took place that ultimately led you

25   to enter into a contract with SAW-Greenland?

Direct Examination - Ivan Oelrich

1    A.   So they courted us.  They came to town and they were

2    looking at the project probably 6 months before it actually

3    became real.  We did some budget work with them.  You know, met

4    with them a few times, looked at the job, looked at the site and

5    just kind of developed a rapport with them.  I think that they

6    may have gotten another quote from a couple other contractors.

7    I am not positive about that.

8    Q.   So, did you submit a quote?

9    A.   We did.

10   Q.   In the process of submitting the quote, was the number that

11   you gave them a, what's called a stipulated sum?

12   A.   It was a stipulated sum, but we gave them somewhat of an

13   open book.  We negotiated some of the things, you know, some of

14   the parts and pieces, I don't really remember what they were,

15   but I do remember there was some back and forth about getting

16   the contract right, get the number right.  Because they had to

17   produce a number to the VA that made the project go.

18   Q.   Did they produce -- are the prices that you gave them based

19   on plans and specifications?

20   A.   Undoubtedly, yes, sir.

21   Q.   Were the specifications those that we discussed earlier

22   today as being part of the contract between SAW and the VA?

23   A.   Yes, sir.  Yeah.  They were the project plans and specs

24   that we all were held to.

25   Q.   And, did you use those specifications in soliciting bids

1   from the subcontractors?

2   A.   Absolutely.

3   Q.   Did you use the plans?

4   A.   Yes.

5   Q.   And, did you, were there specifications as part of that SAW

6   VA contract that applied to all of the various subs that were on

7   this job?

8   A.   Each and every one, yes, sir.

9   Q.   And, was it important to follow those specifications and

10  the plans on this job?

11  A.   That's the nature of commercial construction, yes, sir.

12  It's very, very important.

13  Q.   And, if you did not follow the plans and specifications

14  what would be the consequence of that?

15  A.   They could, you would have to rip it out.  I mean, if you

16  brought materials that were subpar or whatever and it was

17  discovered, you know, those things have to come out of the

18  building and the right thing has to go in.

19  Q.   Other than the initial proposal, bids that you worked on to

20  be able to come up with the stipulated price, contract, or bid

21  that you gave to SAW, when did you become more involved in this

22  project?

23  A.   Gosh, as this precast issue started to come to a head.  So

24  the end of 2019.

25  Q.   Did that come to a head as a result of PRC billing one

1    hundred percent for the precast?

2    A.   It was already -- it was at a full roar by then.  That was

3    one of the straws that -- everybody, everybody, I was and our

4    team was very skeptical of PRC at that point because we had been

5    through a lot.  And then to get a bill like that was not a good

6    sign.

7    Q.   I want to show you Exhibit Number 12, please.  Do you

8    recognize that?

9    A.   Absolutely, yes, sir.

10   Q.   Can you describe what led to that email that you sent?

11   A.   Well, certainly the lead up to that was the months before

12   that.  We had a lot of issues with the billing and getting

13   information from PRC.  They were always hard to get ahold of.

14   And then when we did get ahold of them they were tough on our

15   people.  We were having a tough time with that through the, you

16   know, let's say the third quarter or third and fourth quarter of

17   2019.

18        The issues, you know, we were trying to get a date set for

19   January 6th was our date.  That was the first date that they

20   said they would be out there and we were going to get it done.

21   And, you know, that came and went.

22        We still hadn't gotten all of their information like we've

23   heard the Court talk about it all day today.  Couldn't get

24   information.  Just started piling up.  We got a hundred percent

25   billing.  Dana's testimony you just heard.  He had gone up

Direct Examination - Ivan Oelrich

1   there.  They didn't have anything close to a hundred percent.

2   It was not looking good.  We had spent $109,000 with PRC, with

3   this firm.  And, you know, I was starting to worry that we were

4   going to be left out, hung out to dry after paying them that

5   money.

6        And so, I tried to call on several occasions up to that

7   office.  You get the -- they send you through all the different,

8   press the different extensions.  One time I got the sales guy,

9   he answered the phone.  And I told him who I was.  And he was

10  quick to get me off.  But I could never get anybody on the

11  phone.

12       And so, on January the 9th I wrote an email to the

13  president Mr. Randall Davis trying to set the tone of, you know,

14  I don't understand what the issue is, what, you know, it speaks

15  for itself I think.  I wanted to understand what was happening

16  and what we could do to make it better.

17  Q.   Did you receive a reply to your email?

18  A.   No, sir.

19  Q.   Did you receive a telephone call response to your email?

20  A.   No, sir.

21  Q.   If we can look at Exhibit Number 558, please.

22       I would like you to reference the schedule of values.

23  A.   Yes, sir.

24  Q.   We talked about this this morning with Mr. Crehore.  Do you

25  recognize this document?

1   A.    I do, yes, sir.

2   Q.    And when you mentioned that PRC had billed one hundred

3   percent for the panels, what did you mean specifically by that?

4   A.    Line item 4 is production.  That is production of the

5   panels.  And in this pay app they've actually billed us a

6   hundred percent for all of the materials and mockup samples.

7   Everything that they, you know, as they talked about earlier,

8   they're a manufacturing type company.  And everything that was

9   in their control they had billed a hundred percent for.

10  Q.    What percent -- and at this point you had paid them how

11  much money?

12  A.    109, close to 110, somewhere like that.  The exact number

13  is floating around there somewhere.  It's on one of the

14  exhibits, obviously.

15  Q.    Have you had an opportunity to calculate what percentage of

16  the total in column C, if you add 2,800, 2,400, or 24,000,

17  65,160 and 43,437, just those first four numbers?

18  A.    Yeah.  That gets you close to 130, 140 grand.

19  Q.    And you had paid them how much at that time?

20  A.    109, 110.

21  Q.    Have you had an opportunity to calculate what percentage of

22  that 130 or $40,000 --

23  A.    Yes, sir.

24  Q.    -- represented by the 109 or 10 that you had paid them?

25  A.    For sure.  That's about 80 percent of all of the costs that

1  they incurred for manufacturing.

2  Q.   I'm going to ask you to take a look at Exhibit 9, please.

3       And if we can look at the, I'm sorry.  I didn't mean -- I

4  meant Exhibit Number 557, pay app 9.

5  A.   Yes, sir.

6  Q.   What do you recognize this document to be?

7  A.   Pay app number 9 for October of 2019.

8  Q.   Is this the last time that PRC billed for fabricating

9  products?

10 A.   No, sir.  They billed in the previous one we just looked at

11 in 10 as well.

12 Q.   Is this, is October the last time PRC fabricated products

13 in 2019?

14 A.   I don't know that I have knowledge of that.

15 Q.   Do you know whether PRC fabricated any products in

16 November?

17 A.   I'm going to go off my recollection of sitting through the

18 depositions that they said that they did not.

19 Q.   So, what percentage does, is PRC requesting payment for of

20 the products of the total of line item 1, 2, 3, and 4 all the

21 way down through production, what percentage of the production

22 is being requested here, is being represented as being

23 completed?

24 A.   So, the only thing they got, we'll go with 37 percent left

25 to finish on the actual production of the panels.  Other than

1  that, everything has been billed for.

2  Q.   And at that time, Oelrich Construction had paid

3  approximately 80 percent of all of the line item 1, 2, 3 and 4?

4  A.   Yes, sir.

5  Q.   Was there any incentive for Oelrich Construction to insist

6  that PRC install panels on January the 6th if the project was

7  not ready for the panels to be installed?

8  A.   No, sir.  We would not harass a subcontractor to show up on

9  a job site that wasn't ready.  That would not be, maybe harass

10 wasn't the right word, but --

11 Q.   Was the project ready on January 6th?

12 A.   Absolutely.

13 Q.   What if PRC had delivered the panels in January of 2019 and

14 you did not have someone to erect them, what would you have

15 done?

16 A.   Presumed, I mean, erection was in PRC's contract, of

17 course.  But we were looking to help them with that with finding

18 them an erector but nonetheless, if they had said, hey, the

19 panels are ready, bring me the panels.  I mean, like we talked

20 about earlier, I own a piece of property right down the road

21 that we could have put all of those panels on.

22 Q.   Could you have stored them in a way that would keep them

23 safe?

24 A.   Absolutely.

25 Q.   Could you have stored them as well as they appeared to be

Direct Examination - Ivan Oelrich

1   stored in the photographs that we talked about earlier today?

2   A.   I would like to think we could do better.

3   Q.   Did you have any incentive to help PRC to complete its work

4   on this project?

5   A.   Absolutely.  I had 109 or 110,000 incentives to get them on

6   board and get them out there to get this thing going because I

7   have already spent a bunch of money.

8   Q.   Was there anything, according to your knowledge, that

9   precluded PRC from fabricating the panels regardless of when the

10  project was ready?

11  A.   Absolutely nothing.  They could have met the -- we've

12  talked about this July date, that was the original date of the

13  original contract.  And they could have made the panels and we

14  would have paid them for them.  And they could have said, hey,

15  your panels are done per the original schedule and now you got

16  to take them.  And we would have had to figure that out.  They

17  are a manufacturing facility as they have said several times.

18  And they could have manufactured them and brought them to us.

19  Q.   If you will look at Exhibit Number 4, please?

20       Do you recognize that?

21  A.   Yes, sir.

22  Q.   What is that document?

23  A.   It's our subcontract with Spring Precast.

24  Q.   It appears that there was some negotiations on markups on

25  the contract?

1  A.    Yes, sir.  As I recall.

2  Q.    Is the date that you signed it, is that the correct date as

3  to when the contract was entered into?

4  A.    That would be my standard procedure.  Yes, sir.

5  Q.    Do you recall when Spring was able to get started on the

6  project?

7  A.    It was early September, in my recollection.

8  Q.    And, when did they complete their work?

9  A.    About a month later, month and a half.

10 Q.    Did you have any problems with them?

11 A.    Absolutely none.  Well, let me back up for just a second.

12 We had a problem getting, matching the existing precast.  So we

13 ended up --

14 Q.    How did you address that?

15 A.    Well, they had to go to Georgia and buy some white clay,

16 rock or whatever it was.  Some specialty rock.  And, that ended

17 up costing us another 6,700 bucks.  So but, that was not

18 Spring's, necessarily their problem.  It just was an issue we

19 had.  But they did an outstanding job.

20 Q.    Once Spring came on board, what was the -- and once PRC was

21 no longer part of the team, what was the -- what was your

22 incentive to get the project done at that point?

23 A.    Well, we were getting, we had gotten to the end of our

24 float time with PRC.  And that happened in March, like Chris was

25 just talking about.

Direct Examination - Ivan Oelrich

1    And it got to the point where we needed to finish the

2    building, the outside of the building because we, we had to

3    finish that before the VA finished on the boilers inside.

4    Because if we had missed that date then they would have been

5    slamming us with liquidated damages and we would have gotten

6    eaten up in cost there.

7        I mean, the other incentive is once we've past that date of

8    about March 10th, every day that we're out there it costs us a

9    bunch of money to be out there.  So, I'm looking at we need to

10   beat the VA or, excuse me, SAW.  We need to make sure that they

11   don't finish their boilers and have it all hooked up and ready

12   to go and we're holding up the job at the end.  In the end we

13   need to get somebody else on board so we can get going and get

14   ourselves out of here because every day we're on the job past

15   our scope of work is costing us thousands of dollars.

16   Q.   I just want to look at the Exhibit 3, please.  Do you

17   recognize this document?

18   A.   Yes, sir.

19   Q.   And, what is it?

20   A.   It appears to be our subcontract agreement with

21   SAW-Greenland or I guess just SAW there.

22   Q.   And, can you reference paragraph 2.1, please?

23       Is it your understanding that this paragraph incorporates

24   the contract with the VA?

25   A.   Absolutely.  Yes, sir.

Direct Examination - Ivan Oelrich

1    Q.   If you would reference Exhibit 32, please?

2         Do you recognize this?

3    A.   Not immediately, but --

4    Q.   Can we reference, let's refer to the --

5    A.   Can we go back to, what is it?

6    Q.   You want to go back?

7    A.   Yeah.  You asked me if I recognize this document.  I'm

8    drawing a blank I guess.  I don't know what that --

9         MR. DARR:  Your Honor, I don't know if you already

10   ruled on this, but this is the document that we had the hearing

11   on last week as to whether or not this is authentic.  This is

12   the testimony I think you said they needed to get it in.  To the

13   extent you haven't ruled on it --

14        THE COURT:  Just, let's just see what he says.

15        MR. DARR:  Okay.

16        THE WITNESS:  I mean, this looks like the contract

17   with the VA and SAW-Greenland.

18   BY MR. BUTTS:

19   Q.   Can we reference the specifications portion of it that

20   pertains to precast?  Do you see that?

21   A.   I absolutely do.

22   Q.   Do you recognize what that is?

23   A.   Absolutely.  That is the specifications for the project.

24   Q.   And, are there similar specifications for all of the

25   various disciplines that go into this project?

Direct Examination - Ivan Oelrich

1    A.    For every trade in the project, yes, sir.

2    Q.    Is this an example of the specifications that you

3    referenced earlier that are part of the instructions that you

4    have to use to build this building?

5    A.    Yes, sir.

6    Q.    Why are these specifications so important to a construction

7    contract?

8    A.    Because they tell you what the -- the plans tell you where

9    things go and how they are situated.  And the specifications

10   tell you what they are.  If they wanted Pella number 17 series

11   windows then it would say Pella number 17 series windows.  And

12   that better be what you put in the job.

13   Q.    Let's go to Exhibit 2, please.  Do you recognize this

14   document?

15   A.    I do.  It's our subcontract with PRC.

16   Q.    Can we go to Defendant's Exhibit 274, please?

17         Do you recognize this document?

18   A.    I do.

19   Q.    What is it?

20   A.    It looks like the original quote that we got from PRC.

21   Before, when they were --

22   Q.    If we can go back to Exhibit Number 2, please?  Let me back

23   up.

24         If we can go to the end of it?  Are quotes sent to you

25   typically signed?

Direct Examination - Ivan Oelrich

1   A.   Yes, sir.

2   Q.   Do you know why this one is not signed?

3   A.   No, sir.

4   Q.   If we can go back to Exhibit 2, please?

5        Is that quote incorporated into this contract in any

6   manner?

7   A.   No, sir.  We make a point not to put those quotes in our

8   contracts because those quotes have or a lot of times don't --

9   are trying to skirt around the project specifications.  And when

10  we're bidding a job we want to buy the product based on the

11  plans and specifications specifically.

12  Q.   Can we go to Exhibit 14, please?

13       Do you recognize this document?

14  A.   Yes, sir.

15  Q.   Can you explain why you sent an email to Chris Crehore on

16  September the 2nd, including this document?

17  A.   Because it came from Dana.  This was the results of Dana's

18  or this was the -- when Dana went up there they --

19  Q.   If Mr. Davis --

20  A.   Oh, I'm sorry.  Yeah.  So, Dana sent it -- Dana must have

21  sent to me and then I forwarded it to Chris.

22  Q.   Well, it looks to me that it was sent, if I'm reading it

23  correctly, from --

24  A.   I'm sorry.

25  Q.   It looks like it's sent from Randall Davis.

1          Do you see that?

2     A.   I do.

3     Q.   And it was sent to Dana?

4     A.   Correct.

5     Q.   How do you end up with it?

6     A.   Because when Dana had left I had took over his email

7     account.  So emails to Dana came to my account so that I could

8     monitor anything that came in.

9     Q.   When you, did you have any involvement with selecting

10    Spring to perform the work that PRC was going to perform on this

11    job?

12    A.   Besides just monitoring what Matt and Lee were doing to

13    make sure that we were getting this thing taken care of, no,

14    sir, I did not, not in that negotiation.

15    Q.   What's Matt's role?

16    A.   Matt is the preconstruction manager.

17    Q.   And Lee?

18    A.   He's the estimator.

19    Q.   And, do you know how many -- do you have knowledge of how

20    many people they reached out to to try to take care of that?

21    A.   So, when I talked to Matt after, or after our deposition I

22    was curious about that.  And he had mentioned that they had put

23    it on the building connected, which connects to 20, 30 subs.

24    And they had gotten so many back.  But they ended up with 2 or

25    3, you know, qualified bids that could do this.

Direct Examination - Ivan Oelrich

1  Q.   Do you know whether they took the lowest or the highest of

2  that group?

3  A.   It's my understanding from Matt, Matt suggested that we

4  took the lowest.  He had suggested that we had, you know, Spring

5  at whatever they are 230 and, or 330 and the other one at 360 or

6  something like that.

7  Q.   After PRC was terminated, how did that impact

8  Oelrich Construction in terms of job site supervision?

9  A.   I don't necessarily understand your question.  I'm sorry.

10 Q.   Was there an impact to Oelrich Construction in terms of

11 supervising the project for an extended period of time?

12 A.   Yeah.  We needed to get this -- like I was just talking

13 about, this project -- now we are on the critical, precast is on

14 the critical path because the critical path is shifting.

15 Typically, when you build a building, you build the exterior

16 shell, you get it dried in.  And then the critical path will go

17 to the interior finishes.  That's how a typical project goes.

18 And that's how this one was originally laid out.

19     But once the, so once the building was dried in we still

20 didn't have precast, but we had moved on to the inside and

21 started doing all those inside finishes.

22     And, while the inside were getting done the outside was not

23 getting done.  And, so the critical path changed from the inside

24 of the building to, hey, the precast has got to start now so

25 that we can get the metal guy behind him and the brick guy

1    behind him and then we can do all the site, you know, we've got

2    a lot of site concrete and fencing and what not to do after

3    that.

4    Q.    Did that have an impact on the sequencing of the job and

5    your organization?

6    A.    Absolutely.

7    Q.    I would like you to look at Exhibit 6, please.  Plaintiff's

8    Exhibit 6.

9              MR. DARR:  Your Honor, this is one of the objections

10   that we filed to the pretrial exhibit list for Oelrich.  We

11   objected to the admission of this exhibit primarily for two

12   reasons.  One being that this chart, this table basically has an

13   analysis of what they believe their delayed damages to be.  And,

14   unfortunately though for them, you need an expert to provide

15   testimony and analysis as to what the delay damages would have

16   been.  They don't have anyone designated even as a quasi fact

17   expert witness in this case to testify as to that matter.

18             And, given that the admissibility of this would depend

19   on some sort of expert opinion to support it we believe it's

20   objectionable for that reason under Rule 702.  But also an

21   easier one is under Rule 1006 for summaries.  This is

22   summarizing, in the left-hand column under general conditions,

23   various costs that Oelrich supposedly incurred as part of their

24   delayed damages calculation.  And, we were never given any of

25   the backup documentation for those costs.

Direct Examination - Ivan Oelrich

1           For example, you've got the project manager there.
2   And they are trying to charge his salary for this period of time
3   that they allege that they were delayed and kept on the project
4   longer due to PRC.  But we were given no backup that shows proof
5   as to what was actually paid to the project manager for the
6   case.

7           I asked them during Mr. Oelrich's deposition whether
8   they had that sort of documentation.  And I can run through his
9   transcript and find where he told me, yes, they do.  But we
10  weren't given any of it.

11          THE COURT:  Well, let me deal with that and then we
12  can double back to the expert.

13          It really doesn't matter to me whether you ask
14  Mr. Oelrich in his deposition whether that document exists.
15  What you need to show me is your production request where you
16  asked for that document.  And then if they didn't provide it
17  I'll exclude it.  But, more to the point, if they didn't provide
18  it, you asked for it, there should have been a motion to compel
19  and we would have solved the problem.

20          So, I mean, if you didn't ask for it, why does that
21  mean I should exclude the evidence?

22          MR. DARR:  Well, I mean, I can -- construction case, I
23  guarantee my requests for production tried to get all of these
24  documents.  They didn't produce them.  Frankly, when I'm trying
25  to prove a delay of claim in particular I'm going to make sure I

Direct Examination - Ivan Oelrich

1   get all the documents produced that I need to rely on to prove

2   my claim.  It's their damages claim.  The burden is on them to

3   prove it.  If they decide not to produce those documents why am

4   I going to, you know, frankly, I don't want to waste my client's

5   money trying to have a fight over trying to get the documents

6   that they should have a motivation to produce in the first

7   place.  That explains my rationale, to be blunt.

8          THE COURT:  Well, and I get it.  And, if they come in

9   and Mr. Oelrich says, I paid the superintendent $1,900 a week,

10  or whatever this says, if he doesn't have backup for that, that

11  may go to credibility, but why can't he testify to that?  I

12  mean, you know what the people make in your office.  I mean, if

13  you are in a lawsuit and it makes a difference what Ms. Bunch

14  makes you know the answer to that question and you can testify

15  to this.

16         MR. DARR:  Well, I guess I can testify to it, but the

17  summary itself would be inadmissible.  That's all I'm talking

18  about right now.

19         THE COURT:  And, I don't get that either.  I do

20  understand Rule 1006, but if you have a witness who testifies to

21  a fact, Rule 1006 doesn't have anything to do with it.  So if he

22  comes in and says, this is what we paid, and this is what we

23  lost, this is the effect of not getting the precast when we were

24  supposed to, if he knows that, and it's information he can

25  testify to, then he is not summarizing other stuff.  He's just

1    testifying.  Isn't that right?

2            MR. DARR:  Well, I guess if Your Honor's ruling only

3    depended on his testimony with regard to their damages then,

4    yes.  But, obviously, this table wouldn't be a basis for

5    evidence is all we're trying to say, Your Honor.  The actual

6    excel spreadsheet itself.  I know it seems like I'm kind of, you

7    know, making a thin distinction there so to speak, but to me I

8    wasn't provided any of those records that were underneath all of

9    this.  For all I know those records are inadmissible themselves.

10   I have no idea.

11           I mean, it's got to be based on admissible evidence

12   too which is another reason that I don't know one way or the

13   other whether it's based on admissible evidence or really

14   whether it's even true.  I guess that could go to credibility.

15   And, if he just wants to testify to that, that's fine.  But the

16   table should be a piece of evidence that's admitted.  It's one

17   of the only two objections we made to all of their trial exhibit

18   list.

19           THE COURT:  I understand the argument, but I only made

20   a couple of objections, cut me some slack.  But I got to deal

21   with the objections on the merits.

22           As to expertise, the 702 objection, he's the president

23   of the company.  So, if he wants to testify here is how we do

24   business, here is what I pay a supervisor, if I have to do this

25   project 3 weeks late, if I have to keep the supervisor on the

1    job for 3 extra weeks, it cost me $5,700, it seems to me he can

2    give that testimony.

3            MR. DARR:  From the cost perspective it seems like you

4    are probably right.  I guess I was more focused on the actual,

5    any delay analysis that was performed.  Typically in delay

6    claims, at least the ones I've been involved with, you've always

7    got some sort of expert, at least a quasi one, who can testify

8    as to what the analysis was that they did to arrive at the

9    conclusion that, yeah, indeed, we suffered however many weeks of

10   delay, and it was on the critical path, and let me explain to

11   you how I got there.

12           Now, they didn't designate any experts here, quasi or

13   otherwise.  So, I think that's a real issue, Your Honor.  And

14   that's why I'm raising that objection now.

15           THE COURT:  Well, I overrule the objection.  If he

16   gets to something that only an expert could testify to, and he

17   hasn't made the required expert disclosure, object again and

18   we'll deal with it.  But, if it's just things that the president

19   of the company can testify to, he can testify to it.

20           And I understand that often in a case like this you'd

21   have an expert.  There's no limit how much money you can spend

22   to litigate a case, but you don't have to.  And, frankly

23   sometimes the guy that runs the company is more credible on that

24   kind of thing than the fellow that you hired who is good at

25   giving expert testimony.  So, when he gets through on direct and

1    you get through with cross we'll see what he has proved.

2         MR. DARR:  I was going to say, maybe that's something

3    I can address on cross.  Thank you, Your Honor.

4    BY MR. BUTTS:

5    Q.   Mr. Oelrich, do you recognize the document that's Exhibit

6    6?

7    A.   I do.

8    Q.   The information that's on the left side of the exhibit, can

9    you explain what the line items are, first of all, going down

10   under what they call general conditions?

11   A.   Yes, sir.  So I guess maybe to better, to back up a little

12   bit, this document I went, when we had this issue and we had

13   removed PRC, we were looking to define what, you know, what our

14   damages were.  That was the goal.  And so I went and sat with

15   Mr. Wilson, who is the assistant project manager, and pulled up

16   a stool to his desk.  We took the -- to the left, to get into

17   your direct question, the left is a very much abbreviated -- we

18   took the original budget that we did for this job and broke it

19   down into just the things that we needed to show for our

20   extended stay on the job.

21        And so those are the items in column B there that we

22   thought were affected by us being out there on the project for

23   an extended duration.

24   Q.   On the first line it says, project manager.  Is that

25   Mr. Crehore or whoever followed behind him or before him?

1   A.   Yes, sir.  Correct.  Yes, sir.

2   Q.   And why is the quantity .5?

3   A.   Because roughly half of his time or half of his time or,

4   excuse me, approximately half of his time was attributed to that

5   project.

6   Q.   And, is the unit price his weekly salary?

7   A.   Yes, sir.  That's his weekly salary.

8   Q.   And, what constitutes the labor burden?

9   A.   Labor burden is all of the soft costs that go into having

10  an employee; retirement funds, workers' comp, insurance, FICA,

11  all of the different things that go into employing someone.

12  Q.   What type of employee benefits does Oelrich Construction

13  pay?

14  A.   We pay for health insurance, we pay for dental insurance,

15  we have vision, we a have 401K that we match up to a percentage.

16  Vacation time.  People's vacation can vary depending on the

17  length of stay.  So, paid vacation.  I'm sure I'm forgetting

18  some other things, but that's generally it.

19  Q.   Does the 23.59 percent in the case of the project manager

20  reflect that labor burden?

21  A.   It does.  That's a specific number that

22  Miss Christina Sapp, our accounts payable person, she calculates

23  that number on a form.  And we do a lot of work for the

24  University of Florida.  There is a form we fill out and create

25  that number specific to each employee.

Direct Examination – Ivan Oelrich

1   Q.   I'll ask her more about that when she testifies.

2       So, is the product of the multiplication coming across left

3   to right, is that what we're seeing for the 1,307?

4   A.   Yes, sir.  That's half, .5 times the full week salary of

5   2,115 multiplied by the labor burden should give you half a week

6   of what they cost.

7   Q.   And the superintendent on the next line down, did you have

8   a full-time superintendent on this job?

9   A.   We did, yes, sir.

10  Q.   And, is the unit price that's reflected of $1,900 accurate?

11  A.   Yes, sir.

12  Q.   And, is the labor burden of 24.96 percent calculated in the

13  same way as it was up above for the project manager?

14  A.   Yes, sir.

15  Q.   And is the product of those numbers on the right-hand side

16  accurate, 2,374?

17  A.   Yes, sir.

18  Q.   And, the project engineer, did you have one project

19  engineering on this job?

20  A.   We actually had a couple different ones on this job.

21  Q.   Did the combination of the project engineers total one full

22  work week?

23  A.   For sure, yes, sir.

24  Q.   And, is the price, the unit price for one full work week of

25  a project engineer or engineers $1,050?

1  A.   Yes, sir.

2  Q.   Is the labor burden stated or calculated the same way?

3  A.   Yes, sir.

4  Q.   As the others we talked about?

5  A.   Yes, sir.

6  Q.   Is the product accurately stated on the right-hand column

7  under total?

8  A.   Yes, sir.

9  Q.   Is that $1,282?

10  A.   That's correct.  Yes, sir.

11  Q.   The next line item it says cellphones and communications,

12  .25 months.  Can you describe to me how that calculation is

13  performed?

14  A.   So, again, we're trying to get down to what this project

15  was costing us per week.  So some of these items were figured in

16  months, units is the months.  So, in order to get a week you get

17  a quarter of a month, .25 percent of a month.

18  Q.   So, what is the total cellphone expenditure attributed to

19  this project for one week?

20  A.   $58.

21  Q.   Did you attribute anything to sanitary facilities?

22  A.   No, sir.

23  Q.   Job site security?

24  A.   No, sir.

25  Q.   Dumpsters?

Direct Examination – Ivan Oelrich

1    A.    No, sir.

2    Q.    How did you calculate the postage?

3    A.    That is 25 percent.  Again, this is a paired down version

4    of the original estimate we did for the job.  So, when we

5    originally did the job we said that it's going to take $40 a

6    month to do postage.  And so in this instance we took a week of

7    that and ended up charging $10 for the week.  But, in summary,

8    we get a bill from the post-it thing and all the stuff we send

9    out.  And Miss Christina cuts it up and puts it on jobs based on

10   the scale of the job.  But as you can see, it's not a big

11   expense.

12   Q.    Is there some historical information that goes into the

13   estimate or the proposal that you give originally on this?

14   A.    Absolutely.  This was all based on, I mean, beside the

15   people cost, most all of this other stuff is --

16   Q.    Does your company keep track of the expenditures so they

17   can generate the historical information accurately?

18   A.    Yes, sir.  We spend a lot of time on that.

19   Q.    The small tools, can you tell us how that was calculated?

20   A.    Yeah.  We were charging 250 a month for that project.  So,

21   a quarter of that is $63.

22   Q.    And, is the calculation for the vehicle fuel accurate at

23   $400 a month?

24   A.    Yes, sir.

25   Q.    And, you took one fourth of that for a week?

Direct Examination - Ivan Oelrich

1    A.   Correct.

2    Q.   And, is the one hundred dollars that are under the total,

3    is that an accurate number?

4    A.   Yes, sir.

5    Q.   And, for the job site vehicle, is it accurately stated that

6    one fourth of the monthly cost of $250, is it accurate that it's

7    $250 a month for the job site vehicle?

8    A.   Yes, sir.

9    Q.   And, is it the -- did you just multiply that times -- you

10   divided it by four?

11   A.   Correct.

12   Q.   And, in terms of the clean up on the job, does it --

13   historically is $907 an accurate number to attribute to a job

14   like this for cleanup?

15   A.   Yes, sir.

16   Q.   Did you multiply that number times .25 to equal $227?

17   A.   We did.

18   Q.   What's the $5,482 that we see on the right?

19   A.   That's the sum total of column line L to that point.  So

20   that's the people and --

21   Q.   Could you scroll up a little bit, please?  I mean, I should

22   have said down.

23        Can you describe what the construction aids are, MOT?

24   A.   That's modifications of traffic or maintenance of traffic.

25   Those are cones and stop signs and, you know, bob the barricade

Direct Examination - Ivan Oelrich

1   type stuff.

2   Q.   Do you rent that?

3   A.   We do.

4   Q.   Is $75 an accurate number for one week?

5   A.   Yes, sir.

6   Q.   And, equipment rental, what would you -- what is an example

7   of what you're paying for equipment rental?

8   A.   That's the big forklift that we have out on the job that we

9   use to move equipment and materials around the job site.  Keep

10  the job site organized and clean.  It's a large scale forklift.

11  Q.   You rent it by the month?

12  A.   Yes, sir.

13  Q.   And, is $3,000 the accurate amount of money that is paid

14  for each month?

15  A.   Yes, sir.

16  Q.   And, temporary protection.  What is that for?

17  A.   That's for -- it could be for like cardboard to cover

18  countertops.  You know, it can be visqueen to cover things up.

19  It's, you know, tape and all the things that go into to keep

20  things covered from getting damaged.

21  Q.   Thank you.  Is that rented by the week for $150?

22  A.   No, it would be an expendable thing that they --

23  Q.   Oh, a one time expense?

24  A.   No.  It's an ongoing expense.  Keeping things covered and

25  protected during the job site.  It's something that happens the

Direct Examination - Ivan Oelrich

1  whole job.

2  Q.    How much does that cost per week for that product?

3  A.    $150.

4  Q.    Is the $975 a total of the 3 numbers in column L?

5  A.    Yes, sir.

6  Q.    Can we scroll down a little bit more?  What is the 6,457

7  represent?

8  A.    The sum of column M so far.

9  Q.    What is the payment and performance bond that's listed on

10  the left-hand side?

11  A.    The bonds, we have to have a bond for this project.  And we

12  get charged on that based on cost.

13  Q.    Is that $65 an accurate number for the bond?

14  A.    It is, yes, sir.

15  Q.    And, how did you determine that general liability amount,

16  the percentage in column C?

17  A.    Again, that's a historic cost that our general liability

18  insurance is based on cost.  So you multiply .98 times $6,457.

19  Q.    And that .98, how did you develop that number or arrive at

20  that number?

21  A.    That's a historical number that we've, you know, we add it

22  in every year.  We calculate to see what we're spending on

23  general liability insurance.  Lots of money though.

24  Q.    What is this 6,574?

25  A.    6,574 is the total of the 6,457 plus those two numbers we

1    just discussed, bond and general liability.

2    Q.    What is -- and then the CM fee, what does that mean?

3    A.    That's our overhead and profit for that line item.

4    Q.    And, how did you determine 15 percent is the correct number

5    to put there?

6    A.    That's, it's a feeling thing, but it seems like a

7    reasonable fee for, you know, $6,500 worth of expenses.

8    Q.    Is that what you would typically charge to perform this

9    type of work under these circumstances?

10   A.    Yes, sir.

11   Q.    That CM fee, does that pay the -- is that -- does that

12   represent the profit for Oelrich Construction?

13   A.    That represents profit and overhead office expenses.

14   Q.    Okay.  And the combined overhead profit and profit is

15   represented as $986, is that an accurate number?

16   A.    Yes, sir.

17   Q.    And so what is the total amount per week that

18   Oelrich Construction incurs expenses for each week that they had

19   to stay on the job beyond when they would have?

20   A.    I got to get Sean to move the cursor off the number because

21   I can't read it.  7,560.

22   Q.    And then, if we go to the top of that next column, at the

23   top of the page over here.  How did you determine that -- how

24   was it determined that there was a 14 week delay?

25   A.    So, like I said, when we started this thing I gave it to

Direct Examination - Ivan Oelrich

1    Andy.  I went and sat with him and said, here is the things that
2    we need to put this together.  And I left it for him to, you
3    know, figure out what those dates were and what was reasonable.
4        So the ready for precast date was our drop dead date to
5    install the precast before we got into -- before it hit the
6    critical path is what that was.  Mr. Crehore just talked about
7    that.
8    Q.   Did you -- is the $105,000, 105,845, is that an accurate
9    reflection of what it cost Oelrich Construction to continue the
10   project as a result of PRC Precast failing to fully perform
11   their work?
12   A.   It ended up costing us a lot more than 14 weeks in the end.
13   I mean, Spring didn't even get out there until September after
14   we got through all of the parts and pieces.  But, yeah, I mean,
15   we put this together in June of 2020.
16   Q.   So, below that number, that yellow line that says 7,560 a
17   week times 14 weeks, is a number that's $316,533.
18        Do you see that?
19   A.   I do.
20   Q.   Does that accurately reflect the amount of the Spring
21   Precast contract?
22   A.   Yes, sir.
23   Q.   And do you see the number below that, 272,257.00?
24   A.   Yes.
25   Q.   And is that, what is that number?

Direct Examination - Ivan Oelrich

1   A.    That's PRC's contract value.

2   Q.    Does that -- there was one change order on the job, wasn't

3   there?

4   A.    There was.  The change adds about $2,000.  It, that was a

5   deducted change order.

6   Q.    Does this number accurately reflect the PRC contract value

7   after the deducted change order is taken out?

8   A.    No, sir.  I think it's $2,000 less.

9   Q.    Are you sure of that?

10  A.    No.  I'll suggest no, I'm not.  I do know there is a $2,000

11  deductive change order on PRC's contract to remove the stainless

12  steel weld plates.

13  Q.    What do you mean by the word, delta?

14  A.    That's the difference between the 316 and the 272.  That

15  turns out to be the additional contract value that we had to pay

16  to switch from PRC to Spring.

17  Q.    And, what is the $6,996 represent?

18  A.    That's the additional aggregate that Spring had to get from

19  Georgia or whatever.  We talked about that a little bit ago.

20  But in order to match the panels, the existing panels that are

21  there at the VA.

22  Q.    Under the 109.832, is that the amount of money that Oelrich

23  Construction paid to PRC?

24  A.    Yes, sir.

25  Q.    Did you receive any panels or anything for that money?

Direct Examination - Ivan Oelrich

1    A.    No, sir.

2    Q.    Why does the next line say, 12 week delay instead of 14

3    weeks?

4    A.    It's an error.  It's the same number 105,845, but it's just

5    an error.

6    Q.    The travel expenses to Greenville, South Carolina, we heard

7    Mr. Noyes indicate that he did not turn in any receipts for

8    expenses.  Do you know whether or not the $1,000 is accurate in

9    terms of what it cost Mr. Crehore to go up there or should that

10   be $500?

11   A.    It's an estimate.  So, I mean, we had to buy a plane ticket

12   and get him up there.  And we had to pay a salary for him to go

13   up there for the day.  So, you can get to a thousand pretty

14   quick.  But, I mean, yeah, it could be $500 too.  That's not the

15   hill I'm here to fight.

16   Q.    Consequently taking that into consideration, is the

17   267,949.09 the amount that you are requesting a judgment for in

18   this case?

19   A.    Yes, sir.

20   Q.    Did PRC breach the contract by overbilling for its

21   materials in December of 2019 when it billed one hundred percent

22   for work that was not fully performed?

23   A.    Yes, sir.

24   Q.    Did it breach the contract by failing to deliver and

25   install the materials according to the directions that they were

Direct Examination - Ivan Oelrich

1    being given by Oelrich Construction throughout the, especially

2    the spring or the first quarter of 2020?

3    A.    Absolutely, yes, sir.

4    Q.    Did they, did PRC breach the contract by failing to

5    properly, to incorporate all of the, to build the panels

6    according to the specifications of the contract?

7    A.    Yes, sir.  They were required to follow the specifications.

8    Q.    And are those breaches material?

9    A.    Absolutely.

10   Q.    And, you heard Mr. Crehore's testimony earlier, in regard

11   to the, when those precast panels came onto the critical path.

12   Do you recall what he said?

13   A.    I do.

14   Q.    Do you have any reason to disagree with him?

15   A.    No, sir.

16   Q.    When Mr. Crehore was terminated, was that amicable or a

17   difficult departure?

18   A.    It was a somewhat difficult departure because I have known

19   him professionally for a long time.

20   Q.    Have you known him personally?

21   A.    Yes.

22   Q.    And, was Mr. Noyes also terminated?

23   A.    Yes, sir.

24   Q.    And, was that a difficult decision?

25   A.    Yes, sir.

Direct Examination - Ivan Oelrich

1          MR. BUTTS:  I don't have any other questions.  Thank

2     you.

3          THE COURT:  I've got a couple of questions before

4     cross, but I would like to finish this, this evening, if we can.

5     But, Mr. Darr, tell me -- I guess you get some preference if you

6     would rather start in the morning.  I'll give you a trade secret

7     to both sides.  All you really have to do is say this will go

8     faster if I get tonight to prepare further and then you get the

9     night and you start in the morning.  So, I'll leave it a little

10    bit up to you whether you want to do your cross tonight or in

11    the morning.

12         MR. DARR:  I was going over my outline right now, Your

13    Honor.  And while you're asking the questions I'm going to try

14    to listen and get an estimate.

15         THE COURT:  All right.  My questions are easy.  First,

16    the 9 cents is just a typo, right?

17         THE WITNESS:  I suppose.  Yes, sir.

18         THE COURT:  On that chart?

19         THE WITNESS:  Yeah, that's way too technical.

20         THE COURT:  It's just somebody hit the 9, it's back

21    up there now.  You can look on the right side.  This is

22    Plaintiff's 6.  I think the 9 cents is just, somebody hit the 9

23    instead of the zero.

24         You've included additional cost for aggregate for the

25    Spring Precast sample to pass?

Direct Examination - Ivan Oelrich

1                 THE WITNESS:  Yes, sir.

2                 THE COURT:  I'm not sure I understand why that's

3    different for Spring than it would have been for PRC.

4                 THE WITNESS:  Your Honor, I don't know that I'm

5    qualified to answer that question.  I didn't get into the nuts

6    and bolts of why.  I would surmise it was an original, you know,

7    they negotiated and said we're going to do this and that didn't

8    work and so now they agreed to, you know, I would be guessing.

9    I don't know.

10                THE COURT:  All right.  Fair enough.  So, that didn't

11   put your multitasking much at risk?

12                MR. DARR:  I think we're going to defer to start

13   tomorrow morning at 9 a.m. for our cross.

14                THE COURT:  All right.  Let's do that then.  Anything

15   else either side needs out of me before we break for the night?

16                We'll start at 9 o'clock tomorrow morning.  If you

17   will be ready to go I will be here on time and we'll go back to

18   work.  We are adjourned for the evening.

19                Thank you, Mr. Oelrich.  You may step down.

20                THE WITNESS:  Thank you.

21        (Proceedings concluded at 5:15 on Monday, October 25,

22   2021.)

23

24

25

Direct Examination - Ivan Oelrich

1                        * * * * * * * *

2              I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter.
3  Any redaction of personal data identifiers pursuant to the
   Judicial Conference Policy on Privacy are noted within the
4  transcript.

5  /s/ Lisa C. Snyder                    3/13/2022

6  Lisa C. Snyder, RPR, CRR              Date
   Official U.S Court Reporter

7

8                        **I N D E X**

9  PLAINTIFF'S WITNESSES                            PAGE

10 CHRISTOPHER CREHORE
   Direct Examination By Mr. Butts                    48
11 Cross-Examination By Mr. Darr                      124
   Redirect Examination By Mr. Butts                  155

12
   DANA NOYES
13 Direct Examination By Mr. Butts                    156
   Cross-Examination By Mr. Darr                      171
14 Redirect Examination By Mr. Butts                  177

15 IVAN OELRICH
   Direct Examination By Mr. Butts                    181

16

17                      E X H I B I T S

18
   (All stipulated-to exhibits were discussed)        52
19

20

21

22

23

24

25