1          **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF FLORIDA**
2               **GAINESVILLE DIVISION**

3

4

OELRICH CONSTRUCTION, INC.,    )
5                               )
   Plaintiff,                   ) Case No: 1:20cv169
6                               )
            v.                  ) Gainesville, Florida
7                               ) October 26, 2021
PRC PRECAST, LLC,               )
8                               ) 9:00 AM
                                )
9   Defendant/Counter-Plaintiff,)
                                ) VOLUME II
10           v.                 )
OELRICH CONSTRUCTION, INC.,     )
11   Counter-Defendant.         )
  _____ )
12          **TRANSCRIPT OF BENCH TRIAL**
13    **BEFORE THE HONORABLE ROBERT L. HINKLE**
            **UNITED STATES DISTRICT JUDGE**
14          **(Pages 219 through 415)**

15

16

17

18

19

20

21          *LISA C. SNYDER, RPR, CRR*
         **Official United States Court Reporter**
22      **111 North Adams Street, Tallahassee, FL 32301**
          **(850)567-1374 * lisasnydercr@gmail.com**
23
         *Proceedings reported by stenotype reporter.*
24    *Transcript produced by Computer-Aided Transcription.*

25

1   <u>APPEARANCES</u>:

2

    For the Plaintiff:          Warner, Sechrest & Butts, PA
3       Counter-Defendant        By:  ROBERT PAUL BUTTS, JR.
                                     MICHAEL DUSTIN SECHREST
4                                        SEAN GERALD HIPWORTH
                                     Attorneys at Law
5                                        RButts@fbswlaw.com
                                     sechrest@fbswlaw.com
6                                        shipworth@fbswlaw.com
                        5200 SW 91st Terrace Suite 101
7                           Gainesville, Florida 326008

8       For the Defendant:          Kirwin Norris, PA
    Counter-Plaintiff        By:  DAVID JOSEPH DARR
9                                        Attorney at Law
                                   djd@kirwinnorris.com
10                        15 W. Church Street, Suite 301
                      Orlando, Florida 32801
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                **P R O C E E D I N G S**

2     (Call to Order of the Court at 9:00 AM on Tuesday, October

3 26, 2021.)

4         THE COURT:  Good morning.  Have a seat, please.

5         Mr. Oelrich, you are still under oath.  Mr. Darr, you

6 may proceed.

7              CROSS-EXAMINATION

8 BY MR. DARR:

9 Q.   Could you pull up Plaintiff's Exhibit 2, please?

10     Good morning, Mr. Oelrich.

11 A.   Good morning.

12 Q.   I'm going to pull up Plaintiff's Exhibit 2.  Could you zoom

13 in a little bit on that, please?  And, this is the contract that

14 existed between Oelrich and PRC for the project; is that right?

15 A.   Yes, sir.

16 Q.   And, if we could turn to page 16?

17     Could you scroll down, please?  And, could you zoom in on

18 15 there, please?

19     I'm sure you heard me talking during opening statements in

20 this case about the additional payment terms that were

21 applicable to this contract?

22 A.   Yes, sir.

23 Q.   And, these are the terms that I was talking about.  Now,

24 before we get started looking at them, would you agree that

25 these terms were included within the contract that you signed

Cross-Examination - Ivan Oelrich

1    with PRC?

2    A.   Yes, sir.

3    Q.   And, if you would take a second, you can either read it to

4    yourself right now real quick, but I would like to focus in on a

5    couple of the terms that were applicable to this contract to see

6    if you're on the same page with my views on it or not.

7        If you look at it starting right here it says, PRC will

8    invoice monthly based on the attached schedule of values for

9    materials and labor purchased or performed at our facility.

10   Buyer has 10 calendar days to dispute submitted invoices.

11   Invoices offered at a 2 percent discount for net 30 or regular

12   terms for net 30, 30 days.  When I say, net 30 days, what does

13   that mean to you, Mr. Oelrich?

14   A.   The invoice is due within 30 days.

15   Q.   Of the date of the invoice?

16   A.   Well, they are billed through the end of the month.  I

17   mean, we could, but --

18   Q.   No later than the end of the month for what the billing is,

19   right?

20   A.   So, they are going through the end of the month.  So, yes,

21   from the end of the month.

22   Q.   Okay.  And then, going off of that net 30 days, looking

23   right here at the word work.  It says, work will not be

24   performed on accounts that are more than 5 days past due based

25   on the net 30 day terms.  Did I read that correctly?

1  A.   You did.

2  Q.   So, if they have an account that's more than 5 days past

3  due the net 30 day terms, PRC had the express right to not

4  perform work any more on that account; is that right?

5  A.   As long as they met all of the requirements of our

6  sub-contract.  Yes, sir, that's correct.

7  Q.   And, the next language or the next clause in this

8  additional payment term section provides, all accounts more than

9  5 days past due will be put on hold and all work stopped until

10 accounting issues are corrected to the satisfaction of PRC.  Did

11 I read that correctly?

12 A.   You did read that correctly.

13 Q.   And, would you agree that Oelrich was put on notice that if

14 your account became past due, work would be put on hold and

15 stopped until PRC felt the accounting issues were corrected to

16 their satisfaction?

17 A.   I would agree that this gives us notice of what you said.

18 Yes, sir.

19 Q.   And going right through this to the next part here where it

20 says "delivery":  Delivery schedule will be modified to account

21 for delays due to lack of payment from buyer.  Did I read that

22 correctly?

23 A.   You did.

24 Q.   So, is it fair to say that it was contemplated again that

25 if an account got behind and not being paid on time that they

1  would have to adjust the delivery schedule to bring the precast

2  to the project, right?

3  A.   Presuming they had done all of the parts and pieces they

4  need to in the sub-contract, yes, sir.

5  Q.   And, moving on to -- starting here with the word

6  additionally.  It says, additionally precast concrete members do

7  not ship from PRC's facility prior to payment for said members

8  or on accounts that are past due.  Did I read that correctly?

9  A.   You did read it correctly.

10 Q.   So, is it fair to say that it was contemplated that PRC

11 would be paid for the precast materials that it was making as

12 they were making them?

13 A.   That is correct, it was contemplated.

14 Q.   And then the last -- well, actually not the last, the

15 second to last term here.  It says, the terms and conditions in

16 note A supercede all other payment terms in this agreement.  Did

17 I read that correctly, Mr. Oelrich?

18 A.   You did.

19 Q.   From there it says, retainage is not allowed on material

20 unless indicated on the attached schedule of values.  Did I read

21 that correctly?

22 A.   You did.

23 Q.   Now, if we could take a look at the schedule of values

24 attached to the contract, please?  I believe it's on the last or

25 close to the last two pages.

1       Was this the schedule of values that was attached to your

2  contract with PRC, Mr. Oelrich?

3  A.   It appears to be, yes, sir.

4  Q.   And, if you were to look up here where it says, retainage

5  allowed?  It says, 5 percent on erecting, zero on material; is

6  that right?

7  A.   That's correct.

8  Q.   So, under this contract Oelrich agreed that there would be

9  zero percent retainage on the materials that PRC was making,

10 right?

11 A.   Yes, sir.

12 Q.   And did Oelrich withhold retainage on PRC for this project?

13 A.   We did.  By mistake, I might add.  But, yes, we did.

14 Q.   Could we take a look at Plaintiff's Exhibit 7, please?

15       Could you tell me what is this document we are looking at,

16 Mr. Oelrich?

17 A.   This is out of our accounting software.  It's our

18 sub-contractor status report.  It's basically a record of the

19 contract, any change orders to the contract, and then payments

20 made throughout the contract down there below.

21 Q.   And, since Oelrich maintains these status reports

22 internally, these reports are accurate, right?

23 A.   Yes, sir.

24 Q.   Could you scroll down a little bit, please?

25       Now, we're looking at the columns here.  And this provides

1  an overview of the amounts billed, amounts paid to PRC, is that

2  fair to say, Mr. Oelrich?

3  A.   Yes.

4  Q.   And, right here you've got the amount invoiced.  And that's

5  just the amount that PRC billed Oelrich, right?

6  A.   Correct.  Well, I mean, that's the -- yes.

7  Q.   And then, right here we've got the invoice date.  And these

8  are the dates of the invoices that PRC sent Oelrich, right?

9  A.   Correct.

10  Q.   And then, here we've got this thing that says AP reference

11  number.  Can you tell me what does AP reference number mean?

12  A.   Those are the accounts payable, that's our job numbers that

13  go on there.  So the 18066 is this job number.  And then you can

14  see it's pay app 1, 2, 3.

15  Q.   Right.  So these are the -- each pay app goes up one by

16  one, the first one is 1, the second one is 2 and so on and so

17  forth; is that right?

18  A.   Yes, sir.

19  Q.   And then over here for the amount invoiced this shows how

20  much each pay app was billed to Oelrich; is that correct?

21  A.   It does.  And, retainage is broken out separate on those.

22  Q.   We're going to get there.  Then the amount paid, this is

23  how much Oelrich has in their records as to what they paid PRC;

24  is that correct?

25  A.   That's correct.

1    Q.   And then, as you were mentioning, this unpaid retainage

2    column, this indicates how much retainage was withheld from each

3    payment application, right?

4    A.   That's correct.

5    Q.   So, on this project Oelrich withheld at least $5,850.88 in

6    retainage for PRC's work, correct?

7    A.   Not at least.  Exactly.

8    Q.   And, this is something I probably should have asked during

9    your deposition.  Can you scroll up just a little bit on this?

10        This right here it says, through month 021.  Does that mean

11   this report was ran in January of '21?

12   A.   No, that, I think the, it's at the bottom right of the date

13   the report was run.

14   Q.   Can you scroll back down to the bottom right, please?

15   A.   I think that means that it was --

16   Q.   Right here.  So, this report was ran on January 20 of '21,

17   9:56 a.m.?

18   A.   So, yeah.  Then that -- I think that is consistent with the

19   top there.

20   Q.   Okay.  As you recall, when was Oelrich ready to set PRC's

21   precast panels?

22   A.   On January 6, 2020.

23   Q.   Right.  That's what I heard Mr. Crehore testify while you

24   were in here yesterday.  Could you pull up Exhibit 307?

25        Do you remember giving a deposition in this case earlier

Cross-Examination – Ivan Oelrich

1   this year?

2   A.   Absolutely.

3   Q.   Do you remember that you were under oath?

4   A.   Absolutely.

5   Q.   And, all of the answers you gave were truthful, correct?

6   A.   That's correct.

7   Q.   Could we take a look at page 50, please?

8       And, I'm looking in particular at page 50 line 10 through

9   line 12.  It reads, question, and when was Oelrich ready to set

10  the panels?  Answer, according to my records in, on 3/10,

11  March 10th of 2020.

12      Does reading that answer change your answer that you are

13  providing today that you were ready for the precast panels in

14  January of 2020?

15  A.   No, sir, it does not.  Am I allowed to explain myself?

16          THE COURT:  Just answer his questions.  We'll get

17  there.

18          THE WITNESS:  Yes, sir.

19  BY MR. DARR:

20  Q.   And so, I think I heard earlier during, I can't remember if

21  it was testimony from you or Mr. Crehore, that Oelrich doesn't

22  actually perform any of the work that it did on this project, it

23  was all subcontracted out to subcontractors, right?

24  A.   We are a management firm, yes, sir.

25  Q.   And that means that necessarily Oelrich could not have

1   self-performed the architectural precast work for that project;

2   is that right?

3   A.   That's not what we do, no, sir.

4   Q.   With that in mind, you wouldn't consider yourself an

5   architectural precast expert, right?

6   A.   No, sir.

7   Q.   And given that, do you know what sort of special

8   requirements are for the storage of architectural precast?

9   A.   Well, I've certainly seen, you know, put it on A frames.  I

10  mean, I've seen how they were stored at PRC's site.  And that's

11  not rocket science.

12  Q.   Well, sir, in your opinion, architectural precast could be

13  stored at PRC's site the same way at the project site, is that

14  your opinion?

15  A.   Sure.  I mean, we would rely -- to answer your question to

16  offer more, we would rely on the expertise of the professional

17  to tell us how to store it.  If the professional says it's okay

18  to stack it with dunnage under it at their place then I presume

19  it's okay to stack it at our place as well.

20  Q.   But, you don't know one way or the other whether that's

21  true though or not, right?

22  A.   That's why we hire professionals to work with.

23  Q.   After PRC was terminated it was Spring Precast that

24  completed PRC's scope of work; is that right?

25  A.   Yes, sir.

Cross-Examination – Ivan Oelrich

1    Q.   And, you personally, did you get involved with re-procuring

2    PRC's contract?

3    A.   Besides managing the fact that it was getting done, no,

4    sir.

5    Q.   And, that brings up a good point.  In terms of interactions

6    with PRC, how many times did you directly interact with PRC?

7    A.   None.  I made an attempt and I couldn't get any response.

8    Q.   Just an email or 2 then; is that right?

9    A.   No.  I called several times, on several occasions and got

10   the runaround.

11   Q.   Did you speak with anyone from PRC on the phone?

12   A.   I finally hit the sales button and the salesman picked up.

13   Q.   Other than that, did you talk to anyone at PRC?

14   A.   I made several attempts, no.

15   Q.   How active -- let me be more specific.  How many times were

16   you out at the project site on average per month?

17   A.   Once a month, twice a month.

18   Q.   And how many projects was Oelrich contractually engaged in

19   in the year 2020, approximately?

20   A.   We'll go with 40, 50, something like that.

21   Q.   Do you have a similar sort of project load, so-to-speak

22   usually year to year, 40 or 50?

23   A.   We discussed that in the deposition.  I mean, we've got

24   lots of small jobs.  We do a lot of work for UF.  Those can be

25   50, $60,000 jobs.

1   Q.   And, in 2019, similar caseload, 40 or 50?

2   A.   Yes, sir.

3   Q.   In terms of in the organization you're at the very tippy

4   top and you're responsible for, at the end of the day, all of

5   them; is that right?

6   A.   Correct.

7   Q.   So, is it fair to say that when it came to this particular

8   job you were relying on the information of your employees when

9   making decisions as to whether or not to terminate PRC?

10  A.   That's correct.  Well, plus my own experience.  I verified

11  that their fears and complaints, you know, by calling, trying to

12  connect with them.  We also got a bill for one hundred percent

13  of the materials.  I mean, that, that was the, that's the huge

14  red flag.

15  Q.   And who told you about that bill for one hundred percent of

16  materials?

17  A.   I don't recall, but it was, that was a big deal.

18  Q.   Did anyone ever tell you that someone from PRC had

19  explained to an Oelrich employee why they billed at one hundred

20  percent?

21  A.   No, sir.

22  Q.   Okay.  Let's go on to Defendant Exhibit 288, please?

23       Let's do the Excel version instead.  Sorry.

24       Plaintiff's Exhibit Number 6.  Can you make it a little

25  smaller so we can see the whole thing?

1        So, I believe, do you recall looking at this table

2   yesterday during your testimony while Mr. Butts was asking you

3   questions?

4   A.   Yes, sir.

5   Q.   And, is it fair to describe this document as a calculation

6   of Oelrich's damages in this case?

7   A.   Yes, sir.

8   Q.   And, as a component of those damages you've included

9   $105,000, give or take, for delay damages; is that right?

10  A.   I can't see it.  But, yes, sir.  Oh, I can.  Yes.  There it

11  is.  Yes.

12  Q.   To come to the conclusion that -- first of all, I think the

13  Judge clarified this yesterday, but where it's in yellow there,

14  where it says 12 week delay 105,000, that's a typo that's

15  supposed to say 14 week delay; is that right?

16  A.   That is correct.

17  Q.   Now, can you tell us how did you come to the conclusion

18  that PRC had caused a 14 week delay of the project?

19  A.   As we discussed yesterday, the 3/10 mark showed or was

20  generally where PRC switched from not being on the critical path

21  to being on the critical path.

22  Q.   When you say 3/10 you're talking about up here?

23  A.   Yes.

24  Q.   Did you perform -- well, let's back up.  When you say,

25  critical path, what do you mean by that?

Cross-Examination - Ivan Oelrich

1    A.   The critical path are the activities in a project that must

2    go on in order to get to the end.  As opposed to a noncritical

3    path where you can kind of -- it has float, it can happen at

4    different intervals and not change the end date.  In this case,

5    the critical path was flipped because of PRC.

6    Q.   When you say flipped, what do you mean by that?

7    A.   Well, originally our critical path went through the inside

8    of the building.  We got the building dried in.  And then while

9    the outside was being finished the critical path was the

10   interior finishes of the building.

11   Q.   Okay.  And, can you describe the analysis that you

12   performed to determine that PRC's work was on the critical path?

13   A.   You look at what all of the activities are that need to be

14   finished to complete the project.  In this case it was about 90

15   days.  We had committed to a May, I think 17th, completion date.

16   So you work backwards from there and that gets us to about early

17   March.

18   Q.   When you say you had committed to a May 17th completion

19   date, that was to SAW?

20   A.   Yes.

21   Q.   Ultimately, the project wasn't completed until well after

22   that, right?

23   A.   That's correct.

24   Q.   When was the project completed?

25   A.   April of 2021.

Cross-Examination – Ivan Oelrich

1    Q.   When did Oelrich complete its work at the project?

2    A.   Gosh, it was probably in July.

3    Q.   Well, I could have swore I heard you testify yesterday that

4    Spring Precast didn't finish up until October of 2020?

5    A.   I wasn't done answering your question.

6    Q.   Oh, I apologize.

7    A.   It had to be towards the end of 2020.

8    Q.   But you don't know one way or the other when Oelrich

9    finished its work in the project as you sit there today?

10   A.   It's somewhere in that range.  At the end of the year,

11   maybe January'ish, something like that.

12   Q.   January of 2021?

13   A.   Yes, sir.

14   Q.   But you're not sure one way or the other what the exact

15   month and year was that Oelrich finished its work at the

16   project, right?

17   A.   No, I'm not sure because we couldn't go back -- we had

18   punch list stuff to do and different things like that.  I'm

19   talking about finish the major activities.  So, we had to wait

20   for -- luckily, we had to wait for them to finish so that we

21   could go back and do some of the last minute activities.

22   Q.   When you say you had to wait for them to finish, to whom

23   are you referring?

24   A.   SAW.

25   Q.   So, SAW was behind therefore it wasn't a big deal for

1   Oelrich that they may have perceived you as behind; is that

2   right?

3   A.    Thankfully, yes.

4   Q.    And, did SAW ever assess any sort of liquidated damages or

5   other delay damages against Oelrich for late completion of your

6   work?

7   A.    No, because we beat them to the finish line.  Had we not,

8   we certainly would have faced them.

9   Q.    And, as a part of this critical path analysis that you

10  performed that came to the conclusion that PRC was responsible

11  for delaying your work on the project 14 days, can you tell us

12  who did that analysis?

13  A.    It was -- I mean, Chris was leading the charge.  Then he

14  left and Andy was taking charge of it.  So, we were talking

15  about it in the office and working through those things.

16  Q.    Did you personally take a look at the schedules and confirm

17  any sort of analysis that Mr. Crehore and Mr. Wilson provided

18  you?

19  A.    I did not look at the schedules, but we certainly discussed

20  it.

21  Q.    So, if I were to show you --

22  A.    Excuse me, sir.  I mean, they did show me the schedules.

23  Did I sit down and check their work?  No, sir, I did not.

24  Q.    Let's look at some of these general condition costs, if we

25  could, please.

Cross-Examination – Ivan Oelrich

1          First, could you tell me, what do you understand general

2    conditions to mean?

3    A.    Those are the soft costs of the project as opposed to the

4    hard costs which are brick and --

5    Q.    Is it your position that these costs couldn't have been

6    absorbed by any other projects that Oelrich had at the time?

7    A.    No.

8    Q.    So, --

9    A.    Why, never mind.  No, sir.  They could not be absorbed by

10   another project.

11   Q.    And, these costs right here, let's focus in on rows, let's

12   say, 15 through 18.  I think it's fair to say that these items,

13   these rows make up the lion share of your daily general

14   condition cost; is that fair?

15   A.    Yes, sir.  Very typical.  Yes, sir.

16   Q.    And it looks like you have indicated that, for instance,

17   for the superintendent you're allocating one, which means that

18   all of his salary and labor burden was dedicated 100 percent to

19   the project at issue in this lawsuit?

20   A.    Yes, sir.

21   Q.    And this $1,900, that's his weekly pay?

22   A.    Correct.

23   Q.    And that's an actual cost; is that right?

24   A.    That's his actual weekly pay, yes.

25   Q.    You were actually paying the superintendent for the job

1   $1,900 per week?

2   A.   That's his salary.  I mean, what he actually gets paid is

3   --

4   Q.   Sir, before taxes his gross pay was $1,900 per week; is

5   that right?

6   A.   Yes, sir.

7   Q.   And, somewhere in Oelrich's accounting system, or otherwise

8   in your records, there would have been some sort of either pay

9   stubs or checks to prove that you had paid that amount to the

10  superintendent; is that right?

11  A.   Absolutely.  Yes, sir.

12  Q.   And, that's true for the executive management on 15, the

13  superintendent on 17, and the project engineer on 18; is that

14  right?

15  A.   No, sir.  The executive manager makes a lot more than zero

16  dollars.

17  Q.   Fair enough.  You got me.  Good one.  But, as to the

18  project manager --

19  A.   Yes.  I'm sorry.

20  Q.   No, that's fine.

21  A.   I couldn't pass that up.  I'm sorry.

22  Q.   Listen, I would have made fun of me too.

23       So 16, 17 and 18, those though, there would all be checks

24  and other proof that you actually paid those people those

25  amounts?

Cross-Examination - Ivan Oelrich

1   A.   Yes, sir.

2   Q.   Do you know one way or the other whether those were

3   produced in this case?

4   A.   No, sir, I don't.  I don't think that they were.

5   Q.   And I'm looking at this project engineer here.  I believe

6   you testified yesterday that's not actually one engineer, it's

7   multiple engineers, right?

8   A.   Yes.  I mean, it could be a combination.  We had multiple

9   project engineer types on that project.

10  Q.   How many project engineer types did you have assigned to

11  the project?

12  A.   We had Yosamani, we had Jerry, we had another one that's

13  forgetting me.  At least 3.

14  Q.   You're not sure one way or the other how many project

15  engineers are included in that 1,050 rate there; is that right?

16  A.    No.  Like I talked about yesterday, this spreadsheet or

17  this portion of the spreadsheet is a breakdown from our original

18  estimate for the project.  And so, these are rates that were,

19  that are, we charged on the original end.  So, we're trying to

20  assess what our weekly cost was.

21  Q.   I apologize.  Go ahead.  Are you finished?

22  A.   Yes, sir.

23  Q.   Is it fair to say that you believe calculating your damages

24  based on the estimate you had for the project is a fair way of

25  presenting your damages in this case?

Cross-Examination – Ivan Oelrich

1    A.   Yes, sir.

2    Q.   So, that 1,050 there, just so I understand, it's comprised

3    of multiple project engineers, but we're not sure how many and

4    we're not sure who they are, as you sit there today, right?

5    A.   No, sir.  It does not.  It's someone's actual salary.  And

6    the labor burden that goes with it is attached to someone.

7    Q.   I would like to go back to this critical path analysis.

8    So, would you agree to perform a critical path analysis you need

9    to be looking at a schedule of some sort for the project?

10   A.   Yes, sir.  Well, I mean, so we could do one on a

11   chalkboard.  We could have a conversation about it.  So maybe my

12   answer is no.

13   Q.   How would you do it on a chalkboard?

14   A.   You'd write out the activities that have to come after, you

15   know, let's say precast in this instance.  And after that we

16   need to do the louvers, we need to do the brick.  Each one of

17   those is going to take a certain number of days.  And we just

18   write it out.  And, you could come up to -- you add up the

19   number of days of the activities that are left.  I mean, at this

20   point we are down to, you know, it's a very easy thing to look

21   at as far as the activities that are going to be, you know, left

22   to do.

23   Q.   So, I mean, I want to make sure I understand what you're

24   saying.  But, if you write it out on a chalkboard the way you

25   describe with remaining activities, the duration of each, so on

Cross-Examination – Ivan Oelrich

1    and so forth, that sounds a lot like a schedule to me.  I mean,

2    it's just handwriting on a board basically, right?

3    A.    Yeah.  It's handwriting, but, yeah.  I mean, that's the way

4    a schedule is calculated.

5    Q.    Would you say it's typical in the construction industry

6    that construction schedules and, frankly, critical path analyses

7    are performed on computers usually?

8    A.    Yes, sir.

9    Q.    And, was that done in this case by you guys?

10   A.    Yeah, we had a schedule.

11   Q.    What sort of scheduling software did you guys use to

12   perform the critical path analysis?

13   A.    Typically we use Microsoft Project Schedule, I guess.

14   Q.    And, you said typically.  I just want to make sure I

15   understand.  Do you know one way or the other what software you

16   used to perform the analysis that came to the conclusion that

17   PRC was responsible for a 14 week delay?

18   A.    No, sir.  I don't definitively.

19   Q.    And, do you guys own a copy of Primavera?

20   A.    We do.

21   Q.    Do you know why it wouldn't have been used on this

22   particular project?

23   A.    No.

24   Q.    This is Defendant's Exhibit 128.  It looks like it's an

25   email from Jordan Robinson.  He was the superintendent for

Cross-Examination - Ivan Oelrich

1    Oelrich; is that right?

2    A.   Yes, sir.

3    Q.   And Mr. Robinson was the one who was personally responsible

4    for maintaining the schedule internally at Oelrich that was

5    supposed to reflect what was actually happening at the project,

6    right?

7    A.   Yes, sir.

8    Q.   Was there anybody else at Oelrich responsible for

9    maintaining the schedule to make sure it's accurate and reflects

10   what was happening at the project?

11   A.   He probably got help from, like, Andy Wilson would help him

12   with that.  And the assistant project manager might help him.

13   Q.   I think I seem to recall during your deposition you

14   testified that Mr. Robinson is a competent superintendent, at a

15   minimum; is that fair?

16   A.   That is.

17   Q.   So, whatever he included in this schedule do you think it's

18   likely that people relied on it and assumed it was correct?

19   A.   I do.

20   Q.   So, once again, this is from Mr. Robinson.  And there's a

21   whole bunch of names here.  If you could take a look at the two

22   columns -- actually, could you scroll up this a little bit?

23       This was sent on January 23rd, 2020.  Does that appear to

24   be correct?

25   A.   Yes, sir.

Cross-Examination - Ivan Oelrich

1  Q.  And then, in this to column here there's a whole bunch of

2  names.  Am I right to assume that those are what would appear to

3  be all the subcontractors that were on the project?

4  A.  I would agree with that.  Yes, sir.

5  Q.  And, of course, one of them was Mr. Davis, so that's the

6  PRC representative; is that right?

7  A.  Yes.

8  Q.  And, attached to it is the overall schedule, it's a PDF.

9  It looks like it has a date of 1/15/20; is that right?

10  A.  That is.

11  Q.  Do you know, how often did Oelrich update its project

12  schedules for this project?

13  A.  They should be updated monthly.

14  Q.  Can you scroll to the actual schedule?

15      So, this looks like your full schedule that you had at the

16  project as of January 2020; is that right?

17  A.  Yes, sir.

18  Q.  And, just to sort of educate the non-construction folks in

19  the room, can you tell us generally what the ID, task and

20  duration, all those columns mean?

21  A.  ID is just simply a number that breaks down all of the task

22  names that are attached there.  So, number or, let's see, 2 is

23  an overview of preconstruction.  It's going to take a total of

24  84 days.  And then under that there's executing the contract,

25  permitting all of the things that go into the preconstruction

Cross-Examination - Ivan Oelrich

1  process.

2  Q.   Okay.  And, the start and finish dates are when the work

3  was -- actually did start and when it actually finished for

4  things that are already done; is that right?

5  A.   That's the concept, yes, sir.

6  Q.   And, if we could scroll slowly through these pages, please?

7       So, generally, the schedule reflects everything that had to

8  be done for the project in the order that you guys felt it had

9  to be done.  Things that are gray, I assume that means that

10  that's work that's already been completed; is that right?  Or am

11  I incorrect?

12  A.   I don't know the answer to that.  But it appears that --

13  well, no, it doesn't because there is a 43 percent that's not.

14  Q.   So you don't know one way or the other what the gray means

15  versus the yellow and so forth and so on?

16  A.   I sincerely don't, no, sir.

17  Q.   Can you go down to like page 15?  That keeps going on and

18  on.  Eventually you get to a bar chart.  That's what I'm trying

19  to get to.  Okay.

20       This is a bar chart depiction of the schedule for the

21  project.  Basically, is it fair to say, it shows the same thing

22  as a bar that we looked at with the start finish dates, but it's

23  in a graphic format showing when things were supposed to be

24  done; is that fair?

25  A.   Yes, sir.

Cross-Examination - Ivan Oelrich

1    Q.   Is it fair to say that from construction bar charts one

2    could get a rough idea of what the critical path is for the

3    project?

4    A.   Yes, sir.

5    Q.   Could you tell me, based on reviewing this, and we're happy

6    to show you whatever pages you want, see what was the critical

7    path of the project as of January 2020?

8    A.   Well, they usually show up in red down there.  I think

9    where you're heading is this schedule was not maintained very

10   well at all.

11   Q.   Right.  So, I heard Mr. Crehore testify or at least suggest

12   that he wasn't sure one way or the other whether the schedule

13   actually reflected what was happening on the project site; is

14   that fair?

15   A.   That is absolutely fair.

16   Q.   So, if we go down to the bottom, even if this isn't

17   accurate, I'm just curious to see what your opinion is of where

18   the precast is in terms of falling on the critical path as of

19   January 2020.  Can you determine that from this particular

20   document?

21   A.   Well, I'll tell you one thing that I noticed in here.

22   So, --

23   Q.   Stop for a second, sir.

24   A.   I'm sorry.  Can you go back?

25   Q.   Which page?  It's at the bottom there.

1  A.   It's the next one up I think.  On this, this bar chart that

2  he has it's showing 2/17.  Yeah, the date of February 17

3  starting the precast.  Right there.  And, then it goes

4  through -- it follows that down.  If you'll go to the next page,

5  you know, it's going around the building there as we build it on

6  the schedule.

7       Continue on down, please.  And then it's showing the metal

8  panels.  And then, on the other side there, or excuse me, in the

9  middle it shows metal stud framing starting in December.  And,

10 then as you go down you can see the interior -- or continue to

11 go down, please.  Those are the -- if you'll stop right there.

12 Those are the interior activities.  And you'll see the

13 Acoustical does the vinyl base, which is the last activity for

14 the interior of the project in March 5th.  But, substantial

15 doesn't happen for almost 2 months after that; a month, month

16 and a half.

17 Q.   Looking at what you see here on this document, can you tell

18 me whether or not PRC's work was on the critical path of your

19 work on the project as of the date of this schedule?

20 A.   Looking at the activities on the schedule you can see that

21 the outside finishes after the inside, like I just discussed.

22 Q.   Can we go back to the Excel spreadsheet?  I believe during

23 your deposition you testified that you were the one that created

24 this spreadsheet, right?

25 A.   I sat with Andy and we sat down and we built this together.

Cross-Examination - Ivan Oelrich

1    Yes.

2    Q.   When you say Andy, Andy Wilson?

3    A.   Mr. Wilson, yes.  Sorry.

4    Q.   And, what was Andy Wilson's role at the project again?

5    A.   He was assistant project manager.

6    Q.   And, if you could go to the upper right-hand corner,

7    please?  We've got -- back up.  That's good.  Just leave it.

8         Ready for precast, 3/10/2020.  That's what it says, right?

9    A.   Yes, sir.

10   Q.   And, that was the date by which, at least when this

11   document was drafted, Oelrich believed that the project was

12   ready for PRC's precast, right?

13   A.   No, sir.  That was the date that it changed from

14   non-critical path to critical path.  We were ready for precast

15   on January 6, 2020.

16   Q.   And, how did you make the determination that you were on

17   the critical path as of March 10, 2020?  Was that based on

18   Mr. Crehore's calculation that he testified about yesterday?

19   A.   Yes, sir.  I would have relied on his -- and, as I said

20   earlier, it was a discussion that we were having.

21   Q.   As far as you know, that calculation determining that the

22   precast critical date, sort of drop dead date of March 10, 2020,

23   that was never provided to PRC, right?

24   A.   To my knowledge, no.

25   Q.   And, this document was drafted and the damages calculated

Cross-Examination - Ivan Oelrich

1  before Spring Precast actually started its work, right?

2  A.   That's correct.

3  Q.   Do you recall when this document was drafted?

4  A.   It says right there, June 16th of 2020.

5  Q.   And, is it Oelrich's position that no other work on the

6  project could have been completed between March 10, 2020 and

7  July 28, 2020?

8  A.   No, that is not our contention.  We finished up the inside,

9  inside work.

10  Q.   So, I seem to recall you testifying yesterday, and correct

11  me if I'm wrong, that part of Oelrich's scope for this project

12  was site work and fencing?

13  A.   That's correct.

14  Q.   Could you describe to us what you mean when you say site

15  work?

16  A.   So, the -- all the underground storm piping, water piping,

17  that type of stuff, plus grading out the site.  Getting the

18  building pad ready.  There was some paving to do around to tie

19  it all in.

20  Q.   And, is any of that site work outside the blueprint or the

21  blueprint of the structure?  Let me put it this way.

22         MR. DARR:  If I may, Your Honor, can I point to it

23  real quick?

24         THE COURT:  Yeah.

25

Cross-Examination – Ivan Oelrich

1    BY MR. DARR:

2    Q.   Is any of the site work outside here, outside the actual

3    building?

4    A.   Yes, sir.  Some of the tie-ins I believe were outside of

5    that.  Certainly, the asphalt patching was outside of that

6    realm.  They tied in a waterline that went down the parking lot.

7    So, yes, sir.

8    Q.   And then, when you say fence work, I mean, I just want to

9    make sure I'm on the same page.  You're referring to this fence

10   that's around in the final picture, right?

11   A.   Yes, sir.

12   Q.   Okay.  And, is it Oelrich's position that absolutely none

13   of this site work and fence work could have preceded before the

14   precast was installed at the project?

15   A.   That's correct.

16   Q.   Can you explain to me why none of this work could have been

17   done outside of the building where the panels are before the

18   panels were erected?

19   A.   That's a relatively small footprint.  And getting cranes

20   and bringing trucks full of precast and all that, and you had to

21   get around the building.  And after the precast is done the

22   masons got to get there.  They got to run the lull, stock all of

23   the block, excuse me, brick around the building.  We've got to

24   access the outside of that building.  And you wouldn't want to

25   drive on their brand new concrete or running over their brand

Cross-Examination - Ivan Oelrich

1   new fence while you were doing those things.

2   Q.   But, was it possible that that work could have been done

3   prior to the precast installation?

4   A.   I mean, with money anything is possible.  Yeah.  If someone

5   wanted to pay us to put sponge tires on stuff, yeah, we can do

6   anything.  But that wasn't what the job was set up for.

7   Q.   And, earlier today I heard you testify that the general

8   contractor did not assess any damages against Oelrich for being

9   late in the completion because they were already late; is that

10  right?

11  A.   Yes, sir.  Essentially.  There's more to it than that, but,

12  yeah.

13  Q.   Okay.  So, had they come to the determination that there

14  was a concurrent delay, they were causing delay as well as you

15  guys at the same time, so that's why they didn't assess

16  liquidated damages or any other delay damages?

17  A.   I'll phrase it in my own words.  If they would have

18  finished the boilers and all of the start up and all that before

19  we finished the building they would have assessed us liquidated

20  damages.

21  Q.   And, is it fair to say that generally in the construction

22  industry whenever there is a concurrent delay that's a

23  non-compensable event?

24       MR. BUTTS:  Object, Your Honor.

25       THE WITNESS:  I don't know the answer to that.

1              THE COURT:  Overruled.

2              MR. DARR:  I'm sorry, I didn't hear the answer,

3    Your Honor.

4              THE WITNESS:  I don't know the answer to that.  I

5    don't know what you are asking me.

6    BY MR. DARR:

7    Q.   So, the general contractor didn't assess any delay damages

8    against Oelrich, but Oelrich's position is that it's entitled to

9    damages for delay because but for PRC they would have finished

10   early, is that generally your position?

11   A.   No, sir.  It's not.  I have -- we had a scope of work to do

12   and we could not do that scope of work because PRC did not

13   perform.  And, as soon as we finished our work then we could get

14   off the job.  We're a subcontractor on-the-job.  We're not the

15   general contractor.

16   Q.   So, if PRC, according to this table, had been there on

17   March 10, 2020 to start its work, then the project would not

18   have had this 14 week delay; is that right?

19   A.   It's really -- PRC should have been done about that time.

20   But, okay, I mean, we don't need to split hairs.  But, yes, sir.

21   I will agree with you for the sake of argument.  Yes, sir.

22   Q.   So, I don't understand.  How is that not Oelrich taking the

23   position that had PRC been there on March 10, 2020 Oelrich would

24   have finished ultimately its work earlier by 14 weeks?

25   A.   Yeah.  I mean, if you guys -- that's what I'm getting at.

Cross-Examination - Ivan Oelrich

1    If PRC would have -- I would say we would like you to have been

2    done by March 10.  But, okay, so, let's say you started on

3    March 10th, that's fine.  Same, I mean, we're talking about a

4    month, they said it was a month of time to do it.

5    Q.    Do you know what float is on a construction schedule?

6    A.    I absolutely do.

7    Q.    What is float?

8    A.    Float is an activity that doesn't drive or it's a time

9    within an activity that it's, they can move back and forth.

10   It's not on the critical path.

11   Q.    And, is it fair to say that during this relative time

12   period there were things left in Oelrich's scope of work that

13   weren't on the critical path unlike the precast, right?

14   A.    Yes.

15   Q.    So, can you tell me, do you know any basis under the

16   contract by which Oelrich would be entitled to at that float

17   time?  Let me rephrase that.

18        Is there anything under the subcontract that says Oelrich

19   owns the float on the project?

20   A.    Yeah, it says we're in charge of the schedule.

21   Q.    Other than that, is there anything that you're aware of

22   under the subcontract that says Oelrich is entitled to

23   compensation for float it would have otherwise have had?

24   A.    Yeah, it says it in there that if we're delayed by the

25   subcontractor then the subcontractor is responsible for paying

1    exactly what we have on here.  I do believe that's in the

2    subcontract.

3    Q.   If we could look back at this spreadsheet here, please?

4    And if we can go down a little bit, please?  A little bit more.

5    Still going.  It's to the left.  That's why I can't see it yet.

6         And, yesterday we were talking about the CM fee --

7    A.   Yes, sir.

8    Q.   -- that was included, 15 percent.  It looks like it was

9    right around a thousand dollars a day, $986 a day; is that

10   right?

11   A.   About a thousand dollars a week.

12   Q.   A week.  I'm sorry.  On a weekly basis?

13   A.   Yes, sir.

14   Q.   And, can you tell me again what does that line item

15   represent?

16   A.   It represents our overhead for the office, the general

17   office overhead.  And it represents our fee or how we make a

18   living.

19   Q.   And, part of it is Oelrich's profit for being on-the-job,

20   right?

21   A.   Yes, sir.

22   Q.   And, you included that 15 percent CM fee because you

23   believed it was equitable; is that right?

24   A.   I do.

25   Q.   And, your estimated profit margin for this job was

Cross-Examination - Ivan Oelrich

1   6 percent though, right?

2   A.   On $7 million, yes, sir.

3   Q.   So, despite the fact that the estimated profit margin was

4   6 percent of the job, PRC is still on the hook for a 15 percent

5   profit margin, right?

6   A.   I think that's pretty generous, yes, sir.

7   Q.   How did you come to the idea that 15 percent was an

8   equitable fee to charge?

9   A.   I've been running a business for 17 years.  And, that's a

10  dollar value of this much that's very reasonable.

11  Q.   Can we pull up Defendant Exhibit 307, please?  Wait.  No.

12  Actually.  One second, Your Honor.  I apologize.  I think it's

13  137.  Defendant 137, please?

14      And, this is the semi-infamous now termination notice dated

15  March 17, 2020.  Do you see that?

16  A.   Yes, sir.

17  Q.   And, as of the date of this email March 17, 2020, Oelrich

18  had terminated PRC's contract, right?

19  A.   That's correct.

20  Q.   Before March 17, 2020, are you aware of Oelrich ever

21  declaring PRC to have been in breach of contract?

22  A.   Declaring them in breach, no, sir.

23  Q.   And, you personally had zero communications with PRC where

24  there was a response, right?

25  A.   Unfortunately that's true, yes, sir.

Cross-Examination – Ivan Oelrich

1   Q.   And, you are not aware of Oelrich, the company, not you,

2   ever stating to PRC that if PRC did not deliver and install the

3   materials by a specific date their contract might be terminated,

4   right?

5   A.   Well, there's the original contract itself that contracted

6   them to meet the original schedule, which that was -- they

7   committed to that original schedule.  They could have

8   manufactured.  You know, you talked about it yesterday, they are

9   a manufacturing company.  You said that.  And they could have

10  manufactured the panels on the original schedule.  There's

11  nothing that stopped them from doing that.

12  Q.   Respectfully, I don't think that was my question.  Again,

13  it's pretty simple.

14       Are you aware of Oelrich the company or anyone at Oelrich

15  stating to anyone at PRC that if they didn't deliver and install

16  their materials by a specific date they might be terminated?

17  A.   We went through lots of that correspondence yesterday.

18  There's a letter from Mr. Wilson that he said this needs to all

19  be completed and I need to get responses by these dates.

20       I mean, we had our attorney write them a letter in

21  mid-January or, yeah, I guess it was mid to late January.  That

22  said pretty much the same thing.  Chris testified yesterday that

23  he told him that on, I think he said, 3 occasions.  So, yes, I'm

24  aware of that.

25  Q.   Were you there for any of those conversation that

1    Mr. Crehore allegedly had with Mr. Davis regarding potential

2    termination of their contract?

3    A.    No, sir, I was not.

4    Q.    And, if there is a writing where Oelrich had informed PRC

5    if they didn't deliver by a specific date they might be

6    terminated we're going to see that during this trial you'd

7    expect, right?

8    A.    Yes, sir.  I contend that -- I think we've already seen it.

9    Q.    Did you make the decision ultimately to terminate

10   Mr. Crehore?

11   A.    I believe I did, yes, sir.  To terminate Mr. Crehore?  Oh,

12   yes, definitely.

13   Q.    And, why did you terminate Mr. Crehore?

14   A.    We were changing our management structure.  I was looking

15   for a long-term, a guy that could lead lots of different folks

16   at the same time.  A higher manager.  And he just didn't seem to

17   fit that role.

18   Q.    And, do you disagree with his testimony yesterday that he

19   was terminated because of the precast scope of work on the

20   project?

21   A.    Well, I'm not going to disagree with his -- no, I mean,

22   that's what he thinks that it was about, and, you know,

23   certainly the precast, there was a lot of pressure on all of us

24   to get this done and get it done correctly.

25   Q.    Do you think he -- I apologize.

Redirect Examination – Ivan Oelrich

1    A.   But, I mean, that's his perception.  I'm not here to argue

2    his perception.

3    Q.   And, he was the project manager for the project, right?

4    A.   He was.

5    Q.   And, do you think that he properly managed this project?

6    A.   I do.

7    Q.   But he still got terminated?

8    A.   Not because of, I mean, no.  Yes.  Yes, he still got

9    terminated.

10   Q.   I'm all done.  Thank you for your time.

11   A.   Thank you.

12            THE COURT:  Redirect?

13                      REDIRECT EXAMINATION

14   BY MR. BUTTS:

15   Q.   Can we look at Defendant's Exhibit 307, please?

16        Mr. Oelrich, there were several questions that Mr. Darr

17   asked you about the March 10th date and whether or not that was

18   the day that Oelrich Construction was ready for PRC to do the

19   precast, for the first time?

20   A.   Yes, sir.

21   Q.   Do you recall that?

22        If we can turn to page 120?  I'll give you a moment to read

23   that page.  Specifically starting down around line 16.

24   A.   Yes, sir.

25   Q.   Do you remember giving that testimony?

Redirect Examination - Ivan Oelrich

1    A.    I do.

2    Q.    Do you remember why it was that you changed the date from

3    March the 10th to January the 6th?

4    A.    I do.

5    Q.    Why was that?

6    A.    Based on the -- we continued, as we did this deposition we

7    started to look at different emails and different, you know,

8    different exhibits, if you will, that showed that we were ready

9    for them to come on the 6th and we were setting all up for that.

10   Q.    Why was -- changing away from that, is there anything else

11   you wanted to add to that part?

12   A.    Well, I mean, I would say in the beginning of my deposition

13   one of the first questions they asked was, you know, what did

14   you do to prepare for this.  And what I said and what I talked

15   about was I was trying to get dates for when things happened

16   on-the-job.  And I was talking to Mr. Hunnicut there and asking

17   him and asking around the office.  But as we all know,

18   Mr. Crehore and Mr. Robinson and Mr. Wilson are no longer

19   employed with us.  So it was tough to find the information that

20   I was looking for.

21        And then the part of the deposition that Mr. Darr pulled

22   up, we were looking at that spreadsheet that has damages on it

23   where it says the 3/10.  So, he was asking me about that.  And

24   that was the information that I had at the time of that

25   deposition.  I went on and three- this one and two more -- to

1   retract that part of that testimony because that was incorrect.

2   Q.   There were some questions that were asked to you about the

3   Primavera software program for scheduling.  You are familiar

4   with that, I think you said you had that?

5   A.   Yes, sir.

6   Q.   Why was a complex delay analysis not necessary in this

7   case?

8   A.   Because we were down to a handful of activities at this

9   point.

10  Q.   So, when would be an example of when something like

11  Primavera software would be necessary to do a complex delay

12  analysis?

13  A.   At the beginning of the job site or at the beginning of the

14  job.  I mean, Jordan, he should have kept up a better schedule.

15  I will concede that.

16  Q.   Nevertheless, did that hinder your ability to determine the

17  extent to which PRC delayed the job?

18  A.   Absolutely not.  And to add to what I just said, Jordan did

19  keep -- he kept a very good 6 week look ahead.  And, we've

20  looked at some of those I think in this trial.

21  Q.   Can you explain to the Court what you mean by 2 week look

22  ahead as opposed to the schedule that Mr. Darr was referring to?

23  A.   It's a very simple -- it goes on an Excel spreadsheet.

24  It's a bar graph.  And it goes week by week and activity by

25  activity exactly what's going to happen during those weeks.  And

1  so, it's very laid out by trade and activity.  And says, you

2  know, if you're going to lay block you are laying block here and

3  you're going to finish there and then we're going to start --

4  it's very defined.  And, Jordan, he kept up that very well.  And

5  apparently, did not keep up the master schedule as well as we

6  would expect.

7  Q.   On regard to the profit on this job for Exhibit Number 6,

8  15 percent, you mentioned something about the profit margin on

9  the larger job versus the profit margin on a smaller job.  Can

10  you explain that a little bit more, please?

11  A.   It's a scale.  Obviously, you know, a $7 million job, it

12  just doesn't command as high a percentage as a -- well, we were

13  working on 7,000, but a hundred thousand dollar type project.

14  There is more profit percentage in a smaller project.

15       And, a lot of that has to do with, I mean, just the nature

16  of the business.  And then risk.  If something goes wrong, you

17  know, if you have extra cost on a smaller job you need a higher

18  profit to cover those things.

19  Q.   Do you do small jobs?  What would you consider to be a

20  smaller job?

21  A.   We do jobs of all different.  I mean, as I've said a couple

22  of times, working at UF we'll do whatever UF asked us to do from

23  a $5,000 job to a $10 million job.

24            MR. BUTTS:  Thank you.

25            THE COURT:  Mr. Oelrich, I wanted to ask you a couple

1    of questions.  I don't have the chart back in front of you.

2    And, I probably don't need it.  But, on your damages chart, for

3    example, one thing you put in was the supervisor's salary.  This

4    is the person who is out there working on this job full-time.

5    Another thing you put on is the, I guess Mr. Crehore's or the

6    person in his position after he left, you put that one at half

7    time and that's because you've got this person working for you

8    and he's spending half his time on this project?

9              THE WITNESS:  Yes, sir.

10             THE COURT:  Now, I understand that if you're a cost

11   accountant, and the man is spending half his time on this job,

12   to do a good cost accounting analysis for this project you

13   attribute half of his time to this job.  That's how a cost

14   accountant would do it.  I want to push a little bit on what the

15   actual marginal cost to Oelrich is, Oelrich the company.

16             THE WITNESS:  Yes, sir.

17             THE COURT:  You were going to have that person on the

18   payroll anyway, true?

19             THE WITNESS:  Correct.

20             THE COURT:  And, if PRC had done their job and had

21   everything done by January 6th, and it went in just like you

22   would have liked it to go in, that person would still be on your

23   payroll in June, July, August, 2020, true?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  Now if it had all gone the way you wanted

Redirect Examination – Ivan Oelrich

1  it to, that person wouldn't be working on the VA project in

2  June, July, August?

3          THE WITNESS:  That's correct.

4          THE COURT:  That person would be doing something else?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  But it seems to me that the net profit

7  that Oelrich reported on its tax return at the end of 2020 might

8  be no different with respect to that person's salary, whether

9  that person was working on the VA project during June, July,

10  August, or he was doing something else like he should have been

11  if PRC had done its work on time.

12          So, that's what I want to ask you about.  Just

13  focusing on that person's salary, what would have been different

14  in your net income, in what got reported on your tax return for

15  2020, based on whether PRC did or did not perform on time?

16          THE WITNESS:  So, the project, the VA project had a

17  set fee that we were going to make.  We work for a fee.  And so,

18  when we can get off a job, the sooner we can get off a job and

19  be done with it we've earned that fee.

20          THE COURT:  Right.

21          THE WITNESS:  And so, that if we can go in 2020, to

22  use your example, to go to another job, that represents another

23  fee, another fixed fee.  They are based on percentages.  But,

24  once we start the job, that's a number.  It's a hundred bucks.

25  And so, if we could have earned a hundred bucks on the VA and

Redirect Examination - Ivan Oelrich

1    been out of there in May then we could have gone to the next job

2    and earned the next hundred bucks.

3              THE COURT:  Did you turn work down because you were

4    busy on the VA project?

5              THE WITNESS:  We're always moving -- I'm not going to

6    say we turned work down.  That would not be true.

7              THE COURT:  If you get a good job, you get a good job.

8              THE WITNESS:  We're always looking for more to do.  I

9    mean, that's the nature of our -- unfortunately, we work

10   ourselves out of a job.  The faster and better we do, the more

11   happier everybody is.  But, that's another discussion for

12   another day.

13             THE COURT:  Law firms work the same way.  I get it.

14   But, that's sort of my question.  I mean, it seems to me that

15   your project manager, I may be using the wrong term,

16   Mr. Crehore, the person in his position, if you still got the VA

17   project and you didn't get it finished when you were supposed

18   to, you are still working on it, then either that person works a

19   little harder, doesn't go home as soon, works more than

20   otherwise he would, or maybe another project doesn't get as much

21   of his attention as it would have.

22             THE WITNESS:  That's certainly the case.

23             THE COURT:  But that's what happens, not a change in

24   the bottom line?

25             THE WITNESS:  Well, I mean, if we had got to finish

1   when we wanted to that project manager would have been done.

2   The job may have still been going on, but his touch points are

3   minimal at that point.  And then, he can move on to the next job

4   and be totally involved in that and we can --

5          THE COURT:  And maybe do a little better job, maybe

6   train people a little better, maybe he gets to go home and eat

7   with his family a little more often.  That's what I'm trying to

8   find out is, I know it's a problem, but is it a financial

9   problem?  And, that's what we're talking about.  We can talk

10  with the lawyers a little bit later about whether the actual

11  marginal cost or the way a cost accountant would do it is the

12  right way to analyze damages.  That's a different question.

13  But, just to get the facts straight, what I'm trying to find

14  out, just focusing on that person's salary, did it really make a

15  difference in your bottom line?  Would the company have more

16  money in its pocket today based on just that person's salary if

17  PRC had done its work when it was supposed to?

18         THE WITNESS:  Yes, sir.  A lot of the work that we do

19  is construction management, like the University of Florida.  And

20  so, we have to submit to them all of the hours that are worked

21  on their jobs.  And it's a very onerous program.  So,

22  Mr. Crehore could have been doing other UF stuff and charging

23  his time to that.  And, therefore, instead of his time being

24  charged to this project which had a fixed, everything was fixed,

25  we could have been doing our normal construction management work

Redirect (cont.) Examination - Ivan Oelrich

1    for UF and been charging his time on there.

2            THE COURT:  So some of your UF jobs you may have

3    gotten more revenue?

4            THE WITNESS:  Yes, sir.

5            THE COURT:  All right.  You've answered my questions.

6            Questions just to followup on my questions?

7            MR. BUTTS:  If I may just for a minute?

8            THE COURT:  Sure.

9                        REDIRECT EXAMINATION

10   BY MR. BUTTS:

11   Q.   Following up on Judge Hinkle's questions, we're looking at

12   revenue, expense and bottom line?

13   A.   Yes, sir.

14   Q.   Using Mr. Crehore as an example, if whether or not he was

15   on this job or a different job the expense component for Oelrich

16   Construction at the end of the year, taking all jobs in

17   consideration, would have been unchanged, correct?

18   A.   Correct.

19   Q.   However, had he been able to perform other work and get off

20   of this job sooner, how would that have affected the revenue

21   portion of Oelrich Construction's revenue for the year?

22   A.   So, similar to what I was just discussing with His Honor

23   there.  I mean, you know, UF -- we do different work that way.

24   And so, he could have worked on those jobs and been able to have

25   billable hours and stuff on those type projects.

Recross-Examination - Ivan Oelrich

1   Q.   So, would that have improved your bottom line?

2   A.   Yes, sir.

3          MR. BUTTS:  I don't have any other questions.

4          THE COURT:  Yes, sir.  Mr. Darr?

5          MR. DARR:  Thank you, Your Honor.

6                    RECROSS-EXAMINATION

7   BY MR. DARR:

8   Q.   I just want to make sure I heard your testimony correctly a

9   second ago, Mr. Oelrich, with the Judge.

10         As you sit there today, you don't recall having turned down

11  any other projects due to the fact that you guys were still tied

12  up with the VA project; is that right?

13  A.   I don't recall that, no, sir.

14         MR. DARR:  Thank you.

15         THE COURT:  Thank you, Mr. Oelrich.  You may step down

16  and return to counsel table.  Please call your next witness.

17         MR. BUTTS:  Your Honor, the next witness would be

18  Christina Sapp.

19         MR. DARR:  Your Honor, may we have 5 minutes for a

20  bathroom break?

21         THE COURT:  Surely.  Let's take until 10:20.  That's

22  11 minutes.

23         MR. DARR:  Thank you, Your Honor.

24      (Recess taken 10:09.)

25      (Resumed at 10:20.)

```
 1                 THE COURT:  Please be seated.
 2          CHRISTINA SAPP, PLAINTIFF WITNESS, DULY SWORN
 3                 THE COURTROOM DEPUTY:  For the record, state your name
 4   and spell your last name?
 5                 THE WITNESS:  Christina Sapp.  S-A-P-P.
 6                        DIRECT EXAMINATION
 7   BY MR. BUTTS:
 8   Q.    Good morning, Ms. Sapp.
 9   A.    Good morning.
10   Q.    What is your role in your employment?
11   A.    I am a senior account manager.
12   Q.    And, just for the record, you work for?
13   A.    Ivan Oelrich.
14   Q.    When you say Ivan Oelrich, do you mean his construction
15   company?
16   A.    Yes, sir.  Oelrich Construction.
17   Q.    And, as the senior account manager, what are some of the
18   tasks that you perform in that capacity?
19   A.    I receive all payment applications for subcontractors.  I
20   review them.  Upload them.  I do accounts payable.  Accounts
21   receivable.
22   Q.    So you do payables and receivables, did you say?
23   A.    Both.
24   Q.    And, in the context of pay applications, when you say that
25   you review them, what do you review them for?
```

Direct Examination - Christina Sapp

1    A.   I make sure that they are, one, their contract is approved,

2    it's in the system.   When we get the payment application I

3    review, make sure that their contract matches what they show on

4    the payment application, what they previously billed.   I review

5    the schedule of values and make sure the money lines up and it's

6    corrected or it's valued out correctly.

7    Q.   Then when you -- what else do you do in terms of accounts

8    payable?   Do you pay the bills?

9    A.   I don't physically cut the checks.   Once we get payment I

10   notify Mr. Oelrich what month we received the money from the

11   owner from.   And then he in turn releases the checks.

12   Q.   Are you familiar with the VA job?

13   A.   Yes, sir.

14   Q.   And, are you familiar with PRC Precast --

15   A.   Yes.

16   Q.   -- as a subcontractor to Oelrich Construction on that job?

17   A.   Yes, sir.

18   Q.   Are you familiar with the pay applications and the payables

19   process as it pertains to them in particular?

20   A.   Yes, sir.

21   Q.   Are you familiar with the, what has been marked as Exhibit

22   Number 6, in this case, which we'll show you in just a moment?

23   A.   Yes.

24   Q.   Have you seen this document before?

25   A.   Yes.

Direct Examination - Christina Sapp

1  Q.   If I could please just direct your attention to the part

2  that's under, that's in column F.  And, it's under labor burden.

3  Do you see that?

4  A.   Yes, sir.

5  Q.   And then, for the project manager on line 16, I see that

6  there's a percentage and there's also a percentage for the

7  superintendent and project manager, the project engineer, excuse

8  me.

9       What is the process that was used to determine those three

10  different percentages and why are they different?

11  A.   Those are owner paid portions or owner paid.  They could be

12  FICA, their workers' comp fees, their insurance that

13  Oelrich Construction pays directly for.

14  Q.   And, how did you determine the percentage for project

15  manager?

16  A.   You total up all of those portions.  And, those are called

17  the total benefits.  And then you divide that by the employee's

18  compensation.  And that's how you get the percentage of the

19  burden.

20  Q.   For the project manager on this job, what was the correct

21  percentage?

22  A.   It was listed 23.59 percent.

23  Q.   And for the superintendent general, what's the correct

24  percentage?

25  A.   24.96 percent.

Direct Examination - Christina Sapp

```
1   Q.   For the project engineer, what is the correct percentage?

2   A.   22.05 percent.

3   Q.   And, when you are referencing a percentage, are you

4   referring to a percentage of the numbers that are in column E

5   under unit price?

6   A.   Can you repeat that?

7   Q.   When you, when we say, for example, that the labor burden

8   for the project manager is 23.59 percent, are we talking about

9   23.59 percent of the 2115 in column E?

10  A.   Yes.

11  Q.   If we could move please over to the right side where the

12  yellow highlighting is?

13       Do you see a number that says $316,533?

14  A.   Yes.

15  Q.   Do you recognize what that was for?

16  A.   Yes.

17  Q.   As the, in your capacity working with Oelrich Construction

18  did Oelrich Construction -- do you know if Oelrich Construction

19  did, in fact, pay Spring Precast $316,533?

20  A.   Yes.

21  Q.   And the PRC contract value that's stated there, is that the

22  correct amount?

23  A.   Yes.

24  Q.   And, do you know in your capacity with

25  Oelrich Construction, did Oelrich Construction pay Spring an
```

Cross-Examination – Christina Sapp

1   additional amount of $6,996 for aggregate?

2   A.   Yes.

3   Q.   Did Oelrich Construction pay PRC a total of $109,832?

4   A.   Yes.

5          MR. BUTTS:  I don't have any other questions.

6          THE COURT:  Cross examination?

7                    CROSS-EXAMINATION

8   BY MR. DARR:

9   Q.   Can you pull up Defendant Exhibit 550, please?

10       Good morning, Ms. Sapp.  How's it going?

11  A.   Good.  How are you?

12  Q.   Good thanks.  Just give me a second to pull up some

13  documents for us here to look at.

14  A.   Okay.

15  Q.   So, is it fair to say that you were the one who was

16  primarily responsible for reviewing PRC's payment applications

17  for this project?

18  A.   Not final review.  I look at them.  I upload them.  It's

19  the project manager and the project engineer's responsibility to

20  approve them.

21  Q.   On this project the person who made the final decision as

22  to whether or not to approve the payment applications would have

23  been Mr. Crehore, the project manager at the time?

24  A.   Or Andy Wilson.

25  Q.   Or Andy Wilson who was the assistant project manager?

Cross-Examination – Christina Sapp

1   A.   Project engineer.

2   Q.   Engineer.

3        And, if you look here, this is an email from Allison Taylor

4   of PRC to various PRC individuals.  It's a pay app.  The pay app

5   number 1.  If you scroll down to the attachment, please, the

6   actual payment application and the invoice.  Actually, can you

7   go slower to let her look?

8        Is this typically how you recall seeing the payment

9   applications from PRC come in in terms of format, an invoice

10  that describes what they are billing for and then the next page

11  the actual payment application, and then on the next page a

12  schedule of values?  Is that generally how you recall the

13  payment applications from PRC looking, Ms. Sapp?

14  A.   Yes.

15  Q.   And, eventually you became aware -- well, I got to back up

16  one step.

17       Initially, you thought this was a typical contract where

18  retainage was allowed on subcontractor work; is that right?

19  A.   Yeah.

20  Q.   Eventually you found out that under the subcontract that

21  Oelrich had with PRC you guys weren't allowed to withhold

22  retainage on their production work, right?

23  A.   I'm not quite sure if it was just production, but I knew

24  that there was circumstances not holding retainage.  I don't

25  remember if it was just the production part.

Cross-Examination – Christina Sapp

1   Q.   Sure.  But at least for part of the work that they were

2   billing eventually you discovered, oh, we can't withhold

3   retainage on those amounts, right?

4   A.   Yes.

5   Q.   On this payment application, if you look up here in the

6   upper right-hand corner on this schedule of values, the

7   retainage indicated at least on this payment application 1 is

8   zero?

9   A.   I just saw that, yes.

10  Q.   As far as you recall, did all of the payment applications

11  that PRC submitted indicate zero percent on the amounts billed?

12  A.   I have never looked at that part.  I'm sorry.  I just now

13  noticed that from you pointing it out.

14  Q.   Oh.  So, when you were reviewing the payment applications

15  back in 2019 and 2020, you didn't look one way or the other as

16  to whether or not the schedule of values included a zero percent

17  retainage as indicated here?

18  A.   No.  Because typically I look at column D and column E and

19  F.

20  Q.   As you sit there today, do you recall whether or not

21  Oelrich withheld retainage on PRC's work?

22  A.   We did hold retainage.

23  Q.   And, if you can please pull up Exhibit 93, Defendant 93.

24       Let's start at the bottom and work our way up, but not the

25  attachment, please.

1          So this is an email chain.  Do you remember

2    Miss Allison Taylor at PRC?

3    A.    Yes.

4    Q.    Is it fair to say she was PRC's accounting person, for lack

5    of a better description?

6    A.    Yes.

7    Q.    Seem to have a similar role as you for PRC in terms of the

8    job?

9    A.    Yes.

10   Q.    And, if we look at this bottom email here it's dated

11   October 25, 2019.  It's from you to Ms. Allison, said you

12   requested the payment for PA 6, that means payment application

13   6; is that right?

14   A.    Yes, sir.

15   Q.    To be released.  Can you send a clearer schedule of values,

16   couldn't read it very well?

17   A.    Right.

18   Q.    And then, if you go up a little bit further, please?

19         Miss Taylor writes back and says, please she attached.  So,

20   she sent you back a clearer version of the schedule of the

21   values; is that fair to say?

22   A.    Yes.

23   Q.    Everyone is happy in this email chain, surprisingly.  You

24   say, thank you, lots of exclamation points on October 15th.  So,

25   at that point she had submitted the clearer schedule of values

Cross-Examination - Christina Sapp

1    to you; is that fair to say?

2    A.   Yes.

3    Q.   And then, email above that up here, it's Miss Taylor on

4    October 21, 2019 asking for an update on payment.  If we go up

5    one more.  And you wrote back on October 21st, the same day

6    promptly, Allison, you are on my radar.  I submitted the request

7    to release the check with Mr. Oelrich.  Should have a better

8    update tomorrow for you.

9         So, is it fair to say that ultimately no checks would be

10   cut to any subcontractors on this job without Mr. Oelrich's

11   personal approval?

12   A.   Mr. Oelrich cuts the checks, yes.

13   Q.   And, he has to approve the payment before?  You don't have

14   the authority to approve payment without his approval; is that

15   right?

16   A.   It's already been approved for payment.  It's in the

17   system.  He just needs to, he cuts the checks personally.

18   Q.   And if you go up a little bit more?  One more.

19        In this email October 22, 2019 Miss Taylor wrote back the

20   next day and she said, our pay app is 3 weeks past due now, can

21   you look into that one as well?  The August pay app.  Do you see

22   that?

23   A.   Yes.

24   Q.   And, if we go up one more, please?

25        Now we are into December 10th, 2019.  And, it appears we

1    still got some past due payment applications.  One of them is 7,

2    it's now over 2 months old.  8, it's a month old.  Payment app 9

3    is over a week past due.  Do you see where Ms. Taylor wrote that

4    to you?

5    A.    Yes.

6    Q.    If you can go up one more, please?

7          And then, here is your response.  You wrote back to her

8    again the same day to Miss Taylor.  And you said, please refer

9    back to the attached email where I requested a pay app for the

10   retainage that needs to be released.  So, is it fair to say at

11   this point no later than December Oelrich realized it needed to

12   give this retainage to PRC that it had been withholding?

13   A.    Yes.

14   Q.    And, if we look all the way at the bottom, this is the

15   attached email you gave her.  Let's scroll down a little bit

16   more, please?

17         Miss Taylor wrote to you right here on November 14th,

18   Christina, Oelrich continues to hold 10 percent retainage on

19   materials and production despite it only being allowed on the

20   erection portion.  Did I read that correctly?

21   A.    Yes.

22   Q.    So no later than at least November 14th, 2019, PRC had

23   informed Oelrich that it was improperly withholding retainage;

24   is that right?

25   A.    Yes.

Cross-Examination – Christina Sapp

1   Q.   And, if you scroll up one more, please, Caitlin?

2        And you wrote back.  And, again, this is your explanation

3   for why the retainage had not been released yet as of December

4   2019, I believe.  You wrote back, our accounting system is set

5   with a standard 10 percent retainage compliance code held on all

6   progress payment requests.  I will request the change on the

7   next monthly draw.

8        Did that request ever happen?  Did you request the release

9   of retainage for PRC's next monthly draw on December of 2019?

10  A.   I don't recall.

11  Q.   And, you do say, we are not intentionally holding your

12  retainage.  So, it's your position that it was just accidental;

13  is that right?

14  A.   It's in the system.  I don't change the compliance codes.

15  Q.   Who would be responsible for that?

16  A.   The project manager.

17  Q.   Which was Mr. Crehore?

18       It looks like Mr. Crehore was copied on this particular

19  email; is that correct?

20  A.   Yes.

21  Q.   And then this is where we had a little bit of a

22  disagreement.  How do we correct this error, how do we get PRC

23  paid their retainage where you wrote, I suggest the following to

24  correct this error.  Send me a pay app for the retainage that is

25  owed for the previous months.  Ivan will be back on Monday.  I

Cross-Examination – Christina Sapp

1    will request the release of retainage.

2         So, in essence you're saying, hey, PRC we want to pay you

3    the 10 percent retainage that we withheld, but in order to do so

4    I need you to submit us a revised payment application; is that

5    right?

6    A.   Not a revised payment application, but a payment

7    application for that retainage that I'm going to release.

8    Q.   And, we didn't go through all of the payment applications

9    they submitted, but the payment applications that were

10   submitted, do you recall any that indicated that retainage

11   should have been withheld on them in the schedule of values?

12   A.   Not that I recall.

13   Q.   Are you aware of anything under the contract that would

14   have required PRC to submit another payment application for

15   retainage it was already owed?

16   A.   We do require a retainage payment application.

17   Q.   And, do you know -- are you aware of anything in the

18   contract between Oelrich and PRC that required PRC to submit

19   pictures or certificates of insurance related to their product?

20   A.   It's in the payment section.

21   Q.   So, that would be in the payment section of the

22   subcontract?

23   A.   Right.

24   Q.   And, in terms of the approval process, again, for payment

25   applications, I just want to make sure I understand.  The PM

Redirect Examination – Christina Sapp

1    makes the decision whether to approve the payment applications?

2    A.   Right.

3    Q.   And, he has authority without consulting with Mr. Oelrich?

4    A.   Yes.

5    Q.   Okay.  Thank you for your time.  I appreciate it.

6    A.   No problem.

7             THE COURT:  Redirect?

8                  REDIRECT EXAMINATION

9    BY MR. BUTTS:

10   Q.   Can we refer please to Exhibit 2?  If we could turn to

11   paragraph 5B, please?

12        Do you -- first of all, do you recognize what this document

13   is or should we go back to the beginning of it?

14   A.   It's our subcontract terms and conditions.

15   Q.   Okay.  Do you recognize this to be the contract with PRC?

16   A.   Yes, yes, sir.

17   Q.   Mr. Darr asked you a moment ago where in the subcontract it

18   says that Oelrich Construction can request documents such as

19   photographs and certificates of insurance.  Do you remember that

20   question?

21   A.   Yes, sir.

22   Q.   I'm going to direct you to a part of that paragraph and ask

23   you to read it.  It is the fourth line from the bottom.  The

24   sentence starts about two rows above that on the right-hand side

25   where it says, subcontractor agrees to provide contractor.  Do

1   you see that part?

2   A.   Yes.

3   Q.   I'll read it for you into the record.  Subcontractor agrees

4   to provide contractor with a list of suppliers, laborers,

5   mechanics and material men and shall complete the application

6   for payment and any other documents reasonably required by

7   contractor prior to requesting any such payment.

8        On projects where, such as this one where there are stored

9   materials, projects are being fabricated in another place, how

10  do you go about knowing whether the projects are actually

11  fabricated when the pay request comes in?

12  A.   It's noted on the material.  It could be labeled with a

13  sharpy or whatever, the project name on the actual material

14  that's being stored at the subcontractor's facility.

15  Q.   Are photographs requested?

16  A.   Yes.

17  Q.   And why is the insurance important?

18  A.   On the insurance certificate they actually list the value

19  of the stored material in the event there is theft, fire, water

20  damage, whatever.  The subcontractor's insurance would cover and

21  reimburse us for the money already spent for that material.

22  Q.   And is it reasonable for Oelrich Construction to require

23  the certificates of insurance and the photographs in this type

24  of case?

25  A.   No, it's standard procedure.

Redirect Examination - Christina Sapp

1    Q.    I beg your pardon?

2    A.    It's a standard procedure with us.

3    Q.    Mr. Darr was asking you about some of the pay applications

4    and when they were paid.  Specifically, pay app 7 and 8.  Do you

5    remember that?

6    A.    Yes.

7    Q.    When was that -- when were those pay applications paid?

8    A.    They were both paid on November 8th, 2019.

9    Q.    7 and 8 were paid on that date?

10   A.    Yes.

11   Q.    And, do you recall why they were paid on that date?

12   A.    We received money from the owner, so they were both

13   released at the same time.

14   Q.    I'm sorry, I didn't hear your answer.

15   A.    They were -- we just paid them both out at the same time.

16   We received money from the owner.

17   Q.    Do you recall the circumstances that led you to pay them

18   both out at the same time, at that time?

19   A.    Well, we were waiting on some waivers.  They were both cut

20   on the same check.

21   Q.    Did you pay them within 30 days of the day that you

22   received the waivers?

23   A.    Payment application number 8, yes.  We originally requested

24   the release of liens on November 12th.

25   Q.    And was payment application 7, what was the reason that it

Redirect Examination - Christina Sapp

1  wasn't paid at the same time as number 8?

2  A.   I don't know that reason.

3  Q.   They were both fully paid except for the retainage; is that

4  right?

5  A.   Yes.

6  Q.   And, were all the pay applications through pay application

7  8 fully paid except for the retainage?

8  A.   Yes, sir.

9  Q.   Was there any -- can you explain for the Court what it is

10  that you were requesting in order for you to simply pay the

11  retainage?

12  A.   Again, in our subcontractor agreement we do state that a

13  payment application G702, G703 you do submit a request for the

14  retainage on there.  This is a formality that we use.  Two, I

15  have to make sure the retainage payment application matches

16  everything on a regular submission for their payment.  It's, in

17  the event maybe we have an audit, I have proof that we paid them

18  that retainage so I have the payment application in hand.

19  Q.   So, is the typical way that you close out a job, as far as

20  the payment, is there a final pay application that the

21  subcontractor gives asking only for the retainage?

22  A.   Yes, sir.  Retainage is also submitted on the --

23  Q.   Is that why you asked to handle it that way in this case?

24  A.   Correct.

25  Q.   And, how was your accounting software set up in terms of

Redirect Examination – Christina Sapp

1  things like retainage and payment and things of that nature?

2  Does it have a default set up?

3  A.   Yeah.  Yes, sir.  So, when you upload the payment

4  application you enter in the schedule of values amount.  And

5  then, within the system it defaults to a 10 percent retainage

6  held unless you change it.

7  Q.   In this case, the total payments were a little over, around

8  $110,000, weren't they?

9  A.   Yes.

10  Q.   And the pay request was probably a little more than that,

11  correct?

12  A.   Yes.

13  Q.   And, the retainage at issue here is I believe around

14  $5,800; is that right?

15  A.   Yes.

16  Q.   So, in terms of a percentage, we're talking about

17  something -- would you agree that we're talking about something

18  less than 10 percent?

19  A.   Yes.

20  Q.   Closer to 5 percent?

21  A.   I believe one of the payment applications did pay off the

22  retainage.  So, that's why the money is off a little bit.

23  Q.   Thank you.

24  A.   You're welcome.

25              THE COURT:  Thank you, Ms. Sapp.  You may step down.

1          MR. DARR:  Your Honor, may I ask a couple more

2    questions?

3          THE COURT:  Okay.  But, I'm not sure Ms. Sapp has

4    brought any new value to the trial.  It's very little.  But you

5    are right, that the redirect was much longer than the direct.

6    You can cross again, but this is the point in the trial where I

7    will tell both of you, I'm looking for new value.  So, if it's

8    something we already know and it's proved nine ways to Tuesday

9    you don't need to prove it again.

10         MR. DARR:  I know we talk too much, but I have one

11   question I would like to address.

12         THE COURT:  Surely.  Go ahead.

13                    RECROSS-EXAMINATION

14   BY MR. DARR:

15   Q.   Ms. Sapp, I saw it looked like you were looking down when

16   you were answering questions to Mr. Butts; is that right?

17   A.   Yeah.

18   Q.   I guess that's two questions.  What is the document that

19   you're looking at?

20   A.   I just have internal notes for myself, just on dates and

21   payment applications.

22   Q.   Is it a subcontractor report?

23   A.   No.  It's just a general description of the payment

24   application.  It's just my own notes.

25   Q.   Okay.

1           MR. DARR:  That's all.

2           THE COURT:  Thank you, Ms. Sapp.  Now you may step

3   down.

4           THE WITNESS:  Thank you.  Have a good day.

5           THE COURT:  Please call your next witness.

6           MR. BUTTS:  May I have just a moment to confer?

7           THE COURT:  Sure.

8           MR. BUTTS:  I think we are almost finished, so just

9   give me a moment.

10           (Pause in proceedings.)

11           MR. BUTTS:  The plaintiff rests, Your Honor.

12           THE COURT:  All right.  Mr. Darr, please call your

13   first witness.

14           MR. DARR:  Candidly, Your Honor, we didn't expect them

15   to finish this early.  My next witness is a 5 minute walk from

16   here.  Can I go ahead and give him a call and he'll walk over

17   from the hotel?

18           THE COURT:  Sure.  We probably just need to take a

19   break.

20           MR. DARR:  Maybe 10 minutes to be realistic then so he

21   doesn't have a heart attack running over.

22           THE COURT:  We don't want him out of breath when he

23   gets here.  He needs to be able to talk.  Yeah.  Let's start

24   back at 5 after 11.  That's 15 minutes.

25           MR. DARR:  Okay.

Direct Examination - Randall Forde Davis

1          (Recess taken 10:50.)

2          (Resumed at 11:08.)

3               THE COURT:  Please be seated.

4          **RANDALL FORDE DAVIS, DEFENSE WITNESS, DULY SWORN**

5               THE COURTROOM DEPUTY:  For the record, state your name

6    and spell your last name?

7               THE WITNESS:  Randall Forde Davis.  R-A-N-D-A-L-L,

8    F-O-R-D-E, D-A-V-I-S.

9                          DIRECT EXAMINATION

10   BY MR. DARR:

11   Q.   Good morning, Mr. Davis.

12   A.   Morning.

13   Q.   How are you?

14   A.   Good.

15   Q.   Deep breath, it's going to be fine.

16        Can you please tell us what your role was on the project

17   that is at issue in this lawsuit?

18   A.   I was the project manager for PRC Precast.

19   Q.   As the project manager for this project, what were your

20   duties and responsibilities for PRC?

21   A.   At the very beginning it was contract negotiation.  Then it

22   was submittals, procurement of materials, scheduling, and

23   dealing with any subcontractors we may have had.

24   Q.   Did you negotiate the subcontract between PRC and Oelrich

25   in this case?

Direct Examination - Randall Forde Davis

1   A.   Yes, I did.

2   Q.   Can we pull up Plaintiff's Exhibit 2, please?  Generally,

3   if you could scroll down slowly through?

4        If you take a look at your screen, does this appear to be

5   the contract that PRC had with Oelrich?

6   A.   Yes.

7   Q.   And, if we could back up a little bit?

8        Do you recall how much was this contract for?

9   A.   Around $275,000.

10  Q.   And, what is it that PRC was supposed to provide to Oelrich

11  for this $275,000?

12  A.   A complete precast concrete package, which would have

13  included shop drawings, samples, engineering, and embeds that

14  would go into the concrete structure of the building for our

15  pieces to attach to.  And then, at the end that all leads to

16  fabricated pieces.

17  Q.   After this project was executed, who did you understand to

18  be the primary contact that you were to deal with at Oelrich?

19  A.   My understanding was Chris Crehore is who I worked out the

20  contract with and he was their project manager.

21  Q.   And, were your communications regarding this project

22  limited to just Mr. Crehore?

23  A.   No.

24  Q.   Ultimately, would you say that you ended up having to

25  correspond with more than just Mr. Crehore at Oelrich regarding

Direct Examination - Randall Forde Davis

1  this project?

2  A.   Yes, for sure.  Normally, I'll save the number of the

3  project manager or the superintendent, whoever they tell me

4  that, you know, I may need to be in contact with more.  This

5  job, they had many interns and project engineers.  I think by

6  the end of it there was like 8 or 9 different people that were

7  contacting us for the same things.

8  Q.   Can I ask a question real quick?  How many people from

9  Oelrich do you think you were dealing with, with regards to

10  email communications on this project?

11  A.   Multiples.  I mean, 5, 6 or 7.

12  Q.   Do you remember any of their names?

13  A.   Yeah.  There was obviously Chris Crehore, Andy Wilson,

14  Jordan Robinson there towards the end.  Then there was a lot of

15  interns that I don't remember their full names.  It was Yosamani

16  Alords (phonetic).  There was a Jerry.  And I think there was

17  one or two others.  A lot to keep track of.

18  Q.   And, what did you understand Mr. Andy Wilson's role to be

19  at the project?

20  A.   I think he was the project engineer.

21  Q.   How about Mr. Robinson, Jordan Robinson?

22  A.   He was the superintendent.

23  Q.   And, do you recall what the role of the interns were on the

24  project?

25  A.   I do not.

Direct Examination - Randall Forde Davis

1  Q.   Could you please pull up Defendant's Exhibit 5, please?

2       You mentioned a little bit ago that you were responsible

3  for negotiating the contract between PRC and Oelrich; is that

4  right?

5  A.   That's correct.

6  Q.   Could you scroll all the way to the bottom, Caitlin?  Back

7  up a little bit to the next page.  Stop right there.

8       Okay.  So, I'm looking at a document here.  This appears to

9  be the date that Oelrich sent the initial draft of the contract

10  to PRC.  What date do you see there?

11  A.   November 28th, 2018.

12  Q.   And if you could scroll up, please, Caitlin?  All the way

13  to the top of this email, please.

14      And, here is an email from Brooklyn Powell of Oelrich.  Do

15  you remember what Brooklyn's involvement was with the project?

16  A.   I don't.

17  Q.   It looks like it's dated November 28, 2018; is that

18  correct?

19  A.   Yes.

20  Q.   And, I'll let you read through it real quick.  What do you

21  understand that she is sending to you there in that email?

22  A.   The subcontract agreement.

23  Q.   Was this the, one of the first drafts of the subcontract

24  agreement?

25  A.   Yeah, it would have had to have been.

Direct Examination - Randall Forde Davis

1    Q.    Okay.  Let's go up one more email, please?

2         On December 4, 2018, looks like it's an email from

3    Mr. Crehore to yourself about whether you sent the contract

4    back; is that right?

5    A.    Yes.

6    Q.    Go up one more, please?

7         You wrote back to him on December 4.  What is it you're

8    telling Mr. Crehore here on December 4, 2018 before the contract

9    was signed?

10   A.    We were still reviewing the terms of the contract

11   internally.  And we're going to put our markups and suggestions

12   on there before we sent it back to them.

13   Q.    You said, it's still under review by our team.  Do you

14   recall who you had on your team at that point that was taking a

15   look at it?

16   A.    Just some of the higher up people at our company.  And then

17   we also have an attorney in South Carolina that will bounce some

18   ideas off of too.

19   Q.    Can you go one more email up, please?

20        And, looks like you got a response from Mr. Crehore

21   December 6, 2018.  Could you read what he wrote to you there?

22   A.    Yeah.  Do you want me to read it out loud?

23   Q.    To yourself.  I'm sorry.  Is he asking for the contract

24   back?

25   A.    Yes.

Direct Examination - Randall Forde Davis

1   Q.   And if we do up one more email, please?

2        You wrote back to him on December 7th.  What is it that you

3   sent him on that date?

4   A.   I sent him the subcontract with our comments on it.

5   Q.   And your comments, would those have included proposed

6   markups to the subcontract?

7   A.   Yes.

8   Q.   One more, please?

9        He wrote you back on December 11th.  What is it you

10  understand he wanted to talk about there after reading that

11  email?

12  A.   It looks like he wanted to talk about the comments we

13  included.

14  Q.   Can we go to Defendant's Exhibit 6, please?

15       Take a look at this document, if you could.  It looks like

16  this is an email from Mr. Crehore to yourself; am I correct?

17  A.   Yes.

18  Q.   And, he sent you a revised scope sheet.  Where do you

19  understand the revised scope sheet to have been in the

20  subcontract?

21  A.   I believe it was towards the back.  It was kind of like an

22  addendum to the main subcontract.

23  Q.   And, this sentence right here, starting with once.  It

24  says, once you review it and confirm we are good we'll revise

25  the contract and send it again so we can execute without any

Direct Examination - Randall Forde Davis

1    additional markups.

2        What did you understand that to mean when Chris Crehore

3    wrote that to you?

4    A.   That he was accepting what we had proposed, our comments in

5    there.

6    Q.   If we look to Defendant Exhibit 7, please?  Can we go down

7    to the email at the bottom there, please?

8        You wrote back to him.  And do me a favor and please

9    quickly read through that.  And then if you could summarize what

10   you were communicating to Mr. Crehore in this email dated

11   December 14, 2018.

12   A.   Yeah.  So, it looks like he had sent the subcontract back

13   and incorporated our comments.  But, I do remember he still

14   hadn't incorporated our full payment terms, what we were asking

15   for.  So, this was just another followup to that saying, you

16   know, this is something we, we -- it's common language in all of

17   our contracts.  We don't do a project without this.  And if we

18   can't have it, if it can't be incorporated then odds are we

19   probably can't move forward with the project.

20   Q.   And, if you could scroll down just a little bit more on the

21   same page?

22       This red language you see here, do you understand or do you

23   know whether or not this language made it into the PRC-Oelrich

24   contract?

25   A.   Yes, it did.

Direct Examination – Randall Forde Davis

 1  Q.   And, as far as you know, that language verbatim that you

 2  described as imperative made it into the contract, right?

 3  A.   That's correct.

 4  Q.   Now, if we can go back to Plaintiff's Exhibit 2, please?

 5  Which is the subcontract between PRC and Oelrich.  And if you

 6  can go down to, I think it's page 14.  Scroll down, please?

 7  Another page.  One more.  It's page 16.

 8       Do you understand this to be the additional payment terms

 9  that PRC described as being imperative that be added to the

10  contract?

11  A.   Yes.

12  Q.   And would PRC have entered into this contract without the

13  additional payment terms being included in the contract?

14  A.   No.  As I said in the email previously, that's pretty

15  imperative to everything we do.

16  Q.   Can you tell us why was this language so important to PRC

17  that they wouldn't enter into the contract without it?

18  A.   I think I described it some in the previous email that we

19  have looked at.  But, just to reiterate, number one, is a lot of

20  people in the construction realm, they don't want to pay for a

21  product until it arrives on site, whether it be brick, or dry

22  wall, or steel.  You know, basically commodities that you can

23  get anywhere.

24       Whereas, our process is, it's a custom product.  And we

25  have a lot of leg work just to get the right materials and

Direct Examination - Randall Forde Davis

1    design and all that.  And we want assurances that, you know,

2    we're going to produce this stuff, sometimes 12 months plus in

3    advance, we don't want to just sink that kind of money into the

4    project and then not be paid for it for 12 months until it shows

5    up on-site.  So that's, some of the wording in here is that, you

6    know, we're going to invoice for stored materials at our

7    facility.  And once we do that, if you don't dispute the

8    invoice, we ask to be paid within 30 days.

9    Q.   Can I ask you this?  Generally, the goods that PRC

10   manufactures, are they custom?

11   A.   Yes.  Everything we do is custom to that project.

12   Q.   And generally, after you've made materials for a client,

13   can you readily sell those materials to someone else if the

14   client doesn't pay for them?

15   A.   No.

16   Q.   And, was that true of the product that PRC was making for

17   Oelrich in this case as well?

18   A.   Yes.  Very much so.  I mean, it had -- everything we've

19   talked about, it had special steel embeds in there.  It had

20   special rock to match the local architecture down here in

21   Gainesville.  We couldn't sell that to someone in North

22   Carolina, for instance.

23   Q.   I'm not going to pull up a bunch of documents to show it,

24   but do you recall whether or not Oelrich improperly withheld

25   retainage in this case?

Direct Examination - Randall Forde Davis

1   A.   Yes, I do recall that.  On, I believe, every invoice.

2   Q.   Do you recall whether or not Oelrich had past due invoices

3   on this project?

4   A.   Yes, they did multiple times.

5   Q.   Do you recall whether or not Oelrich timely paid any of the

6   invoices net 30 days as required under the contract?

7   A.   I don't recall.  I just remember there were a lot of

8   internal discussions at our company of anytime we had a meeting

9   of where, what was the status of Oelrich's payment.  They were

10  behind.

11  Q.   Could we take a look at Defendant Exhibit 50, please?

12       This is an email dated September 12, 2019.  If you scroll

13  down one more, please?  And another one.

14       This is an email right here from September 12, 2019.

15  Earlier we heard Miss Taylor was basically the accountant person

16  for PRC on this project; is that right?

17  A.   Yes.

18  Q.   And, can you just read this to me and tell me what it is

19  Allison is asking about in this email?

20  A.   She is talking about pay apps and waivers for pay app 6.

21  But then I guess the discussion changed to go back to pay app 5.

22  Q.   And, can you pull up Defendant Exhibit 53, please?

23       And, looking at this email, it's another one from

24  Miss Taylor to Oelrich, Andy Wilson in particular; is that

25  right?

Direct Examination - Randall Forde Davis

1    A.    Yes.

2    Q.    This is October 1, 2019.  What is it you understand she's

3    asking for here?

4    A.    Status on our July pay app.  It looks like it's a month

5    past due.

6    Q.    Is this consistent with your memory that -- well, you

7    testified earlier that there were many invoices that were past

8    due under the terms that you agreed to, right?

9    A.    That's correct.

10   Q.    And, is this email consistent with that memory?

11   A.    Yes.

12   Q.    Can we take a look at Defendant Exhibit 90, please?

13         If you could read this email from Miss Taylor to Ms. Sapp,

14   the accounting person at Oelrich, to yourself real quick.  Let

15   me know when you're done.

16   A.    Okay.

17   Q.    What is Miss Taylor inquiring about in this email?

18   A.    It appears to be multiple pay apps that are overdue.

19   Q.    And, how overdue are they at this point, according to this

20   email?

21   A.    One is over 2 months.  One is over a month.  And one is

22   over a week.

23   Q.    So, is it fair to say that as of December of 2019 Oelrich

24   was past due on at least several invoices, some as much as 2

25   months?

Direct Examination - Randall Forde Davis

1  A.   Yes.  I think that's a very fair statement.

2  Q.   If we could take a look at exhibit, Defendant Exhibit 306,

3  please?

4       If you could review the front page of this exhibit,

5  Mr. Davis?  What do you understand this to be?

6  A.   So, this was our responses to Oelrich's interrogatories.

7  Q.   Sure.  And, if we can take a look at page 3, please?  If

8  you make that a little bigger?

9       This Oelrich payment history table, what do you understand

10 this to be?

11 A.   So, this was produced by us to show Oelrich's payment

12 history.  And not only that they didn't make full payments on

13 the invoices we sent, but also the days past due when each one

14 was paid.

15 Q.   And, do you know where this information was pulled from in

16 PRC's system, so to speak?

17 A.   Yeah.  It came from our accounting software.

18 Q.   And, what does this column indicate?

19 A.   The days past due over 30 days.  So that's not just -- the

20 first one is 18.  That doesn't mean 18 days since the invoice

21 was sent.  It would be 48 days.

22 Q.   And, according to your own accounting system here, can you

23 take a look at them and indicate to me whether any of these were

24 paid in full?

25 A.   It looks like pay app 6 was paid in full.  And that's the

Direct Examination - Randall Forde Davis

1    only one.

2    Q.   So the other, what are we looking at 9 pay apps roughly,

3    none of those were paid in full?

4    A.   That's correct.

5    Q.   And, when was the very first payout issued on this project?

6    A.   December 19, 2018.

7    Q.   Some of these payout payment applications as far back as a

8    year before you were terminated were not paid in full; is that

9    correct?

10   A.   That's correct.

11   Q.   So, do you recall why Oelrich would not pay -- let me back

12   up one step.

13        Was there retainage that PRC requested which Oelrich would

14   not pay?

15   A.   Yes.

16   Q.   And do you recall why Oelrich would not pay the retainage

17   that was owed?

18   A.   My recollection is that at first they tried to say that

19   wasn't part of our agreement, which it was.  It was in our

20   subcontract, the percentages.

21        Then they said they weren't doing it because it was

22   something internal in their system that wouldn't let them bypass

23   it, which didn't sound like a great excuse to us.

24        And then they said, at the very end they said they would

25   fix it but we had to basically erase the previous pay apps and

Direct Examination - Randall Forde Davis

1    issue a new one with that current date.

2    Q.   And, as far as you recall, none of the invoices that you

3    submitted in this table indicated that retainage should be

4    withheld at all, right?

5    A.   Right.

6    Q.   So, do you understand why Oelrich wanted you to submit new

7    payment applications for retainage that you had already billed

8    as far back as December 19, 2018?

9    A.   We couldn't understand the exact reasoning behind it.  But

10   just internally at our company, what it seemed like was almost

11   fraudulent, like you want us to submit new invoices and start

12   the date over again and you are already missing payment dates

13   left and right.  It just, we never really understood the full

14   reasoning behind that, but it wasn't something that we were very

15   keen on.

16   Q.   Did they ever point out a specific provision of the

17   contract that would have required you to resubmit the payment

18   applications for the retainage that they withheld?

19   A.   No.

20   Q.   And as far as you know, the retainage indicated on this

21   table that was withheld was never paid to PRC; is that correct?

22   A.   Yes, that's correct.

23   Q.   What did you understand Oelrich's scope of work to be at

24   the project?

25   A.   I believe they were a subcontractor to the prime GC.  And,

Direct Examination - Randall Forde Davis

1  their scope was the concrete, steel, masonry, maybe some site

2  work too I believe.

3  Q.   And, out of Oelrich's scope of work that you just

4  mentioned, was any of that work required to be completed before

5  PRC could begin to install its materials at the project?

6  A.   Yes.  I mean, the majority of it.

7  Q.   Can you tell us what parts of that work had to be completed

8  before you guys could install your product at the project?

9  A.   Well, our product is dependent on, hanging on other, on

10 basically the structure of the building.  So, the concrete

11 framework of the building had to be complete.  There had to be

12 access to the building with site work to get trucks and cranes

13 and all that in there.  I think there was some steel that had to

14 go in before us.  And then, also we were, in some instances we

15 were hanging on masonry blocks, CMU.  So those had to be

16 installed as well.

17 Q.   Could you pull up Plaintiff's Exhibit 2?  Can you go to the

18 schedule please at the bottom at the end?  Can you make this

19 page a lot bigger?  Okay.  And then scroll up.

20      And, do you recall the date by which you expected Oelrich

21 to start its concrete work at the project?

22 A.   I do not.  But, by the looks of this, it looks like March,

23 April of 2019.

24 Q.   Supposed to start in March of 2019, is that what you said?

25 A.   Yes.

Direct Examination - Randall Forde Davis

1   Q.   And, could you show me where you are getting that date on

2   this schedule, what item number that is?

3   A.   72, foundations.

4   Q.   This one right here?  Okay.

5        And, when was the steel supposed to start?

6   A.   June 2019.  I think that's number 84.

7   Q.   And, do you recall whether or not those scopes of work for

8   Oelrich started on those dates?

9   A.   They did not.

10  Q.   And, when you originally submitted -- let me back up one.

11       Did PRC submit a quote for this work or a proposal?

12  A.   For the --

13  Q.   For your scope of work for the project?

14  A.   Yes.

15  Q.   And did, was your proposal based on the assumption that

16  these dates would be met?

17  A.   Yes.  Well, let me back up.  Our proposal says an agreed

18  upon schedule, but we were sent this prior to, you know, signing

19  the contract for the job and saying we could do it.  So, this

20  schedule was our understanding, but then also, you know, there

21  may be some other things to work out that we need to agree on.

22  Q.   So, if these dates weren't adhered to are you saying that

23  you would have tried to figure out a mutually agreeable new set

24  of dates, basically?

25  A.   Yeah.

Direct Examination - Randall Forde Davis

1   Q.   And, one more question on the dates that are in this

2   schedule that were in the party's contract, can you tell me what

3   was the date that you were scheduled to start PRC's work at the

4   project?

5   A.   I don't see it on this page, but I think it was July 2019.

6   Yeah.  Number 97, July 11, 2019.

7   Q.   When was PRC scheduled to be done with its work, according

8   to the original schedule attached to the contract?

9   A.   It looks like August the 7th, 2019.

10  Q.   And, if the project had been complete on July 11, 2019

11  could you guys have delivered it and installed it at the project

12  at that time?

13  A.   Yes.

14  Q.   You could have installed it in July 11th of 2019?

15  A.   Yeah.  Those were our initial plans.  I mean, that's when

16  we had an erector lined up.

17  Q.   Even if the predecessor work wasn't complete before that,

18  the building wasn't up, could you have erected your precast at

19  the project?

20  A.   Oh, no, no.  I was giving that answer assuming every other

21  date had stayed on schedule.

22  Q.   So, if it had stayed on schedule you guys could have met

23  that date, but since it didn't then the product wasn't ready to

24  be installed at the project as of July 11, 2019; is that

25  correct?

Direct Examination - Randall Forde Davis

1   A.   Yes.

2   Q.   Ultimately, when do you understand that project was ready

3   for precast to be installed?

4   A.   I believe once they sorted all their stuff out the first

5   date I was given was January the 6th, I guess that would have

6   been 2020.

7   Q.   Needless to say though, the predecessor work wasn't

8   complete by the July 11th date that you just mentioned; is that

9   correct?

10  A.   Yes.

11  Q.   In between the date that this July 2019 time period

12  elapsed, and the end of 2019, did Oelrich ever come back to you

13  and say, hey, we think we're going to be ready on this date or

14  this date?

15  A.   Not to my knowledge, no.

16  Q.   So, the first time you heard of a new date that they would

17  be ready was January?

18  A.   6th, 2020.

19  Q.   Of 2020?

20       MR. DARR:  One second, Your Honor.

21       (Pause in proceedings.)

22  BY MR. DARR:

23  Q.   If you could turn to page 14, please, of that exhibit?

24       So, as of October 2019, do you recall what percent of the

25  materials PRC had manufactured up to that point?

Direct Examination - Randall Forde Davis

1    A.    I believe it was around 65 percent.

2    Q.    If you could take a look at number 17 there, which are

3    PRC's interrogatory responses?  Go ahead and review that to

4    yourself and let me know if that refreshes your memory as to

5    that question?

6    A.    Yeah, I still don't remember the exact percentage.  I know

7    it was in the 60's.

8    Q.    Okay.  Can we take a look at page 16 then?

9          If you look at the response to number 19 there, does that

10   refresh your memory as to what percent was complete as of

11   October 2019?

12   A.    Yes.  So that looks like 61 percent.

13   Q.    And, do you agree with that assertion and that answer that

14   it was 61 percent complete as of October 2019?

15   A.    Yes.

16   Q.    And, as of May 2020, what percent did PRC have complete of

17   the product?

18   A.    82 percent.

19   Q.    So, in October of 2019, was there a decision made to

20   suspend production of the materials?

21   A.    Yes.

22   Q.    Can you explain why the material production was stopped

23   after that month or suspended?

24   A.    It would have been multiple factors in-house.  Number one

25   being, Oelrich's payment history.  But then also just being a

Direct Examination - Randall Forde Davis

1    manufacturer and having multiple clients, if you have clients

2    that are -- their projects are on time and they are paying on

3    time, and then you have another client who isn't paying on time

4    and they are delayed, we tend to prioritize the people that are

5    on time and doing what they are supposed to do.  So, I believe

6    at that time, you know, we gave priority to clients that were

7    doing the right things and needed materials pretty quickly.

8    Q.   And, at the time that production was suspended, did you

9    have any clear idea as to when the project would be ready for

10   PRC's precast?

11   A.   I didn't have a date from them at that time.  I think

12   around that time we had lost our erector because the project had

13   been pushed back.  And I was contacting other erectors to see if

14   they could do it.  I think I was just throwing dates out to

15   them, November, December 2019, just to get something on the

16   books that I could hold them to, but I don't believe that I

17   received any hardcore dates from Oelrich at that time.

18   Q.   And, did you ever at any time provide a deadline by which

19   you guys promised to bring the precast to the project and start

20   installation at all?

21   A.   No.

22   Q.   Does PRC generally maintain production slots for scheduling

23   the precast that they have to make?

24   A.   Yes.

25   Q.   So, you aren't just working on one project, you're working

Direct Examination - Randall Forde Davis

1    on precast for multiple projects throughout the southeast?

2    A.    That's correct.

3    Q.    And, how do production slots usually generally work for PRC

4    in terms of scheduling out the precast that needs to be made?

5    A.    There's multiple factors.  Normally, it may have to do with

6    when you sign the contract, you know, there would be a queue of

7    people getting in line to get production space.  It also could

8    hinge on when the product is needed by the client.  And then

9    also, as I said, and I believe this is pretty industry standard

10   just from talking to other precasters and precast erectors and

11   all that, is you prioritize the people that are on time and not

12   delayed to help them get their building envelope closed in.

13   Q.    Once you and Mr. Crehore started trying to target some sort

14   of date in January of 2020, is that what you said?

15   A.    Yeah.

16   Q.    Were there other jobs that PRC was actively producing at

17   that time?

18   A.    Yes.  There were multiple.

19   Q.    Do you recall what those other jobs were?

20   A.    Yes.

21   Q.    What were they?

22   A.    EVMS, which is Eastern Virginia Medical School, they were

23   doing like a 12 story parking garage and classroom.

24       We were doing Richmond Community College in Rockingham,

25   North Carolina.

Direct Examination - Randall Forde Davis

1      Sycamore Hill in Greenville, North Carolina.  And then also

2  I believe at that time we were doing an addition to University

3  of Alabama's football operations building.

4  Q.   And, do you recall why those -- well, I'll back up one

5  step.  Were those projects urgent at that point?

6  A.   Yes, they were all urgent.

7  Q.   Why was that?

8  A.   Everyone wants precast yesterday.

9  Q.   Were those jobs ready to accept installation of the precast

10  that they had ordered?

11  A.   Yes.  So at that time, January 2020, I believe we were

12  actively shipping and erecting on our two biggest projects,

13  which would have been EVMS in Virginia and Richmond Community

14  College in North Carolina.  So, we were producing panels for

15  them and we were shipping and erecting them.

16  Q.   And, do you recall whether or not the clients for those

17  projects were timely paying their invoices?

18  A.   Yes.

19  Q.   Were they?

20  A.   I know EVMS was spot on.  We had some problems with

21  Richmond at the beginning of or the end of 2018, I think.  But

22  we had settled those issues.  And, you know, it was a year later

23  down the road and we were making -- they were doing a lot better

24  with payment.

25  Q.   And were those additional payment terms that were

Direct Examination - Randall Forde Davis

1  applicable to your Oelrich subcontract applicable to those jobs

2  as well?

3  A.    Yes.

4  Q.    In December of 2019 did Oelrich suddenly come out and ask

5  you for delivery of the precast materials?

6  A.    That is what I recall, yes.

7  Q.    Do you recall what you told them during that time frame

8  regarding the ability to immediately deliver and install the

9  materials?

10 A.    I believe I told them, you know, this was the first time I

11 was hearing of a set date that we had to be out there.  And I

12 think I was very open with them in saying that, you know, since

13 this project had pushed back we had lost our installer because

14 they had to move on to other things.  They couldn't just sit

15 around and wait on us.  And I was actively trying to find

16 someone else to install the pieces.  But then also that we

17 hadn't completed production of the pieces either.  We would have

18 to basically restart that process.

19 Q.    Do you recall whether you asked Oelrich in December of 2019

20 to pay in full for the pieces that had been manufactured?

21 A.    I don't think that I explicitly asked him to pay in full

22 right then.  But, per the terms of our contract, the materials

23 had to be paid for before they shipped.  We went over that.  I

24 mean, it's a custom product.  That's what we ask for.  And,

25 given that they had just given me a date of early January to be

Direct Examination - Randall Forde Davis

1    out there with product, we billed them for the remainder of the

2    precast up to a hundred percent just so they could get it

3    basically in their system and through the higher ups, whoever

4    they needed to get it to so that it wouldn't be an alarm.  You

5    know, we wouldn't one week be going to ship panels and say, oh,

6    no, wait, you guys haven't paid for this.  And then they would,

7    of course, say well, you haven't billed for it.  And then there

8    could be a delay where we're having to hold a truck or something

9    just for clerical issues.

10   Q.   And, did you ever tell anyone at Oelrich in December of

11   2019 that you guys had manufactured all of the precast

12   materials?

13   A.   No.

14           THE COURT:  Let me just me give you a heads up.  I'm

15   the fact finder.  I generally find far more persuasive answers

16   that a witness gives that are not responsive to leading

17   questions.

18           So, if you just lead him, you are not persuading me

19   very much.  I know your position.  I heard your opening

20   statement and I'll hear your closing argument.  So, you can do

21   it.  And if they don't object I'm not going to stop you.  But

22   you can persuade me more if you ask what happened than if you

23   tell him what happened.

24           MR. DARR:  Sure.  Okay, Your Honor.

25

Direct Examination - Randall Forde Davis

1    BY MR. DARR:

2    Q.    In light of that comment, do you recall having submitted a

3    payment application to Oelrich in December of 2019 that

4    indicated one hundred percent of the product was being built?

5    A.    Yes.

6    Q.    And, I think you touched upon it just a second ago, but can

7    you explain why that was done?

8    A.    Yes.  So that was in anticipation of us completing the

9    manufacturing of the precast.  And then them giving us this date

10   in early January that they wanted us out there.  And given that

11   our contract terms said the material had to be paid for before

12   it shipped to the site, this was, as I said, to just get it in

13   their accounting system, get it submitted to the VA, or whoever

14   they needed to submit it to, to be processed, so that there

15   wouldn't be any potential delays on the back end when we were

16   going to ship the panels of there being a lack of payment for

17   them.

18   Q.    And, did anyone --

19   A.    And this was something that myself and Chris Crehore had

20   multiple conversations about in 2018 when we were signing the

21   contract.  I believe we had a phone call where he said, you

22   know, if we just got it to him early enough he could handle it.

23   He didn't want to have to be waiting on the side of the road

24   with the check in his truck, you know, while our trucks are

25   going by and having to hand me a check and that kind of thing.

Direct Examination - Randall Forde Davis

1    So, it was something that I think he was very aware of.

2    Q.   During this time frame of December of 2019, did you ever

3    have a conversation with Mr. Crehore about this 100 percent

4    billing issue?

5    A.   I believe I would have, yes.

6    Q.   Do you know whether or not in December of 2019, Oelrich

7    paid all of its open invoices for this project?

8    A.   No, they didn't.

9    Q.   Had they paid them in full at that point in December of

10   2019?

11   A.   No.

12   Q.   All right.  Do you recall there being any OSHA and lift

13   plan document requirements on this project?

14   A.   Yes.

15   Q.   And, what do you recall those requirements as being?

16   A.   I believe all personnel that were going to be on-site had

17   to have an OSHA 10 hour certificate.  The foreman or responsible

18   person, the leader of the crew on-site had to have an OSHA 30

19   hour certificate.  They wanted a lift plan from the crane

20   company before arriving.  And then there was the -- I just call

21   it an AHA document, which is their overall safety plan.

22   Q.   And, do you ever recall discussing these documents with the

23   project manager, Mr. Crehore?

24   A.   Yes.  I believe I discussed it with him and

25   Jordan Robinson.

Direct Examination - Randall Forde Davis

1    Q.   And did you ever have any discussions with him about the

2    timing of the submission of those documents from PRC?

3    A.   I did.  And, I believe we had discussions with some of

4    their interns too.  I mean, at first they were asking for them

5    months in advance.  But, as I think I previously said, we had --

6    basically our erector had moved on to a different project since

7    this project had lapsed on its date.  So, at that time we didn't

8    even know who would be out there yet.  So, I could submit you

9    documents for the personnel that I had lined up, but that

10   doesn't mean those are the people that are going to be on-site.

11   And I tried to convey that to them.

12        And then, I believe at the end we agreed on within 2 weeks

13   of us arriving on-site they would have all of those materials,

14   all of that paperwork.

15   Q.   Did Mr. Crehore ever indicate that that timing was

16   acceptable?

17   A.   Yes, he said it was acceptable.

18   Q.   When was that?

19   A.   It was the early part of 2020.  May have been in that

20   January time frame.

21   Q.   And, could you please pull up Plaintiff Exhibit 121?

22   Mr. Davis, can you take a look at this document and review it

23   and tell me what you're looking at?

24   A.   This looks like a notice to cure from SAW Contracting to

25   Oelrich.

Direct Examination - Randall Forde Davis

1   Q.   And prior to this lawsuit being initiated, had you ever

2   seen this letter?

3   A.   No.

4   Q.   As you read through it, what is it here that SAW is writing

5   to Oelrich about?

6   A.   It looks like they are just kind of putting them on notice

7   of failing to meet certain progress dates with, it looks like

8   the masonry precast, steel platforms and roof system.

9   Q.   And, in January of 2020, did you know whether the general

10  contractor, SAW, believed that your scope was in any way

11  impacting the project schedule?

12  A.   I did not.  Those weren't relayed to us.

13  Q.   If you could pull up Plaintiff Exhibit 13, please?

14       If you could do me a favor, Mr. Davis, and review the first

15  page at least and let me know what it is you're looking at.

16  A.   This looks like Oelrich's response to that notice to cure

17  letter.

18  Q.   And, did Oelrich address PRC's scope of work anywhere in

19  this letter?

20  A.   Yes.  It looks like right there in the third paragraph.

21  Q.   This one right here?

22  A.   Yes.

23  Q.   If we take a look at this.  I believe the paragraph reads,

24  precast installation has been delayed.  It is worthy to note

25  that precast installation is not a critical path item and is not

Direct Examination - Randall Forde Davis

1    hindering forward progress of any of JV's trades.  Did I read

2    that correctly?

3    A.    Yes.

4    Q.    And then, towards had bottom there, particularly this

5    section, could you read from where it says OCI, the next

6    sentence?  There is a mention of a private inspector there.  Do

7    you have any idea who they are referring to there?

8    A.    No.

9    Q.    And, there's a mention of falsely claimed that production

10   was at 100 percent.  Are you aware of anyone at PRC

11   communicating to Oelrich that product was 100 percent complete?

12   A.    No, not to my knowledge.  I don't believe anyone would have

13   conveyed that to them.

14   Q.    And, can you read that last sentence there out loud

15   starting from as?

16   A.    As of the time of this inspection, the precast

17   subcontractor had 53 percent of the material produced and has

18   promised OCI in writing that material will be complete and

19   erection will start on 2/17/20.

20   Q.    Did you ever promise Oelrich in writing that material will

21   be complete and erection will start on 2/17/20?

22   A.    I did not.

23   Q.    Are you aware of anyone at PRC that made that promise to

24   Oelrich?

25   A.    I think, I think Randy sent them an email that said that

Direct Examination - Randall Forde Davis

1   was our best estimate that we were working towards.  But in no

2   way was that a guarantee of when we would be out there.  I mean,

3   that's, you know, it was a fluid situation trying to get this

4   project restarted.  That was just, like I said, our best

5   estimate.

6   Q.   And if we could pull up Defendant Exhibit 129, please?

7        What document are you looking at here, Mr. Davis?

8   A.   This looks like a letter that was sent to us.

9   Q.   Who do you understand Warner, Sechrest and Butts to be?

10  A.   Oelrich's counsel.

11  Q.   And, do you recall whether or not you received this letter?

12  A.   Yes, I did receive it.

13  Q.   And, do you recall whether or not they asked you to reach

14  out to them or their client about the project?

15  A.   They did, yeah.  They put that in the letter.

16  Q.   And, do you recall whether or not there was a deadline by

17  which you were supposed to respond or get in touch with Oelrich

18  regarding this letter?

19  A.   I think it was January 31st.

20  Q.   Can you scroll down to the second page, please?

21       Is that what you are basing it upon, this language right

22  here?

23  A.   Yes.

24  Q.   And, did you reach out to Oelrich about this letter prior

25  to that date?

Direct Examination - Randall Forde Davis

1    A.   I would have reached out to Chris Crehore.  I don't know if

2    by Oelrich you meant Mr. Oelrich or Oelrich Construction, but

3    yeah, I would have talked to Chris Crehore about this.  We were

4    talking weekly, daily.

5    Q.   And, can we pull up Defendant Exhibit 299, please?  Can you

6    go to page 7?

7         And, if you could take a look at this document for me

8    Mr. Davis, let me know what you understand this to be?

9    A.   This looks like a lawsuit by Oelrich Construction to us.

10   Q.   And, at the top of this document, what is the date that it

11   says that this was e-filed?

12   A.   January 27, 2020.

13   Q.   And, did Oelrich ever inform you that this lawsuit had been

14   filed any time between January of 2020 to March 2020?

15   A.   No, we had no idea until discovery in this case.

16   Q.   Were you surprised to find out that this lawsuit had been

17   filed when you discovered it had been after the lawsuit had been

18   served on PRC?

19   A.   Yeah, very surprised.

20   Q.   Why is that?

21   A.   Just the timing of it.  I felt like we were still trying to

22   work things out with them.  And then, the letter from their

23   attorney, if I recall, explicitly said they weren't threatening

24   legal action.  But then just a couple days later they took legal

25   action without our knowledge.

Direct Examination - Randall Forde Davis

1    Q.   And, did you continue to work with Oelrich in early 2020 to

2    get the precast materials installed at the project?

3    A.   Yes.

4    Q.   And, do you recall generally what efforts were made on your

5    part to make sure that happened?

6    A.   First and foremost, we restarted production of the precast.

7    But then also, just more documents that they asked for I would

8    send over.  And then, also trying to coordinate with them on

9    where they wanted to start the erection on the building.  Stuff

10   like that.

11       I told them, you know, even if we're not a hundred percent

12   complete with production if we coordinate and schedule this

13   thing properly we could still go out there and put panels on the

14   building while we're producing at our plant.  And then, just

15   kind of catch up to ourselves and complete the building.  So

16   that way, we wouldn't have to be a hundred percent complete

17   before we went out there.  And, we could maybe shave off a

18   little bit of time.

19   Q.   And, could you please pull up Defendant 137?

20       Do you recognize this document?

21   A.   Yes.

22   Q.   And what do you understand this document to be?

23   A.   This is an email from Chris Crehore to me.  This was their

24   termination.

25   Q.   And, prior to receipt of this termination email, did

1    Oelrich ever tell you or anybody else at PRC that it might be

2    terminated?

3    A.   No.

4    Q.   And, in particular, did anybody from Oelrich ever tell you

5    or anybody else at PRC that you might be terminated if you

6    didn't start installing by some specific date?

7    A.   No.

8    Q.   When did you first see this termination notice,

9    approximately?

10   A.   May of 2020.

11   Q.   And, could you explain why it is you didn't see this

12   termination notice when it appears to have been sent on

13   March 17th, 2020?

14   A.   Yeah.  So, in regards specifically to the termination, I

15   believe I scanned it, the email.  I saw some dates in there.

16   But, there was nothing alerting me to the importance of this

17   email.  It was in a string of emails.  Subject, Malcom Randall

18   VA precast, which was other topics that we were discussing.  It

19   was kind of buried at the bottom.  Consider this notice of

20   termination, there was no priorities put on it.  There was no

21   letterhead or letter.  And then also, just at that time

22   March 17th, I know that COVID had started.  I mean, just going

23   back through for this case and looking at our emails, COVID

24   stuff had started days prior to that.  This was kind of in the

25   throws of it.  And, I was getting hundreds of emails a day from

Direct Examination - Randall Forde Davis

1    our clients, from suppliers, from everyone of stuff shutting

2    down.  We had multiple crews out of state that we were

3    monitoring.  I'm not a huge avid news watcher.  I was glued to

4    the news trying to find out what was going on in the country

5    because I didn't want our guys to get stranded in Virginia or

6    Tennessee or wherever they were.

7        And, this just kind of, just the timing of it, it got lost

8    in all of this other stuff that we were trying to figure out.

9    All of these other emails and things we were deciphering.

10   Q.   And, if you had seen this termination on March 17th, what,

11   how do you think you would have responded?

12   A.   I don't know that I would have responded personally.  We

13   may have sent it to an attorney.  To me this just says like

14   you're done, you're terminated.  It's kind of hard to come back

15   from that.

16   Q.   And, you were just mentioning the impact of COVID-19.  Can

17   you, beyond what you just described, describe to the everyone

18   here, any other impacts that may have occurred from COVID-19 on

19   PRC's manufacturing capabilities in March of 2017 or 2020?

20   A.   Yeah.  We were heavily impacted.  We lost probably half of

21   our work force.  Just them being single parents.  And in South

22   Carolina where we were they sent everyone home from school.

23   They didn't have -- so these single parents didn't have any

24   daycare or anything like that.  So, a lot of our work force just

25   left.  I mean, they just went home to take care of their

Direct Examination - Randall Forde Davis

1    children.  And it heavily impacted our manufacturing process.

2    And then also, our supply chain issues.  You know, we have

3    multiple emails from suppliers.  Us being a specialty product we

4    pulled supplies from all over the country.  The north, midwest,

5    I think there is colors coming out of China, and we were getting

6    multiple notices of delay to those, delays to getting product

7    shipped to us because places were closing down.

8         And, then I think I already mentioned our, our installers

9    that we feel some responsibility for that are hours away and

10   we're trying to just coordinate with them and make sure they

11   don't like get stranded somewhere and have to quarantine 14 days

12   away from their family and stuff like that.

13   Q.   Did PRC continue to manufacture the precast materials after

14   the date of the termination notice?

15   A.   Yes.

16   Q.   And, why did you continue to manufacture precast materials

17   after the date of the termination notice?

18   A.   As I said, I didn't see this part of the email that we had

19   been terminated.  To my knowledge, we were still working with

20   Oelrich and we were trying to get the product, get the project

21   done.

22   Q.   If Oelrich had advised you or anyone at PRC that if the

23   installation of the precast panels did not begin by a certain

24   date your contract may be terminated how would you have

25   responded to that?

Direct Examination - Randall Forde Davis

1  A.    Obviously, there would have been, I believe, followup

2  discussions to that, but we would have taken it very seriously.

3  Any time you have a hardcore set in stone date, I mean, and

4  termination is looming on the other side of that, it's something

5  that you want, you don't want to miss.

6  Q.    Do you have any idea the date by which PRC would have been

7  done manufacturing materials had you continued on with producing

8  them?

9  A.    I don't.  I would just be guessing at this point.  But, I

10 mean, we were at 82 percent in May.  It wasn't but a few more

11 pieces that we had to make before we were completely done.

12 Q.    Do you believe that you could have completed the pieces

13 prior to October of 2020?

14 A.    Yes.

15 Q.    How about September of 2020?

16 A.    Yes.

17 Q.    And, can I ask you, why is that?

18 A.    Like I said, we were at 82 percent already in May.  And

19 then since we were actively producing in May we would have had

20 those -- we would have already had that production space blocked

21 off in our plant and had the forms down.  We would have had all

22 of the -- I guess, the leg work done on the front-end and then

23 at that time it's just churning out panels, for lack of a better

24 word.

25 Q.    Okay.

Cross-Examination - Randall Forde Davis

1           MR. DARR:  That's all.  Thank you for your time,

2    Mr. Davis.

3           THE WITNESS:  Thank you.

4           THE COURT:  We're going to be at lunch here at some

5    point.  This is, I guess, Mr. Butts, I'll give you your choice.

6    You want to cross examine now or wait until after lunch?

7           MR. BUTTS:  Your Honor, we'll wait until after lunch.

8           THE COURT:  Let's take an hour.  We'll start back at

9    1:20.

10          Thank you, Mr. Davis.  You may step down.

11          If you will be back on that witness stand at 1:20.

12   Thank you.

13          THE WITNESS:  Okay.  Thank you.

14      (Recess taken 12:20.)

15      (Resumed at 1:21.)

16          THE COURT:  Please be seated.

17          Mr. Davis, you are still under oath.  Mr. Butts, you

18   may proceed.

19                    <u>CROSS-EXAMINATION</u>

20   BY MR. BUTTS:

21   Q.   Mr. Davis, you told Chris Crehore the reason you couldn't

22   hang those panels on January the 6th was because you didn't have

23   an erector.  And that's not true, is it?

24   A.   I believe that to be true.

25   Q.   You had an erector, didn't you?  You had Mr. Marc Davis who

Cross-Examination - Randall Forde Davis

1  you spoke with in September and October who said he would hang

2  those panels as early as November if you needed him to, right?

3  A.   No.  We never had -- we never came to terms with him.

4  Q.   But he said he would hang those panels, didn't he in

5  November?

6  A.   For double the price of the contract.

7  Q.   So the only reason you didn't have an erector was because

8  you didn't want to pay him, right?

9  A.   It's just not feasible to pay someone double the contract

10 amount, no one can do that.

11 Q.   You had another erector back in July who you were

12 negotiating with but you couldn't get him to hang them either,

13 could you?

14 A.   That's correct.

15 Q.   But you had this Mr. Davis who would have hung those panels

16 and could have hung them on the 6th but there was another

17 problem, you hadn't produced the panels, had you?

18 A.   We had not produced 100 percent at that time.

19 Q.   In fact, you had only produced, by your own count,

20 63.4 percent in December, in October; right?

21 A.   Yes.

22 Q.   And, you didn't produce any in November, right?

23 A.   Right.  Because we stopped production.

24 Q.   You didn't produce any in December, did you?

25 A.   That's correct.

Cross-Examination – Randall Forde Davis

1    Q.   So your company billed for a hundred percent production

2    panels on December the 16th in a sworn affidavit on a federally

3    funded job, right?

4    A.   We billed on the standard AIA documents and invoices.

5    Q.   Let's look at Exhibit 10 or pay app 10.  Block 58.  Let's

6    go back a page, please.  And another page.  And one more.  That

7    page.

8         Whose signature is that on that affidavit?

9    A.   Randall Davis'.

10   Q.   And to the left of that, what's it say?

11   A.   Sworn to and subscribed before me.  It's --

12   Q.   Do you have any reason to think that's not a sworn

13   affidavit?

14   A.   I don't know the legal definition of it, but this is our

15   standard lien waiver that we send.

16   Q.   So, then you told Chris Crehore you couldn't install it on

17   the 6th like he wanted you to, but you didn't tell him that you

18   hadn't produced the panels, right?

19   A.   I believe I did -- I never insinuated we had produced all

20   of the panels.

21   Q.   Except for the pay application, right?

22   A.   Yes, it did say a hundred percent, but I've explained why

23   previously.

24   Q.   Well, I heard your explanation, but my understanding of

25   your explanation that you gave Chris Crehore was that you

Cross-Examination - Randall Forde Davis

1   couldn't hang the panels.  You didn't tell him you had not

2   produced the panels, right?

3   A.   I believe I told him both.  We didn't have a hundred

4   percent produced.  And, the big thing was we didn't have anyone

5   to hang them.

6   Q.   So whatever you said to him caused him to be skeptical

7   enough to ask Dana Noyes to drive all the way from Gainesville,

8   Florida to Greenville, South Carolina to see if you had a

9   hundred percent of the panels built, right?

10  A.   Yes, I guess that's how he interpreted it.  He wanted

11  someone to see with their own eyes what we had produced.  That's

12  not -- it is uncommon for people to show up unannounced like

13  Mr. Noyes did.  It is not uncommon for contractors to visit our

14  facility and check on progress and --

15  Q.   Mr. Davis, so what if he comes up there unannounced, you

16  asked for a hundred percent of the money, right?

17  A.   We billed for a hundred percent, yes.

18  Q.   And he just wanted to see what he was getting ready to pay

19  for because you wanted to be paid, right?

20  A.   Technically, yes.  But, they didn't have to pay that for

21  another 45 days.  I mean, the way construction billing works,

22  we're billing this on the 15th of December, it's a projection

23  through the end of the month where we think we'll be.  It's not

24  for materials that are physically made.  And then as I explained

25  previously, our contract states materials have to be paid for

1   before they leave.

2   Q.   You didn't build any panels in January, did you?

3   A.   I don't think we did.

4   Q.   You didn't build any in February, did you?

5   A.   I don't think we did.

6   Q.   And you didn't have but 90 something panels, 80 percent, or

7   whatever it was, 82 percent had been built all the way out in

8   May, right?

9   A.   Yes.

10  Q.   But yet you billed for 100 percent in December and you

11  asked Oelrich Construction to pay that money and you were put

12  out when they went up there to see if you had actually done it.

13  And, you told Chris Crehore instead that the reason you couldn't

14  put them up was because you didn't have an erector that you

15  didn't want to pay for, right?

16  A.   We never told Oelrich to pay it.  I mean, as I said, this

17  was us submitting this bill at a hundred percent was just to

18  start the process, it being a government job, get it submitted

19  to the VA.  We've had clients before that on the final pay app,

20  well, this wasn't a final pay app, but, you know, paying

21  progress payments for production they'll come look at the panels

22  and bring a check with them or see for themselves.  We never

23  demanded on December 15th pay us a hundred percent or else.

24          MR. BUTTS:  Your Honor, I don't have any other

25  questions.

Redirect Examination - Randall Forde Davis

1           THE COURT:  Redirect?

2           MR. DARR:  Yes, Your Honor.

3                  REDIRECT EXAMINATION

4    BY MR. DARR:

5    Q.   Can you pull up Exhibit 106, please?

6         Mr. Davis, do you see this email in front of you?

7    A.   Yes.

8    Q.   And, if you could take a look at point number one there

9    that you wrote and read through that real quick.  Is there any

10   mention of the hundred percent billing issue that Mr. Butts was

11   just talking to you about?

12   A.   No, there is not.

13   Q.   Number 1 there, the number 1 paragraph?

14   A.   There is mention that I'm not authorized to ship a hundred

15   percent until it's paid, but there is no mention of what has

16   been made to date.

17   Q.   What did you intend to communicate when you wrote that in

18   that email?

19   A.   That materials per our contract, per my previous

20   discussions with Mr. Crehore had to be paid for before they

21   could ship.

22   Q.   And, up until, up through November 2019, the month before

23   this email, had all of PRC's invoices been paid in full?

24   A.   No.

25           MR. DARR:  Thank you.

1          THE COURT:  Mr. Davis, was there a time when you

2     stopped production because invoices had not been paid?

3          THE WITNESS:  Yes.

4          THE COURT:  When?

5          THE WITNESS:  I believe that was around October or

6     November of 2019.

7          THE COURT:  You sent a bill on December 16th for a

8     hundred percent of the production.  You've told us that the

9     hundred percent was both what you had produced and what you

10    expected to produce by the end of the month?

11         THE WITNESS:  Yes, sir.

12         THE COURT:  If you had stopped production in October

13    or November, as you just told me, how were you going to increase

14    the amount that was produced by the end of December?

15         THE WITNESS:  I don't believe that we sent them a bill

16    in November.  Definitely not for a hundred percent.  But the

17    bill in December was just based upon my discussions with

18    Oelrich Construction and them basically turning the tap back on

19    and saying, hey, we need all this precast now, it was in

20    anticipation of that.  Okay, we'll get you back in the schedule

21    and we'll get your panels start being made again, but in the

22    meantime I'm going to send you this bill so you have it, you can

23    see it, it can be processed so there are no delays on the back

24    end when we go to ship these pieces.

25         THE COURT:  On December 16th had you resumed

Redirect Examination - Randall Forde Davis

1    production?

2            THE WITNESS:  No.  Like I said, we were projecting and

3    trying to get it back into production.

4            THE COURT:  Did you decide on December 16 that you

5    were going to resume production?

6            THE WITNESS:  We did have internal discussions in

7    meetings like, hey, where can we fit these panels in, you know,

8    when can we get the forms built, when can we start production.

9    We were moving in that direction, trying to.

10            THE COURT:  Did you decide on December 16 that you

11   would resume production during December?

12            THE WITNESS:  I don't recall exactly.  But, like I

13   said, I know that we were seriously moving in that direction.

14            THE COURT:  When did you decide to resume production?

15            THE WITNESS:  I mean, we decided pretty early on.

16   Like, we were going to resume production, we were going to

17   complete the job.  It wasn't until I guess February or March

18   where we were actually able to, whether it be work force issues

19   like I mentioned earlier, or just other jobs that had been

20   completed or fallen off or finished.  It wasn't until those

21   months that we were actually able to move Oelrich Construction

22   on to the production floor and start producing again.

23            THE COURT:  My question wasn't when you were going to

24   resume production.  My question was, when you decided that you

25   were going to resume production.  When did you decide that you

Redirect Examination - Randall Forde Davis

1    were going to resume production?

2           THE WITNESS:  I believe it was in that December,

3    January time frame after, after we billed them a hundred

4    percent, after I conveyed to them why we were doing that, and

5    then just discussions with Mr. Crehore on schedule moving

6    forward and what they needed.

7           THE COURT:  Had you made the decision when you issued

8    the invoice on December 16, that is, the decision that you were

9    going to resume production?

10          THE WITNESS:  Yes.  We were -- had all intentions of

11   resuming production.

12          THE COURT:  When you submitted the invoice on

13   December 16, and you had decided that you were going to resume

14   production, did you believe that you would finish the production

15   during December?

16          THE WITNESS:  I don't recall.  I knew that it would

17   be, you know, close.  I knew that we would have to work with

18   them to, as I told them I believe in later emails, to kind of

19   overlap production with shipping the panels and try to maximize

20   our efficiency as much as possible just because of other things,

21   other projects we were doing.

22          THE COURT:  Did you believe, when you submitted the

23   invoice on December 16, that you would finish the production

24   during December?

25          THE WITNESS:  At that time I don't remember.  I mean,

Redirect Examination – Randall Forde Davis

```
 1    like I said, it would have been a projection for 15 days from
 2    then to the end of December.  But, mainly the invoice wasn't
 3    just, we're going to be complete by the end of December.  It
 4    was, as I said, it was a get it through the bureaucracy part,
 5    get it through the proper channels.  You don't even have to pay
 6    us.  I mean, obviously, they hadn't been paying 30 days the
 7    whole project.  I didn't expect them to pay right when it was
 8    due.  It was a:  Hey, get this ready, you can hold the check,
 9    but per our contract -- like, we just -- that's our agreement.
10          THE COURT:  If I understand what you said at the
11    beginning of that statement, you don't remember whether you
12    expected on December 16 when you submitted the invoice that you
13    would be able to do the production during December.  Do I have
14    that right?
15          THE WITNESS:  Yes.  That's correct.
16          THE COURT:  Did it occur to you that it might well be
17    a federal crime to submit this invoice for a hundred percent of
18    production if you did not intend at that time to finish the
19    production during December?
20          THE WITNESS:  It did not.
21          THE COURT:  Questions just to followup on mine?  No,
22    all right.  Thank you, Mr. Davis.  You may step down.  Please
23    call your next witness.
24          **RANDALL E. DAVIS, DEFENSE WITNESS, DULY SWORN**
25          THE COURTROOM DEPUTY:  For the record, state your name
```

1    and spell your last name.

2              THE WITNESS:  Randall E. Davis, D-A-V-I-S.

3                         DIRECT EXAMINATION

4    BY MR. DARR:

5    Q.    Good afternoon, Mr. Davis.

6    A.    Hello.

7    Q.    Can you do us a favor and tell us what your title is with

8    PRC Precast?

9    A.    I am the president.

10   Q.    And, how long have you been involved in the precast

11   industry?

12   A.    Since 1979.

13   Q.    How long have you been working for PRC Precast, LLC?

14   A.    Since 2010.

15   Q.    Can you pull up Exhibit 276, please?  Defendant's Exhibit.

16         And, if you take a look at this document in front of you,

17   does this appear to be your CV, Mr. Davis?

18   A.    Yes.

19   Q.    If you could scroll through it just to make sure.  Does

20   this appear to be up-to-date with your education and previous

21   experience with regards to the precast industry?

22   A.    Yes.  Some of the PE licenses are expired, but --

23   Q.    Do you have a current PE license right now?

24   A.    I do.

25   Q.    And, where is that currently active where you have an

Direct Examination – Randall E. Davis

1   active license?

2   A.   Georgia, South Carolina and North Carolina.

3          MR. DARR:  I know we're in a bench trial here and

4   Mr. Davis was disclosed as a hybrid fact expert witness, Your

5   Honor.  I'm not sure if you want me to keep going about his

6   background, but the CV is right there and I would like to tender

7   him as an expert with regard to industry norms and customs for

8   the precast industry, the suitability of their materials for the

9   project, subject to our objection regarding whether it's an

10  issue in the case, of course.  And last, as the reasonable value

11  of the services that were provided within the precast industry.

12         THE COURT:  Mr. Butts, any questions at this time?

13         MR. BUTTS:  Yes.

14         THE COURT:  All right.

15         MR. BUTTS:  Your Honor, it's all right.

16         THE COURT:  All right.  You may proceed.  Mr. Darr,

17  you may proceed.

18         MR. DARR:  Okay.  Thank you, Your Honor.

19  BY MR. DARR:

20  Q.   What was your involvement with this project, Mr. Davis?

21  A.   I am in charge of the plant day-to-day.  I basically am

22  senior management.

23  Q.   Do you oversee multiple projects that PRC has going on

24  overall?

25  A.   Yes.

Direct Examination - Randall E. Davis

1    Q.   And who did -- what involvement in particular did you have

2    with the project that's at issue in this lawsuit?

3    A.   I oversaw the initial sampling, creating of the samples,

4    getting engineering performed, making sure it got through the

5    system and it matched our system and so forth.  I guess I could

6    back up earlier than that, that I worked with the salesman on

7    the estimate and coming up with a price and the quote, details

8    and what we offered.

9    Q.   And, who was the salesman that was involved with the

10   estimate that was provided for this project?

11   A.   I think it was Steve Realto on this job.

12   Q.   And, do you know whether PRC provided a quote to Oelrich

13   for this job?

14   A.   We did.

15   Q.   Did that quote include inclusions and exclusions for what

16   you could and couldn't do for the job?

17   A.   Yes.  We are a manufacturer.  So, we have a system.  And

18   architects and engineers put out drawings and specs and it's

19   their best guess on what they can buy.  So, what we have to do

20   is work with the contractor to adapt our system to what they are

21   trying to buy and that we can sell it to the owner and the

22   architect.

23   Q.   Could you explain the distinction between APA plans and PCI

24   plans?

25   A.   PCI is Precast Concrete Institute.  It was started, excuse

1   me, Prestress Concrete Institute.  It was started many years ago

2   for the prestress concrete industry.  And it tried very hard to

3   take a lot of the architectural precast manufacturers under its

4   wing.  And the precast architectural folks kind of rebelled and

5   said we don't like your fee structure, it's pretty expensive and

6   we refer to do your own thing.

7       So, in the 60's, I believe it was, they started the APA,

8   which is the Architectural Precast Association.  And for many,

9   many years the PCI has sought to keep the APA out of specs.

10  But, about 15 years ago or so master spec, which is the main

11  spec that most commercial projects use, the government uniform

12  guide spec and all of the others changed the line in the wording

13  in their spec to say if it was an architectural job like this it

14  would say PCI and/or APA, either one.  They realized they were

15  equivalent and they finally went down that path.

16  Q.   What is your understanding of what occurred with regard to

17  the invoices that PRC submitted for this project in terms of the

18  timing of payment that PRC was receiving?

19  A.   We submitted invoices.  And per our agreement with them,

20  with the edits to the contract, we say in that edit that you

21  have 10 days to dispute the invoice.  If you don't dispute it in

22  10 days we assume that you've accepted the invoice and it's in

23  your system.  And you are supposed to pay us in 30 days.

24      And, that's typically as far as it goes for me.  A clerk

25  brings me an invoice and says, here's the monthly invoice for

1   these folks that we've worked out based on production and so

2   forth.  And, I sign it and give it back.

3        Well, I don't typically get involved beyond that point

4   unless there's a problem.  And, in this case, I was involved

5   because I am constantly being brought emails and so forth that,

6   hey, Oelrich is not paying or Oelrich is withholding retainage

7   and Oelrich is, you know, if you look at it they were

8   withholding 10 percent up and until I think December, up through

9   December.

10       So, I usually only get involved in that stuff if there's a

11  problem and I'm trying to figure out why aren't they paying and

12  what's the issue here.  And Oelrich didn't seem to have an

13  excuse.  It was just, we'll get you paid or, yeah, your app was

14  approved, but then we would go weeks without being paid.  And

15  then we were always short paid.

16  Q.   And, earlier today I think you were in the room to hear

17  testimony about the no day additional payment terms that were

18  included in this contract.  Do you know what I'm referring to in

19  that regard?

20  A.   Oh, yes.

21  Q.   Typically, are you the one who ultimately makes a decision

22  on behalf of PRC whether or not to accept a contract for any

23  given project?

24  A.   Yes.

25  Q.   And, but for the -- would PRC have entered into this

Direct Examination - Randall E. Davis

1  contract unless that note A additional payment term language had

2  been added to the contract?

3  A.   No.  We have not accepted a contract without note A since

4  January 2014.

5  Q.   I'm sorry, I couldn't hear you.

6  A.   January 2014 is when we started that and we've not accepted

7  one since then.

8  Q.   And, do you recall what changed around January 2014 where

9  you made a decision that those additional payment terms needed

10  to be added?

11  A.   Can you rephrase that?

12  Q.   Yeah.  Was there something that triggered you wanting to

13  add that contractual language to PRC's subcontracts?

14  A.   Oh, yeah.  We had a contractor, we shipped the last couple

15  of loads of precast on a project to him and he handed our truck

16  driver a check for almost $50,000 and we deposited it and the

17  bank called and said they put a stop payment on the check.

18  Q.   Because the driver took it?

19  A.   No, because, I don't know why.  They just put a stop

20  payment on the check.  So we met with our attorney and came up

21  with note A and said, you know, we're not -- fortunately they

22  need us more than we need them because there are not that many

23  people doing what we do.  And, so we negotiate contracts, we've

24  negotiated contracts upwards of $2 million that had note A and

25  never any problems.

1  Q.   Mr. Forde Davis explained why those terms were important to

2  PRC.  Can you explain in your own words why you felt those terms

3  were important to PRC?

4  A.   It's really simple.  We're not a commodity.  We're

5  basically art in concrete and what we make is specifically for

6  that project.  And we can't sell it to someone else.  So, if I'm

7  selling you steel and you don't want it I could typically turn

8  around and would sell a modification and sell it to somebody.

9  But, in the architectural precast world it is designed and

10  fabricated to go on that building and it will not fit any other

11  building.

12  Q.   If you make -- is all the precast that you make now for

13  projects specially manufactured?

14  A.   Yes.

15  Q.   So, would it be difficult to sell those products, that

16  product to another company if you didn't get paid for the

17  product you had made for someone?

18  A.   It is impossible.

19  Q.   Can we take a look at exhibit, Defendant Exhibit 306,

20  please?

21       Do you recognize this document, Mr. Davis?

22  A.   Yes.

23  Q.   Can we turn to page 3, please?  And, could you make that

24  bigger to look at that table?

25       Can you describe in your own words what this table

Direct Examination - Randall E. Davis

1   reflects?

2   A.   That is an accounting of basically Oelrich payment history.

3   It shows when their invoice was sent to them, when it was due,

4   if they paid, if they short paid, there is a remainder due and

5   the past due date on it or the past due days on it.

6   Q.   And, where was that information pulled from?

7   A.   SAGE, our accounting system.

8   Q.   And, the information that's included in this table is true

9   and accurate or do you believe there may be something incorrect

10  in there?

11  A.   I have no reason to believe it's incorrect.

12  Q.   And, according to this table, by the time PRC was

13  terminated in March of 2020, what was the longest period of time

14  that one of PRC's invoices were past due?

15  A.   107 days.  And I think Forde said it earlier, you got to

16  add 30 days on top of that to how old the invoice was.

17  Q.   Why is that?

18  A.   Because this only counts past due days.  So, there's 30

19  days of allowance in front of that.

20  Q.   Can we pull up Plaintiff's Exhibit Number 2, please?  Could

21  we scroll down to paragraph 5?

22       What do you understand this document to be, Mr. Davis?

23  A.   This is the subcontract agreement between PRC and Oelrich,

24  I believe.

25  Q.   And, what is paragraph 5 there labeled?

Direct Examination - Randall E. Davis

1   A.   Payment.

2   Q.   And would you generally -- how would you generally describe

3   the terms that are under paragraph 5?

4   A.   How would I describe them?  I would describe them

5   incredibly favorable to the GC.

6   Q.   What subject are they governing?

7   A.   Payment.

8   Q.   Was it your understanding that these payment terms were

9   applicable to this project or was it some other terms in the

10   contract that were applicable to the payment that was due to PRC

11   on this case?

12   A.   No.  The purpose of our note A is to change these payment

13   terms to something that's much more amenable to both parties.

14   Q.   With regards to the predecessor work that we've been

15   talking about that Oelrich needed to complete, could you

16   describe for us in your opinion what work that Oelrich was

17   responsible for that they had to complete before the precast

18   product that you were manufacturing could be installed at the

19   project?

20   A.   All, to my knowledge all of the cast-in-place work and all

21   of the masonry block work had to be installed and cured before

22   we could hang precast.

23   Q.   And, what is your understanding of when that work was

24   complete?

25   A.   I don't think they got ready for it until some time in

1    February, is in my opinion.  But it was a moving target.

2    Q.   If you could turn to the schedule on the subcontract.  I

3    think it's page 14, maybe 16.  16 on that.

4         What was your understanding on here that the schedule

5    attached to the contract would specify the time with which PRC

6    was supposed to perform its work?

7    A.   Yes.

8    Q.   Can you describe to me when that was supposed to have been?

9    A.   July of 2019.

10   Q.   And, how does the inclusion of these dates in the contract

11   typically effect how PRC bids a job, if at all?

12   A.   I'm sorry, say that again?

13   Q.   Do the dates that are included in contracts that PRC

14   executes effect the bid on the job?

15   A.   Oh, yeah.  No doubt.  I bid one last week at BMW that we're

16   not erecting panels til December of next year.  So, obviously,

17   inflation is included in that.  So dates are very important to

18   us.

19   Q.   Do you rely on dates as a precast contractor to schedule

20   out projects?

21   A.   Yes, a hundred percent.

22   Q.   How else do these dates effect your bids, if at all?

23   A.   I'm sorry, say that again?

24   Q.   Yeah.  How else do dates that are included on schedules

25   that are provided to you to bid on effect whether or not you bid

Direct Examination – Randall E. Davis

1   on it or any other aspects of your bid for going after that

2   work?

3   A.   Yeah, I mean, if this date had been much later in the year

4   we would have probably passed on it due to other work.

5   Q.   I'm sorry, you would have passed on it because of why?

6   A.   Because of other work that we had that was scheduled out

7   later on in the year.  So we look at our overall schedule when

8   we're bidding work.  And, one of the first things we ask them

9   during the bid is what's the anticipated delivery time.

10  Q.   As far as you understand, was the project ready for the

11  precast panels you manufactured as indicated in the schedule and

12  those dates?

13  A.   No.

14  Q.   There has been some discussion about whether or not the

15  panels and other product could have been delivered to the job

16  site before the building was ready for the panels.  Can you

17  explain why or why not the panels could have been delivered to

18  the project and stored before the project was ready for them?

19  A.   Yeah.  That's an incredibly weak statement.

20       These are really thin panels for their size.  And they got

21  to be handled pretty carefully.  And, we have special spreader

22  beams we use to get them out of the forms after we pour them and

23  then we stack them, like we saw in the yard in the pictures.

24  So, they are stacked on flat ground.  We make sure they're done

25  properly and everything is the way it's supposed to be.  We do

Direct Examination – Randall E. Davis

1    not ship them that way because trucks have camber built into the

2    trailers and that doesn't work for what we're trying to do.  If

3    we had shipped these panels flat to the job they would have been

4    broken in a hundred pieces.

5        But instead, we roll them up with our spreader beam and put

6    them on A frames and ship them on edge vertically.  And what

7    that does is we're now bouncing down the road on the strength of

8    the panel instead of flat and we don't break them.  We have a

9    better success that way.

10       So, for Oelrich personnel to claim that they could have

11   stored them as well as us, if you had been storing them right

12   out of the form possibly, but you're not.  You got to take them

13   off of the truck and store them vertically and then how are you

14   going to store them vertically because you don't have A frames

15   and I'm not leaving my trucks and trailers for to you to store

16   them.

17       So, if you had taken them off the truck, laid them flat on

18   the ground they would have broken.  And then, you would have

19   been calling me going, why did these break?  That's because you

20   handled them improperly.

21   Q.   So, it's your opinion that, and I'm sure you remember

22   seeing some pictures of when Mr. Noyes made a visit that he took

23   of where the panels were stored.  Do you remember that?

24   A.   Yeah.

25   Q.   It's your opinion that based on your experience those

Direct Examination – Randall E. Davis

1    materials could not have been stored in a similar manner once

2    they had been loaded onto the trucks the way you described and

3    delivered to the project?

4    A.   No.   The goal of precast is to handle it as few times as

5    possible.   So, when we take it out of the form and lay it on the

6    ground, that's it.   That's where we want it to be.   When I say

7    ground I mean concrete or whatever.   That's as far as we want to

8    go with it until it's cured for awhile.   Then we roll it up on

9    edge in these shapes.   And, this is all in the design from the

10   engineers.   We roll it up on the edge and put it in the A frame.

11   It needs to stay in that position until it's put on the building

12   which is in that same position.   So, unless Oelrich has specific

13   A frames, A frames that are specific to the precast industry

14   like we have in our yard somewhere in his facilities he would

15   not have stored them properly, he would have broke them.

16             THE COURT:   Are we shifting gears?

17             MR. DARR:   Yes, sir.

18             THE COURT:   Mr. Davis, let me stop you for a minute.

19   There are 20 or 30 people in the room.   I'm the worst engineer

20   among us.

21             THE WITNESS:   I am too.

22             THE COURT:   I think you are probably a pretty good

23   engineer and that's why I'm going to ask you some questions

24   about this.

25             I think I got the gist of what you just said, but I'm

1    going to try to understand it a little bit better.  We saw those

2    pictures.  Those things are lying flat on the ground, or

3    whatever, but they seem to have something in between them so

4    there's some spacers or something that are keeping them

5    separate.

6           If I understand what you just told me, you take them

7    out of the mold, or where ever you fabricate these things, put

8    them straight there, they cure, I guess get stronger, these are

9    concrete, they've got rebar inside them, right?

10          THE WITNESS:  That's correct.  Sadly, the rebar

11   doesn't do anything in the architectural world unless the panel

12   cracks.  So, our goal is to make sure it never cracks.

13          THE COURT:  And so, what you would do, those things

14   would stay right where I saw them in the picture until you put

15   them on what, a flat bed truck, but they are going to be

16   standing tall?

17          THE WITNESS:  Either -- yeah, correct.  The goal, the

18   number one goal is to take them off of the position they were in

19   in the picture, roll them up on edge with our beams and then put

20   them on, we have these special A frames, these big steel frames.

21   You might have seen them on the highway before going down the

22   road, but they stand on that vertically.

23          THE COURT:  And so, vertically, I mean, that, the

24   tall, the longest, the longest direction goes up?

25          THE WITNESS:  No, the longest direction is horizontal

Direct Examination - Randall E. Davis

1    and stronger.  And then, the 4-foot direction is this way.

2              THE COURT:  Is what's vertical?

3              THE WITNESS:  The 4-inch thickness is horizontal.  And

4    that's what your goal is.

5              THE COURT:  And, what you call A frame, you've got

6    some kind of braces that hold this thing in that position?

7              THE WITNESS:  It bolts to the trailer and provides

8    stiffness.

9              THE COURT:  And then, it goes down and then the goal

10   is then to deliver it to the VA hospital to the site of this

11   production and you take it off right there?

12             THE WITNESS:  You take it off there and you put it on

13   the building.  You don't put it on the ground.  So the truck

14   driver will sit there and wait until he's unloaded, but it's

15   because they are putting them on the actual building.

16             THE COURT:  So, it goes directly from the truck to the

17   building?

18             THE WITNESS:  Yes, sir.  That is the goal.  Now,

19   there's a part two to that, which we haven't discussed, which is

20   we have concrete A frames in your yard that are big A frames.

21   And sometimes if we get a project that the schedule goes to, you

22   know, we're in a handbasket and we can't keep them stacked

23   inside the shop like that, we'll roll them up and put them on

24   those A frames in the yard, but we're storing them properly.

25             THE COURT:  I may be getting ahead of Mr. Darr, but I

1  understand that explanation for why it doesn't make any sense to

2  you, why you don't want to take your product and ship it to

3  Gainesville in July 2019 if it's not going to be installed until

4  sometime early 2020 or who knows when.

5          THE WITNESS:  Correct.

6          THE COURT:  Why couldn't you go ahead and manufacture

7  a hundred percent, just like you manufactured 50 or 60 percent,

8  and just hold at your yard in South Carolina?

9          THE WITNESS:  My yard is only so big.  I mean, I'm

10  like everybody else.  Whether you have 10 acres or a hundred

11  acres you only have so much land.  And, I only have so many A

12  frames to store these on.  And I had about $3 million worth of

13  precast coming through starting in November.  And it was -- I

14  can't store all of this job at a hundred percent and manufacture

15  all of this.  Now I'm going to have, instead of one problem

16  client, I'm going to have three problem clients.  So, I got to

17  figure out who can I get manufactured and be shipping out the

18  door so I'm not covering up my yard with all of these pieces

19  because you're talking a hundred, I don't remember how many

20  pieces, 115 pieces I think that I have to store at my facility.

21  Who is paying me for my storage and moving it around and all

22  that?  That's a cost.

23          THE COURT:  Nobody is going to pay you to store it I

24  guess, but they are going to pay you --

25          THE WITNESS:  Well, that's not true.  That's a real

Direct Examination - Randall E. Davis

1    animal.  That is a real animal.

2            THE COURT:  Oh, I understand that there's a cost to

3    storing them.  I mean, they are not going to pay you to store

4    it, but they pay you to manufacture it?

5            THE WITNESS:  Uh-huh.

6            THE COURT:  So, if you had manufactured it in June,

7    July 2019 they would have paid you at the time?

8            THE WITNESS:  Well, we did manufacture in I think

9    July, August, September, October of 2019 and we didn't get paid

10   for it.

11           THE COURT:  Well, I said it badly.  They had an

12   agreement to pay you.  I know there's a dispute about whether

13   they did or not.

14           THE WITNESS:  Uh-huh.

15           THE COURT:  Got it.  You answered my questions.

16   Mr. Darr, go ahead.

17   BY MR. DARR:

18   Q.   With regard to that lack of timely payment that you were

19   just describing up through October of 2019, did that have any

20   effect on PRC's decision to suspend production in October of

21   2019?

22   A.   It does.  Our note A says if you fall behind we have the

23   right to stop work and reschedule it.  And, that's exactly what

24   we did.

25   Q.   And, can you describe to me how or to all of us how

1    production slots generally work with PRC scheduling out when

2    precast is going to be made among your various jobs?

3    A.   Yeah.   I mean, we have 4 beds.   We have a certain number of

4    square feet of space to cast on in the facility.   And, when you

5    build a form like, for example, when we spend the money to build

6    the forms to cast this project then you want those forms to stay

7    down until you're done with the project.   You want to be able to

8    cast out entirely because the cost of building the forms is not

9    cheap.

10        So, when we say, or when I say, we stopped production in

11   October, that was not free.   That cost us money because we had

12   to pull those forms up to put other forms down to go into work

13   that was, that was flowing.

14   Q.   And, for us nonconstruction folks, can you explain how the

15   forms work in the process to make the product you make?

16   A.   The forms we make look better than the wood in this place.

17   They are all made out of birch.   I'm not insulting, I'm just

18   saying that they are beautiful, they are made out of birch, they

19   are fiberglassed and they are gorgeous.

20        THE COURT:   This is not the courthouse that the

21   federal courts are the most proud of.

22        THE WITNESS:   Well, I'm just saying that most people

23   don't realize, you think it's concrete form, it's rough, no, it

24   looks better than this.   It's gorgeous.   And the reason is

25   because we want the precast to come out with the same finish

1    every day.  And so, they are made out of birch plywood, they are

2    structurally pretty damn strong because of the way the concrete

3    and that kind of abuse they take.  And then they get fiberglass

4    resin and all on them.  So you can't even, like, it's hard to

5    run a screw through this thing because it's that hard.

6            The other part of, if I can come back to your previous

7    question, we don't like to ship to somebody to store for a year

8    or however long it's going to be because when you go to hang it

9    on the building it looks like crap.  It's been sitting stored

10   without being in the sunshine and stuff.  One of the last things

11   we do before we put it on a truck is clean it.  Put it on, you

12   know, sandblast it clean and give to you and it looks good.

13   Q.   Now, is it fair to say that as far as PRC's business plan

14   for manufacturing these pieces, storing them isn't part of the

15   equation and, if not, why?

16   A.   Oh, it's very much a part of the equation.  It's very much

17   a part of the cost in the estimate.  If you tell me, if you tell

18   me I'm bidding a job for you and you want precast next December,

19   as I said earlier, that involves inflation and other things like

20   labor increase or whatever.  But, if my production slot is in

21   March to make that job, then I have to include the cost of the

22   panels being in my yard and in the way and some movement and

23   things like that for 8 or 9 months before I can ship them to the

24   job site.  If my production slot is closer to when they ship,

25   then that number is a lot more favorable.

Direct Examination – Randall E. Davis

1  Q.   Right.   And we still got the subcontract up in front of you

2  and this is the schedule attached to it.   Can you remind me,

3  what was the date again by which you guys were supposed to be

4  done installing the precast?

5  A.   We were supposed to start installing precast I think late

6  July.   And it was going to take 20 days, something like that, 22

7  days.

8  Q.   Do you recall when this subcontract was originally signed?

9  A.   I don't know.   I think December of 2019, something like

10  that.   2018.   I'm not really sure when the date was we signed

11  it.

12  Q.   The very first page.   And, if you go to the bottom there is

13  a signature.   Do these dates refresh your memory as to when this

14  was signed?

15  A.   December 2018, yeah.

16  Q.   How long did PRC originally contemplate having to store the

17  precast they were making for Oelrich, if at all, based on the

18  schedule that was attached to this?

19  A.   Well, based on this contract, we weren't going to store it

20  at all.   Our production was overlapping with the actual

21  installation.   I think our production was only like 24 days or

22  something if we ran it as a hundred percent of that job.

23  Q.   And, when you bid on a job like this, would you ever expect

24  to see a 6 plus month delay from when you are supposed to start

25  your work to when you actually start it?

1    A.   Oh, no.  I didn't anticipate getting delayed, well, shoot,

2    until February, you're talking 8 or 9 months, I guess.

3    Q.   And, let's talk about that site visit that Mr. Dana Noyes

4    made.  Do you recall anything about that day?  Were you there

5    when Mr. Noyes made the visit?

6    A.   Yeah, I was there.  He showed up unannounced.  And we

7    typically, no one gets past the front door if you don't have an

8    appointment just because we frequently have "dog and pony shows"

9    as we call them where we have architects and customers coming in

10   to look at sample panels and all that kind of stuff.  And the

11   last thing I want is to have a dog and pony show going on with

12   this guy and this guy shows up demanding attention for no

13   reason, you know.  Make an appointment, it's not that hard.

14   Q.   And, were you the one who showed Mr. Noyes around PRC's

15   facilities?

16   A.   I am the one.

17   Q.   And, can you describe to us what it is Mr. Noyes asked to

18   see and what you showed him, in general?

19   A.   Well, he came in.  I met him in the conference room.  We

20   talked for a few moments.  He pulled his phone and threw it on

21   the table and started dialing a number on speaker phone.  And I

22   said, no, I didn't agree to conference calls with anyone.  You

23   and I can talk and solve whatever it is you want to know.  But

24   I'm not going to get involved in conference calls, I got other

25   work going on.

Direct Examination - Randall E. Davis

1     And, he put the phone away and we walked out.  He said,

2  well, I really just want to see the precast.  I said, sure.  So,

3  we walked out into the shop area.  There was a lot of precast on

4  the floor in there.  That's the interior photos.  I think he had

5  like three of those.  And I said, that's your precast.  And

6  showed him that.  And then we walked into the lower yard and I

7  said there is more of your precast over there.  And he took

8  photos.  And he said, okay, thanks, I'm good.  And I went, okay.

9  And he left.  I mean, I didn't show him all the precast.  He

10  didn't ask to see the precast.  So, there's two other yards we

11  didn't visit.

12  Q.   And, did you ever represent to Mr. Dana Noyes that a

13  hundred percent of the precast had been manufactured?

14  A.   On December 30?

15  Q.   In December of 2019?  I apologize.

16  A.   No.  We weren't there.  I didn't say that.

17  Q.   Generally, do precasters in the construction industry

18  typically rely on the schedule that's provided to bid on as

19  something that would be realistic and accomplishable, something

20  that could be done realistically on time?  And, if so, how?

21  A.   During this time frame there were quite a few projects that

22  were going quicker than the original.

23  Q.   Can you explain generally how precasters rely on the

24  schedules that are provided for them from the general

25  contractors or subcontractor that wants them to perform precast

Direct Examination – Randall E. Davis

1    for them?

2    A.   I mean, we kind of work from both ends.  We work from the

3    standpoint, if we're installing the project we work from the

4    standpoint of how many days does it take to install it versus

5    when do they want it installed.  So, we take that calendar and

6    we work from the other end, which is how many days does it take

7    to produce it and how many days of overlap can we have so that

8    the erector doesn't catch us.  So, if I make the last panel, you

9    know, 4 or 5 days before he finishes, what's the problem?  And,

10   we do that a lot.  So, we have a lot of overlap where we are

11   producing a job here and the erector is installing it out there.

12   I think Forde mentioned EVMS was like a 12 story building.  We

13   were producing that job at the same time it was being installed.

14   And I think we were producing 8 to 10 pieces a day and they were

15   erecting 6 to 8 a day.  So, we managed to stay well ahead.

16   Q.   And, in your experience do precast contractors that have

17   agreed to perform a job, do they -- is it typical for them to

18   suspend production if the project that they are working on gets

19   delayed significantly?

20   A.   If it gets delayed significantly, yes.  You don't want to,

21   like I said, there's a cost involved in that because you got to

22   build the forms twice.

23   Q.   And, what would you consider a significant delay?

24   A.   It depends on the workload.  But if you have a pretty good

25   backlog, as we did at that time, then any delay is significant.

1   I mean, anything beyond 30 days is going to hurt you because

2   you're tripping over yourself in the yard now.  You got 115

3   panels of this job sitting in the yard and I've got another job

4   over here that's got, I don't know, 4 or 500 panels.  And, I'm

5   trying to juggle all of those.  And I've got cranes rolling

6   through the yard, things like that.  So, this is not something

7   that you take lightly.  You got to have space to put this stuff.

8   Q.   Are you aware that Oelrich hired a replacement contractor

9   named Spring Precast to complete PRC's scope of work after PRC

10  was terminated?

11  A.   I am.

12  Q.   Do you think that was necessary, in your opinion?

13  A.   No, not at all.  Especially now that we know the dates that

14  Spring performed its work.  When we stopped working in 20, or

15  excuse me, May of 20 we were 10, 11 days, 12 days from being

16  done with a hundred percent production.  We could have started

17  erecting in May with the overlap, but no one -- we didn't get

18  there.

19  Q.   And, when do you understand that Spring Precast completed

20  their work on the project?

21  A.   I think it was late October, something like that.

22  Q.   And, had things continued on track and PRC hadn't been

23  terminated, when do you expect that your product would have been

24  installed at the project?

25  A.   We were shooting to have it all complete in July.  That's

Direct Examination - Randall E. Davis

1    our goal.

2    Q.   And, with regard to these safety document issues that you

3    probably heard talked about the last couple of days, and in

4    particular I'm talking about the OSHA 10 and the OSHA 30 and the

5    lift plans, can you describe to me why -- well, first, do you

6    believe that PRC was compliant with the contract as to the

7    timing of the submission of those documents?

8    A.   What was the last part?  I'm sorry.

9    Q.   Do you believe PRC was complying with the contract as to

10   the timing of the submission of those safety documents, the OSHA

11   10, 30 documents?

12   A.   Yes.  In fact, I got a -- we had a call being, what we call

13   ROBO dialing through the company.  And, someone answered and

14   said, hey, boss, I happened to be walking by and said, hey, this

15   is a guy from Oelrich.  And I grabbed the phone and said, yeah,

16   what do you need.  And, it was the superintendent.  I can't

17   remember his name -- Jarred or Jason or something like that --

18   anyway, he went at me about OSHA 10, OSHA 30 documents.  And I

19   said, look, first off, the problem here is you guys have like 10

20   people there and you all want the same document and you

21   apparently don't talk to each other because we are getting beat

22   up with this.  You know, get us one person to deal with.  This

23   is ridiculous.  And I think, you know, this is arrogance, but I

24   was in a position in the company that I could make those kind of

25   statements to that company.  Y'all need to get it under control.

Direct Examination – Randall E. Davis

1    I said, secondly, this OSHA stuff is from the person who is

2    going to be on-site.  We're not on-site.  Our sub is going to be

3    on-site.  And right now we don't have a sub because you missed

4    your date.  So, we're in between subs.  So, I can give you those

5    documents right now and they would be a lie.  Why would I do

6    that?

7    Q.  Why would they be a lie?  Could you clarify a little bit on

8    that?

9    A.  Because it's documents pertaining to the training of the

10   individual who is going to be on-site.  I don't know who was

11   going to be on-site.  I didn't have an erector.  We lost our

12   erector because they missed their dates.

13   Q.  And, I suspect you're probably going to get some questions

14   from Oelrich's counsel about these technical specifications that

15   were purportedly in the VA-SAW contract.  And, when I say

16   technical specification, what do you understand that to mean?

17   A.  The specification of the project?

18   Q.  Yes, sir.

19   A.  Yeah.

20   Q.  And do you know, in those specifications that they

21   introduced as an exhibit in that VA-SAW contract, were any of

22   those specifications regarding precast?

23   A.  Yes, 34500.

24   Q.  And, with regard to those specs, what is your opinion as to

25   whether or not the materials that PRC was manufacturing complied

1    with any requirements in that regard?

2    A.   We complied with all of the requirements in the spec or we

3    specifically noted it to Oelrich and said this is a very old

4    spec, it's outdated, this doesn't exist anymore, this is what it

5    should say.

6         In all of our -- early on in the job, we submitted all of

7    the, there is a list of submittals in there which is where we

8    have to give them material specs on the reinforcing, material

9    specs on cement, sand, rock, all of that kind of stuff.  We

10   submitted all of that and it was all approved.  So, if we missed

11   it that's where you get told, that ain't right, you missed it.

12   Q.   And, could you elaborate on those submittal docs that were

13   approved?  What on there would have indicated what PRC was or

14   wasn't providing?

15   A.   I mean, on the drawings I'm pretty sure it said we were

16   providing these items and here is the way we are doing it.  But,

17   we get mill certs for the material we buy.  So we would have had

18   a mill cert for reinforcing, for example, and a mill cert for

19   cement and we submit that and then they approve it.  And the

20   mill cert comes from the actual manufacturer of the product that

21   we buy from.

22   Q.   And, who does the approval?  Is that Oelrich or is that

23   someone all the way to the top at the owner level?

24   A.   My understanding it would be up to the owner's rep,

25   architect, whoever is handling construction administration for

1    them.

2    Q.   And, could you pull up Plaintiff's Exhibit 11, please?

3         You have seen this document a couple times now during the

4    trial, but do you recognize this document?

5    A.   I do.

6    Q.   And, what do you understand this to be?

7    A.   This is a notice to cure from the, I guess the general

8    contractor to Oelrich.

9    Q.   And at any time had you seen this letter before the lawsuit

10   was served on PRC?

11   A.   I have not.

12   Q.   If you had received this letter when it was issued back in

13   January of 2020, would that have changed potentially how PRC

14   would have performed on this project?

15   A.   Yeah.  I would have sat down, I would have made an effort

16   to get ahold of Oelrich and say, you know, why is precast in

17   here and what do we need to talk about.

18   Q.   When you say, why is precast in here, what do you mean by

19   that?

20   A.   Isn't it mentioned in here specifically?  Masonry,

21   precast -- the other is masonry, precast, steel platforms.  I

22   would have said why are we listed in this in January when my --

23   well, two things were going on still in January.  The last email

24   I saw between accounting and Oelrich was January 13th.  And they

25   still had short paid every single invoice and hadn't paid

1    retainage and all this kind of stuff.  So, whether we wanted to

2    go erect on January 6th or not, accounting would have said,

3    don't load the trucks boys, those are the rules.

4        So, the other thing that went on with this was according to

5    the schedule that I saw, and I don't remember which one it was,

6    we saw a schedule that they still had masonry to work on or

7    erect.  And, this is wintertime.  If you put masonry up today I

8    can't hang it today.  It's got to cure for 7 to 14 days.  So,

9    it's great they have these schedules that act like we're going

10   to put masonry up and you're going to put precast on it

11   tomorrow, but it doesn't work that way.  Structurally incapable

12   of doing it.

13   Q.   So, to summarize that last part of what you said, are you

14   saying essentially that the schedules during that December 2019

15   time period weren't reflecting reality of what needed to be done

16   at the project?

17   A.   No.  The one they gave me in December that said you need to

18   be here in December erecting also had erecting of masonry at the

19   same time.  If I'm going to take 20 days to erect and you're

20   putting up masonry that's going to take 14 days to cure, I'm

21   guessing I'm going to cover you up and then I'm going to have to

22   pull off the job and come back.  Who is paying me for that?

23   Q.   And, if you could pull up Plaintiff's Exhibit 13, please?

24       Do you recognize this document?

25   A.   I do.

Direct Examination - Randall E. Davis

1    Q.   And, if you could scroll down a little bit so we can read

2    it?

3         Generally, what do you believe this is?

4    A.   This was Oelrich's answer to the notice to cure.

5    Q.   And, was this another document that you never saw prior to

6    the lawsuit being served?

7    A.   That's correct.  I don't think they wanted me to read

8    things like they had a private investigator and that kind of

9    stuff.  Where did that come from?

10   Q.   And, can we take a look at Defendant Exhibit 299?  Go to

11   page 3 or 4.  Actually, 7.

12        Do you recognize this document, Mr. Davis?

13   A.   Yes.

14   Q.   And, what is it?

15   A.   That's the complaint from Oelrich.

16   Q.   And, had you ever seen this document during the time frame

17   it was filed?

18   A.   When was this filed?  I'm sorry.

19   Q.   Scroll up, Caitlin, to the top.

20   A.   Oh, 1/27.  No, I had not seen that until -- I think we saw

21   this when we got served a revision of this in July or something

22   like that.

23   Q.   So, you are -- you didn't know about this until after the

24   March 17, 2020 deadline?

25   A.   Correct.

1    Q.   And, had you known that PRC had been sued in state court

2    over this very issue we're here today on, prior to the

3    termination, what would PRC have done?

4    A.   I wouldn't have been happy about it, but I think I would

5    have probably said:  Hey, you want somebody else to finish the

6    precast, we'll give you mix, you know, we can settle on the term

7    for the balance of this job and y'all go finish the job.  That's

8    fine.  That's possible.  No one ever called us and said, you've

9    made 60 or 70 or however much percentage of the project, what

10   would it take to get that delivered and exchange, and the mix

11   design and your drawings, we'll use all those so we don't have

12   to do this again and we can get this thing finished quicker.

13   We've had that happen before.

14        In fact, we've been the other precaster in several

15   instances where large precasters have called us and said, hey,

16   we can't get all this knocked out, can we get you to pick up and

17   run with this part of the job for us so that we can make our

18   customer happy.  And, I would have done it here.  If somebody

19   would have called me and said, look, obviously, you're really

20   busy with these other projects.  We understand that.  We

21   understand we missed the date.  What can we do to get another

22   precaster to run with this thing.  Because it's very simple.  I

23   mean, if we give them the mix design there's no reason they

24   can't make the precast and match ours.

25   Q.   Just so we're clear, is it your opinion that the product

1    that your company had already made for this project could have

2    been used and matched up with whatever contractor they had found

3    to complete the project, they could have completed the product,

4    this new guy, and made it match so that it could be used on the

5    project?

6    A.   Yeah, no doubt.  I mean, like I said, we've done it for

7    several other precasters over the years.  Many -- I'm not saying

8    many times, but we've done it maybe once every other year or so

9    we get a call that says, hey, we need some help, can you do this

10   for us.

11       Savannah airport parking garage -- if you've ever been

12   there -- Metromont built the parking garage for $20 million and

13   we built all of the walkways that connect to it because they

14   said, we can't do it, we're too busy.  Can you do this to make

15   our customer happy.  That should have happened here.  Instead,

16   we've now got all these panels sitting in the yard that aren't

17   being used.  And they went through the whole effort of drawings

18   and design and all that stuff again.  No wonder it cost them so

19   much money.  They didn't make any effort to say what they had.

20   Q.   So, if someone were to assert that they couldn't accept

21   your product because they couldn't make the aggregates match to

22   the replacement contractor's ability to complete the project you

23   would disagree with that contention or is there any merit to

24   that?

25   A.   Oh, I can improve upon that contention.  The rock was a

Direct Examination – Randall E. Davis

1   specialty rock that we found and we got through the approval

2   process pretty quick and the approval process on the drawings.

3   In fact, we got an official attaboy back from the VA folks on

4   our drawings.  We would have packaged up the rocks and shipped

5   it to the new guy to solve that problem.  I don't need them.

6   Now I've got all of this rock sitting in my yard that I don't

7   need anymore.

8   Q.  And, did anybody from Oelrich approach you or anybody else

9   at PRC with potential options for taking delivery of the

10  materials that had already been made?

11  A.   No.  In fact, I find it fascinating that, we've not talked

12  about this, but in the termination email I wasn't copied.  Every

13  other time in history there was something very important I got

14  an email directly from Ivan or I got an email attachment from

15  their attorney.  I was copied on that kind of stuff.  I knew

16  what was going on.  But, on the one email where we're being

17  terminated no one copied me.  I found that fascinating.

18  Q.   Can you pull up Defendant Exhibit 137, please?

19       Is this the email that you are talking about?

20  A.   Yeah, my name is not on there.

21  Q.   And, prior to receipt of this, had anybody from Oelrich

22  ever told you or anyone else at PRC that your contract might be

23  terminated if you didn't deliver and install the precast by a

24  specific date?

25  A.   No.  In fact, I was told the opposite of that.

Direct Examination - Randall E. Davis

1   Q.   And, what was that?

2   A.   In a letter from their counsel that said, this is not about

3   a lawsuit or going to suit or anything like that.  It said, on

4   January, I think it was 24th, here is the letter, this is what

5   we need, reply to us by January 31st.  And now we find out they

6   filed lawsuit on January 27th.  So, I'm really confused as to

7   the process or the thinking of Oelrich.  It does not seem that

8   it was about getting the job finished.  It was about preparing

9   for going to Court.

10  Q.   Can you pull up Defendant 283, please?

11       I'd like to talk about COVID-19 and its impact, if any, on

12  PRC's work.  Now, can you just describe generally what you

13  recall during the time frame that PRC was terminated about the

14  impact of COVID on PRC's ability in its day-to-day operations?

15  A.   Yeah.  We lost almost, approximately 50 percent of our

16  workforce overnight.  I mean, when the schools shut down all of

17  the people who work for us had kids and several of them came in

18  and said, hey, man, I want to work, can I bring my kid.  And I'm

19  like, God, I can't.  You know, OSHA would eat me alive if they

20  came in here and found your kid in the plant somewhere.  And, I

21  didn't have any other facilities for that.  So, we just said,

22  you know, we're going to do the best we can, but we're operating

23  on a 50 percent capacity as far as our workforce is concerned.

24       And then we find out that -- we were guilty of the just in

25  time manufacturing also.  So, we would call a cement guy and

1   say, which is a major company called Lehigh and say, we need

2   cement and typically we'd get it within a day or a day and a

3   half.  Now we're calling and asking for cement and we can't get

4   it for a week.

5   Q.   And, we just pulled up a document.  This is Defendant 283.

6        Can you describe the document that's up on the screen right

7   now?

8   A.   That's a payroll register for 20, that's all of 2019, yeah.

9   Q.   And, is this information that was pulled from PRC's system?

10  A.   Yes.

11  Q.   And, can you describe what's reflected in this payroll

12  register?

13  A.   Yeah.  Those are my notes just basically just showing that

14  the payroll went down from 2019 to 2020 by 23 percent.  And,

15  that was pretty harmful to us because we had a pretty big

16  backlog of work at the time.

17  Q.   And, that backlog of work, do you attribute that work going

18  away to COVID and, if so, why?

19  A.   No, the work didn't go away.  The employees went away.

20  We're still trying to figure out how to do the work.

21  Q.   The employees went away.  And, you mentioned, I can't

22  remember, did you testify that the schools had been closed in

23  South Carolina during this March 2020 time period?

24  A.   Uh-huh.  Yes.

25  Q.   And, do a lot of your employees have kids or was it only

1   one employee?

2   A.   It was a lot of, pretty, I think all of them had kids.

3   Q.   How many employees does PRC have?

4   A.   At that time I think we had about 28, something like that.

5   Q.   And, had Oelrich advised PRC that it might terminate the

6   contract for failing to deliver by some specific date, are there

7   any options that PRC would have considered in light of that

8   advice from Oelrich that they need the product by a specific

9   date or they might terminate the contract?

10  A.   Yeah.  I think that's what I said earlier.  It would have

11  been much smarter on their part to have contacted us and say,

12  what do we do to get the precast from you that we've already

13  paid for and/or any other product we can get from you.  We've

14  got another precaster out here who is willing to finish the job.

15  And, it wouldn't have been -- it would have been the first time

16  for us, but it wouldn't be the first time that we've been party

17  to a similar situation.

18  Q.   Now, with regard to PRC's damages -- can you pull up the

19  interrogatory responses?  This is that payment history table we

20  talked about earlier.

21       If I'm not mistaken, we have the total balance due here.

22  And, can you also, in addition to that, can you pull up,

23  actually, can you switch to page --

24            THE COURT:  While you're looking for that, back up to

25  the last exhibit, please, for just a minute.  The one with the

1    payroll information for 2019 and 2020.  That one.  Mr. Davis, I

2    can't make heads or tails out of this.  The $37,396 number,

3    that's called regular.  That's for 2019.

4               THE WITNESS:  Yes, sir.

5               THE COURT:  What is that number?

6               THE WITNESS:  That was the dollar value of payroll for

7    2019 to the yard or to the production folks.  So, in other

8    words, that's what we spent on payroll in 2019.

9               THE COURT:  $37,398?

10              THE WITNESS:  No, no.

11              THE COURT:  That can't be right.

12              THE WITNESS:  No, the 606 is right.  37,000 was for

13   the -- I don't know what that is.  Wait a minute.

14              THE COURT:  It's not a 12th.

15              THE WITNESS:  Oh, that's hours.  I'm sorry.  I'm in

16   the wrong column.  That's not dollars.  That's hours.  It's

17   payroll hours.

18              THE COURT:  So, when you say your payroll was down

19   23 percent, your hours were down 23 percent?

20              THE WITNESS:  Hours were down.  So, we didn't have

21   people there to produce the hours.  I apologize.  I was thinking

22   dollars.

23              THE COURT:  I knew the money didn't make sense.

24              THE WITNESS:  That's a good catch.

25              THE COURT:  Now I got it.

Direct Examination - Randall E. Davis

1           THE WITNESS:  Okay.

2   BY MR. DARR:

3   Q.   If you could go to page 18, please?

4   A.   I apologize for fidgeting.

5           THE COURT:  That's all right.  I'm glad I asked.  Now

6   I understand.

7   BY MR. DARR:

8   Q.   And, Mr. Davis, if you could take a look at this?  What do

9   you understand this table to reflect?

10  A.   Those are damages to PRC for improper termination.

11  Q.   As to that first item there, that's the amount unpaid under

12  the contract; is that right?

13  A.   Yeah.  That's on the previous page which was the chart you

14  were showing me.

15  Q.   3.  And, for the unpaid balance, can you please describe

16  how you reached that number based on the accounting on this

17  table?

18  A.   That's the bottom right column over there.

19  Q.   This one right here?

20  A.   Yeah.

21  Q.   Plus?

22  A.   Plus the 3,896 which is the amount due from some other

23  invoice.  So those two are the unpaid balance.

24  Q.   And, did you perform a calculation for the cost that PRC

25  incurred to store the precast?

Direct Examination – Randall E. Davis

1   A.   I did.

2   Q.   And, that was disclosed through discovery.  Pull up 279,

3   please?

4       Could you do me a favor and please describe your

5   calculation for the storage fee PRC incurred for the pieces?

6   A.   This is what we charge, basically we charge $55 per month

7   per piece for storage beyond what's reasonable on a project.

8   And in this case we had 3.37 months, we stored 70 pieces of

9   precast, and we put 15 percent on there for overhead and markup.

10  Q.   And, how did you come up with 3.37 months?

11  A.   I don't remember the exact date range I used on that.  I

12  should have written that down.  I did it on the calendar and

13  where we were on the project.  I want to say it was from the end

14  of December until the improper termination but, or beginning of

15  December I think.

16  Q.   And, what did you mean up here, store precast from date of

17  wrongful termination to receipt of suit?

18  A.   Yeah.  I'm sorry.  There we go.  So, it's from the date of

19  wrongful termination until we got served the revised suit, for

20  lack of a better phrase, in July.  So, that's where the 3.37

21  came from.  Like I said, there were 70 pieces of precast and

22  that's simple math.

23  Q.   So, in your experience in the precast industry, what do

24  precast contractors usually charge to store precast panels and

25  pieces and the such for their clients?

Direct Examination – Randall E. Davis

1   A.   I have worked in, I believe, 6 precast operations in my

2   life.  And we have charged anywhere from $35 per piece per month

3   to $85 per piece per month, depending on the square footage of

4   the pieces and so forth.

5       Based on the square footage of these size pieces and the

6   amount of yard space it took up, that's where I came up with 55.

7   It's somewhere in the range of 35 to 85.

8   Q.   And, obviously, these precast pieces, you got to get rid of

9   them, right?

10  A.   Yes.

11  Q.   And, why is that?

12  A.   They are occupying my yard and nobody is paying storage.

13  Q.   Can you sell them to anybody else?

14  A.   No.  They have to be disposed of.  It's not fun.

15  Q.   And can you please pull up Defendant Exhibit 280?

16          THE COURT:  Are you moving on from that one?

17          MR. DARR:  Yes, sir.

18          THE COURT:  I got a question about that too.  First,

19  on the dates, on the dates for the storage, if they hadn't

20  terminated you, you still would have stored those things on your

21  lot from the March 17th, the date of the termination, up until

22  you installed them, right?

23          THE WITNESS:  Yeah, that's true.  But we, I mean --

24          THE COURT:  And, you weren't going to be paid for

25  that?

Direct Examination – Randall E. Davis

1          THE WITNESS:  But I would have been paid the balance

2     of the contract.

3          THE COURT:  Got it.  I understand.  That's a different

4     item of damages.  But, storage from the date of the termination

5     til the date you would have installed it, that's not a damage

6     from the termination, right?

7          THE WITNESS:  It is a damage, in my opinion.  Because

8     we spent a lot of time rearranging the yard and getting them out

9     of the way and protecting them because we knew we need to have

10    them for the suit.  And somebody's got to pay for the manpower

11    and crane and that stuff to move these things around and get

12    them out of the way.

13         THE COURT:  Well, why did you move them differently

14    based on the termination than you would have moved them if you

15    were going to install them on the job?

16         THE WITNESS:  Because if I was going to install them

17    on the job I would be taking them from their stored place, final

18    blasting, putting them on a truck and shipping them.  But, now

19    the stored place is in the way of other product coming out.  I

20    got to move them off to a corner of the yard, protect them.

21         THE COURT:  Let's back up and make it easier.  You

22    didn't know you had been terminated until May because nobody

23    read the email, right?

24         THE WITNESS:  Uh-huh.

25         THE COURT:  So from March 17th, until whenever you

Direct Examination - Randall E. Davis

1    finally read the email in May, you sure didn't do anything

2    different than you would have done if the contract had still

3    been going forward, did you?

4          THE WITNESS:  No.  Okay.  So you're taking a month and

5    a half or so out of that versus --

6          THE COURT:  Well, I would take the rest of it off.

7    Look, here is the date that matters.  The date that matters is

8    the storage from the time you would have installed it, if it had

9    gone forward, to the date when you get rid of it.  So you've

10   used the completely wrong dates.  When did you get rid of it?

11         THE WITNESS:  I haven't yet.  We kept it in case

12   somebody wanted to see it for this case.  That's the problem.

13         THE COURT:  So you're still storing it?

14         THE WITNESS:  I'm still storing it.  I got to get rid

15   of it.

16         THE COURT:  You put the wrong dates on here, but you

17   put fewer dates than you could of?

18         THE WITNESS:  Oh, I don't disagree with that comment.

19         THE COURT:  70 pieces, where did you come up with that

20   number?

21         THE WITNESS:  That was what I think we produced at

22   that time.  We produced 70 --

23         THE COURT:  As of when?

24         THE WITNESS:  As of, I think I counted that as of -- I

25   didn't count all of it because we produced before the

Direct Examination - Randall E. Davis

1    termination date.  So, I counted whatever was effective at that

2    date is what I remember.

3              THE COURT:  Did somebody go out there and count them

4    or is it -- this is kind of the --

5              THE WITNESS:  Yeah, we got a schedule and a QC record.

6    I mean, we know what's been produced.

7              THE COURT:  This is what I might call the back of

8    napkin calculation.  It's not actually a napkin, but it's just a

9    piece of paper.  And that's what I guess, how many pieces

10   existed when is one of the things that's at issue in this case.

11             THE WITNESS:  Right.

12             THE COURT:  And so, what I'm trying to find out is 70

13   something that somebody thought was about right or did somebody

14   count them?

15             THE WITNESS:  I think we had produced -- if I remember

16   right we had produced 70 pieces through, we have a document on

17   that, whatever it was.

18             MR. DARR:  Interrogatory response I could put up.

19   It's an exhibit.

20             THE WITNESS:  Through October or whatever it was.  So,

21   I didn't count anything we produced after the termination.  I

22   just said the pieces before that.  I don't think I could be any

23   fairer than that.

24             THE COURT:  But, you don't know who came up with that

25   number or how they did it?

1          THE WITNESS:  The 70 pieces?

2          THE COURT:  Right.

3          THE WITNESS:  Well, I know how I came up with it.

4          THE COURT:  How did you come up with it?

5          THE WITNESS:  I sat down and went through the QC

6    records and the schedule.  And this is what was produced.

7          THE COURT:  So, that's an actual number based on

8    records?

9          THE WITNESS:  That's correct.

10         THE COURT:  All right.  Mr. Darr, go ahead.

11   BY MR. DARR:

12   Q.   And, these pieces are -- they need to be disposed of I

13   believe is what we were talking about, right, Mr. Davis?

14   A.   Uh-huh.

15   Q.   And, obviously, it appears, based on -- this is a

16   calculation that you made; is that correct?

17   A.   Yes.

18   Q.   And, can you go ahead and do us a favor and describe your

19   calculation for the cost that PRC will incur to get rid of these

20   pieces that you testified nobody else will buy?

21         THE COURT:  And, let me clarify.  I understand the

22   question the way you just phrased it, will incur.  If I

23   understand the last answer, it has not been incurred, this is

24   something you anticipate incurring going forward?

25         MR. DARR:  That's correct, Your Honor.

Direct Examination - Randall E. Davis

1           THE COURT:  Got it.  All right.

2           THE WITNESS:  We erred on the side of safety in

3    keeping them on hand.  And you call this a napkin, but, you

4    know, I'm an engineer, this is what we do as work product.

5    Anyway, at the current time we have 94 pieces to get rid of.  A

6    standard yard handling fee every time you got to pick them up

7    and move them around that's a hundred and 50 bucks.  That's

8    common across the industry.  That's not even my number, but it's

9    common.

10          Based on the size, the weights and so forth, and what

11   we can get on there, it's 7 truckloads of material.  When I say

12   truckloads, I'm talking 18-wheeler trucks.  So it's $650 a load

13   to haul from our place to the landfill.  The dunnage is the wood

14   you got to do, the wood is pretty expensive back then, so that

15   might come down some now.  But, the disposal rate was from the

16   landfill.  I talked to them directly.  And this piece of paper

17   that's down below was printed off of their website.  I called

18   them up and said this is what I'm bringing to you, which one of

19   these rates is it.  And they told me it was this rate.  So,

20   that's all it is.  It's basically trucking, handling and the

21   disposal fee.

22   BY MR. DARR:

23   Q.   And, with regard to -- if you could go back up please --

24   with regard to the dunnage, you said that that current rate was

25   little high, you're talking about the hundred and 50 dollars

1    there?

2    A.    Uh-huh.

3    Q.    What would you say would be an appropriate rate now based

4    on market conditions?

5    A.    On this many pieces, probably 50 bucks a load right now.

6    So that number has to come down some.

7    Q.    So 50 bucks off a load times 7 would be what $350 less than

8    what you've got listed?

9    A.    No.  $50 per load total.  I'm sorry.

10   Q.    Say that again?

11   A.    $50 per load total would be a better number on that today.

12   Q.    Okay.  And, with regard to the lost production line item,

13   the damages we have, Would you pull up 281, please?

14       Could you do us a favor and describe how you calculated

15   this lost production number?

16   A.    As I talked about before, the first time we pulled the

17   forms off the bed, you know, it costs us money because we got to

18   pull up forms that we want to use for the duration of the

19   project.  So, in this case, we had put the forms down again and

20   gone back at this project trying to finish it.  And, basically

21   when we found out, hey, they filed a suit against you, you've

22   been terminated we had to pull them off the form again.  And

23   then, we have the time frame of getting the forms up, getting

24   all the beds cleaned up, building the new forms.  So, basically

25   redirecting the work force to head towards another project.  And

1  we lost 5 days there.  So, we lost a solid week of just getting

2  new forms down and going back and pouring on something else.

3  Q.   And, can you stop there for a second?  How did you

4  determine you lost 5 days?

5  A.   The time between when we stopped pouring on this and we

6  started pouring something else.

7  Q.   And, with regards to the daily rate there, the 3,240, how

8  did you come up with that rate?

9  A.   That is our daily overhead rate.  I did not charge labor on

10 that.  I guess I could have charged labor on there.  I just

11 said, you know what, I just want to be covered for my overhead

12 here.  We got to go towards -- we would have had to tear these

13 up anyway to put down other forms at the end of the job.  But

14 the difference is that in this case we couldn't plan for the

15 other job in time.  So, our loss was building those -- waiting

16 on those forms to be built.

17 Q.   And, when you say we couldn't plan for the other job on

18 time, do you know what job are you referencing there?

19 A.   Oh, man.  I think it's Snap Finger.

20 Q.   Say again?

21 A.   Snap Finger.  It's like a $200 million water treatment

22 plant.

23 Q.   Okay.  And, if you could pull up Defendant 282, please?

24     And, the last line item on the damages in that table from

25 interrogatories was the lost profit on the remainder of work

1  that was not allowed to be completed.  Could you do us a favor

2  and explain how you calculated your lost profit calculation

3  here, Mr. Davis?

4  A.   That is the summary sheet or the recap sheet for the

5  estimate of the project.  So, it's just right off the estimate.

6  Q.   And could you describe some of the numbers here?  In

7  particular, the overhead rate section right here in yellow, what

8  each of those mean to give everyone an idea of what we're

9  looking at?

10  A.   Basically, the first line is the overhead, which we talked

11  about that number earlier.  How much -- if it take us -- we

12  calculated our overhead based on the number of days that the

13  product is on the bed being poured.  So, I like to say that when

14  we pour precast we run concrete vibrators.  I don't know if

15  y'all are familiar with those, but I tell everybody at work that

16  that's the sound of money.  We base everything on the amount of

17  time we're running the product on the bed.

18       So, if we have overhead attributed to the amount of time it

19  takes to run that job.  And, in this particular instance, so

20  that would have been the overhead rate.  There is a cost number,

21  which is the materials and the overhead and all combined, which

22  is the 70, right above the red box 73,481.

23       And then, we have what we call the owner's markup which is

24  20 percent, which is basically if I can't get 20 percent

25  on-the-job I don't want to play.

Direct Examination - Randall E. Davis

1        And then, we have the profit line, which I should probably

2  change that line to the word market, which is what will the

3  market bear.  Can I get more than 20 percent?

4  Q.    And so, is it fair to say that this is -- during your

5  estimate phase for trying to bid on this job, that's what you

6  intended to make lost profit wise for the work or am I

7  misstating that?

8  A.    That was the profit on the precast itself.  I did not

9  include, below that you'll see transportation.  There's a

10 15 percent markup on the transportation sub.  There's 15 percent

11 on engineering.  And then there was a, basically a 30 percent

12 markup on the erecting.  I didn't include those numbers, but --

13            MR. DARR:  That's all I have for you, Mr. Davis.

14            THE COURT:  Cross examine?

15            THE WITNESS:  Can we take a bathroom break?

16            THE COURT:  We can.  We're going to take a 10 minute

17 break.  Let's start back at 3:05.

18            We'll be in recess until then.

19       (Recess taken 2:51.)

20       (Resumed at 3:10.)

21            THE COURT:  Please be seated.  Mr. Davis, you are

22 still under oath.  Mr. Butts, you may proceed.

23            MR. BUTTS:  Your Honor, if it please the Court, I'm

24 going to take a little longer with Mr. Davis than I did before.

25 I've got to cover affirmative defenses in his testimony

1    regarding damages.  So, I apologize in advance.  It may take me

2    a little longer.

3               THE COURT:  The rule here is the same as always, take

4    however long it takes to do it well and hopefully not longer

5    than that.

6               MR. BUTTS:  I will try.  Thank you.

7               I'd like to look at Exhibit 25 first, please.

8                          CROSS-EXAMINATION

9    BY MR. BUTTS:

10   Q.   Mr. Davis, do you recognize this?

11   A.   I do.

12   Q.   What is it?

13   A.   It's from my personal notes.

14   Q.   This is as a result of Mr. Noyes visiting your shop on the

15   30th of December 2019, isn't it?

16   A.   That is correct.

17   Q.   And, your opinion of the visit and your customer

18   Oelrich Construction is that they were idiots, right?

19   A.   I would correct the use of the word customer.  Customers

20   pay their bills.  But, yes, they do come across as idiots the

21   way they all -- they have 10 people calling us.  They don't talk

22   to one another.  It was pretty clear at the time that we were

23   frustrated with them.

24   Q.   You've got no evidence that they don't talk to each other?

25   A.   Can I ask you to remove the mask because I'm having a hard

Cross-Examination – Randall E. Davis

1   time following you, hearing you or something.

2   Q.   You don't have any evidence that they don't talk to each

3   other, do you?

4   A.   What's that?

5   Q.   You don't have any evidence that they don't talk to each

6   other, do you?

7   A.   The evidence I have is that we will get multiple people

8   asking for the same thing.  And when we give it to one of them

9   we still get the others calling asking for it.  And we're like,

10  wait, we gave it to this person, do y'all not talk to one

11  another.

12  Q.   So, you didn't like Mr. Noyes dropping in on you, did you?

13  A.   I did not like him dropping in on me.  He was a nice

14  fellow.  I didn't have any issues with him.  I just didn't like

15  the fact that he dropped in unannounced and demanded attention.

16  Q.   Well, you had billed his company or Mr. Oelrich's company

17  for a hundred percent of the panels having been built at that

18  time, correct?

19  A.   Yes.  Glad you brought that up because the fact is, we've

20  done this for years.  We've built the previous version of this

21  at the VA Hospital in Atlanta, a lot bigger than this.  And we

22  did the same thing with that contractor.  He said, hey, based on

23  the current schedule, what do you want to do here.  And we said,

24  we're going to send you a bill for a hundred percent, get it in

25  your system ready to pay, hold the check, whatever you want to

1    do.  But we're not on a pay when paid clause.  So, whether it
2    goes to the VA or not that's their problem.  They are the ones
3    who decide that situation.  We're on a, it's your money, you're
4    financing the project, we're not.  So, we did the same thing
5    here.  We gave them an invoice and said, we're going to go ahead
6    and give you an invoice for a hundred percent so you can have it
7    in your system.  Because in the past when we haven't done that,
8    and we get ready to ship, and our accounting says, wait a
9    minute, they still owe us a bunch of money for panels.  And then
10   we call the contractor and they are screaming and yelling going,
11   well, now, I got to go to accounting and try to get a check from
12   these people and they get really mad about that.  So, we did
13   this, we thought it was a courtesy to them to do that because
14   we're not asking to be paid for it.  We're saying, put it in
15   your system and get ready to go.  And, I think we had emails
16   that even reflect that.
17   Q.   We haven't seen it in the trial yet?
18   A.   I thought Forde read, went over a little while ago and he
19   also said he talked to Chris Crehore at length about it and said
20   this is what we're doing.
21   Q.   Well, can we look at Exhibit Number 2?
22        Are you familiar with this contract?
23   A.   I am.
24   Q.   And, in fact, you negotiated or your company negotiated
25   with Oelrich Construction pretty heavily on this contract

1    especially in regard to the payment clause that you just

2    mentioned, right?

3    A.   I don't know that I would say heavily, but we negotiated

4    with them.

5    Q.   So, show me in this contract everywhere that it talks about

6    what you just said in response to my last question all that

7    about where you have to pay the money.

8    A.   In note A it says -- sorry.  I thought you asked me a

9    question.  Are you done?  I apologize.  Note A says very clearly

10   that precast does not leave until it's paid for.  And so, when

11   we get into a situation where we're possibly going to be

12   shipping precast ahead of the billing and payment terms that's a

13   problem.  We have a conflict there.  We have to resolve the fact

14   that you can't ship the precast without it being paid for.

15       So, the answer to that is we're going to give you a bill in

16   advance.  You hold it.  Do what you want with it, but you at

17   least know it exists, you've got to solve this bill before we

18   ship the product.  And, since it's not a pay when paid clause

19   there is not an issue there.  This is their money.

20   Q.   But it doesn't say that in your contract, does it?

21   A.   It says very clearly in note A.

22   Q.   Well, let's read note A.

23   A.   Go for it.

24   Q.   Where does it say it in note A?

25   A.   Where does it say what?

Cross-Examination – Randall E. Davis

1   Q.   What you just said, that you're going to bill for the

2   material --

3   A.   Precast contract members do not ship from PRC's facility

4   prior to payment for said members on accounts that are past due.

5   How do you resolve that issue if you don't give them an invoice

6   in advance of the shipping?

7   Q.   What it doesn't say is that you can bill for material that

8   you have not fabricated yet?

9   A.   It doesn't say I can't either.  It says, you can't ship the

10   material until it's paid for.  And, the only way for us to get

11   paid is to give them an invoice.  What I could have done was

12   said, you know what, to hell with Oelrich.  We are going to make

13   the precast and when they want us to ship it we're going to go,

14   hey, you need to pay us a hundred percent for material right

15   now.  And then Oelrich would have went, wait, what the hell?

16   What do we do?  That's not fair.  But it's in the contract,

17   right there.

18   Q.   But it does not say in this contract that you can fabricate

19   material and that you can bill for material that you have not

20   fabricated and expect to be paid, does it?

21   A.   Well, that's two questions.  Your first question, it

22   doesn't say I can't do that.  And the second part of the

23   question is to be paid for it.  We didn't ask to be paid for it.

24   We made it very clear we didn't want to be paid for it until we

25   were ready to ship.

Cross-Examination - Randall E. Davis

1   Q.   You said there was no pay when paid clause in this

2   contract.  Let's go back to paragraph, I think it's 5 in the

3   main contract.

4           THE COURT:  Let me stop you before you ask the next

5   question just to try to clear up the record on the last thing

6   Mr. Davis said.  You said we made it very clear that we didn't

7   want to be paid until you were ready to ship.

8           THE WITNESS:  Uh-huh.

9           THE COURT:  Who is we?  When did you make that clear?

10          THE WITNESS:  Forde discussed it with Chris Crehore.

11          THE COURT:  Before you tell me what Forde said, did

12   you hear the conversation?

13          THE WITNESS:  I had the conversation with Forde.

14          THE COURT:  So, what you're telling me is what you

15   heard from Forde?

16          THE WITNESS:  Yes.

17          THE COURT:  Did you ever have any conversation like

18   that with anybody from Oelrich?

19          THE WITNESS:  No, I don't usually go out of line to do

20   that.  That's not necessary.

21          THE COURT:  Did you ever talk with anybody from

22   Oelrich after this contract was being performed?

23   A.   Yes.  Dana Noyes.  I think I talked to Chris Crehore a

24   couple of times.

25          THE COURT:  Did you ever talk to Mr. Oelrich?

Cross-Examination - Randall E. Davis

1                THE WITNESS:  I don't think so.

2                THE COURT:  You talked with Chris Crehore a couple of

3      times?

4                THE WITNESS:  I think so, yeah.

5                THE COURT:  When was the last time?

6                THE WITNESS:  It was some time around October when we

7      were still trying to figure out why are they not ready, what's

8      killing us here, what's killing the schedule.

9                THE COURT:  All right.  So, October 2019?

10               THE WITNESS:  Yeah.  I'm sorry.

11               THE COURT:  Now, you say, we made it clear we didn't

12     expect to be paid until we were ready to ship.  And then, when I

13     asked about that you said, well, you got to talk with Forde

14     about that.  What did Forde tell you?

15               THE WITNESS:  I'm sorry.  What did he tell me?

16               THE COURT:  What did he tell you on that subject?

17               THE WITNESS:  I think I signed the invoice.  And I

18     asked Forde why are we billing a hundred percent.  And he said,

19     because the schedule says this.  And I said, okay.  And I knew

20     exactly what he was talking about.  Like I said, we've done this

21     with lots of other customers.  We say this helps them out we

22     thought.  So, that's why we did it.

23               THE COURT:  And he said the schedule says this?

24               THE WITNESS:  Yeah.

25               THE COURT:  The schedule says --

1          THE WITNESS:  Well, this is when they had said they

2    wanted us November or January 6th, or whatever.  And we're like,

3    okay.  We didn't think they were going to get there.

4          THE COURT:  So, when you signed the December 6th

5    invoice your understanding of the schedule was installation

6    January 6?

7          THE WITNESS:  Installation in January, yeah.  I didn't

8    think they were going to get to January 6th.

9          THE COURT:  And, that was okay with you?

10         THE WITNESS:  Which part?

11         THE COURT:  Installing on January 6.

12         THE WITNESS:  We could have started installing on

13   January 6 if they were ready and if we had an erector.  We were

14   trying to find one.  So, yeah.  We would have had to scramble to

15   get all the rest of the precast made.  But, like I said, it was

16   10 to 12 days worth of work.

17         THE COURT:  You could have done it?

18         THE WITNESS:  Yeah.

19         THE COURT:  Mr. Butts, go ahead.

20   BY MR. BUTTS:

21   Q.   Do you see paragraph 5A?

22   A.   I do.

23   Q.   Is that, that's a pay if paid clause, isn't it?

24   A.   If it was in effect it is, but it's not in effect.  Note A

25   supercedes these conditions.  Very clearly.

1    Q.   Note A only deals with receiving payment, right?

2    A.   Note A are the payment terms for us on the contract.

3    Q.   Note A, if you read note A, it doesn't say anything about

4    applying for payment.  It only talks about receiving payment,

5    right?

6    A.   That's absolutely incorrect.  It talks about applying for

7    payment, giving you the invoices, you have 10 days to correct

8    them, if you don't they are accepted.  All of that is applying

9    for payment.

10   Q.   But it only supercedes what it applies to?

11   A.   It supercedes all other payment terms in the contract.

12        MR. DARR:  Your Honor, objection.  I think we are

13   starting to ask legal conclusions.  I always lose debates with

14   witnesses about interpreting contracts.

15        THE COURT:  If you want to ask him his understanding

16   of the contract, that's fine.  And if a contract is ambiguous

17   somebody's understanding may affect it.  Let me just tell you

18   that what I'm watching is an argument back and forth.  And

19   that's fine.  Sometimes you want to argue with a witness and it

20   gives me a feel for the witness.  And if you want to do it, it's

21   okay.  But, I can tell you, I can read the contract.  And, if it

22   helps you, Mr. Butts, you're going to lose this argument.

23        MR. BUTTS:  Pardon me?

24        THE COURT:  You are going to lose this argument.  Note

25   A says what it says.  So, you are going to deal with note A.

1    And, you're not going to win the pay when paid argument.  Note A

2    supercedes that.  So, you can argue with Mr. Davis all you want,

3    but I'm just telling you, you're going to lose that argument.

4    BY MR. BUTTS:

5    Q.   You didn't send any photographs along with your request for

6    payment in December, did you?

7    A.   I don't know.  I didn't personally do it, but I don't do

8    that so.

9    Q.   It's reasonable for, if you're asking for payment for

10   materials, is it reasonable for Mr. Oelrich to expect to see

11   photographs of what you want to be paid for?

12   A.   On some projects we do that.  Some projects we don't.  Some

13   contractors ask, some don't.  Usually if they ask we do it.

14         THE COURT:  I should back up while you're paused and

15   say this about my last comment.  I said sometimes a witness'

16   understanding when there is an ambiguous contract affects how

17   the contract winds up being construed.

18         A witness' understanding may be more important in

19   another respect.  Here, what the people did and why they did it

20   is part of the lawsuit.  And, a decision maker's understanding

21   of the lay of the land may impact what the decision maker did

22   and why he did it.  And, that may affect the reasonableness of

23   what he did.  So, I don't want to cut you off on asking

24   Mr. Davis' understanding of the contract, whether right or

25   wrong.  And, I may, that will be an issue for me later.  But I

Cross-Examination – Randall E. Davis

 1   don't want to cut you off on asking his understanding of the

 2   contract or why he did anything he did.  So, if my earlier

 3   comment seemed to say stay away from that, I didn't mean for it

 4   to.  You can ask anything you wish.  I guess that's a too long

 5   explanation that Mr. Darr's objection is overruled.

 6   BY MR. BUTTS:

 7   Q.   Paragraph 5B of the contract, do you have any -- scratch

 8   that.

 9        Did you ever submit a change order on this contract for

10   anything?

11   A.   I do not know off the top of my head.

12   Q.   You didn't, did you?

13   A.   I don't know off the top of my head.

14   Q.   Well, you're requesting payment, according to your, you're

15   requesting for payment for storage and for lost profit and for

16   disposal and various things of that nature, right?

17   A.   Correct.

18   Q.   And, but the contract requires you to submit those change

19   orders in writing, doesn't it?

20   A.   I don't think I submitted those to you during the terms of

21   the contract.  I'm confused by that as being a change order.

22   Q.   So, --

23   A.   We were terminated before I did that, so I'm confused as to

24   how that's part of the contract.

25   Q.   So, is it your position that the damages you're seeking are

1   not subject to the need for a written change order?

2   A.   Are we reopening the contract after your improper

3   termination now and submitting these as change orders?  I'm very

4   confused by this path.  I guess I'm confused by the question.

5   Q.   Can we look at Exhibit 8, please?  No, I'm sorry, Exhibit

6   12.

7        You never responded to Mr. Oelrich when he sent you this

8   email, did you?

9   A.   That's correct.  I was really busy on two other projects

10  that -- two big projects that were bidding that week, and --

11  Q.   Did you ask anyone else in your office to respond to --

12       THE COURT:  Wait, one at the time.  Let him finish his

13  answer before you ask the next question.

14       THE WITNESS:  Yeah, I was -- I saw it.  I was really

15  busy on two other projects I was trying to bid that I was just

16  covered up that week and the time slipped away from me.  And

17  then, quite frankly, 2 or 3 days later my accountant came in and

18  said, hey, I'm still battling Oelrich's accounting, they won't

19  pay us, this is what's going on.  And then my attitude got the

20  better of me and said, to hell with him, I don't want to talk to

21  him right now.

22       I was tired of -- we're being given dates now to do

23  things and perform and yet Oelrich doesn't perform.  You know,

24  Oelrich had a simple job to do.  It was put up the structure and

25  pay us and that was it.  And, they couldn't seem to do it.

Cross-Examination - Randall E. Davis

1   BY MR. BUTTS:

2   Q.   You really thought Ivan Oelrich was all cattle and no hat,

3   right?  Isn't that what you said in your deposition?

4   A.   If that's what I said it's fitting.  It doesn't sound like

5   something I would say, but --

6   Q.   That's the real reason you didn't respond to him, right?

7   A.   I just told you why I didn't respond to him.

8            THE COURT:  It's all hat and no cattle is the

9   expression, not the other way around.

10           THE WITNESS:  Either way, I don't remember saying it.

11  BY MR. BUTTS:

12  Q.   The original contract called for you to start on July the

13  11th, called for the precast to be installed on July 11th of

14  2019, correct?

15  A.   We looked at that earlier.  I think it was some time in

16  July.  I don't remember the exact date.

17  Q.   We can refer to Exhibit 2.  And, if you need to look back

18  at that schedule.

19  A.   Yeah, okay.  July.

20  Q.   Does that help you to refresh your memory on line 7?

21  A.   July 11th, yes.

22  Q.   On July 11th, you only had 24 pieces of precast fabricated,

23  didn't you?

24  A.   That's correct.

25  Q.   And, you didn't have anybody to put it up with a crane

Cross-Examination - Randall E. Davis

1   either, did you?

2   A.   I think in July I did have an erector, yeah.  Before we got

3   to July 11th it was very clear you guys weren't going to get

4   anywhere near there.  So, we slowed down production.  But I

5   could have banged this thing out in about, I don't know, another

6   2 weeks after this or 3 weeks and we would have overlapped with

7   the wrecking and we would have been pretty damn close to those

8   dates.

9   Q.   Did you ever visit the job site?

10  A.   No, I rarely visit job sites.

11  Q.   So, you don't really know the extent to which the job was

12  ready on January 6th to install precast, do you?

13  A.   I will say that I do not have firsthand knowledge of that,

14  but I had implied from the emails and the scheduling that it

15  appeared to me they were not ready.

16  Q.   Do you remember me taking your deposition back in May?

17  A.   I remember the deposition.  I don't remember what month it

18  was.  Yes, that's correct.

19  Q.   I took your deposition on May the 26th.  And, I asked you

20  questions about damages, the damages that you assert in this

21  lawsuit.  At the time that we discussed those damages you didn't

22  have any calculation whatsoever for storage, did you?

23  A.   That's not correct.  I had calculations, chicken scratch

24  that I couldn't give to you to see at the time because it

25  wouldn't have made any sense.  So, I kind of rewrote it into

1    something that was clear.

2    Q.   Do you remember giving your deposition on that day?

3    A.   I remember the deposition.  I don't remember what day it

4    was, yes.

5    Q.   Do you remember that you were under oath that day?

6    A.   Yes.

7    Q.   And was your attorney present?

8    A.   No, we were -- we were doing the video thing.

9    Q.   He was present by video?

10   A.   I guess he was present on the video somewhere, yeah.

11   Q.   The question I asked you was in regard to your claim for

12   damages, including storage.  I said, number 20 is asking about

13   the cost of storing the materials.  I think we've already talked

14   about that, if I recall correctly.  You have not done a

15   calculation that you can share with me on how you reach the

16   number $14,910, am I right?  And your answer was, correct.

17   A.   That is correct.  I had not done a calculation I could

18   share with you.  It was chicken scratch.  And I said I need to

19   write this in a legible form you can follow.  Engineering

20   chicken scratch is a pretty ugly thing.

21   Q.   My question wasn't whether you had done a calculation you

22   could share with me with chicken scratch or anything else.  I

23   just asked you if you had done a calculation and you said, you

24   had not?

25   A.   No.  You just read, you could share with me.  And, I said,

1  no, I don't have one that I can share with you.

2  Q.   Oh, the distinction is one that you could share with me

3  when I was asking you for a calculation instead of just whether

4  you had just done one?

5  A.   I'm sorry.  I thought that was pretty clear.  Yeah.  I had

6  not done one that was legible that you could read.  So, I had to

7  go back and rewrite it.

8  Q.   So, the next day, when we finished up your deposition,

9  that's when you brought in all of the calculations that you've

10 discussed with the Court today, right?  All of the handwritten?

11 A.   That's correct.  Yes.  I rewrote them into neater -- I

12 write really fast and really illegible for most people.  So, I

13 rewrote it into something neat.

14 Q.   Can we look at Defendant's Exhibit 202, please?

15          MR. DARR:  282, Mr. Butts.

16          MR. BUTTS:  Thank you.

17 BY MR. BUTTS:

18 Q.   Mr. Davis, this lost profit of 31,748 includes -- is that

19 the profit for the whole job?

20 A.   That is the profit for the precast portion, the

21 manufacturing portion.

22 Q.   That's if -- that's the profit that you would make on

23 the -- on your schedule of values for which line items?

24 A.   Everything down through production.

25 Q.   Can we look at pay app 10?

Cross-Examination - Randall E. Davis

1        Are you saying through line item number 4, production, that
2   that's how much money you expected to make, the 31,000?
3   A.    Yes.
4   Q.    And, that would be if you had been paid the last 15,899 on
5   this pay app, right?
6   A.    Plus all the other unpaid invoices and retainage and all
7   that stuff.
8   Q.    You had already been paid 110,000 of the 151,000?
9   A.    I believe it was 109 something.  But, yeah.
10  Q.    So, on the last -- is it your position that along the last
11  40,000 or so dollars that your calculations indicate that you
12  had made 30,000 of that last 40,000?
13  A.    It is my position that it cost me -- I always assume the
14  material and labor cost in the front and profit, I don't count
15  my eggs before they hatch.  So, the profit is on the back end of
16  it.  So, that is the unpaid profit.
17  Q.    But profit would be spread out throughout the entire
18  $120,000, wouldn't it?
19  A.    No.  I have the cost of making the job.  Profit is whatever
20  is left over after you get through it.  What if you get to the
21  last piece and you really screw it up and you got to make it a
22  couple of times.
23  Q.    I would like you to look at Exhibit 31, please?
24        Let's move through this slowly.  Do you recognize what this
25  is?

1   A.   It's the specifications for the architectural precast on

2   the project.

3   Q.   Under section 1.3A, what are these notes on here?

4   A.   I have no idea.

5   Q.   You don't know whose notes they are?

6   A.   No.

7   Q.   Are they Mr. Realto's notes?

8   A.   I don't know.  They might be.  I don't know.  I just said

9   that.  I don't know who did it.  I have not seen this, so I

10  don't know who did it.

11  Q.   Are these specifications the specifications that your

12  company was required to follow as part of the contract?

13  A.   That's a yes or no question.  Yes, the specifications are

14  what they are.  No, because as a fabricator, as a manufacturer

15  we try to comply as tight to this as we can, but many times the

16  specs are, in this case, VA specs are years old and they specify

17  things that don't make any sense.  So, you give them the best

18  you can.  You get as close as you can to it.

19  Q.   Do you recognize these as the specs that were included with

20  your scope of work for the precast on this project?

21  A.   I guess they were.  I don't know if they attached to the

22  contract or not.  I don't remember that part.  But, okay.  They

23  are the specs on-the-job, I'll give you that.  I don't know --

24  the rest of that question I don't know.

25  Q.   Well, we can refer to the specs in the contract if you'd

1    prefer to do that.  I just thought it might be simpler for you

2    to --

3    A.   I'll take your word for it.  If they are in the contract it

4    wouldn't be uncommon.

5    Q.   Did you comply with MNL 117?

6    A.   Yes.

7    Q.   Can we look at exhibit -- I believe it would be 584.

8    Excuse me, Exhibit 33.

9         Did you enroll -- what do you recognize this document to

10   be?

11   A.   I have no idea.

12   Q.   Okay.  It says MNL 117.

13   A.   Okay.  Is it out of MNL 117, is that what you're saying, as

14   part of the book or something?

15   Q.   I'm saying -- it says MNL 117?

16   A.   I will admit it says MNL 117.  I don't know where it came

17   from.

18   Q.   Well, let me just ask you this, did you enroll one or more

19   plant personnel in a quality control school?

20   A.   I have, yes.

21   Q.   Pardon?

22   A.   Yes.

23   Q.   And, did you schedule an in-plant precertification

24   evaluation with an audit agency, RBA Audit?

25   A.   Not with RBA Audit, but we were inspected by a firm out of

1    Florida twice a year which qualifies for Florida DOT.

2    Q.   Did you meet the PCI requirements?

3    A.   Yes.

4    Q.   Are you a PCI certified shop?

5    A.   No.  We are an APA shop.  We had this discussion earlier.

6    They are an equivalent.

7    Q.   Do you remember giving your deposition on May 26, 2021?

8    A.   You keep asking me that question.  I remember the

9    deposition.  I don't know the date.

10   Q.   Were you under oath?

11   A.   Yeah.  I'm sure I was.

12   Q.   And your lawyer was with you, right?

13   A.   Yeah, we had this discussion.

14   Q.   And I asked you, did you meet the PCI requirements?

15   A.   Uh-huh.

16   Q.   And your answer was no?  Today your answer is yes?

17   A.   I must have misunderstood your question.  I thought maybe

18   you were asking me if I was a PCI certified plant.  No.  We're

19   an APA certified plant.  However, the requirement of both are

20   equal, according to the federal government now.  And we,

21   therefore, meet the PCI requirements.

22   Q.   Is your erector, whoever you were going to use, PCI

23   certified?

24   A.   No.  There is a huge problem because, in fact, I would ask

25   you the same question of the so-called erector that you found to

1  do the job.  PCI certified erectors are far and few these days

2  and hard to find.  And, they certainly don't want to do

3  architect precast projects.  They want to erect big parking

4  garages.  What we offer in our quote, and we offered it to

5  Oelrich and they accepted it, and I'm assuming they passed it on

6  to the VA, was that we would hire an auditor to come out and

7  audit the erection one time that it was going the way it was

8  supposed to go.  And, we have now done that on almost every job

9  the past couple of years because all of these specs have all

10  gone to this PCI certified erector stuff.  And the problem is

11  the erectors have not kept up with, it cost too much money to do

12  it.

13  Q.  Can we look at Exhibit 274, please?

14      Is this the quote you referenced a minute ago?

15  A.  That is a quote from Steve Realto of us, yes.

16  Q.  Anybody sign that quote?

17  A.  I have no idea.  I guess Steve did.  Steve didn't sign the

18  quote.

19  Q.  That quote is not incorporated into this contract that you

20  signed, is it?

21  A.  I don't think it's in this contract.

22  Q.  So consequently, Mr. Oelrich didn't agree to this quote,

23  did he?

24  A.  I would assume, I don't know.  That's a legal opinion, but

25  --

Cross-Examination - Randall E. Davis

1    Q.   But, this is the quote you submitted to him, didn't you?

2    A.   I don't know if that's the actual final quote or not.  We

3    go through multiple quotes when we are working on a job.

4    Q.   Is there anything about this quote that you disagree with?

5    A.   I have not read the quote.  I'm seeing it for 30 seconds.

6    Q.   I'm going to direct you to number 9.  This is your quote,

7    isn't it?

8    A.   I'm sorry, what?

9    Q.   This is your quote, isn't it?

10   A.   Yeah, we just said that like 19 times.

11   Q.   Number 9 is requiring you to design -- that you're saying

12   that you are going to design and produce this material in

13   accordance with PCI MNL 117, right?

14   A.   Yep.  And we did.

15        117 is a quality control manual.  I don't know what you

16   think it is.  But it's just a quality control manual is all it

17   is.  There is two of them.  There's 116 and 117.  116 is for

18   structural precast.  117 is more stringent for architectural,

19   which is what this is, the exterior of the building.  So, all we

20   were required to do is follow the requirements in 117 for design

21   and production tolerances.  And we did that.

22   Q.   Let's go back to Exhibit Number 121, please.  No.  Sorry.

23   Exhibit Number 33.

24        The highlighted part down near the bottom says that if you

25   are not PCI certified you are not eligible to bid on projects

1  since there is no guarantee that a plant will become certified.

2  But you bid on this project and you are not PCI certified,

3  right?

4  A.   That's not what that says.  Sorry.  That's funny.  This

5  says if you are in the program, you're trying to get PCI

6  certified, you are not eligible to bid on a project because you

7  may not get certified.  I'm not trying to get PCI certified.

8  I'm not selling that to anybody.

9       What I said was, if you read this quote you just had up,

10  design and production tolerances.  Our design requirements were

11  produced in accordance with this quality control manual which

12  means loads, connection types, all of that kind of stuff.  We

13  did it all per this book.  Our production tolerances came from

14  this book.  There are pictures in this book of panels and it's

15  got dimensions and it says, if this panel is within this length

16  it better be plus or minus an eighth of an inch and that kind of

17  stuff.  We met all those requirements out of this book.  Nobody

18  here is trying to sell PCI to anybody.

19       In fact, the problem is not a single PCI plant bid on this

20  project.  They don't want this crap.  PCI plants are huge.

21  Sorry, I shouldn't have called that crap.  That was bad.  My

22  apologies.

23  Q.   Did you build the panels with epoxy-coated rebar in them?

24  A.   No, it's not a requirement.  Neither did Spring Precast.

25  Q.   Do you see under section 1.3 where it says the fabricator

1    qualifications must be a firm that complies with PCI MNL 117?

2    A.    Yup.  And we complied with PCI MNL 117.

3    Q.    But you are not a member of PCI, are you?

4    A.    It does not say I have to be.  It says we have to comply

5    with it.

6    Q.    Well, did you participate in PCI's plant certification

7    program?

8    A.    No, I just told you we are an APA certified plant.  They

9    are equivalent, according to the federal government, master

10   spec, you name it today, everybody accepts them as equivalent.

11   This is an old spec.

12   Q.    I'm sorry.  I didn't mean to interrupt you.

13   A.    That's fine.  Go ahead.

14   Q.    Under A2, you were required to be a PCI plant certified

15   program, right?

16   A.    And we notified you in the bid we are not.  It's big and

17   bold on top of the quote.  And, I believe there's a line item

18   that says, fabricated by a plant participating in the APA

19   certification program.

20   Q.    That's not incorporated into the contract, is it?

21   A.    What's that?

22   Q.    The, that quote is not part of the contract, is it?

23   A.    It's not.  It does not alleviate the fact that we're an APA

24   plant.  We were presented by Oelrich, we gave them all of our

25   submittals, and they presented it to the VA for approval for us

1   to make the product.  And we were accepted and approved.

2   Q.   If we go to the next one, B, number B1.  It says that a

3   precast concrete erector qualified by the Precast Prestressed

4   Concrete Institute prior to beginning work at the site submit a

5   current certificate of compliance.  Did you do that?

6   A.   We've already answered this question like 3 times.  There

7   are not PCI erectors out there because the program costs too

8   much money, they don't want to participate in it.  So, there are

9   very few of them.  And they are all building $50 million parking

10  garages.  So what we do is we offer a 2A field certified auditor

11  to come in and audit the erector.  That's the only option we

12  have.  You have no erectors available.  If you demand PCI from

13  the spec you will never put the building up.

14  Q.   Go to, in this it would be 2.2B.

15       Do you see B1 requires epoxy-coated reinforcing bars.  And

16  you didn't use them, did you?

17  A.   You really don't know how to read specs, do you?  B1 is

18  under B, which is ASTM 8, 7 out of 6 weldable reinforcing bars

19  are required to be epoxy-coated.  We come under A, the one above

20  that, reinforcing steel, grade 60 deformed.  It doesn't say

21  anything about epoxy-coated.

22  Q.   In your deposition transcript, the one we referenced

23  before, I asked you, did the panels you produce have

24  epoxy-coated reinforcing bars?  No, that was negotiated out in

25  the bid phase.

1  A.   Okay.  I don't -- what do you want me to say to that?  Is

2  that a question?

3  Q.   Well, there was nothing said about welding wire in your

4  deposition?

5  A.   You didn't give me a spec to look at in the deposition, so

6  therefore, I didn't read the specific spec.  All I know is our

7  policy as a corporation is we don't do epoxy-coated rebar.  It's

8  extremely expensive.  It takes an incredibly long amount of time

9  to get it fabricated and get it back to you.  So, we always

10  negotiate that out in the bid phase.  So, that statement is

11  correct.  But now that you've shown me the spec I realize you

12  are reading it wrong.

13  Q.   I don't want to argue with you.

14  A.   I'm sorry.

15  Q.   But I will represent to you that the spec was an exhibit in

16  your deposition.

17  A.   Well then, you must have only showed me this page and not

18  the previous page, so I missed it.

19  Q.   Did the product have an acid etched finish?

20  A.   No.  That was not the final choice by the architect.

21  Q.   I'm going to reference you to paragraph 2.12.  And, if we

22  go 2.12.  2.12.

23       Under A3, doesn't that say that you are to have an

24  acid-etched finish?

25  A.   A2 says, I'm to have an expressed aggregate finish using

1   chemical retardant.  And, that's what we did.

2       This is all a match existing.  So, our choice is, as the

3   experts, to decide what is the finish out there we're matching.

4   In this case, it was not an acid-etched.  It was an exposed

5   aggregate, much like on the outside of this building.  So, we

6   produced a sample using chemical retarders and the architect

7   accepted it.

8           MR. BUTTS:  That's all my questions.

9           THE COURT:  Redirect?

10          MR. DARR:  Just briefly, Your Honor.

11                      REDIRECT EXAMINATION

12  BY MR. DARR:

13  Q.  Could you pull up Plaintiff's Exhibit 4?  Back out so we

14  can see the whole page.  Maybe in a little more, sorry.

15      Have you ever seen this document before, Mr. Davis?

16  A.  This is the contract with Spring.  I don't know that I have

17  seen this, but maybe.  I don't remember.

18  Q.  Well, could you do me a favor and quickly look at the cover

19  page there and see if you could confirm your suspicion that this

20  is the contract with Spring Precast?

21  A.  Yes, that's what it looks like.

22  Q.  Could you turn to page 19, please?  Actually, could you go

23  up one page to the top?

24      What does this appear to be, Mr. Davis?

25  A.  The quote from Spring Precast.

Redirect Examination – Randall E. Davis

1   Q.   And, if you scroll down to where we see the bottom of the

2   page, what's that section 1 titled?

3   A.   Scope of work.

4   Q.   And, do you see here this section?  What would you

5   understand that subsection to be?

6   A.   That's inclusions.

7   Q.   And, when you say inclusions, what does that mean?

8   A.   Those are the things that they are including in their

9   quote.

10  Q.   And, if you scroll down a little bit more?  Stop.

11       There's, in this inclusion section as you described it, how

12  many items do you see there?

13  A.   12.

14  Q.   And, what is number 6 here mean?  Plain black reinforcing,

15  do you see that?

16  A.   Plain black reinforcing, they chose not to provide

17  epoxy-coated rebar either.

18  Q.   So, would it be fair then, based at least on this document,

19  it doesn't appear as though the replacement subcontractor used

20  epoxy-coated rebar on the project?

21  A.   That's correct.

22           MR. DARR:  That's all I have.  Thank you.

23           THE COURT:  Mr. Davis?

24           THE WITNESS:  Yes.

25           THE COURT:  I'm interested in trying to figure out how

Redirect Examination - Randall E. Davis

1    many pieces were fabricated as of December 30th when Mr. Noyes

2    dropped in unannounced at your plant.  You showed him some

3    inside and some outside?

4              THE WITNESS:  Uh-huh.

5              THE COURT:  And, I think you said, but that's not all

6    because I've got another, I don't remember if you said --

7              THE WITNESS:  Yeah.

8              THE COURT:  -- building or yard?

9              THE WITNESS:  Two other areas, yeah.  Two other yards

10   that we didn't show him or I didn't show him.

11             THE COURT:  Well, why would VA product be at that

12   other area?

13             THE WITNESS:  No.  It's all part of the same facility.

14   I'm just saying there's a backyard and upper yard.  And he

15   didn't ask -- he didn't ask to go see any more than that.  He

16   was very much just like, okay, I'm good.  And that was it.

17             THE COURT:  How many acres do you have there?

18             THE WITNESS:  Like 6.

19             THE COURT:  You knew why he was there?

20             THE WITNESS:  Uh-huh.

21             THE COURT:  He wanted to see the product you had

22   billed for, right?

23             THE WITNESS:  That's, no, that's not what he said.  He

24   just said, I just came here to see the product and you guys have

25   made some precast.  And I said, sure.  So, I showed it to him.

Redirect Examination – Randall E. Davis

1   I personally didn't know where all of it was.  And that was why

2   I was frustrated with him not making an appointment because if

3   he had made an appointment I could have had a little idea of

4   where all the different panels were and then I could have showed

5   them all to him.  But to walk around and go, those are yours, it

6   doesn't work very well.

7          THE COURT:  When did you find out where they were?

8          THE WITNESS:  When did I find out where they were?

9          THE COURT:  Yeah.

10          THE WITNESS:  They were -- these were made up through

11   October.  So, they had been out in the yard for months.

12          THE COURT:  Well, if you didn't know where they were

13   how do you know how many there were?

14          THE WITNESS:  We knew through October how many there

15   were.  That's why I said there was like 70.  I think this was

16   like 63 percent.  We did the math earlier.

17          THE COURT:  Well, I guess you told me, you didn't show

18   it all to him because you didn't know where it was?

19          THE WITNESS:  A, I didn't know where every single

20   piece as to count.  I could have known that if he had planned

21   with me to come I could have taken him around and done that.

22   But he didn't do that.

23          And, then the second one was, he didn't present

24   himself that way.  He didn't say, this is what I am here to do.

25   He just said, you know, can we walk around and look at it some?

Redirect Examination – Randall E. Davis

1   And I said, sure.  And we did.  It was a very calm, friendly

2   walk around.  Nothing to it.  He never said, hey, I need to see

3   every single piece.  That would have been a different animal,

4   but he didn't go there.

5            THE COURT:  Thank you.  Questions to followup on mine?

6            MR. DARR:  No, sir.

7            THE COURT:  Thank you, Mr. Davis.  You may step down

8   and return to counsel table.

9            Mr. Darr, please call your next witness.

10           MR. DARR:  That's our two witnesses, Your Honor.  And,

11  our witnesses were put on in support of our counterclaim as well

12  as rebuttal.

13           THE COURT:  Defense rests.

14           Is there a rebuttal case for the plaintiff?

15           MR. BUTTS:  Can we have a moment, Your Honor?

16           THE COURT:  Surely.

17           MR. BUTTS:  May I ask the Court for a short recess, 5

18  minutes?

19           THE COURT:  Sure.  4:07.  Let's come back at 4:15.

20           MR. BUTTS:  Thank you.

21      (Recess taken 4:07.)

22      (Resumed at 4:15.)

23           THE COURT:  Please be seated.

24           Mr. Butts, what says the plaintiff?

25           MR. BUTTS:  We have no rebuttal, Your Honor.

1          THE COURT:  All right.  Let's talk about where we go

2    from here.

3          What is most useful for me is closing argument, oral,

4    not written submissions.  I propose to have you argue.  I would

5    hope to be able to announce a ruling.  But that depends a little

6    bit on the arguments.  And I'll have some questions as we go and

7    may depend on those.

8          It's a little late in the day to try to do that at

9    this point.  Might all do better if we do it in the morning.

10   Tell me what your preferences are.  We've certainly got some

11   people traveling at least, but probably nobody gets back to

12   South Carolina tonight.  And beyond that, tell me what you,

13   what's best.

14         MR. DARR:  Your Honor, I think we personally, we are

15   stuck here tonight no matter what anyway.  So, probably tomorrow

16   morning at 9 if that works for you for closings.

17         THE COURT:  Mr. Butts is nodding.  That works.  How

18   long do you want for closing?

19         MR. BUTTS:  I think we could probably do it in an

20   hour, our side.

21         THE COURT:  That strikes me as a long time.  I won't

22   cut you off before that.  I mean, one thing about oral arguments

23   in a nonjury case is I can kind of stop you when you are talking

24   about something that you're already ahead on and I don't need to

25   hear more about or sometimes even if you're behind and I don't

1  need to hear more about it.

2          MR. DARR:  If I'm going an hour you can shut me down,

3  Your Honor.  I hope to be done in 30 minutes.

4          THE COURT:  We have got very good lawyers on both

5  sides of the case.  You're not going to waste your time.  And,

6  as I said, I can stop you if I think I've already got command of

7  something.

8          Before we quit, there is one thing I wanted to do.

9  I'm going to call Mr. Oelrich back as a witness.  And you can

10  stay right where you are.  It's going to be brief.  You are

11  still under oath.

12          Here is my question, you authorized the lawsuit when

13  it was filed, I don't know the date in front of me, I think it

14  was February, January, January before the termination.  In any

15  event, you authorized the lawsuit?  Yes?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  It was a lawsuit for replevin.  A lawsuit

18  to make PRC deliver to you, turn over to you the product they

19  had already made.  Here's my question, if you knew that it was

20  impossible to match the product, why did you want the product

21  they had made?  Or the flip side, if you wanted the product they

22  had made didn't you think you could match it?

23          THE WITNESS:  No, sir.  So, at the time it was --

24  what, we didn't know what we were going to do.  We had no

25  communications.  We were having a hard time every step of the

1    way with this.  So, I had engaged with Mr. Butts and his firm to

2    look at options and see how we are going to do this and what we

3    could do.  And, I think we came to the conclusion after we got

4    into it or after we thought about it for awhile we were not

5    going to be able to match their panels.

6            At one time we thought, well, we'll get their panels

7    and then we'll get some other panels.  The more we went into

8    that that's what our conclusion ended up being, is we were never

9    going to be able to match their panels because we had a hard

10   time getting samples back as it was.

11           THE COURT:  You heard Mr. Davis say they've done this

12   a number of times.  They get called in on jobs where somebody's

13   got it and they can go in and match it.  How did you know that

14   you couldn't match their product?

15           THE WITNESS:  Just, just from the experience of having

16   a hard time matching what was there and getting the original

17   samples approved.  That's -- and these panels, when they go on

18   the building they are going to be side by side.  They are not --

19   we don't know what they had.  I mean, we had an idea of what

20   panels they had and what panels they didn't have.  But if there

21   was a slight difference there, we would be sunk.

22           THE COURT:  I got it.  I understand you buy carpet all

23   out of the same lot because if you get two different lots it

24   ain't going to match and if you --

25           THE WITNESS:  That was the conclusion we came to, Your

1  Honor.

2          THE COURT:  If you mess up one panel of the tile in

3  the kitchen you got to retile the whole kitchen because it isn't

4  going to match.  I understand the concept.  This fabricated

5  material had to match the rest of the building?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  And that's why Spring Precast had to go up

8  somewhere in Georgia and get what rocks to go in there?

9          THE WITNESS:  Yes, sir.  If I might add, sir, once we

10  took that step, dealing with Mr. Butts and then we decided, hey,

11  this is about the time that I guess Chris had a good positive

12  conversation with Forde, you know, we thought there was positive

13  movement there.  And, you know, so we decided to let that ride.

14  They never served notice of that as far as I know.  We decided

15  to work through it.

16          THE COURT:  No, I got that.  I just -- who was the

17  person with the most expertise that said it's impossible to

18  match what they've done?

19          THE WITNESS:  That was a conversation we had with

20  myself and Chris and probably Matt, just from experience of

21  working around those kinds of things.

22          THE COURT:  All right.

23          THE WITNESS:  I just didn't -- we didn't think after

24  we talked about it and worked through, it we didn't think they

25  were going to be able to match.

1          THE COURT:  That was my question.  Either side have

2  questions to followup?

3          MR. BUTTS:  No, thank you, Your Honor.

4          MR. DARR:  No, thank you, Your Honor.

5          THE COURT:  All right.  Thank you, Mr. Oelrich.

6          We'll start back at 9 o'clock in the morning.  The

7  sequence will be plaintiff, defense, plaintiff.  And then, as I

8  said, if I'm able I will give you a ruling, may take a break and

9  come back and give you a ruling.  If I'm not, I won't.  But I

10 try to be.  It's better for everybody if we get it done.  And, I

11 will know as much about the case by the end of oral argument as

12 I'm ever going to know about the case.  And, when I take things

13 under advisement, if I don't get back to it for a month, and you

14 know how that goes.  So, it's much better if I can rule on the

15 spot.  And I'll try to do that.  I'll see you at 9 o'clock in

16 the morning.

17         We are adjourned.

18     (Proceedings concluded at 4:23 on Tuesday, October 26,

19 2021.)

20                  *  *  *  *  *  *  *  *

21         I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter.
22 Any redaction of personal data identifiers pursuant to the
   Judicial Conference Policy on Privacy are noted within the
23 transcript.

24 /s/ Lisa C. Snyder                        3/13/2022

25 Lisa C. Snyder, RPR, CRR
   Official U.S Court Reporter

1                          <u>**I N D E X**</u>

2    <u>PLAINTIFF'S WITNESSES</u>                           <u>PAGE</u>

3    Cross-Examination By Mr. Darr                     220
     Redirect Examination By Mr. Butts                255
4    Redirect Examination By Mr. Butts                263
     Recross-Examination By Mr. Darr                  264

5
     <u>CHRISTINA SAPP</u>
6    Direct Examination By Mr. Butts                  265
     Cross-Examination By Mr. Darr                    269
7    Redirect Examination By Mr. Butts                277
     Recross-Examination By Mr. Darr                  282

8

9    <u>DEFENDANT'S WITNESSES</u>                          <u>PAGE</u>

10   <u>RANDALL FORDE DAVIS</u>
     Direct Examination By Mr. Darr                   284
11   Cross-Examination By Mr. Butts                   320
     Redirect Examination By Mr. Darr                 325

12
     <u>RANDALL E. DAVIS</u>
13   Direct Examination By Mr. Darr                   330
     Cross-Examination By Mr. Butts                   379
14   Redirect Examination By Mr. Darr                 405
     <<INDEX END>>

15

16

17

18

19

20

21

22

23

24

25