1
              **UNITED STATES DISTRICT COURT**

             **NORTHERN DISTRICT OF FLORIDA**

2
                **GAINESVILLE DIVISION**

3

4

OELRICH CONSTRUCTION, INC.,   )

5
                        )

  Plaintiff,           ) Case No: 1:20cv169

6
                        )

         v.          ) Gainesville, Florida

7
                        ) October 27, 2021

PRC PRECAST, LLC,         )

8
                        ) 9:01 AM

                        )

9
  Defendant/Counter-Plaintiff,)

                        ) VOLUME III

10
         v.          )

OELRICH CONSTRUCTION, INC.,   )

11
  Counter-Defendant.      )

_____ )

12
               **TRANSCRIPT OF BENCH TRIAL**

13
      **BEFORE THE HONORABLE ROBERT L. HINKLE**

         **UNITED STATES DISTRICT JUDGE**

14
          **(Pages 416 through 540)**

15

16

17

18

19

20

21

22
           *__LISA C. SNYDER, RPR, CRR__*

23
      **Official United States Court Reporter**

   **111 North Adams Street, Tallahassee, FL 32301**

     **(850)567-1374 * lisasnydercr@gmail.com**

24

25
      *Proceedings reported by stenotype reporter.*

   *Transcript produced by Computer-Aided Transcription.*

```
 1   APPEARANCES:

 2

     For the Plaintiff:          Warner, Sechrest & Butts, PA
 3   Counter-Defendant           By:  ROBERT PAUL BUTTS, JR.
                                      MICHAEL DUSTIN SECHREST
 4                                    SEAN GERALD HIPWORTH
                                      Attorneys at Law
 5                                    RButts@fbswlaw.com
                                      sechrest@fbswlaw.com
 6                                    shipworth@fbswlaw.com
                                 5200 SW 91st Terrace Suite 101
 7                               Gainesville, Florida 326008

 8   For the Defendant:          Kirwin Norris, PA
     Counter-Plaintiff           By:  DAVID JOSEPH DARR
 9                                    Attorney at Law
                                      djd@kirwinnorris.com
10                               15 W. Church Street, Suite 301
                                 Orlando, Florida 32801
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            **P R O C E E D I N G S**

2        (Call to Order of the Court at 9:01 AM on Wednesday,

3    October 27, 2021.)

4            THE COURT:  Good morning.  Please be seated.

5            Closing for the plaintiff.

6            Mr. Butts?

7            MR. BUTTS:  May it please the Court.

8            PRC failed to produce or deliver panels that Oelrich

9    Construction paid for.

10           PRC made false assurances that they would do it.  They

11   gave no assurance that they would ever do it.  And they

12   misrepresented the status of the completed product throughout

13   the summer and fall of 2019.  This resulted in delay to Oelrich

14   Construction.

15           Caused Oelrich Construction to hire Spring Precast to

16   come in and perform the work that they had contracted with PRC

17   to do.  And it cost Oelrich Construction to have paid for

18   undelivered and uninstalled product to PRC.

19           PRC billed for 70 panels --

20           THE COURT:  You are welcome to remove your mask as you

21   are talking.

22           MR. BUTTS:  Excuse me, Your Honor.  Thank you for

23   reminding me.

24           PRC paid for 70 panels through October -- through the

25   October pay app.  Through that time, they had only provided

1   photographs of 14 panels.

2          PRC said they were put out by having to start late on

3   this job, but they had agreed to a -- to follow a dynamic

4   schedule.  And they had also agreed to waive delay damages

5   pursuant to the contract.  And PRC ceased to hide behind Note A

6   of the contract and to disregard the contract provisions that

7   they don't want to comply with.  For example, they do not want

8   to give us documents of production and they didn't give us

9   documents of production.

10          They did not -- speaking of photographs, Your Honor --

11  didn't give us timely bond waivers.  They didn't cooperate and

12  communicate.  They didn't -- they had a duty to bill only for

13  material that they produced.  They didn't adhere to the safety

14  requirements, specifically the documentation that Oelrich

15  Construction repeatedly asked them to provide.  They were never

16  given a lift plan.  They were never given an OSHA 30 compliance

17  certificate.  They were very late in December giving the

18  activity hazard analysis.  Most importantly, they had a duty to

19  follow the federal law.  This put Oelrich Construction in an

20  untenable position.

21          PRC had given no photographs to prove that PRC's pay

22  request, specifically number 10, and really number 9 or 8 or 7,

23  were not false.  But when they billed for a hundred percent,

24  given the history, Chris Crehore was understandably skeptical.

25          They billed the middle of the month, 15th or 16th, for

1   a hundred percent of the panels.

2          Oelrich Construction, according to PRC's

3   interpretation of Note A, would be they had 10 days to dispute

4   the pay request, but PRC would have the opportunity to continue

5   to produce and ask for payment for materials that were produced

6   through the end of the month.  It's an unreasonable

7   interpretation of Note A.

8          On the other hand, Oelrich Construction, using PRC's

9   interpretation of Note A, Oelrich Construction can't make a

10  false claim when they make their pay requests.  So they have to

11  know -- they have to have some level of assurance that PRC has

12  actually made the panels that they are asking to be paid for.

13         Using PRC's interpretation, if it's enforced, per that

14  interpretation, it has to be void as to public policy because it

15  enables PRC, or a subcontractor in their position, to violate

16  the federal law.  There is no -- PRC's interpretation is --

17         THE COURT:  Well, now slow down just a minute.

18         If I'm not mistaken, this is the very first time --

19  closing argument -- the very first time I've heard an argument

20  that part of this contract is void as against public policy.  Is

21  that true or not true?

22         MR. BUTTS:  It's true.

23         THE COURT:  Well, that argument won't fly because this

24  is way too late to be making an argument taking a position for

25  the first time.

```
1              MR. BUTTS:  Well, Your Honor, in all due respect, I am
2    speaking in regard to the Court's comment yesterday that Note A
3    wipes out the entire payment provision of the contract.  And I
4    am just trying to reconcile that with -- and express that if
5    that is PRC's position it can't be.  It can't --
6              THE COURT:  Well, let's deal with that in two parts.
7              First, I don't think I said Note A wipes out
8    everything.  It certainly wipes out everything on the same
9    subject, and I have a considerably different view of what the
10   same subject means than what you have been suggesting.
11             Second, there is nothing void against public policy in
12   a sub, PRC saying:  You've got to pay us without regard to when
13   you're entitled to be paid by the VA, or the joint venture.
14             They could enter a subcontract and say:  You've got to
15   pay us the full amount of the contract, full amount of our
16   subcontract, right now.  That wouldn't affect when you could
17   properly bill for your work back to the joint venture, or to the
18   VA.  So your assertion that somehow it's against public policy
19   for them to have a different payment term than what you are
20   bound by in dealing with the VA, that's just not right.
21             MR. BUTTS:  Well, Your Honor --
22             THE COURT:  There is nothing in federal law that says
23   they can't set different payment terms with you.  Isn't that
24   right?
25             MR. BUTTS:  That's right.  However, we have to make
```

1   payment requests to the VA, or eventually to the VA through

2   Spring.  And we have to be able to say what we are asking for.

3   We want to just -- all we're asking -- all we're asking of PRC

4   is just give us the pictures.  Show us the pictures.

5            THE COURT:  Completely reasonable thing to ask for.  I

6   understand that.  But the assertion that somehow it's unlawful

7   for them to have a different payment term that just doesn't fly.

8            MR. BUTTS:  Okay.

9            So, I must -- I misunderstood the Court's direction

10  yesterday to be that the Note A would preclude Oelrich

11  Construction from reasonably asking for photographs of the

12  material that PRC was asking to be paid for.

13           THE COURT:  They told you in the negotiation they

14  would be happy to send photos.  That's documented.  We will get

15  to them.  But, of course, you could ask for photos.  Perfectly

16  reasonable request.  And perfectly reasonable to get very

17  suspicious when somebody won't give you the P sheets and won't

18  send you photos.

19           MR. BUTTS:  Oelrich Construction did ask for the

20  photos and they weren't given the photos.

21           The only photos that I was able to find in evidence,

22  that PRC gave us -- the most recent photo that PRC gave to

23  Oelrich Construction of completed panels -- was Exhibit 250.

24  And by my count I think there are 14 panels in that photograph.

25  That's a defendant's exhibit.

```
 1              That exhibit says that it was representative of panels
 2     that were produced on August 31st, 2019.  That's the last one.
 3              THE COURT:  So that's where the 14 number you said a
 4     few minutes ago came from?
 5              MR. BUTTS:  Yes, sir.
 6              THE COURT:  But you know they had produced more than
 7     14.
 8              MR. BUTTS:  I don't know whether they did or not.
 9              THE COURT:  You do because your inspector went up
10     there on December 30th and saw --
11              MR. BUTTS:  No.  I meant on that day.  On August 31st,
12     or whatever the date is -- here it is.  I don't know -- this is
13     the only photograph that Oelrich -- the last photograph Oelrich
14     Construction got.
15              THE COURT:  But you know by some time in October they
16     had produced at least 51.
17              MR. BUTTS:  Yes.  Whether they did them in October or
18     November, but certainly by December the 30th we know they had
19     produced 51.
20              THE COURT:  But your position is they had quit making
21     them in October.  They haven't contested that.  The undisputed
22     facts are by October they were done.  Isn't that right?  They
23     started back up in May.
24              MR. BUTTS:  March.  They started back up in March and
25     produced, I think, 12.
```

1          THE COURT:  And you think they were actually producing

2     them in March?

3          MR. BUTTS:  I don't know.  This is just their

4     testimony.  It's what they -- how they responded in their

5     interrogatories.  They said they started producing in March.

6     They asked -- Mr. Crehore asked them, on March 17th or 16th,

7     whenever he had the telephone call, he said:  Are you -- have

8     you produced the panels?  The answer was no -- or he said:  Are

9     you producing panels.  And they said no.

10         THE COURT:  They are not producing.  They don't know

11    when they are going to produce.  And then the testimony in the

12    trial is by May they had produced up to what they call

13    82 percent, so some number.

14         MR. BUTTS:  94 panels.  82 percent.

15         And of that -- of the delta between the asserted 70

16    that they had completed in October, and the asserted 94 that

17    they completed in May, they completed -- the testimony from PRC

18    was they completed some in March.  Had to be after the

19    conversation with Chris Crehore because at that time they said

20    they hadn't produced any more.  April and May.

21         THE COURT:  If they said they were producing them in

22    March, I missed it.  How many do you think had been produced as

23    of March 17th?

24         MR. BUTTS:  As of March 17th?  Either 51, according to

25    Dana -- not Dana, but according to the photographs he took and

1    Oelrich Construction interpreted as 51, or 53 percent of 105, as

2    asserted in Andy Wilson's letter that he responded to SAW with;

3    53 percent, so about 56 or 57.

4            THE COURT:  Where did he get 53 percent?  Part of what

5    he says in that letter or email is, your October submission said

6    53 percent.  And that's just wrong.  The October submission, at

7    least the one I have seen, said of 63 percent.

8            MR. BUTTS:  63.4.

9            THE COURT:  All right.  So, where did he get 53?  Is

10   that a typo?

11           MR. BUTTS:  I don't know.  I don't know.  I had no

12   opportunity to speak with him about that.

13           But he said 53, and according to the interpretation of

14   Dana Noyes' photographs it was 51.  51 panels.  53 percent.  So

15   53 percent is about 56 panels.  It's a difference of five

16   panels.  I don't know how many --

17           THE COURT:  If it's 63 percent it's a difference of

18   another 10 or 12 panels.

19           MR. BUTTS:  Yes, sir.

20           THE COURT:  The reason I ask is, if it turns out that

21   you were obligated to take the ones they had made, this makes a

22   substantial difference in the damage number.

23           MR. BUTTS:  I don't know, Your Honor.  I don't know

24   how many panels they made.  I only have photographs of the 14 in

25   August, and then eventually the photographs of the 51 that Dana

1    took.

2              THE COURT:  During discovery did nobody go put eyes on

3    these panels?

4              MR. BUTTS:  No.

5              THE COURT:  So far as the record shows nobody on their

6    side went out there and counted them?

7              MR. BUTTS:  I don't know, Your Honor.

8              THE COURT:  And they are apparently still sitting

9    there right now.  And here we are in federal court trying a

10   case, they are sitting up there on a lot, and nobody knows how

11   many there are.

12             All right.

13             MR. BUTTS:  So, Your Honor, PRC is asking for payment.

14   They are giving no photographs to justify the number of panels

15   they are asking to be paid for.  They -- at the end of August,

16   they sent photographs with 14 panels.  They assert that in July

17   they made 24, and in August they made 13, but at the end of

18   August we only see 14.  They assert they made 13 more in

19   September and 20 more in October.  No photographs.

20             THE COURT:  Where are these numbers coming from?

21             MR. BUTTS:  Interrogatory -- the 14 is coming from the

22   photograph that's Defendant's Exhibit 50.

23             The numbers that I am getting for the date -- for the

24   months are coming from their response to interrogatories, and I

25   believe it's one of the very last ones.  One of the very last

1    interrogatories that they responded to.  I forget the number.

2            THE COURT:  You introduced those at some point?

3            MR. BUTTS:  Yes.

4            THE COURT:  We saw some of them during the trial.

5            All right.

6            MR. BUTTS:  Yes.

7            We could put them up, Your Honor, if you would like to

8    see them.

9            THE COURT:  It would help me if you gave me the

10   number.

11           MR. BUTTS:  The exhibit number?

12           THE COURT:  The exhibit number.

13           MR. BUTTS:  Maybe Mr. Hipworth can help us with that.

14           MR. DARR:  It's Defendant's Exhibit 306, Your Honor.

15           THE COURT:  Thank you.

16           MR. BUTTS:  It's near the end of that.

17           MR. DARR:  Page 14.

18           THE COURT:  Got it.  That's where their 70 comes from?

19           MR. BUTTS:  Yes.

20           THE COURT:  Okay.  That's out of either 105 or 115?

21           MR. BUTTS:  Yes.

22           THE COURT:  And we get that number from references in

23   some of these documents.

24           I would have thought that there would be a definitive

25   number if you went back and looked at something -- the specs,

1    the drawings -- there would be some way to figure out exactly

2    how many pieces there were supposed to be.

3          MR. BUTTS:  I don't know how they count the pieces,

4    Your Honor.  I don't know what constitutes a piece.  But, it

5    would seem that if PRC is seeking to get paid for material --

6    they are the ones who are saying what the percentages are of the

7    completion and they are the ones who would need to demonstrate

8    that they had completed these.  And so consequently the burden

9    is on them if they want to be paid for these panels.  If they

10    said they should be paid for more panels, to demonstrate that

11    they actually made them.  But the only thing that we have are

12    Dana Noyes' pictures and the photographs that you see before

13    you.

14          THE COURT:  To get the number, I guess at least on

15    their count, if I took 70 and divided it by 63 percent, the

16    number in their October pay request, that's going to come up

17    more than a 105.  And I don't have a calculator.  I don't know

18    that it's going to be as high as 115.  It's probably going to be

19    somewhere in between, but we can do that arithmetic.

20          While on that subject, there is a reference in some of

21    these earlier documents to embeds having been done earlier.  And

22    I am not sure I understood what the embed was as opposed to

23    these pieces we are talking about later.

24          MR. BUTTS:  Your Honor, if I may, the panels are like

25    this.  Here is a picture of a panel.  We can't see the back of

```
 1    the panel, but on the back there are -- let's just say -- bolts
 2    sticking out, or opportunities to receive --
 3             THE COURT:  Right.  Things you hook it on with?
 4             MR. BUTTS:  Yes.  And we don't see the precast -- not
 5    the precast, but the cast-in-place concrete columns and beams,
 6    but they probably have a protruding element that sticks out,
 7    cast right into the concrete so when it hardens it's just there.
 8    And then the crane holds it up and a welder welds the piece
 9    that's sticking out to the receptive piece here on the back of
10    the precast.  And that's what holds them in place.
11             I don't -- I don't know, but from my perspective, and
12    having been involved in construction and construction cases, I
13    think the pieces that were referred to in this case are cast
14    concrete pieces, not pieces of metal.
15             THE COURT:  Did PRC do the embeds?  Did they provide
16    the metal?
17             MR. BUTTS:  PRC was to provide the metal as part of
18    their contract, which I believe was around 274.  But then there
19    was a deductive change order because the embeds were taken out,
20    or at least some of the embeds were taken out, of the contract.
21    And I think they were probably provided by Oelrich Construction.
22    It was a $2500 change order that you may have noticed in there.
23             THE COURT:  So if one wants to figure out the dollar
24    amount that goes with say 63 percent completion, all one does is
25    takes the contract amount reduced by the $2500 change order and
```

1    multiplies it by 63 percent.  Does that work?

2          MR. BUTTS:  No, Your Honor, because there are four

3    components of the -- if you recall on the schedule of values, it

4    begins with things like maybe mobilization, shop drawings.  Then

5    it gets down to forms and material, which are the forms that you

6    heard Randall Forde talk about yesterday.  And then the concrete

7    and aggregate and things that are going to go into the form and

8    get mixed up and harden and become the panels.

9          The panels, on line number four, which are the actual

10   produced panels; it is PRC's assertion that at the end of

11   October that they had produced 63.4 percent of the panels, which

12   translates to a number, that I don't have at the top of my head,

13   of 105, perhaps as many as 115, I don't know.  But, the number I

14   think we have all been generally working with, in the lawsuit,

15   is 105.  Now -- so that's why your calculation --

16         THE COURT:  That doesn't work because if it's 70 and

17   105 it just turns out that that math is easy.  That's

18   66.7 percent.

19         MR. BUTTS:  Right.

20         THE COURT:  And so 63.4 means the number has to be

21   higher than 105, if those are the right numbers.  Now I

22   understand there is a little bit of uncertainty in all of this.

23         MR. BUTTS:  If you recall, Your Honor, that they

24   billed for this in October of 2019, as being some asserted

25   percentage.  It wasn't until much later that they responded to

1   discovery.  And it's possible that they actually realized that

2   maybe they had produced another panel or two or a cap they

3   hadn't counted.  I don't know.  Mr. Darr may be able to help us

4   with that.  I don't know.

5            My main point -- and this, so far, in this part of our

6   closing argument -- is that we don't have -- Oelrich

7   Construction does not have any assurance in terms of

8   documentation from PRC that they had produced 70 panels by the

9   end of October.  In fact, they don't have any photographic

10  assurance that PRC has produced anything beyond the 14 panels in

11  the August 31st photograph.

12            So --

13            THE COURT:  Well, your own photos show 51.

14            MR. BUTTS:  Yes, Your Honor, but at the time --

15            THE COURT:  At the time, but what difference does it

16  make what they had done in October?

17            MR. BUTTS:  Because they are asserting that we were in

18  breach of contract because we were late paying.

19            Oelrich Construction is saying:  Wait a minute, you

20  guys aren't even giving us any photographs.  You showed us 14

21  photographs and you are demanding 70 panels that you can't show

22  us you made.  Just give us the photographs and give us the lien

23  waivers and we'll pay you.  That's what I'm saying.

24            THE COURT:  All right.

25            MR. BUTTS:  So we are not in breach.  We are

1   reasonably asking them for something to support what they are

2   asking to be paid for.  And that's the point of this part of the

3   discussion.

4            THE COURT:  Got it.

5            I do have it right that they never said they were --

6   they never told you they were stopping production because they

7   were unpaid.  They never said:  We don't want to go forward.  We

8   are calling it off because we've been unpaid.  I mean, there was

9   jockeying back and forth about payment but nobody ever said this

10  effects the schedule, the performance, the validity of the

11  contract.  This is just a side issue; isn't it?

12           MR. BUTTS:  I agree with that.

13           So, we get to December of 2019.  Middle of December,

14  PRC says:  Guess what?  We're a hundred percent done.  This is

15  good news to Chris Crehore because he's ready for these panels

16  to go up on January the 6th.  So he says:  Let's go on January

17  the 6th.

18           He is skeptical about -- he knows he doesn't have any

19  lift plan.  He is still missing the certifications.  He's only

20  just received the activity hazard analysis at that point, so --

21  but it's bad news to him because he doesn't have any photographs

22  to be sure that he has got panels for an erector on the 6th.

23  And he says to Forde Davis:  I need you to be ready to go on the

24  6th.  Forde says:  I'm sorry, Chris.  We don't have a lift.  We

25  don't have a crane.  Chris says:  Well, I'll get you one.  And

1    he does.  And he let's him know on the 31st day of December:

2    Good news.  I got you a crane.

3         But he told him before:  I am sending somebody up

4    there to look at these panels because I can't take a chance that

5    I got my crane guy sitting down here on the 6th and I don't have

6    panels.  So he asked his friend, Dana Noyes, who had been fired

7    by Ivan:  Will you go up there and check on it for me, please.

8    I need to know if we have got a 105, or whatever -- he didn't

9    say 105.  I need to know what they have up there.

10        Dana testified:  I didn't know how many I was looking

11   for, or how many to count.  I just needed to go up there and

12   look at all the panels they had and report back to Chris so that

13   they could know whether or not there was sufficient material

14   there for them to do whatever they wanted to do.  Because at

15   that point Dana had been away from the company almost two

16   months.

17        THE COURT:  Help me out with part of this, and I have

18   this question of both sides -- and I think I have asked

19   Mr. Davis some about this.  May have asked Mr. Noyes -- some of

20   this doesn't make any sense to me.

21        You send Mr. Noyes all the way to Greenville to look

22   at what they have and you don't tell him what they are supposed

23   to have?  And then on the other side, you know, Mr. Davis says:

24   I showed him some.  I didn't show him all of it.  Seems to me an

25   awful lot of effort to go to be this unconcerned with the

1    details.

2         MR. BUTTS:  Well, Your Honor, I don't know exactly

3    what was going through Mr. Noyes' mind, but we heard Mr. Crehore

4    testify that he asked Dana to go up there and see if they had

5    all of these panels ready to go.

6         THE COURT:  Right.  You just told me, nobody told him

7    how many panels he was looking for.

8         MR. BUTTS:  That's what Mr. Noyes said.  So I don't

9    know what Mr. Crehore asked him to do except what Mr. Crehore

10   said he asked him to do.

11        Mr. Noyes said that he went up there.  Asked Mr. --

12   Forde -- Mr. Davis -- where are the panels?  He pointed to this

13   stack over here.  And he testified that he photographed

14   everything in that stack.  And he took three photographs of that

15   stack.  And then he says:  Where are the rest of them?

16        Mr. Davis takes him out in the yard.  He takes two

17   more pictures of the stack that he points to.  And he testified

18   that he took pictures of everything Davis said was his.

19        THE COURT:  Yeah.  I mean, I guess that was my

20   question.  Doesn't make any sense.  You'd think the man went all

21   the way to Greenville to find out whether all the panels were

22   there, you'd think after he saw these two stacks, and there are

23   about 50 panels, he would have said:  Where are the rest of

24   them?  There is supposed to be 105.

25        MR. BUTTS:  He did.

1          THE COURT:  No; he didn't.  He said he didn't know how

2    many there were supposed to be.

3          MR. BUTTS:  He said -- no; he didn't know there were

4    supposed to be 105, but he did ask him where the rest of them

5    were when he saw the ones inside there.  And he was familiar

6    enough with the building to know that that bunch inside those

7    caps were not all the panels.  So he said:  Where are the rest

8    of them.

9          THE COURT:  And he got shown another stack and

10   apparently at that point he didn't say:  Where are the rest of

11   them?  We are -- this is still only half.

12         MR. BUTTS:  I don't remember what his testimony was in

13   that regard, except that my recollection is that he left there

14   of the opinion that he had photographed everything that he was

15   told were Ivan Oelrich's panels.  That's all I know.

16         THE COURT:  And didn't know whether that was all that

17   was supposed to be or not.

18         MR. BUTTS:  That's correct.  That was his testimony.

19   He didn't know and he wasn't told.

20         THE COURT:  Got it.  Wasn't told by Mr. Davis and

21   wasn't told by Mr. Crehore.

22         MR. BUTTS:  I don't know what Mr. Crehore told him.  I

23   don't -- his testimony was that he did not -- he did not go up

24   there to count panels.  He did not go up there with a direction

25   to say:  Check off this list.

1          Maybe that would have been a better idea, but he

2     didn't.  But the main point of this part of the discussion is

3     that Chris Crehore needed to know whether or not there were a

4     hundred percent of the panels up there in South Carolina, so

5     that he could have panels for his erector that he lined up to

6     hang on this building.

7          When Dana Noyes came back, Chris Crehore realized that

8     there were less than half the panels up there built.  And he

9     challenged -- he challenged PRC at that point:  Where are the

10    panels?

11         And the answer came from Randall Forde -- Randall

12    Davis.  Excuse me.  Randall Davis said:  Tell you what, on the

13    31st day of December, we're not going to be able to make it for

14    the 6th, but we will get you fixed up on the 17th of February.

15         So, at that point the 6th date slipped.  The erector

16    slipped and we're moving into January.

17         Shortly after that gets started we get a letter from

18    SAW that says:  Looks like you guys are in default.  And Andy

19    Wilson responds and he says:  Well, we are really not on the

20    critical path with these panels yet -- which was true, but he

21    said:  By the way, we're having problems with these folks and it

22    looks like they are only 53 percent complete instead of a

23    hundred, or whatever they had asserted back in October or

24    whenever the last pay request was -- 63 or whatever.  He tells

25    them.

1      So Chris Crehore, though, is of the belief that, well,

2  maybe everything is going to be all right because we're going to

3  put them up on the 17th.  We're probably still going to get them

4  up in time and we can keep the ball rolling and he can go focus

5  on something else.

6      Still, he's not getting a lift plan.  He's not getting

7  the OSHA certificate for the guy who is going to operate the

8  crane and be on the job site.  And so he becomes -- he remains

9  skeptical as we get toward the end of the month and he takes it

10  on himself to go up there to sit across the table from Forde and

11  say:  Can you guys do this or not?  If you can't do it, I am

12  going to get somebody else -- words to that effect.

13      Forde Davis gave him a sufficient level of assurance

14  that they were able and willing and going to perform this

15  project.  That's good news to Chris Crehore because he's in a

16  bind now.  He's getting out in terms of the number of days that

17  he has got to get these panels up.  He has got 109,000, 110,000

18  in this thing.  And he's got all of this pressure breathing down

19  on him.  And he's got to make some decisions here and either he

20  is going to have to sue to try to get those panels back down to

21  Gainesville -- replevin -- or he is going to have to try to ride

22  it out with these guys.  He chooses both.

23      THE COURT:  The date when he went up and sat down and

24  talked to him, do you have that date?

25      MR. BUTTS:  I believe it -- I can't remember exactly

1   what his testimony was, but the 28th may have been that date.

2   He said -- I'm sure he said late January.  So -- but the

3   replevin has a problem.

4          THE COURT:  At that point, the scheduled date is still

5   February 17th?

6          MR. BUTTS:  Yes, sir.  At that point though -- but the

7   replevin has a problem because of the matching issue.  So this

8   building is a free-standing building.  It's got to match a

9   building that's over there a little ways.  And, they were able

10  to get a reasonable match that satisfied the architect -- PRC

11  was.

12         And -- and -- but the problem comes in is if now

13  we've -- we've got 51 panels that have -- that are made one way.

14  If we can get these panels from PRC.  And then we got to find

15  somebody else to build the remaining whatever it is.  And, if

16  the aggregate doesn't -- now these panels are right next to one

17  another so it becomes more of a critical exacting match.

18         At the same time, we're being assured that we're going

19  to go on February 17th.  So, the replevin is put on hold.  Not

20  served.  It's put on hold to try to just -- let's just get the

21  job done.  And so the dialogue continues through the month of

22  February.

23         THE COURT:  I get putting the lawsuit on hold and just

24  not serving it.  Probably not the best practice but I understand

25  that that can be done.

```
 1              I guess I should ask you this -- it's been a long time
 2     since I worried about the Florida Rules of Civil Procedure.  I
 3     seem to vaguely recall a deadline coming into Florida law some
 4     time while I was still a lawyer, so a long time ago.  What's the
 5     deadline?
 6              MR. BUTTS:  120.
 7              THE COURT:  120 days?
 8              MR. BUTTS:  Yes, sir.  And that -- the time to amend
 9     and serve was exceeded, but we got an extension from the
10     judge -- Judge Blazington gave us an extension.
11              THE COURT:  I understand not going forward at that
12     point.  The part I don't understand is what I asked Mr. Oelrich
13     about at the end of all of the testimony, and I guess the answer
14     is, it was just a mistake.  We filed a replevin action but we
15     never really wanted replevin because we would have known all
16     along, if we had just thought about it, that those panels
17     wouldn't do us any good.  But that's the best you've got.
18              MR. BUTTS:  Mr. Oelrich's testimony is what the Court
19     has to consider.  I'm not sure, and perhaps -- I'm not sure the
20     extent to which Mr. Oelrich understands the idea of service and
21     not service, the concept of replevin.  But the strategic
22     analysis of that --
23              THE COURT:  Somebody approved that lawsuit?
24              MR. BUTTS:  Yes.
25              THE COURT:  Somebody -- and, I mean, the lawyers don't
```

1   do this by themselves.  Nobody in the law firm said:  Well,

2   let's just go file a replevin action.  Somebody at the company,

3   and I think Mr. Oelrich said him, signed off on filing a lawsuit

4   to compel PRC to turn over this construction.

5            MR. BUTTS:  That was the intent, Your Honor.

6            THE COURT:  And as far as I'm aware, there is nothing

7   in the record to suggest that anything changed from the time the

8   replevin action was filed to the time at which Oelrich decided,

9   we're going to go get Spring Precast to do this, and we're not

10  going to try to get the material from PRC, we're not going to

11  try to match it, we just decided that isn't going to work.

12           MR. BUTTS:  Your Honor --

13           THE COURT:  I'm right about that, right?  There's

14  nothing in the record to give any more analysis to this?

15           MR. BUTTS:  I disagree, Your Honor.

16           The thing that's in the record is that there was

17  assurance given by Forde Davis that it may be more advantageous

18  for -- in this case, Mr. Crehore, to continue to try to work

19  with him to get those panels installed.  That was the goal.

20  Nobody wanted to file a lawsuit for replevin, or anything else.

21  We just wanted the panels put on the building.  And if nothing

22  else just bring them down to Gainesville, or let us come get

23  them, but just finish them.  So that's what changed.

24           THE COURT:  That's what changed in terms of going

25  forward with the lawsuit.  But in terms of whether these panels

1    could be matched, and whether Oelrich could expect to be able to

2    match the panels, nothing changed.  Oelrich didn't get any more

3    information.  Oelrich didn't check with anybody, do any further

4    analysis.  Didn't go back to the contractor or the VA.  Nobody

5    said:  You can't have two subs.

6            If Oelrich sat down to analyze the problem, the

7    analysis on the day they filed the replevin action, and on the

8    day they decided not to go back to PRC but to go straight to

9    Spring, the factual information available, the analysis

10   available, the same.  True?

11           MR. BUTTS:  Not completely, because when the

12   termination discussion took place with Mr. Crehore and Mr. Davis

13   there were invitations -- opportunities -- for dialogue that Mr.

14   Crehore extended, in the invitation and in the telephone call

15   according to his testimony, where if that was going to be an

16   option, if that was a better option, it could have been

17   expressed by Forde Davis to say:  Well, look, when Mr. Crehore

18   says, Is there anything else we need to talk about, or when he

19   writes in his email:  If I've got this wrong, let me know.

20   Forde Davis does not say:  Look, we've got 60 -- whatever, 50,

21   60 panels down here.  Let us just finish them, or, let us just

22   give you the -- whatever it is -- the aggregate or the formula

23   or whatever it is and you guys can finish them.

24           The invitation was not accepted.  There was no

25   dialogue between these companies.  There was contention.  There

1   was deception.  There was mistrust -- justified mistrust on the

2   part of Oelrich Construction.  These guys billed for a hundred

3   percent of the panels when they knew they didn't have them done.

4          So is Oelrich Construction going to -- are they

5   obligated to continue to explore options with these folks when,

6   at every time -- every turn -- they have been rebuffed.  They

7   have been turned away.  They don't answer phone calls.  They

8   don't respond to emails.  They give vague assurances, if

9   assurances at all, and when they give them, on February 17th,

10   they don't follow through.

11          So Oelrich Construction is out there trying to get

12   this building done and they are in a race with SAW.  They don't

13   know when SAW is going to get done.  They are lucky SAW didn't

14   get done.  But if SAW had gotten done in the summer of 2020,

15   this would have been a whole different thing.  Huge delay

16   damages.  But, it didn't happen.  Luckily, it didn't happen.

17   Luckily SAW got the panels up soon enough.

18          I don't know.  I don't know, Your Honor.  Sometimes --

19   sometimes when we're in the heat of the battle we -- our

20   decisions are not as perfect as they would be if we get a chance

21   to reflect on them.

22          I don't know whether to criticize Mr. Crehore for that

23   reason, or Mr. Oelrich for next time.  Why don't you go up there

24   and count the panels?  Why don't you go up there and try to talk

25   to them and say:  Let's work it out?  Chris Crehore did that.

1    Let's -- come on.  Let's just work it out, you guys.  We don't

2    have to have a fight over this thing.  We want to pay you.  You

3    want to get the panels out of the yard.  Just finish them.

4    Randall Davis says they can knock them out in three weeks.  Just

5    do it.  Do it and send us the bill.

6              So we get to March 17th.  Chris Crehore says -- now,

7    we're past the critical path at this point.  Now the pressure is

8    really on -- are you making panels?  No.  Forde Davis; dialogue

9    all during February:  Well, 22 days to make them.  This and

10   that.

11             Then they get -- you know, February 17th slips.  They

12   are talking about maybe we can do it on March the 4th or the

13   6th, and that slips.

14             And then there is a conversation and Forde says:  I

15   think we can build them in 22 days, Chris.  And, Chris adds it

16   up, figures it out, 22 days puts us on March 16th.  We will give

17   you a week.  Got to get the OSHA-30.  Get us your lift plan in

18   the meantime.  And so:  How does this date sound for you, Forde?

19   Silence.

20             March 16th.  Silence.

21             Well, we think -- it looks like we can start on the

22   23rd, and the 6th at the latest.  Silence.  Nothing.

23             Now we are at March 17th or 16th.  I don't know what

24   phone call may have taken place in the meantime.  But the

25   conversation that you've heard so much about, that led to the

1  March 17th termination note was:  When will you be making the

2  panels?  When are you going to make them?  No, we don't know.

3         No assurance at all past the critical path.

4         Does he go up there and try to get those panels and

5  bring them down here, or does he just terminate them and find

6  somebody else?  I don't know in hindsight what his best

7  option -- remedy -- would be.  But I can't imagine what it would

8  be like to be in his position at that point.

9         Forde:  Is there anything else you want to talk about

10  in this conversation?  No.  I'm going to have to terminate you,

11  Forde.  Hang up.  He sends out the termination letter.

12         THE COURT:  I don't think anybody said he told him

13  that on the phone; did he?

14         MR. BUTTS:  Told him what?

15         THE COURT:  That:  I am going to terminate you.

16         MR. BUTTS:  Yes.  He told him he's going to have to

17  terminate him.  So then he does.  He sends the email.  And it's

18  unclear to me whether it was the same day, or the next day, but

19  he sends an email right away; Forde Davis.

20         Now, Forde Davis, he knows he has been terminated.  He

21  gets an email and he says that he read it, but he wasn't looking

22  for the termination language.  He missed it.  I don't know.  I

23  don't know.

24         PRC having not fabricated anything -- having not

25  represented to Chris Crehore that they had fabricated anything

```
 1    since October on that day, says, on the exhibit we looked at
 2    earlier, Your Honor, that they fabricated 12 panels in March.
 3    And they fabricated some more in April.  And they fabricated
 4    some more in May.  And they got up to 94 panels.
 5            But they didn't do a pay request, Your Honor, for any
 6    panels that they fabricated in March.  There is nothing in the
 7    evidence.  They did no pay request for anything they allegedly
 8    fabricated in April or May.  No pay requests.  No dialogue.
 9    No -- no involvement between the two companies.
10            All of a sudden it's silent, until he says that he
11    called somebody in May -- and he doesn't know who they were --
12    and he was told at that time by this person that PRC had been
13    terminated.  I believe that was -- that was the testimony.  We
14    don't know who he called.
15            THE COURT:  Let me back up a little.  I am still I
16    guess surprised, and I may simply have missed it, but I was
17    surprised a moment ago when you told me that Mr. Crehore told
18    Forde Davis on March 17th or 16th -- I think it was the 17th --
19    orally, "I am terminating you".
20            And I am looking at the March 17th letter -- email --
21    that Mr. Crehore sent to Mr. Davis, and he says:  These are my
22    understandings.  We were working toward April 6th.  You have
23    told me that PRC is not currently making panels.  Yes; that's
24    what happened during that conversation.  It's clear you're not
25    going to be able to fulfill the terms of the contract.  Okay.
```

1   He said:  I am not making panels and I can't tell you when I am

2   going to make panels.

3         Then he says:  Therefore, Oelrich Construction has no

4   choice but to terminate the contract per Article VII of your

5   subcontract agreement.  Consider this notice of said

6   termination.

7         Now if he had just finished telling him orally that

8   "you are terminated" and he is writing an email that confirms

9   some of what was said in that conversation, why would the email

10  not say, "as I told you, we are terminating you?"

11        MR. BUTTS:  I don't know the answer.

12        THE COURT:  There is no reference in the email to

13  having told him that.

14        MR. BUTTS:  I don't know.  I don't know, Your Honor.

15  Perhaps we can go back to his deposition transcript on that.

16  It's part of the record, but my recollection --

17        THE COURT:  I suppose it is only because you listed

18  deposition transcripts as exhibits and nobody objected, so I

19  suppose they are part of it, and you think part of that

20  testimony.  And I deliberately didn't read all of the

21  depositions before trial.

22        MR. BUTTS:  I don't know.  But I'm pretty sure that

23  his testimony at trial was that he told him he was terminated,

24  or he told him "I am going to terminate you."  I don't remember

25  exactly what he said, but I am pretty sure that that's what he

```
 1    said he said.  One of those two things.
 2              THE COURT:  We have a record of just exactly what he
 3    said, so I can look back at it.
 4              MR. BUTTS:  Okay.  Good.  That was my understanding.
 5              So, we don't hear anything from them -- from PRC.  But
 6    when Forde Davis reads that email, allegedly in March, carefully
 7    and reaches the conclusion that he had been terminated, what
 8    should he have done?  What could he have done in May of 2020?
 9    At this point, Spring Precast had not began fabricating any
10    panels until September.  They were unable to get the aggregate
11    matched and all that stuff until September.
12              So, had Forde Davis read that email, and done what
13    Chris Crehore asked him to do -- let me know if there is
14    something we need to talk about -- well, how about this?  We've
15    got -- now we've got 94 panels, Chris.  All I got to do is make
16    11 more.  You bring them down and hang them on that building and
17    we're done.
18              THE COURT:  He didn't have 94 at that point.
19              MR. BUTTS:  He allegedly -- if he is right, if his --
20    if the answer to the interrogatory is correct, that we looked at
21    earlier this morning, if you add them all up, they may -- they
22    assert that they made 70 through October and another 24 after
23    March 17th -- and, well, they say in their thing, March through
24    May.
25              THE COURT:  Right.  But as of March 17th, when Mr.
```

1    Crehore wrote the termination note, they had only made 70.  So

2    they had 35 to go and that matches up with some of the other --

3               MR. BUTTS:  Yes, sir.

4               THE COURT:  -- documentation.

5               MR. BUTTS:  But remember the hypothetical

6    discussion -- conversation -- I'm talking about now would be

7    taking place in May after Forde has read the email and

8    admittedly understands at that point that he has been fired.  My

9    point is, what should he do?  What could he have done?  And this

10   is to the Court's point earlier.

11              THE COURT:  Yeah.

12              MR. BUTTS:  All he had to do -- all he had to do was

13   call Chris Crehore and say:  We've got 94 made now, Chris.  We

14   are out here in May and we only need 11 more.  Have you got

15   another precaster yet?  Well, yeah, but they can't -- they are

16   not ready to go.

17              Well, we can go.  We can finish these 11 next week.

18   And we will get them on a truck down there to you.  And if we

19   don't have an erector, maybe you can get one or we will work

20   that out.  Let's don't have a lawsuit.  We will work that out

21   and then you pay us the rest of our money and you've got your

22   panels and you're on schedule.  Why not -- or, why not Forde say

23   to his dad:  Hey, we're terminated.  We got 94 panels sitting

24   out here.  What are we going to do with them?  And his dad says:

25   You know what, I remember Mr. Oelrich wrote me a nice email way

1    back there January and he said:  Can we just talk?  Can we get

2    this worked out?  Do we really need to fight over this.

3            Now we are at the end of the road.  We've got 94 of a

4    105.  Why doesn't Randall Davis call up Ivan Oelrich, like two

5    men, and say:  What can we do?  We have got 94 panels, Ivan.

6    You need them all.  I can get you the other 11.  And we can be

7    done with this thing.  No storage.  No disposal.  No lost

8    profit.  None of that.

9            Nothing.  They don't do one thing.  They don't do one

10   thing until they get sued.

11           I don't think they had the 94, Your Honor.  That's

12   just me.  I don't know how many they had, more than the 51.

13   That's just me.  I don't know why they did not contact Ivan

14   Oelrich at that time, but that's just me.

15           In weighing the candor of this testimony, Your Honor,

16   PRC billed for a hundred percent of this work at a time when

17   they had, at best, by their own admission -- well, we don't know

18   need to know that -- 51, according to Dana.

19           THE COURT:  Let me ask you about that.  They did, and

20   I asked Mr. Davis about it; the only excuse for sending that

21   bill is if they thought they were going to -- and had good

22   reason to think they were going to -- complete the production

23   during December.

24           I even asked the question:  Did it occur to you it

25   might be a federal crime.

1          I preside over a number of federal fraud trials and

2     let me tell you, you swear to something asking for payment for

3     something you haven't done, and aren't going to do during that

4     month, I have presided over cases with less than that in a

5     criminal trial.  But -- so I understand.  It's pretty serious to

6     go submitting a bill for a hundred percent production when it's

7     not done, particularly if you don't have any reason to think you

8     are going to do it.

9          But let me ask you about one thing here.  The bill, I

10    think, was December 16 was the pay request.  Here it is.  I am

11    looking at Defendant's Exhibit 110.  It's an email from Allison

12    Taylor at PRC Precast.  I think Mr. or Ms. Taylor is the billing

13    person.

14         The email says:  This was my mistake.  I don't believe

15    it's shipping this month.  Please see the revised application

16    attached.

17         I don't know that I have seen the revised application,

18    but from the email it sounds like there is a revised application

19    that doesn't have a hundred percent on it.  Maybe that's not

20    what that is.  Can you explain that email to me?

21         MR. BUTTS:  Yes.  I think that we're looking at it

22    now, and what Ms. -- no.  I'm sorry.  The difference in the two

23    is that the revised application deleted the line item 5 for

24    freight.  And I mentioned that in my opening that nobody is

25    asserting here today that PRC overbilled for freight.

1          THE COURT:  Got it.  Okay.  So made a mistake on the

2     freight but the revised bill still had the hundred percent on

3     it?

4          MR. BUTTS:  Yes.

5          THE COURT:  All right.  That's why I ask questions.

6     Thank you.

7          MR. BUTTS:  Going to the candor, Your Honor.  Weighing

8     the candor; we have PRC billing for a hundred percent of panels

9     when they know they don't have a hundred percent done.

10          We have PRC testifying that that's okay because they

11     told somebody from Oelrich Construction -- somebody from PRC

12     told somebody from Oelrich Construction -- that we're just going

13     to bill you for a hundred percent but you don't have to pay it.

14     And we always do it and everybody likes it.

15          And it's true that Note A says that before the panels

16     leave the building they get paid.  Hundred percent.  However, it

17     doesn't say that they can bill for panels they haven't made.

18          So they bill for a hundred percent of the panels, and

19     they knew that they hadn't made them, and they are making this

20     argument that they told somebody something and nobody from

21     Oelrich Construction can remember anything like that.

22          Instead, Oelrich Construction is saying:  Great.

23     Bring them out.  Let's put them up.

24          Forde -- we are to believe that Forde Davis read that

25     termination email on March the 17th.  He admitted that he read

1   it.  He read it.  But he didn't see the word "termination" in

2   there.

3          We are to believe that Dana drove all the way to

4   Greenville, South Carolina, and did not ask to see all the

5   panels they had made.

6          We are to believe, according to PRC, that they just --

7   the reason they never responded to any of this trivial stuff

8   that Oelrich was asking for -- you know, OSHA certificates,

9   photographs, lien waivers -- is because too many people from

10  Oelrich Construction called them, emailed them, or bothered them

11  for photographs of the material that they wanted to be paid for,

12  to the extent that Oelrich Construction had to ask Dana Noyes to

13  drive all the way to Greenville, South Carolina just to see if

14  they built a hundred percent of those panels.

15         Now, we have Mr. Davis, Randall Davis, brings in --

16  after he had given his testimony in a deposition that he had

17  done no calculations for most of these handwritten scratched out

18  things that he is calling his damages calculations -- he brings

19  them in the next morning.  His deposition ends at 5.  He is back

20  by 2.  I don't remember the exact times.  And he's got all this

21  to finish up his deposition.  He has nothing to support it

22  except that he says he is an expert in these fields.  That goes

23  to the weight, Your Honor.

24         On the other hand, we have Chris Crehore.  Chris

25  Crehore fired by Ivan Oelrich.  It was not a pleasant departure.

1   Chris Crehore has no incentive to do anything for Ivan Oelrich

2   except to come in this courtroom and tell the Court the truth.

3   Neither does Dana Noyes.  And that's what they did.  You heard

4   the truth from those two men and I admire them both for it.

5           Thank you, Your Honor.

6           THE COURT:  Mr. Darr?

7           Why don't we do this, let's take a few minutes.  We

8   will start back at 10:15.  That will give us an eight minute

9   break.

10      (Recess taken 10:07.)

11      (Resumed at 10:16.)

12          THE COURT:  Please be seated.

13          Mr. Darr?

14          MR. DARR:  Good morning, Your Honor.

15          So, in my mind the trial did not really change much

16  about what I thought about at the beginning of this case in my

17  opening statement.

18          I view this case as one where a construction

19  contractor was operating as though its form contract applied

20  when it didn't, and when things went awry they wrongfully

21  exercised what I would describe as the nuclear option of

22  remedies in construction law; termination.

23          Now, as I said during my opening I doubt the number

24  one issue here is the wrongful termination of PRC.  It wasn't

25  done correctly.  I am listening to what the Court is saying and

1    I recall you saying you are the fact-finder, so I would like to

2    go ahead and switch around my argument and I am going to focus

3    on the prior breach issue first.

4            Now, as we established during the trial, this wasn't

5    Oelrich's form contract in the sense that PRC had that Note A

6    additional terms that they have testified they absolutely had to

7    have.  It was, quote, imperative they have it added to the

8    contract.  The testimony revealed that they would not have

9    entered into this contract without those Note A terms.  And in

10   my mind you can't get any more material than that.  If those

11   Note A terms weren't in this contract I probably would have

12   advised my client differently and we might not be here today.

13   But they were.

14           So with that in mind, as the Court heard, those terms

15   were pretty beneficial to my client, PRC.  Pay us net 30 days.

16   If you're more than five days past due we've got the express

17   right to put your work on hold.

18           If you get past due, we're going to have to modify the

19   delivery schedule to mutually agreed dates.  No withholding of

20   retainage on work that we are actually making for you at our

21   facility.  And, most importantly, these terms and conditions

22   supercede all of the other payment terms in the contract.

23           Now, as to which particular terms and particular

24   paragraph five of the contract are payment terms.  That's

25   something I am willing to get into if Your Honor wants to talk

1   about which are canceled out and which aren't.

2           THE COURT:  I don't think it matters.  Let me tell you

3   what the difficulty you have on the payment argument is:  Look,

4   they messed up.  They took retainage and they weren't entitled

5   to it.  And there was some back and forth.  And I think it's

6   pretty clear they were going to pay you.  Nobody was asserting

7   that they didn't have to pay whatever they actually owed.  There

8   was some discussion between the -- I don't want to call them

9   bookkeepers -- the professionals that deal with accounts payable

10  and so forth -- the people that do that aspect of it -- they are

11  communicating back and forth.

12          But, here is the difficulty; PRC never said:  We're

13  done here.  Never said:  We're going to stop production until we

14  get our bill paid.  Never said:  This is any kind of a problem

15  for actually performing on this contract.

16          I mean, you can go through.  There is documentation

17  about scheduling this for January 6th.  And then scheduling it

18  for February 17th.  And then scheduling it for April 6th.  All

19  without any objection from PRC when the schedule was made.  And

20  February 17th at PRC's request.

21          They're not saying:  Look, non-payment is a problem

22  here.  They're just putting things off for reasons having

23  nothing to do with payment.  Now, am I wrong about that?

24          MR. DARR:  Well, two things:  One --

25          THE COURT:  And I guess the follow-up question is:  If

1    I am right about that, doesn't that mean that the failure to pay

2    doesn't have anything to do with the dispute we are here dealing

3    with?

4              MR. DARR:  Okay.  Two points I'd like to make in

5    response to that:  One is, I think you're right.  One thing, one

6    of the first things I noticed when I got this case was the lack

7    of any written communication saying:  Hey, you guys haven't

8    paid.  We are suspending production.  That's what I would call

9    an A plus case.  I would like to have that document there so I

10   could say:  Right there, Your Honor, there is the email that

11   told them.  That doesn't exist.

12             Now it wasn't required under the Note A terms either.

13   There is nothing in there that required us to give them notice

14   that we had suspended production.  We just had the right to do

15   it.

16             As to the second point I want to make:  Yes; they were

17   still behind in payment when we still tried to work with them in

18   the spring of 2020.  But the thing that derailed all of this to

19   start out -- the but-for if you will -- was the untimely payment

20   throughout December of 2018 up through October of 2019 from

21   Oelrich.

22             Once that happened, that is what caused, in part, that

23   and the predecessor work not being done, the whole thing started

24   to go off the rails, so to speak, right?  Because that lack of

25   payment -- had they timely paid, and had the predecessor work

1  been done, we wouldn't be here probably.  But the lack of timely

2  payment --

3          THE COURT:  Let me ask about that because my take on

4  the facts, I think, is different.

5          Here's my impression, and I put this out there so you

6  can tell me what's wrong about this; first, the schedule got

7  pushed back for reasons not attributable to either side.  Stuff

8  under the ground that didn't need to be there, bats in the

9  lines, or whatever.  So, it slides the whole deal.

10          Now, PRC has negotiated a different term on what

11  happens when there is a delay.  The form contract, the proposal

12  that Oelrich made said, if the schedule changes we will tell you

13  the schedule and you got to do it our way.  And PRC said no; if

14  the schedule changes we have to agree.  So, PRC is right in

15  there.  You can't change it to a date they don't agree on.  And

16  I think both sides have to be reasonable about that.  So, that's

17  where it is.

18          The whole thing slides and it is going to gear back up

19  and we get to the end of the year; November, it's going to be

20  coming up pretty soon.  Both sides have emails acknowledging

21  that.  It gets set for January the 6th.  Initially PRC is okay

22  with that.  In fact, the only justification -- the only

23  justification -- for sending a bill for a hundred percent, the

24  only way it's not a federal crime to submit that bill is if they

25  think they're going to produce the product during December,

1    which is consistent with the January 6th date.

2          Within a few days there is an email from Forde Davis

3    saying:  We've been dealing with our erector.  We told him some

4    time in January, but now January 6th, and now we hear from him

5    he can't do it January 6th.  Got to move it.  Okay.

6          That's what derailed this.  There is nothing in any of

7    that saying we suspended production, because of non-payment we

8    can't get it done by January 6th.  They have sent a bill saying

9    they are going to do it by the end of December.  They send email

10   and say:  The reason we can't do it January 6th is our erector.

11         And then there is another email, I think, from Forde

12   Davis, and then one from Randall Davis, that talks about how

13   many days we have left to do the production and they are

14   counting out the days.  That's how February 17th gets set.

15   That's how April 6th gets set.  Nothing in there about the

16   problem is, we haven't been paid.  What am I missing?

17         MR. DARR:  Well, I'm trying to remember all of the

18   emails right now, Your Honor.  I am glad to see the Court has

19   read all of them, or most of them apparently.  I don't recall

20   offhand whether or not it is expressly stated in any of the

21   emails that lack of payment was the issue.

22         Generally, from what I recall, the emails from PRC's

23   accounting person, or bookkeeping person, Allison Taylor, she is

24   constantly complaining and raising issue with the lack of

25   payment all the way through as late as, I believe, late January

1  of 2020.

2          And without those emails, you know, there might be

3  some sort of issue of waiver or this isn't a big deal.  But we

4  are trying to perform, and we are still complaining about the

5  lack of payment the record shows at least through January of

6  2020.

7          Now, again --

8          THE COURT:  That's absolutely right.  There is stuff

9  going back and forth about how to pay and what the issue is, but

10  nothing that I have seen ties performance to the outstanding

11  bills.

12          MR. DARR:  In the written record I would say the

13  closest we come --

14          THE COURT:  What's in the testimony about it?  Anybody

15  on your side said:  I called and talked to them?

16          Mr. Oelrich wrote a letter, very professional letter.

17  Exactly what should have happened.  Exactly what should have

18  happened.  You got this thing going sideways.  You've got Mr.

19  Crehore doing what he's doing.  You've got Forde Davis, who is

20  just ignoring -- not communicating back.  Not taking phone

21  calls.  And so what needs to happen in that situation is the top

22  dogs, the guys in charge, need to get on the phone and talk to

23  each other.  That's how we would not have been here.

24          Mr. Oelrich writes a very professional letter to

25  Randall Davis:  What needs to happen?  What can we do?  And

1    Randall Davis' very candid testimony:  My attitude got the best

2    of me.  And that's how this thing went sideways; isn't it?

3              Whoever told Oelrich the problem is we are not getting

4    paid?

5              MR. DARR:  I believe I heard testimony from Forde

6    Davis yesterday saying he had conversations with Crehore about

7    all the project issues, including the lack of timely payment.

8              Now part of the problem, again, is that, you know,

9    admittedly Allison Taylor, the account person, was the one who

10   was primarily responsible for pushing that issue with Oelrich.

11             And, candidly, I think you're right, you know, the

12   principle and my client -- hopefully, you know, if I had been

13   involved, maybe would have called back Ivan and tried to work

14   something out with Mr. Oelrich.  But to say it's is a one-way

15   issue with regard to maybe some attitude kind of getting in the

16   way of getting this resolved pre-hand, I don't know if I agree

17   with that, Your Honor.  I think there is a little bit of doubt

18   on both sides probably.

19             THE COURT:  What evidence is there that anybody from

20   Oelrich ever, even once, failed to respond to an email or a

21   phone call?

22             MR. DARR:  Admittedly, they did what I love my clients

23   to do.  They did an A plus job of what I call papering the

24   project, which is every time you say something, you do

25   something, write it in an email because then that becomes, for

1   better or worse, if someone doesn't respond, then everyone is

2   going to assume that's what happened.  Right?

3           THE COURT:  Right.  And look, it's clear, they didn't

4   call back.  PRC didn't call back.  It's not just that Oelrich

5   documented it.  They testified to it.

6           MR. DARR:  To that?

7           THE COURT:  To the failing to return calls, failing to

8   respond, they -- PRC testified to it.

9           On the other side, I am not asking about failing to

10  document.  Who testified?  What evidence is there at all --

11  testimony, written, emails, whatever -- what evidence is there

12  that there was ever a single occasion when PRC tried to

13  communicate with Oelrich and Oelrich failed to respond?  Anybody

14  who didn't take a phone call, didn't return a phone call, didn't

15  respond to email, ever?

16          MR. DARR:  Well, right offhand I can think of

17  communications where Ms. Taylor, Allison Taylor, at PRC, was

18  asking about:  Hey, we are past due on these payment

19  applications.  Status update, basically.  And then radio

20  silence.

21          And then she follows up again I believe two to three

22  weeks later, with Ms. Christina Sapp, saying:  Hey, never heard

23  back from you on these payment applications.  Where are we?

24          Then suddenly we are getting a response and they write

25  back and say:  Oh, we need pictures and certificate of insurance

1   before we can pay you.

2          So there were some instances, at least, where there

3   wasn't a response, at least initially, with the initial

4   communication.  But, for me to sit here and say that Oelrich

5   wasn't generally responsive, that's not true.  I think generally

6   they were responsive to written communications.  And I don't

7   think that's part of our case at least -- and we're not saying

8   they weren't responsive enough.  I know that's essentially, in

9   my mind, their whole case, we were not responsive enough.

10         Now, under the contract I don't see anything that

11  requires us obviously to respond to every single email we get,

12  in particular when we have already communicated to you our

13  position on each issue; such as, let's talk about the safety

14  documents.

15         From the very beginning there is communications in the

16  exhibit list emails that were admitted where PRC -- I'm sorry --

17  where Oelrich is requesting the safety docs, but all of those

18  emails, all the way up to probably December of 2019, were

19  saying:  Before you arrive on the job site give us those safety

20  documents.

21         And we communicated at the very beginning -- the

22  middle of 2019, Mr. Davis did, that hey -- maybe towards the end

23  of 2019 -- we're going to get you the safety documents you need

24  before we arrive.  I can't remember the exact number of days.

25  It might have been 10 days before or 14.

1          THE COURT:  Nobody said you can bring them with you

2    when you show up.  There are repeated emails saying these folks

3    at the VA, they are going to want to see this stuff well ahead.

4    They like their time with the AHA and with the safety docs,

5    they've got to see them ahead of time.

6          When that gets frantic is in December 2019, when the

7    date is scheduled for January the 6th, and we're coming up on

8    the date pretty quickly, and PRC is just not providing this

9    stuff.

10          I mean, that wasn't an unreasonable request, was it?

11    Get us your stuff?

12          MR. DARR:  I think it was unreasonable from the sense

13    that it wasn't necessarily possible because those safety

14    documents would have come from the erector, right?  PRC is not

15    an erection company.  They sub that work to their erector.  And

16    at that time, especially in December of 2019, the schedule had

17    been pushed out so far they didn't have an erector lined up that

18    they had originally had lined up in the summer of 2019.

19          Without that erector, and an agreed upon date by which

20    they were to start their installation, they couldn't give those

21    safety documents until they got an erector lined up.

22          THE COURT:  Let me ask you about that, one thing I

23    wasn't sure of in all of this; the safety certificates are

24    partly from the erector, and I take it that's a crane operator

25    and probably the crane operator doesn't show up alone so there

1    is probably somebody else from the crane company.  Is somebody

2    from PRC going to be on-sight?  I take it, yes.  They are not

3    going to have their product just installed by an erector

4    company.  Aren't they going to have somebody on-sight?

5            MR. DARR:  It's my understanding that the erector

6    company -- they would have a primary responsible guy that would

7    get the OSHA 30 hour, and then all the crew members would get

8    the OSHA 10 hour.  Little less strenuous.  But those people are,

9    for all intents and purposes, PRC, because it's subcontracted

10   through PRC.

11           Whether or not someone, any of Mr. Davis' over here or

12   someone who is actually employed by PRC would be there or not,

13   frankly, I don't know, Your Honor.  I don't think so.  I think

14   that that would be a responsibility that is contracted through

15   the erector.

16           THE COURT:  That would explain why I didn't see

17   anything in the record indicating that one way or the other.

18           I would have thought maybe somebody from PRC would

19   want to know if they dropped the panel, what happened, but maybe

20   not.  And things get subcontracted.  I understand.

21           MR. DARR:  Okay.

22           So we have established already there were plenty of

23   admissions that they have withheld retainage.  You have made

24   note of that, Your Honor, so I am not going to get into that.

25           With regards to the requirement for pictures and

updated certificates of insurance being required before payment

was due, you know, I agree with you.  It seems to me that trying

to get pictures is a pretty reasonable request.  But I think

it's worth noting that; A, again, not required expressly under

the contract terms, payment terms to which PRC agreed, but also,

B, if you look at the timing of these requests, best I recall

the emails in evidence, the record reflects that these requests

for pictures and certificates of insurance frequently came after

the bills were already well past due.

        And, you know, I am fortunate that I get to represent

a lot of people in the food chain of construction disputes and I

do know one game that is played by higher-tier contractors to

delay payment is to constantly ask for new things that they need

to have before they can pay you.

        Now, if the pictures and certificates of insurance

were desperately needed before they could pay them on time,

PRC -- I would expect that request would have come a lot sooner.

        Also, one of the contract terms in Note A says that --

to the extent that you object to something that is being billed

that should have been brought up within 10 days.  Whether or not

that is something that the certificates of insurance and

pictures not being included in the pay apps should have been

brought up within 10 days or not, I would argue, yes, based on

that contract term alone.

        But, to me, it seems like a typical industry trick of

1    the trade to request those documents after it's already past

2    due, past the net 30 days, as a way to further delay payment.

3           In my mind, based on what I heard at the trial the

4    last two days, three days, is, again, I believe Oelrich was

5    operating as though their typical payment terms applied

6    including sort of this pay-if-paid provision where I don't have

7    to pay you until I get paid by the guy above me.

8           And actually Ms. Christina Sapp testified essentially

9    to that when she said -- she testified that pay apps, I believe

10   it was 7 and 8 were not paid -- or were paid because we got paid

11   from the owner.  That's what she testified.  So I heard that.  I

12   should have -- candidly, I should have asked a follow-up

13   question on that when I crossed her.  But, when I was thinking

14   about my outline for this argument, which is not being used much

15   right now -- I realized --

16          THE COURT:  That's my fault.  I get it.

17          MR. DARR:  I don't even know why I do this sometimes.

18          But I realize though she was operating under the

19   assumption, one, she got to withhold retainage because that's

20   typically what you get to do.  That wasn't allowed here.

21          And, two, I don't have to pay them until I get paid

22   from above.  Also not applicable here, in my opinion, because

23   the payment terms were superceded by these Note A terms.

24          So I -- I believe that that's part of how we got to

25   where we are is this improper assumption that the typical

1    payment terms applied.

2           I would like to talk about this, you know -- no case

3    is without some work, probably wouldn't be here otherwise, at

4    least that's my opinion.  We keep talking about this hundred

5    percent billing issue.  It's less than ideal.  I think the

6    testimony reflected that my client's intent was to get payment

7    in time so that we want to know you guys are going to get caught

8    up on your bills, which again under the Note A payment terms

9    once you fall behind you got to correct the accounting to the

10   satisfaction of PRC.

11          Obviously, there is limits on that discretion of, you

12   know, what is to the satisfaction of PRC, but here to the

13   satisfaction of PRC the intent was, we want to get paid -- all

14   of our past due bills paid.  And, now that we obviously see we

15   have issues getting timely payment from Oelrich we also want you

16   to pay for these panels now so we can get them going for you and

17   get them to you as soon as possible.

18          And I heard Your Honor mentioning were they going to

19   be done by the end of December.  Frankly, I don't remember one

20   or the other what the testimony was on that.  But, I am not sure

21   it really matters in the sense that timely payment never came.

22   We couldn't even get our past due bills paid in December.  They

23   never paid, obviously, the hundred percent bill.  Never

24   happened.

25          And in regard to that hundred percent billing issue, I

1    thought what was really interesting about the Dana Noyes' visit,

2    in December of 2019, is I never heard him testify:  Hey, PRC, we

3    have got a concern.  You have billed one hundred percent for all

4    of these pieces, but before we pay you we want to make sure

5    there is a hundred percent of the pieces here.  I never heard

6    that come from Dana Noyes.

7              Instead what I heard was, and what I heard from

8    Mr. Davis, was that it was a relatively friendly visit with

9    Mr. Noyes getting into the conference room, trying to get his

10   phone out to call up someone at Oelrich.  That didn't happen

11   because for whatever reason Mr. Davis didn't want to have a

12   conference call at that point.  He said:  Can you show me our

13   product.  He goes and shows him the product.  Takes some

14   pictures.  And that was that.

15             Now what I didn't hear from anyone testify is that

16   Mr. Noyes asked:  We have got a real issue.  There is a hundred

17   percent billed.  I need to see all one hundred percent of the

18   pieces.  Now, if he had said that I'm sure Mr. Davis probably

19   would have said:  We don't have a hundred percent done.  But

20   here is every single piece we do have done.  I don't know

21   because the testimony doesn't reflect that that ever happened.

22             Also, with regard to this hundred percent billing

23   issue, and Oelrich, I guess, seemingly believing that a hundred

24   percent was done at that point, we have to talk about Chris

25   Crehore's visit to PRC in January of 2020.

1          I recall Mr. Crehore's testimony being that, I met

2    with Forde and, essentially, I want to see if you guys are

3    serious about finishing this project.  And Forde said he was.

4          Now what I didn't hear was Mr. Crehore testify that:

5    Hey, you guys billed a hundred percent of the panels.  I want to

6    see them now.  I didn't hear him testify that he asked to count

7    or see any of the panels.  If that was such a real issue, to me

8    it makes common sense that he would have already asked, I'm

9    already up here in Greenville.  Can you guys just show me the

10   panels?  Where are one hundred percent of the panels?  Where are

11   any of the panels?  I didn't hear him testify at all that he

12   asked that.  Why wouldn't he ask that if that was a real issue?

13   I don't know.  To me it's because it wasn't a real issue at that

14   point.  I believe that's indicative that Mr. Davis -- Forde

15   Davis -- and Mr. Crehore had already been talking about this

16   issue, trying to work it out.

17          THE COURT:  Well, Mr. Crehore did say that Forde Davis

18   told him that they were going to finish the panels.  So, there

19   wasn't any need to ask:  Have you finished all the panels?  I

20   mean, obviously, he hadn't finished the panels.  He said that

21   was something he was going to do.

22          MR. DARR:  Sure.  So, I mean, that's indicative of

23   them already knowing a hundred percent of the panels weren't

24   done at that point.

25          THE COURT:  Sure.  They knew that hundred percent

weren't done.  Absolutely.

MR. DARR:  And I feel as though --

THE COURT:  Because Mr. Noyes had already been there.

MR. DARR:  That's right.  And he came to the conclusion, in his mind, that there were only 51 percent done. But it wasn't clear to him whether or not he had seen all the panels.  He did admit that as well.  Because again there was no testimony that he said this hundred percent billing in December of 2019 was a real issue.

As to that prior material breach, Your Honor, I believe that Oelrich fail -- entirely failed to live up to their end of the bargain with regard to these Note A terms.  I don't know if it was intentional or not.  I did hear testimony from Ms. Sapp, the retainage was not a non-intentional issue.  They didn't mean to.  They were just used to it.

I am sure that -- most of my high-tier clients, they have got their contract and most of them don't allow their contracts to be amended.  They just say take it or leave it.  We didn't have that here.  And it sounds like either there was a mistaken assumption their typical payment terms applied, or they just misunderstood their contract, but those terms were violated and I believe that was the first material breach of the contract.

THE COURT:  Look, obviously, they didn't communicate this downstream well enough to their accounts payable person.

```
1              This one is different.  The payment terms here are
2    different.  And, of course, it had probably been a long time
3    between when the contract got entered and when the first pay
4    request came in.  For whatever reason it got handled wrong.  I
5    mean, no question about it.
6              I'm right, aren't I, that if PRC did not stop
7    production on this basis -- didn't terminate, didn't say we are
8    not going forward, didn't do anything about the non-payment
9    other than saying you need to pay us -- if that's all correct,
10   then PRC was still obligated to perform under the contract.
11   True?
12             MR. DARR:  I want to make sure I understand the
13   question, Your Honor.  So if they didn't -- can you say it
14   again?  I'm sorry.
15             THE COURT:  Yeah.  It wasn't my best question.
16             MR. DARR:  I didn't say that.
17             THE COURT:  Let's -- no, I did.
18             MR. DARR:  Okay.
19             THE COURT:  If you had you would have been right.
20             Let's see if we can get it out of the weeds here a
21   little bit and just deal with it hypothetically.
22             So totally hypothetical situation; we have a general
23   and a sub and the general says:  Before you start on the project
24   you have to have your safety certificate in.  It's a really big
25   deal to us.  We may not get paid by the owner unless we do all
```

1    of this.  It's absolutely critical.  We mean it.  You got to

2    have your certificate in before you start.  And sub doesn't get

3    the certificate in.  Goes to work.

4         And then general says:  Well, I don't have to pay you.

5    You're terminated.  We are going to bring somebody else in

6    because you didn't get your certificate in.  And the sub has

7    already done 90 percent of the work.  And the sub says:  Wait, I

8    have done 90 percent of the work.  Pay me.  Who wins that

9    lawsuit?

10        MR. DARR:  Well, there is a lot to unravel there.

11   First thing that jumps out to me is, how was the termination

12   executed?  In other words --

13        THE COURT:  Always -- you know, the first response to

14   every hypothetical I ask is, bad hypothetical.  Probably is.

15   I'm trying to cut all of that stuff out of it.

16        The point is, if you went forward with the contract,

17   despite the failure to get the certificate in, and you did 90

18   percent -- or for that matter, a hundred percent of the work --

19   change it and say, they didn't get the certificate.  They do all

20   the work.  They say, pay me, and the general says:  No, no, no.

21   You didn't turn in your certificate.  Material breach.  Not

22   paying you.

23        MR. DARR:  Well, you might -- I don't know if you are

24   getting at this but in my mind you might have a waiver issue

25   there then.

1          THE COURT:  Absolutely, you do.  Of course, you do.

2          MR. DARR:  Performance.

3          THE COURT:  You -- and change it around.  Instead of

4    the certificate, you fail to do something and it cost the

5    general some money.  Maybe the general had to go out and get the

6    project inspected when the sub was supposed to do it.  So the

7    general can still recover damages for not getting the --

8    whatever they had to do to get the inspection done.  But, the

9    sub gets paid for the work because the work went forward.  The

10   point is, when there was a breach, first breach, and the other

11   party chooses not to call it off but to go forward the contract

12   is still in effect.  Both sides still have to perform, right?  I

13   mean, this is basic contract law.

14         MR. DARR:  Yes.  And I was concerned about a waiver,

15   potential waiver issue here, on behalf of my client maybe

16   through performance.  But to me the distinction is -- I can't

17   remember the case offhand but there is Florida law, state court

18   appellate decision, that says despite continued performance as

19   long as you are still raising and objecting to the issue while

20   you are doing it that's not a waiver.

21         THE COURT:  It's not a waiver.  They are still

22   entitled to be paid.  They have not waived the right to be paid.

23         MR. DARR:  Sure.

24         THE COURT:  But they have gone forward with the

25   contract and so they have waived the right to say the contract

1    is over.  They still have to perform.  That's true, isn't it?

2            MR. DARR:  Yeah.  I don't -- PRC never terminated this

3    contract.

4            THE COURT:  And so -- and so they were still obligated

5    to make the product, deliver it, install it at a reasonable time

6    they agreed to.  True?

7            MR. DARR:  Yes.

8            THE COURT:  And they had to be reasonable in agreeing

9    to a time.  That's kind of the implied covenant of good faith.

10   And implied in the condition that it will be done at a date that

11   both sides agree to.  It's at least an implied term that both

12   sides won't unreasonably withhold their agreement.  They will be

13   reasonable in picking a date.  True?

14           MR. DARR:  Yes.

15           THE COURT:  So assume for me the facts are -- I know

16   you disagree with this, or you may disagree with this -- assume

17   the facts are PRC said, February 17th.  That's our date.  And

18   Oelrich said, okay.  And then PRC didn't do it.  PRC has now

19   breached and Oelrich can enforce, take action, recover, whatever

20   the appropriate remedy is, based on the breach.  True?

21           MR. DARR:  Under that hypothetical, if there is

22   evidence that it was a mutually agreed that was the drop-dead

23   deadline, yeah, I think you are probably right.

24           THE COURT:  Even though there is -- the retainage

25   hadn't been paid and there is this other problem, but they went

```
 1    forward.  That's my point.  Even though there is this other

 2    prior breach, PRC has elected to go forward with the contract

 3    and it has to perform.  Then that gets us to the factual

 4    question.  Did PRC agree to February 17th?  And, frankly, I

 5    think the record is they chose that date.  And there is an email

 6    where Forde Davis says February 17th.  Isn't that right?

 7              MR. DARR:  Well, respectfully, I don't agree with that

 8    reading of the emails, Your Honor.  I saw the emails as -- we

 9    will start with the first date, the Randall Davis email in late

10    December of 2019; we anticipate we can start this date.  I don't

11    know the exact date he said.  Maybe that was the February 15th

12    date.  But to me, saying we anticipate that date or we project

13    that date is a lot different than saying, we are going to meet

14    this date come heck or high-water, that's it.  We are a hundred

15    percent going to make it.  We are in agreement that this is our

16    deadline.  That's not how I read that email.

17              I know when I make promises to clients, and I'm not

18    sure whether I can get a motion done by Friday but I am going to

19    try, I say I am hopeful I'm going to get the motion done.  If I

20    say I am going to get it done by Friday, I am going to get it

21    done by Friday.

22              I don't read that email as saying that at all.  I read

23    it in particular in context of the other emails that are going

24    back and forth between the parties and communications, which is:

25    Hey, we are still working to get to this as soon as we can.
```

1   There is emails in late December of Forde Davis telling them, we

2   don't have an erector yet.  So that causes an issue as to

3   whether or not we can make this happen on any time frame you are

4   happy with.

5          They keep working at it.  Then they get to -- even the

6   April 6th targeted date.  I haven't seen any record evidence, in

7   my mind, showing that that was a drop-dead deadline agreed by

8   both parties, especially under the threat of termination.

9          THE COURT:  It wasn't under threat of termination, but

10  I am looking at Plaintiff's Exhibit 14, which is the

11  January 2nd -- I'm sorry -- December 31st email.  It's from

12  Randall Davis and it's addressed to Dana Noyes, but, of course,

13  it went to Mr. Oelrich because Mr. Oelrich is getting emails to

14  that box.

15         And Mr. Davis says:  According to our current

16  production schedule, and when you guys contacted us about

17  rescheduling this project, November 2019, we anticipate a start

18  erection date of February 17, 2020.  This date is based on

19  remaining production.  We are sure this is not the ideal

20  schedule for you; however, this is where we are based on other

21  projects in the system.

22         So, Mr. Davis says:  We got other work.  Based on

23  where we are, February 17.  We understand you had an erector

24  available.  Forward us the contact information.  Well, it turns

25  out their erector -- Oelrich's erector wasn't available anymore

1    because the date moved, but they went back to PRC and they got

2    back working with their erector.  So the erector wasn't the

3    problem.  But that's them saying February 17.  And then they

4    don't communicate.  They don't say, we are not going to be able

5    to do it.  They just don't do it.

6          MR. DARR:  Well, I do think there are some

7    communications, again, in that late December to early January

8    time period where Forde -- Mr. Forde Davis was in communication

9    with Mr. Crehore about the issue with getting the erector.  And

10   still, in my mind, in context, putting it -- making it maybe not

11   crystal clear, but at least pretty clear, that they are still

12   trying to work to get all the pieces together to get it out

13   there ASAP.

14         That's how I read the emails.  The goal was to get it

15   out there as soon as possible.  There was no line in the sand

16   deadline.  I didn't see any emails from Oelrich saying -- and I

17   know, I am feeling like you are not enjoying my improper

18   termination argument, but to me I am a construction lawyer, it's

19   important termination be done properly.  I haven't seen any

20   emails from Oelrich coming back saying:  We are a hundred

21   percent relying on your February 17th deadline.  We need it by

22   then.  If you don't deliver by then, we might terminate your

23   contract.

24         THE COURT:  And they didn't.  They didn't terminate

25   the contract.  PRC missed January 6th, despite letters saying

1   this has to happen.  They missed February 17th, with not much

2   communication.  At their calculation it got pushed back to

3   April 6th.  But then on March 17th, Mr. Davis told Mr. Crehore:

4   This is not going to happen.  We are not producing anything.

5          So despite having said:  Based on current schedule, we

6   will be done by February 17, now it's a month later, March 17,

7   they have done nothing.  We haven't done it.  We're not going to

8   tell you when we're going to do it.  That's pretty clearly a

9   material breach.  They're not talking about how to schedule

10  this.  They are basically saying:  Go pound salt.

11         And I did look back at the transcript and Mr. Crehore

12  had said:  Okay, I am terminating you.  Told him that.  And then

13  sent him an email and said it.  And, Mr. Davis admits that he

14  read the email, or at least read part of the email.  It's a very

15  short email.  And it says very clearly:  You are terminated.

16  Still quiet.

17         Now, explain that to me.

18         MR. DARR:  Well, again, I don't view any of those

19  deadlines that we talked about as what I keep calling drop-dead

20  dates to complete the work.

21         THE COURT:  But, what should he have done on

22  March 17th?  He has been told by the guy running the project:  I

23  haven't done anything even though we told you we did.  I'm not

24  going to be ready for the date, the third rescheduled date --

25  the second one, that we picked, basically.  Not going to be able

1    to do it and I am not going to tell you when I can do it.  What

2    would a letter, written by the lawyer and doing a better job of

3    dotting I's and crossing T's, what difference would it have

4    made?

5           MR. DARR:  These termination cases are becoming more

6    frequent, but in my mind all the difference in the world, Your

7    Honor.

8           Now, again as a great example of a very good cure

9    notice, in my mind, is that cure notice that SAW sent to

10   Oelrich.  It's great.  It's says:  We think you are in breach

11   because you are causing a delay to the project, potentially.

12   You are -- we are going to -- we might terminate under this

13   clause of your contract.  And here is what you need to do to

14   cure.  One, two.  And if you don't do that within so many days

15   we may terminate your contract.  It's a good example.  Puts them

16   clearly on notice.  I call it a shot across the bow.  We are

17   serious.  We are not in day-to-day trying to work this out.  Do

18   it ASAP anymore.  We are in dire straits.  So, when you get that

19   shot across the bow that's usually when I get the call from the

20   other guy who is getting the shot across the bow.  Here, that

21   never happened.

22          In PRC's mind, they are just working in good faith

23   trying to make it happen.  I understand that they anticipated

24   that date.  They were hopeful for this date.  But it didn't

25   happen.  So, what should -- what would I have advised Oelrich to

do, if they had come to me at that point?  I would have said we
need to send them a formal letter saying:  We need this by X
date.  If you're not starting by that date we may terminate your
contract pursuant to whatever clause of our subcontract
agreement.  And if you do not provide assurances within so many
days you can do it by that date, again, we might terminate your
contract.

That's how you get a sub on notice that this is not
just trying to work it out, typical -- construction projects,
there are constant dispute, including whether things are timely
or not going on all the time.  You're not going fast enough.
Well, let me explain why.  And people are always going back and
forth with communications.  And the way you get someone's
attention is by clearly saying:  This is serious.  You are in
breach.  We are really considering terminating your contract.
You don't have to say you are going to.  Just we might.
Expressly state that.

THE COURT:  Look, that would have been good.  And, Mr.
Oelrich could have done that back when he wrote the letter and
said, instead of the stick he tried to use the carrot.  It
didn't work.  And I get it.

Look, it's a hard decision Mr. Oelrich had back on
January 12th, when it's clear this thing is off the track.  Do I
have the lawyer send him a threatening letter, or do I reach out
and try to be nice and work it out?  He tried to be nice and

1    work it out.  Frankly, that's usually the better approach.

2    Lawyers are expensive.  And you start threatening people usually

3    it hardens position instead of -- but, anyway he didn't do it.

4    And, yes, on March 17th they could have written the letter that

5    you described.

6            Take me back to the contract and tell me what in the

7    contract required what you are talking about.  I think it

8    requires 24 hours' notice of termination.  I don't know that

9    there is anything in there that requires any of the rest of the

10   stuff you're talking about.  Find the opportunity to cure

11   provision.

12           MR. DARR:  It is -- we can pull it up, but I think you

13   are generally right.  I think it's paragraph 7 of the

14   subcontract.  The express requirement is, as you stated, is that

15   they give 24 hours' notice.  It's pretty minimum in terms of

16   express contractual obligations.

17           Now, we can start with that first.  Obviously, you

18   know, in my motion for summary judgment I had this issue.  I

19   don't believe it's just 24 hours.  Might be under the contract.

20   I think there are a heck of a lot of cases that have concluded

21   that there is more than just what's required in the contract.

22   There is a certain minimum threshold, so to speak, under

23   construction common law.  Again, admittedly, Florida appellate

24   court decisions are exceedingly rare now for substantive

25   construction law decisions so it's sort of unchartered territory

1    in our state.  But, let's start with the 24 hours' notice.

2             So at trial there were only, in my mind, three pieces

3    of testimony regarding any sort of notice to PRC that they might

4    have their contract terminated.  All three of those pieces of

5    evidence came from Mr. Crehore during his testimony.

6             Now, one of them was that he told Forde Davis on

7    March 17, 2020, the same date as the letter -- the email, the

8    termination notice: Hey -- he is not even saying you guys might

9    be terminated -- I am terminating your contract because I'm fed

10   up, basically.  We're not meeting any of these deadlines that we

11   perceive as deadlines.  It's done.  Is that compliant even with

12   the 24 hours' notice requirement?  No, because they got

13   terminated on the same day as that alleged phone call that

14   occurred.  If it occurred.

15            Number two, he testified that there was a meeting with

16   Forde Davis at PRC's facility in January of 2020.  And he said

17   that he had brought up termination.  That's his testimony.

18   Mr. Davis disagreed in his testimony.

19            I will also point out that I tried to make the point,

20   when I was questioning Mr. Crehore, that he did what I would

21   call a fantastic job of basically sending an email whenever he

22   had a call, or a discussion, or lack thereof, with PRC folks

23   saying:  I called you.  We discussed this.  I understand we are

24   going to be doing this.  Great job documenting what his call

25   was.  Notably absent on probably the most important decision he

1  made with regards to this lawsuit was him supposedly informing

2  Forde Davis that their contract might be terminated.

3          He admitted, when I asked him, termination is a

4  serious deal in construction.  It is the most drastic sanction

5  that you can select out of your arsenal as the upper tier

6  contractor.

7          Certainly, you would think, especially in light of the

8  history of Mr. Crehore and others from Oelrich documenting their

9  conversations with PRC, there would be an email where he says:

10  Hey, you know, thanks for meeting with me today.  I understand

11  that you guys are trying to meet this date.  And as we discussed

12  we might have to terminate your contract if you don't meet that

13  date.

14          It's not in the record.  I find that highly suspect.

15  And also I would like to point out I believe that during that

16  piece of testimony, when he was finished after

17  cross-examination, Your Honor asked him:  Let me ask you, Mr.

18  Crehore, during that discussion did you ever mention anything

19  about a deadline that they had to adhere to.  And I'll give it

20  to Mr. Crehore; I thought for sure he was going to say:  Yes, I

21  did.  But he admitted he didn't.  He didn't say anything about a

22  deadline during that meeting.

23          So I find it highly unlikely he actually told Forde

24  you may be terminated, but we certainly know he didn't say:  You

25  will be terminated if you don't meet a specific date.

1            The third thing he said in terms of notice was through

2      an email; he told them, you may be terminated if you don't step

3      up basically.  I said, will we see that during the trial?  He

4      said, I am sure you will.  I know he is not the lawyer and he

5      doesn't decide what emails are put up, but I don't recall ever

6      seeing that email during the trial.

7            I don't recall ever seeing it during my review of all

8      the emails in this case.  If there was an email where they had

9      said:  Step up and meet this date or you may be terminated, I

10     don't think we would be here because that's one of the arguments

11     that's completely gone regarding wrongful termination.  They

12     gave you a warning.

13           So, even with regard to the 24 hour notice, the only

14     thing they have is notice on the same day he testified about,

15     which, again, wasn't documented in an email.  Regardless it

16     happened on the same day they terminated them.  We have all

17     admitted that that email, March 17, 2020, that was the

18     termination.  It's done.  Finito.  You've been terminated.

19           That call, that day, even if it did happen saying we

20     might terminate you, that's not 24 hours' notice.  It's not a

21     whole lot to answer for.  The contract, obviously, was slanted

22     in their favor.  That was one of the provisions; they couldn't

23     give us 24 hours' notice.

24           Now, as to the other issues I'm bringing out about

25     setting a clear deadline; the contract, best I can tell, did not

```
1    require that.  You are correct, Your Honor.  That's not in the
2    contract.  But it's a fundamental principal of construction law
3    that to terminate a party for a purported material breach you've
4    got to give them notice and opportunity to cure the breach,
5    assuming the breach is curable.  I mentioned in my opening some
6    breaches aren't curable.  One is, if you have got a deadline
7    that is in your contract, and you fail to meet it, and it gets
8    to be two weeks past it, you've blown it.  At that point, they
9    can terminate.
10        THE COURT:  Why isn't that the situation?  January 6th
11   was the date.  They missed it.  Opportunity to cure?  Sure.
12   Let's set a new date.  What works?  PRC says, February 17th.
13   Okay.  They missed it.
14        Opportunity to cure?  Yeah.  What -- all right.  You
15   missed that date.  What do you need?  April 6th.  And then it
16   comes around to March 17th and it turns out they hadn't done
17   anything, they aren't doing anything, they can't give you a date
18   when they are going to do anything.  And they say, okay, you had
19   two more chances.  That's enough.  What's wrong with that?
20        MR. DARR:  Well, again to me -- and I hate to keep
21   saying this cliche' phrase, but the shot across the bow moment.
22   Merely getting into this day-to-day -- I think in my motion for
23   partial summary judgment I have cited authority that says
24   day-to-day correspondence, trying to work things out
25   essentially, does not constitute proper notice and an
```

1    opportunity to cure.

2              I get it.  To Mr. Oelrich's credit and his company's

3    credit, I think that they were trying to work it out.  Every

4    contractor knows it's always better to get it done with the guy

5    you hate than the next guy.  It's going to cost a lot more with

6    the next guy.  But, the problem is at some point you have to go

7    from trying to work it out in good faith to line in the sand;

8    here it is, if you don't meet this date, termination is on the

9    line.  We are dead serious.  Good faith negotiations aren't

10   working out anymore.  Meet it or you might be terminated.  That

11   puts a guy on notice.  I've really got to step up.  And then --

12             THE COURT:  And that really is -- I mean, that's the

13   crux of this.  It pretty much comes down to your assertion that

14   without the shot across the bow you couldn't terminate.  And

15   it's not in the contract but you say the common law of

16   construction litigation, you got to give them the shot across

17   the bow.

18             MR. DARR:  So, it's probably apparent at this point,

19   I'm not a trial lawyer.  These cases rarely go to trial.

20             THE COURT:  I think you've done a great job as a trial

21   lawyer.

22             MR. DARR:  I will defend that one later, but anyway --

23   I guess my point is, I am just trying to say this is a

24   fundamental principle of construction law.  At some point you

25   got to switch from being the nice guy, trying to work it out --

```
 1    because to some degree, to the guy who draws a line in the sand,
 2    because when you are just trying to work it out, these guys, as
 3    far as they know, we are just trying to figure out when we can
 4    get this done.  Once that line in the sand is drawn that's
 5    usually when I get the call; we are under threat of termination.
 6    What should we do?
 7              At that point, that's when we get a chance to step up
 8    and say:  Hey, we can't deliver until this date because,
 9    whatever reason -- COVID-19, whatever -- two production slots
10    are ahead of you.  We can give you a drop deadline of this.
11    They either buy the excuses or they don't.  The guy who sends
12    the cure notice.  Maybe they say, you know what, COVID-19 is not
13    an excuse.  You guys moved on to other jobs.  That's not our
14    problem.
15              THE COURT:  In fairness, nobody ever said COVID-19.
16    He said he had a flu, had another job, been out all week, and
17    these problems -- by March 17th, COVID was just becoming a
18    thing.  But when they missed the day on January 6th, and they
19    missed the day on February 17th, unless they were in Ruhan,
20    COVID-19 wasn't a problem.
21              MR. DARR:  Those are before COVID.  I even hate to
22    bring it up -- I'm not really -- that's not the thrust of what I
23    am getting at.  I am saying hypothetically, if that notice had
24    come during that time, that might have been something we would
25    have said in response.
```

1          Now, I have to say this also, it's not just about

2     giving a chance to cure.  That notice is also critical because

3     it gives us a chance to mitigate our damages.  You get that sort

4     of notice and maybe -- I don't know.  Maybe Mr. Davis, or one of

5     them, reads it and says:  Oh, wow.  They are really serious, and

6     we can't meet their drop dead deadline.  Well, let's -- maybe at

7     a minimum we can try to get them what we've already made.

8          THE COURT:  Absolutely.  That's an important point.

9     But why isn't the answer to that, if they were going to do that

10    in response to a nasty letter -- a shot across the bow -- why

11    didn't they do it in response to the termination letter that

12    said it in black and white:  You are terminated.  And they had

13    the letter.  And Mr. Davis, Sr. knew about the letter from Mr.

14    Oelrich.  I am trying to figure out why in the world didn't

15    somebody pick up the telephone and call Mr. Oelrich and say:

16    This has gone sideways, but we've got a lot of material here on

17    the yard.  You at least need to use it.  Why didn't anybody do

18    that?

19          MR. DARR:  That's a good point, Your Honor.  And, you

20    know, one of the issues, when I first got this case is, I wish

21    you guys had seen the email, you know.  The reality is, as the

22    testimony reflected, it wasn't seen in full until May-ish of

23    2020.  By that time --

24          THE COURT:  Why didn't they make the call in May?

25          MR. DARR:  The contract had already been terminated.

1   In their mind, it was done.  It was said and done.

2           THE COURT:  But, Spring hadn't put a shovel in the

3   ground or put a bit of material in the cast.

4           MR. DARR:  I gotcha.  We didn't know one way or the

5   other whether that had happened.

6           I will say this, the evidence -- all the written

7   record I have seen -- as soon as March 17th happens, Mr. Crehore

8   didn't try to reach out to anyone.  You know:  Did you guys get

9   that termination notice?  They just let it go.  They were done.

10  Admittedly, I guess, at that point maybe the parties were both

11  fed up with each other.  I really can't explain that.  I don't

12  know why they didn't reach out to confirm receipt.  I don't even

13  know why that termination notice was sent in an email.

14          THE COURT:  But if the truth is, if they had sent by

15  an email with a receipt to the email, as you can do, they would

16  have gotten a receipt confirming delivery.

17          MR. DARR:  I didn't see that in the record, if it is

18  there.

19          THE COURT:  No.  No.  No.  They didn't do it.  But if

20  they had, they would have gotten a confirmation of delivery.

21  Because Forde Davis' own testimony is:  I saw the email.  I

22  opened it.  I read it in part.  I just didn't think it was a big

23  deal.

24          What's wrong with this analysis:  Mr. Davis saw it.

25  It was pretty darn serious.  It says terminated.  But he did

```
 1   kind of what he had done through the whole deal, he blew it off.

 2   Is that not a reasonable view of the evidence?

 3           MR. DARR:  I hate disagreeing with you, but I don't

 4   think so, Your Honor, because to me the reason you can tell he

 5   didn't see that part of the email is because, as reflected in

 6   the evidence, and our discovery responses, they kept producing

 7   precast.  They would not keep wasting their own money making

 8   this product for Oelrich if they had seen it.  They didn't blow

 9   it off.

10           THE COURT:  Oh, if he just blew it off and thought, I

11   don't care what they say.  We are going to do it our way.  If

12   that was his approach he would do just what he did.  If he just

13   saw it and didn't think, no big deal.  Just keep marching.  We

14   will do it when we are good and ready.  They wanted it in

15   January, February or April.  We are not doing it.  We are not

16   telling you when we are going to do it.  When we get around to

17   it we will do it and I don't care what they say in the meantime.

18           MR. DARR:  I genuinely don't think that was attitude.

19   I think the attitude was we are trying to get to it as fast as

20   we can, given the production schedule we have going on.

21           Also, I hate to keep saying the COVID word, but there

22   was some impact at that point on the rate of productivity that

23   they could achieve.

24           THE COURT:  By that time, COVID is up and going.  I

25   got it.  But there is not a single communication -- and if PRC
```

```
 1    is really -- thinks the contract is still there, they intend to

 2    perform, they are operating in good faith, why in the world did

 3    they not even communicate any further with Oelrich about when we

 4    will get to it, they are not going to get to it by April 6th,

 5    the date that was set at their urging.  They don't suggest

 6    additional dates.  They don't get back in touch and say, we

 7    finally cleared out the underbrush.  They don't say we have had

 8    a COVID issue.  They don't say May, June, July.  They don't say

 9    anything.  Why is that consistent with your view of the

10    evidence, and not with the suggestion that he just blew it off?

11              MR. DARR:  Because -- well, keep in mind, there was no

12    communications in the record between either of the parties at

13    that point.  The last written email we have between them is

14    March 17th.  Now, there is no email from Oelrich saying:  Hey,

15    where are we?  We got April 6th.  That never happened.

16              THE COURT:  No.  No.  The reason there is no

17    communication from Oelrich is because they have put an end to

18    it.  March 17th they wrote the last letter.

19              MR. DARR:  Sure.

20              THE COURT:  So on their understanding that was the

21    last communication.  What you're saying is, Oh, but PRC didn't

22    know it.  They didn't read it.  They didn't know it.  So, from

23    PRC's standpoint there would be every reason to communicate and

24    there is nothing.  So I guess my suggestion is the lack of any

25    communication is consistent with the view that Oelrich sent a
```

 1    termination notice and Forde Davis knew it.

 2              MR. DARR:  That's not the inference I would draw from

 3    it, obviously, Your Honor.  I think it was more they are doing

 4    the best they can to get the product going.  The record reflects

 5    they did get the product going.  They were trying.  Did they

 6    send an email saying:  We are sorry, April 6th can't happen.  We

 7    are cranking right now.  We are trying to get it going.  That

 8    doesn't exist.  I wish it did.

 9              The only place we've got beat in this case is

10    Oelrich's ability to paper the project.  That's a great thing.

11    My guys didn't do a good job papering the project.  I wish they

12    had sent more emails confirming things that were going on in

13    realtime.

14              THE COURT:  Do we know when they actually started back

15    up production?

16              MR. DARR:  Yes.  If you give me one second I can tell

17    you.

18              THE COURT:  All right.

19              MR. DARR:  It was March of 2020.  They made 12 pieces

20    in March of 2020.

21              THE COURT:  And how do I know that?  That's in your

22    interrogatory answer?

23              MR. DARR:  Correct.  And there are also -- just to

24    clarify something that is semi related -- there is also pictures

25    in the exhibit list that were admitted due to our stipulation

1    earlier before we started the trial, that are time-stamped

2    showing the product after the date of termination.  I think it's

3    in May of 2020, something like that.

4            THE COURT:  So there is documentation that it was done

5    in May of 2020.

6            MR. DARR:  Uh-huh.

7            THE COURT:  My skepticism, and of course the other

8    side says no reason to think it happened in March.  Here is the

9    skepticism about it happening in March.  On March 17, there is

10   this conversation between Forde Davis and Mr. Crehore where Mr.

11   Crehore says:  We are not producing it.  And we can't tell you

12   when we are going to start producing it.  And it is confirmed in

13   the email.

14           So we've March 17th confirmation of Forde Davis

15   saying:  We are not doing it and we can't give you a date when

16   we are going to start.  And then you turn around and say:  Yeah,

17   we did 20 pieces in the last 14 days of March.

18           Does that make any sense?

19           MR. DARR:  Well, based on that record, they weren't on

20   schedule to meet that April 5th deadline.  I would agree with

21   you there.  But, again, that is -- that's when in -- frankly, I

22   think the shot across the bow could have come a lot earlier.

23   Probably January of 2020.  That's what I would have advised them

24   to give a drop dead deadline.

25           THE COURT:  Should have discussed the stick not a

1    carrot.  The carrot didn't work.

2          MR. DARR:  You know, it's an escalation issue.  My

3    advise, my lawyer advise is, frankly, very rarely consistent

4    with the business perspective of my clients.  They want to make

5    money and keep good relationships.  They don't want us involved.

6    So, frequently I advise you escalate.  You start with the

7    carrot, but eventually the whip's gotta come out.  You gotta put

8    that line in the sand.  I don't want to sound like a broken

9    record.

10         THE COURT:  And you do, but only if in hindsight you

11   look back and say the carrot didn't work.  But for everyone that

12   breaks down and winds up in a lawsuit, where everybody loses no

13   matter who wins the lawsuit -- I mean, this is bad for

14   everybody.  You have two CEOs, two very able people with good

15   companies, with good work to do, and they have spent three days

16   sitting in a federal courtroom.  This is not good for anybody.

17         And so the best outcome, back on January 12th, when

18   Mr. Oelrich wrote his letter, was not to escalate things but to

19   work it out.  So, yeah; in hindsight for the lawsuit it may be

20   better to do the shot across the bow.  But, if the real goal is

21   to not get in a lawsuit, and get the project back on track, then

22   it's just somebody's judgment.  Is it better to be nasty or is

23   it better to be nice?  And, anybody that's raised teenagers

24   knows there is no clear answer to that question.  It may be one

25   way, it may be the other.  You just make your best judgment.

1          MR. DARR:  I think the shot across the bow can

2     actually cut off lawsuits as well because --

3          THE COURT:  It can.

4          MR. DARR:  -- if that had happened, I definitely would

5     have recommended we would, at a minimum, get their product to

6     the project site, which could have been matched, according to

7     the expert testimony of Mr. Davis, to whatever the next guy did.

8          I didn't understand that, and I talked to my client

9     last night, but when you match up that product you can put

10    Mr. Davis' product here, PRC's, and next guy's at the corner,

11    and when you have them at a corner like that it's much easier to

12    make them look matching because of the way the light hits.  You

13    look at the corner of something -- getting in the weeds a little

14    bit.  But, my point is that, that would have been an option.

15         Unfortunately, without that clear warning of a great

16    cure notice showing what you need to do to step up we were never

17    given that chance.  And, unfortunately, now we're here in this

18    lawsuit.

19         Had it been sent, you are right, I don't know what

20    would have happened.  Maybe my client would have said, pound

21    sand.  But they probably would have also considered giving them

22    the product that had already been made.

23         THE COURT:  What legal authority, if any, can you

24    point me to on the question of whose burden it was, or is, to

25    prevail on the match issue?

1          MR. DARR:  On the matching of the precast?

2          THE COURT:  Whether it -- whether you could have

3    matched the PRC production to Spring production.  So that's a

4    question.  And you are right, you have Mr. Davis' testimony:

5    Sure, we do it.  It can be done.

6          You have got Mr. Oelrich; not his area of expertise --

7    and, of course, one thing very much in your favor is they filed

8    a replevin lawsuit.  So at some point somebody thought this was

9    valuable product, but leave aside the factual question.  The

10   record is where it is.  It's not great.  Both sides probably

11   could have spent a lot more money and brought in some experts on

12   this, independent experts and we could have gotten opinions.

13   The record is where it is factually.

14         Here is my question:  Whose burden is it to establish

15   that matching is feasible or not feasible?

16         MR. DARR:  Boy, my first reaction is I'd like to look

17   into it in a little more detail, Your Honor.  But, in my mind, I

18   guess it would be -- you are probably going to hold me to it.

19   Again, I'd like to do a little more research on it.  But, would

20   a failure to mitigate affirmative defense, maybe that would be

21   on us to prove by a preponderance of the evidence, which even if

22   that were the case -- I'm not sure -- I think we've met it

23   because we have the only expert testimony in the case saying,

24   yes, it could have been matched.  Not a problem.

25         No expert testimony over here.  Not one designated

```
1    expert witness in their 26 disclosures.  No hybrid fact expert
2    witness.
3             And even if they had designated someone as a hybrid
4    fact expert witness, such as Mr. Oelrich, he readily admitted
5    he's not a precast expert.  They are just construction managers.
6    They just manage projects.
7             So even if it is a preponderance of the evidence
8    standard that applies to us to show it could have been matched,
9    I think we met it.  It's un-rebutted.  There is no other
10   testimony to counteract that.
11            You can obviously weigh, probably you know, how much
12   weight you give that.  But, in my mind, it's one nil on that
13   issue.  We have one.  They have no testimony to counteract that.
14            THE COURT:  Okay.  You answered my question.
15            You told me half an hour and I took up all your time
16   and asked more questions.  Frankly, it was very helpful to me so
17   I appreciate your staying with it.
18            MR. DARR:  No problem.
19            THE COURT:  If you have got anything else to tell me,
20   now's the time.
21            MR. DARR:  Yes, sir.  I would just go ahead and jump
22   into damages real quick if we could.
23            The table that we went through, that's in our
24   interrogatory responses, which is Defendant Exhibit 306, page
25   18.  We are seeking the amount unpaid under the contract, the
```

1    storage costs that was incurred, the disposal fee to get rid of

2    the precast which we can't sell to anybody else, the lost

3    production, line item we talked about regarding having to bring

4    the forms back together and all that, and the lost profit on the

5    work that wasn't allowed to be formed, which was supported by

6    the testimony of Mr. Davis regarding based on their estimate

7    they had.  PRC's damages in that amount total up to $124,969.

8         I would like to also, briefly -- I know I've been up

9    here for an hour and a half almost -- touch upon Oelrich's

10   damages, in the event we are not going to win on liability.

11   Hopefully not, but if we are not I want to talk about their

12   damages.  That $105,000 in delay damages, Your Honor, I am sure

13   you could probably tell during my cross-examination, I try not

14   to get fired up and aggressive with people.  It's not my

15   personality.  But I find those damages highly suspect.

16        I've never had a construction case where you don't

17   have an expert, at least a hybrid fact expert witness, that can

18   testify in support of delay damages because you've got to

19   perform some sort of critical path analysis to support those

20   damages.

21        I get that they are saying this wasn't a real

22   complicated delay, but you still have to have some sort of

23   analysis that you can show to support that.  And frequently

24   that's done through expert testimony.

25        Okay, I didn't know if you had a question.

1            Second, with regard to those delay damages, and much

2     to Mr. Oelrich's credit, he admitted the schedules upon which

3     they are based, they are not accurate.  And that's really

4     common.

5            One thing I asked during Mr. Crehore's deposition is,

6     do you know whether or not the schedules that Mr. Jordan

7     Robinson, the superintendent, maintained were actually

8     reflective of what was going on in the field.  And he kind of

9     paused.  And then I said something along the lines of, you know,

10    a lot of my clients, they tell me their schedules don't really

11    reflect reality.  And I got a laugh.  And I said it in the

12    record, wow, I never get a laugh during a construction

13    deposition.  This is fantastic, something like that.

14           So, he admitted the schedules aren't accurate.  Mr.

15    Crehore's deposition testimony, which is in the record, at least

16    implicitly suggests they may or may not have been accurate.  And

17    without an accurate construction schedule to measure the actual

18    delay from the as-planned dates of their scope of work versus

19    the as-constructed dates, you are just spit-balling about how

20    long the delay was.  You have to have some proper analysis

21    there.

22           I get their position is that it's so simple they don't

23    need one.  But, arguably -- not arguably.  I strongly believe

24    you do need some expert analysis there.  The schedules need to

25    be accurate.  And there aren't --

1          THE COURT:  Why isn't -- they say 14 weeks.  And I

2     think my question to Mr. Oelrich may reflect it.  It seems to me

3     they were picking the wrong dates.  But if the date they were

4     willing to go with was April 6th -- and I think they had given

5     additional chances up to April 6th.  So I don't think they can

6     go back to January 6th or February 17th.  But if you go to

7     April 6th, which is the date when -- last date when PRC should

8     have started, and you run it up to when Spring Precast started,

9     isn't that the period you are looking at?  It does seem to me

10    pretty easy.  And that's probably 14 weeks.

11          MR. DARR:  The analysis would depend on, at a minimum,

12    having to prove that none of the work that was left to do in

13    their scope, that was on the schedule, was -- couldn't have been

14    done in the interim, and it wouldn't have extended out the

15    entire date.

16          I found it rather oblique as to how they got there.  I

17    get the allure of, this is the critical path date when you had

18    to start.  And they didn't start until -- Spring didn't start

19    until this date, so we get all that.  But, as to whether or not

20    that was actually the critical path date, or not, I didn't see

21    any evidence to support that, other than Mr. Oelrich, in my

22    mind, conclusory stating, that was the critical path start date.

23          THE COURT:  Well -- but he explained it pretty well.

24    I'm not suggesting that date.  He said March 10th is when this

25    gets in the critical path.  I am suggesting April 6th.  They had

1   agreed a reasonable date and they have agreed to extend it again

2   out to April 6th.  Take April 6th to the date when Spring

3   started, seems to me that that's pretty clearly the delay caused

4   by PRC failing to perform.

5               MR. DARR:  The April 6th date --

6               THE COURT:  What's wrong with that?

7               MR. DARR:  That wouldn't be the proper start date.

8   The proper start date would be the date when that particular

9   scope fell on the critical path.

10              THE COURT:  Not if the delay was not wrongful at that

11  point.

12              Look, they have -- the contract says, we will agree on

13  a date.  Well, they agreed on a January 6th, or -- maybe.  It

14  was certainly agreed on February 17.  But they don't terminate

15  at that point, and they are still willing to work with PRC

16  starting on April 6th.

17              Now, maybe you are right, maybe the delay goes back to

18  March 10th, because if PRC had done what they were supposed to

19  they would have started by March 10th -- or back on April 17,

20  and March 10th is when it was in the critical path.

21              But if you look at the other way and say they agreed

22  to change the date to April 6th, then if that's the agreement

23  then they don't get damages for the delay that they agreed to.

24  So, April 6th is the date when PRC is to perform.  And it's

25  after that that the delay gets chargeable to PRC as part of the

1   damages calculation.

2          So you go from April 6th and 14 weeks later is

3   probably about right.  I don't know that I am looking at the

4   date when Spring started.

5          MR. DARR:  You know, I'm sure you are aware, Your

6   Honor, there are plenty of cases that say you don't have to get

7   your damages down to the nickel, or something along those lines.

8   But, to me, this is too rough of an estimate.  If they did win

9   on liability, this particular component, it's a little too rough

10  around the edges as I like to call it.

11         I don't think that they proved what predecessor work

12  that they were doing, led up to the supposed date at which PRC

13  not doing its work was pushing out day by day everything that

14  came after there.  I didn't see that because the analysis was

15  what you just described.  I have never seen a delay analysis

16  that could be described in a minute.  It just doesn't happen.

17  Usually you have to go through a schedule, and you get testimony

18  from an expert who says:  Here is the last piece of critical

19  predecessor work that had to be performed on the bar chart

20  before the offending party's work had to start --

21         THE COURT:  I don't doubt that you can hire an expert

22  to analyze things at huge costs, but, you know, sometimes things

23  aren't as complicated as lawyers and experts make them.

24         What you really want to figure out is how much was the

25  delay attributable to PRC's failure to perform.

1          MR. DARR:  And that burden falls on them, is what I

2    would say.

3          THE COURT:  It absolutely does.

4          MR. DARR:  So, beyond just the scheduling critical

5    path dates and analysis, when we were looking at some of those

6    costs that were included in their daily general conditions

7    costs -- I'm sorry -- weekly general conditions costs that they

8    had on that table, admittedly almost all of the items were based

9    on estimates and historical estimates.  But I haven't seen any

10   underlying documentation supporting any of that.  For all I know

11   that was pulled out of the air.

12         I will say that with regard to that project engineer

13   line item, there was an item there for, I think, a thousand

14   fifty per week.  Something like that.  Mr. Oelrich admitted that

15   wasn't just one project engineer, but it was multiple project

16   engineers but he didn't know how many.  Didn't know how many

17   project engineers had been included in that rate.  Could have

18   been two.  Could have been three.  Could have been four.  So,

19   it's another estimate.  Even that one -- it's just too rough

20   around the edges.  I don't think that they proved that those

21   actual costs were real.

22         Again, I still think they should have produced the

23   underlying documentation to support those costs to support their

24   burden to prove that damage amount.

25         Finally, with regard to that delay damages claim; we

 1    have that 15 percent mark-up which Mr. Oelrich included because

 2    he thought it was fair.

 3            THE COURT:  They don't get that.  That's not how you

 4    calculate profit.  I got it.

 5            MR. DARR:  Okay.  I will move on.

 6            THE COURT:  You know, if they bid the job badly and so

 7    they were going to lose money on the deal they don't get to make

 8    money on the delay.  What profit you make is based on what you

 9    bid the project for and what you are entitled to be paid.

10            MR. DARR:  Finally, with regard to their damages, Your

11    Honor, I want to talk about their Spring Precast charge, which,

12    again, if they were to prevail on liability would be a

13    legitimate item of damages.

14            I call it the cost to cover.  Always costs more to

15    hire the replacement guy.  I get the difference between what I

16    paid the guy to do your work and basically your contract

17    balance, so whatever your contract was.

18            If you remember, they had a -- I believe it was a

19    $44,000 delta, something like that -- the difference between

20    what PRC agreed to do it for and what ultimately Spring did it

21    for.

22            Now, they did have evidence of the Spring Precast

23    contract that had the amount on there, which I believe was to

24    the tune of $323,000.  Something like that.  PRC's contract was

25    275.

1          But, the only evidence I saw of actual payment to

2     Spring Precast, that's in the record, is their subcontractor

3     ledger report, which we saw a couple of times during the trial,

4     and that only indicates that they paid Spring $239,761.80.  Not

5     the full amount.

6          THE COURT:  What difference does it make whether they

7     made paid it or they owe it?

8          MR. DARR:  If you are not out-of-pocket on it you

9     can't claim it.

10          THE COURT:  Of course you can.

11          MR. DARR:  Well, how am I to know whether they are

12     going to pay it or not?  I don't know what deal they have with

13     Spring Precast.

14          THE COURT:  If they were obligated to pay it, they are

15     obligated to pay it.  I mean, that doesn't work.  And that

16     happens in lawsuits all the time.  For that matter, it happens

17     in businesses.  People keep track of these things on an accrual

18     basis, not a paid basis.

19          If you incur liability for a hundred thousand dollars

20     as a result of the defendant's tort, or breach, then you can

21     recover the hundred thousand dollars whether you have paid it

22     out-of-pocket or not.

23          In tort cases, the doctor's bill often hasn't been

24     paid.  If the hospital bill hasn't been paid, it's going to be

25     paid out of recovery.

1          All right.

2          MR. DARR:  With that said I'm just going to go ahead

3    and give a quick summary -- one or two sentences.

4          I think you've heard me talk about improper and

5    wrongful termination enough, but it is the nuclear option of all

6    of the options to pick in construction.  There are plenty of

7    cases to hold that the burden will be on them to justify that

8    termination, show that clear shot across the bow.  Give them

9    fair warning, if you don't step up and deliver by a date-certain

10   you might be terminated.  It's just not in the record.  Whether

11   or not you agree with me, Your Honor, that needs to happen,

12   debatable.

13         It's also a case about them assuming their form

14   contract applied throughout the whole project.  Obviously, we

15   have talked about Note A ad nauseam.  That's a huge deal to my

16   client.  They needed those terms.  Oelrich didn't live up to

17   that end of the bargain.  Their one main primary obligation to

18   PRC; pay us on time and in full, otherwise we can suspend

19   production.

20         Thanks for your time.  I appreciate it.

21         THE COURT:  Thank you.

22         Rebuttal, Mr. Butts?

23         I haven't forgotten what you told me the first time,

24   so let's don't do it again.

25         MR. BUTTS:  Your Honor, I would like to first speak to

1   the match issue that you asked Mr. Darr about, and the question,
2   if I recall correctly was, whose burden was it to determine the
3   feasibility of the match?  I think it's important to note a
4   couple of things:
5              One, I have already pointed out and that is that PRC
6   had every opportunity, in May 2020, re-engage with Oelrich
7   Construction and try to salvage this, and, in fact, they would
8   have salvaged it at that time.
9              But the points that I want to make are:  In terms of
10  matching these panels, Oelrich Construction would need to know
11  which panels exactly had been fabricated.
12             They would need to know the formula or aggregate that
13  was used on them.
14             They would have to go to South Carolina to try to
15  match them, so they would have had to gotten someone like Spring
16  to go up there, onto PRC's plant, look at the panels, make
17  mock-ups, go back up there and see if they matched.  An
18  architect from UF or VA would have to approve it by seeing the
19  panels up there, or else try to transport them down here.
20  Mr. Davis said that was not practical to do unless you are going
21  to hang them on the building.
22             So in terms of the practicality of who was responsible
23  for, let's just get somebody else to finish these panels and
24  match, that's PRC's responsibility to participate in that.
25             They gave no indication throughout this entire project

1    that they would cooperate with Oelrich Construction about

2    anything, including returning a phone call.

3            Now, we've got to try to figure out a way to build how

4    many panels -- we don't really know.  Maybe 50 something.  Maybe

5    they assert they built 94 -- they got up to 94 -- but we don't

6    really know that, Your Honor, because their testimony was the

7    wheels fell off in South Carolina when COVID came.  And COVID

8    came in, what, middle of March, April, May, when they say that

9    they produced, what?  40 panels.

10           In those two and a half months they say they produced

11   40 panels.  In four months leading up to March, four and a half

12   months they hadn't produced one panel.  COVID comes and they say

13   they can produce 40 more panels.  We don't know whether if they

14   have those panels up there.  So, the burden to cooperate on that

15   match --

16           THE COURT:  I guess nobody in discovery figured out to

17   check on this?  I mean, this is one of those I kind of scratch

18   myself and say I don't know how many tens of thousands of

19   dollars have been spent, but it's a lot.  And you go through the

20   discovery process.

21           I understand; travel is difficult during some of this

22   because COVID is out there.  And depositions are taken by video.

23   Maybe somebody there at that property, when this is -- when they

24   are being deposed.  Cameras exists.  Somebody can walk around

25   and do it.

1          Surely -- and you've got good lawyers that are by all,

2    everything I can tell, you have been very professional with each

3    other, nobody could work out for someone to walk around with an

4    iPhone turned on video and go around and show what was there?

5    Nobody -- none of that happened?

6          MR. BUTTS:  Your Honor, I would submit to you that PRC

7    is the one who is seeking to be paid here.  They have got the

8    panels.  We don't.

9          THE COURT:  I understand.  Yeah.  But you also had the

10   rules of civil procedures that would have allowed you to see

11   these things.

12         MR. BUTTS:  I agree.

13         THE COURT:  I got to tell you, if somebody wanted to

14   see the panels and you said:  We have COVID.  We don't want to

15   travel.  We don't want to get a Rule 34 visit to the property.

16   We'd just like to have somebody take pictures, I would have said

17   sure and they wouldn't have been objected to.

18         MR. BUTTS:  We asked them for pictures of everything

19   they've got.

20         THE COURT:  Well, you say send us all the pictures you

21   have.  But did you say how about going and making us some

22   pictures?

23         MR. BUTTS:  No.  We didn't do that.

24         THE COURT:  Okay.

25         MR. BUTTS:  But what -- we would view that as their

1    burden.

2              THE COURT:  Yeah, I got it.  There is a burden issue.

3    And Mr. Darr was very candid and said probably it seems to me it

4    may very well be a mitigation issue and he may be right.  The

5    burden may be on him.

6              MR. BUTTS:  Your Honor, I didn't mean to get into the

7    discovery issue again, but I was just attempting to respond to

8    your question that you asked Mr. Darr.

9              THE COURT:  Fair enough.

10             MR. BUTTS:  Your Honor, we have some cases that we

11   would like to just cite, if I may, in regard to who can testify

12   as a CPM -- as to CPM, that an expert is not required, a project

13   manager can testify, and I will go ahead and cite those cases

14   now.  *Helena and Associates, LLC versus EFCO Corporation.*  It's

15   a southern district New York case.  May 14, 2018 [sic].  It's

16   2008 US District.  It's Lexus 39977.  And there are several

17   cases cited in that that may be helpful for the Court in

18   addressing that issue that Mr. Darr raised.

19             THE COURT:  My only question about that, and maybe I

20   heard you wrong, I thought you said a 2020 southern district

21   case and then you gave me a 2008 citation.

22             MR. SECHREST:  It's a 2008 case.

23             MR. BUTTS:  It's a 2008 case, southern district May

24   14, 2008.  I may have said 2020 by mistake.

25             THE COURT:  I may have heard you wrong.  Okay.

1          MR. BUTTS:  There were some photographs that were

2     referenced about -- that were taken.  I think Mr. Darr may have

3     been of the impression that these -- these are photographs of

4     the panels -- that PRC asserts that they were -- all the panels

5     that were fabricated, or panels that were fabricated, and the

6     photograph is stamped May -- excuse me, June 2020, is when the

7     photograph is stamped.  Those are in evidence.

8          It's important to note that the VA's rules, which are

9     found in Exhibit 32, as it pertains to work being performed on

10    their property, require two weeks to review the safety documents

11    that we have discussed.  But then, in addition to that, there is

12    a meeting that is also required.  So it's not just a two week

13    lead time there.  There has to be that meeting that's scheduled,

14    and they won't schedule the meeting until they get the documents

15    that were at issue.  And there has been a lot of discussion

16    about those documents.

17          I just want to correct one thing that -- my

18    recollection is just a little bit different than Mr. Darr's in

19    regard to Chris Crehore's testimony; the meeting that we had

20    when he went up there late January.  I believe that Mr. Darr's

21    recollection of perhaps Forde Davis' testimony was that

22    Mr. Crehore went up there and did not ask to see the panels.

23    But I believe the testimony was that he went up there to have a

24    face-to-face conversation with Forde Davis, but when he got

25    there he was told that he would not be able to see the panels

1   because they were moving, or something was happening with the

2   yard that would preclude him from being able to see the panels.

3          Nevertheless he used that time to talk with Mr. Davis,

4   and, according to his testimony, gain a level of assurances that

5   allowed him to keep the ball rolling so to speak as they went

6   forward.

7          I think it's important for the Court, only in terms of

8   the weight of the evidence and the candor of the witnesses, to

9   recognize perhaps something the Court has already recognized;

10  but PRC sent that pay request for a hundred percent on December

11  the 16th, if my memory is correct.

12         Randall Davis testified that it takes two weeks for

13  the concrete to cure -- to cure.  I don't know how long it took

14  to make the forms, or how long it -- but, if we said that the

15  date they sent the pay request they poured those forms full of

16  concrete, that would take us out to December the 30th that they

17  would have all of the panels built.

18         And that would be the day that Dana Noyes went there

19  and he did not see them.  He only saw 51.  So without getting

20  wrapped up in how many panels were there -- I'm only saying that

21  because they said they would have a hundred percent of those

22  panels -- 105 panels on that lot by the end of December.  They

23  said that.  And it does not appear that that was an accurate

24  statement to make on the 16th of December, based on Mr. Davis'

25  testimony how long it takes those panels to cure.  And what

1    Mr. Noyes took pictures of when he was up there.

2            Thank you.

3            THE COURT:  All right.  Thank you.

4            Give me just a minute.

5            (Pause in proceedings.)

6            THE COURT:  Let me give you findings and conclusions

7    on liability.

8            I am going to take the damages question under

9    advisement.  I need to spend a little more time with the record

10   and going back over some of the things you've told me in

11   response to my questions and in your arguments.

12           First, I have got an outstanding issue on exhibits.  I

13   think the objections were to Plaintiff's Exhibit 6th and 32.

14   Those are admitted.

15           The objection to 6th is overruled, although the crux

16   of the defense problem winds up being moot.

17           32, I think, is an amended answer.  It will be part of

18   the record either way, whether it was admitted or not, but it

19   was listed as an exhibit and I treat it as part of the evidence.

20           Some background initially: Oelrich had the contract to

21   do the building where the boilers would be housed out at the VA

22   hospital here.  Oelrich subcontracted with PRC.  PRC was to do

23   the precast.

24           A negotiated term, different from what Oelrich would

25   ordinarily put into a subcontract, dealt with payment.  PRC

1    insisted, and was able to get in the subcontract, a provision

2    that there would be no retainage on the precast material, only a

3    five percent retainage on the actual erection activity, and that

4    payment would be due net 30 days.  So, 30 days after invoicing.

5           Another special term that PRC was able to negotiate

6    was that if the schedule that was anticipated at that time

7    didn't turnout to be the actual schedule, then rescheduling

8    would not be done by Oelrich unilaterally, but would be done by

9    agreement between Oelrich and PRC.

10          Through no fault of either side, the schedule was

11   substantially delayed.  There were sub soil conditions, bats in

12   pipes, various things.  It caused the entire schedule to be

13   delayed.

14          That meant that each side had an obligation to agree

15   to a revised schedule.  Each side was obligated under the law to

16   act reasonably, and that was done.

17          The parties addressed the schedule.  It was delayed

18   and then delayed again and again.  I will get back to that in a

19   few minutes.

20          Before getting to that, there were some skirmishes

21   that were unrelated to the outcome of the litigation.  Oelrich

22   asked, again and again, for documentation that was going to be

23   needed.  It's referred to as an OSHA 10 and OSHA 30.  These

24   confirm required training for personnel on-sight.  Needed a

25   hazard assessment.  It was perfectly reasonable for Oelrich to

1    ask for those things when it did.

2           PRC's response consistently showed a disdain for

3    communicating and for requirements that Oelrich reasonably

4    brought up.  These are things that's part of the government

5    contract that had to be done, so it's reasonable for Oelrich to

6    ask.  PRC's responses were not as reasonable.  Ultimately, makes

7    no difference in how this thing played out.

8           More significant, but still not having affect on the

9    outcome, is that Oelrich failed to pay invoices properly under

10   the revised payment term that was part of the subcontract.  It's

11   been referred to as Note A.  That's what it's called when it's

12   appended to the subcontract.  That's what reduced the retainage

13   on construction work and eliminated the retainage on the

14   production of the product.

15          For whatever reason that didn't get properly

16   communicated and handled through the accounts payable folks at

17   Oelrich, and so the bills weren't properly paid.

18          It was a mistake.  It shouldn't have happened.  There

19   wasn't anything intentional or nefarious about it.  It was just

20   a mistake.

21          The entire dispute about payment doesn't show fault at

22   Oelrich.  Oelrich did reasonably ask for lien waivers and

23   confirmation of insurance on the product that had been

24   manufactured and was there on PRC's lot.

25          You might wonder, at first instance, why do we have to

provide an insurance certificate every time we ask for payment,
but if that's the federal requirement that Oelrich needs, in
order to send a pay request up the line, then that's what's
required.  So it was reasonable to ask for those things.

It was reasonable at the later point after production
was being done for Oelrich to ask for photographs of the
produced materials.  Forde Davis had said, when the payment
provision was being negotiated, that they would be willing to
provide photographs at the proper time.  So those were
reasonable requests by Oelrich.

The accounts payable or accounts receivable
professionals at each shop had an exchange.  They are
professional in tone trying to work it out.

One of the parts of the exchange was that the Oelrich
person said, suggested -- didn't demand -- but suggested that
one way to deal with the unpaid retainage would be to submit an
invoice for the retainage.  That would let her run it through
her software and get it paid.

You have all heard the expression, Computers, can't
live with them can't live without them.  We have all dealt with
software that sometimes is not the most user-friendly or the
easiest way to get where you're going.  So she suggested, if you
send me another invoice for the retainage I will get you paid.

Forde Davis says here at trial that this is somehow
nefarious that they are trying to start the clock over, or --

1    there is nothing to that.  That just wasn't the case at all.

2    This is a professional that has no interest in delaying

3    payments.  She is trying to get her job done.  Get the payment

4    made.  She just suggested this is one way to do it.

5            Now, I understand why the professional on PRC's side

6    didn't want to do it that way.  She thought if, Well, I do that

7    I have to go back and rearrange the amount billed and unpaid and

8    all that, because she is dealing with her software, too.

9            Those are the kind of software things that we all deal

10   with from time to time and it's just not a big deal.

11           PRC is correct, they were entitled to be paid the full

12   amount that they had properly billed, whatever that number was.

13   And this will become a theme through some of this; if that was

14   really a problem for PRC, Randall Davis should have picked up

15   the phone and called Mr. Oelrich.

16           There is no doubt in my mind, based on all this

17   evidence, that had people high enough in the chain talked about

18   this it would have been cured very promptly.

19           There is nothing in the record suggesting this was any

20   effort by Oelrich to delay its payments.

21           Oelrich probably didn't like payment term.  They would

22   have preferred their pay-when-paid provision that they usually

23   have, but at a high enough level a phone call saying, Remember

24   back at the beginning we changed that term.  And the folks at

25   Oelrich undoubtedly would have said:  Yes, we need to pay you,

1    and it would have gotten worked out.

2           More importantly about all of this, PRC never stopped

3    production based on the failure to pay the full amount due.

4    Never communicated to Oelrich that the failure to pay the full

5    amount due was affecting PRC's performance.

6           PRC didn't walk away based on this.  Ultimately, for

7    the issues that we are here to deal with, the failure to make

8    full payment made no difference.  The failure to make full

9    payment was not a reason why this contract broke down and we

10   wound up where we are.  It just didn't make any difference.

11          Now, a general comment about the relation between the

12   parties through the contract period.  There was an astonishing

13   lack of communication.  And it was PRC's fault throughout.  PRC

14   failed to communicate.  More than anything else that's why we

15   are here.

16          Let me go through the chronology that deals with what

17   we are here about, which is the schedule -- the failure to meet

18   the schedule.

19          By November 2019, it was clear that things were about

20   to ramp back up.  Forde Davis sent an email on November 11,

21   2019, on this issue about the documentation, the AHA, A-H-A,

22   plan and the OSHA 10 and OSHA 30 documentation.

23          What Mr. Davis said in his email was that PRC hadn't

24   narrowed it down and wasn't going to be providing the

25   information right then, but he starts by saying, being three

months out from arriving on site.  Now three months out from

November 11 would be February 11.  Three months out at that

point was an exageration that runs through some of the testimony

and some of the communication.  But what it makes clear is that

things are about to go at least within the next three months.

Then on November 20th, nine days later, Oelrich sends

a schedule to Forde Davis and it has construction set at

January 7 -- precast panels on January 7.

I'm sorry.  I gave you the wrong lead into that.  It's

not November 20th.  It's November 25th.  And it's the

distribution not just to Forde Davis but to all of the others

involved informant project -- the other trades and so forth, and

it shows January 7th, so a month and a half ahead and the

schedule has it as January 7th.

Then there is another email on January 27th, which

shows -- with a schedule and it shows precast on January 6th

through 10th.  So, again, this is confirmation more than a month

out that the anticipated date is that first week in

January 2020, starting on January 6th or 7.

By December 3rd, Oelrich sends Forde Davis another

email about the documentation that's needed, reminding that

documentation needs to be in place before the forthcoming

meeting.  He says, "You've been extremely hard to get a hold of

and I need your attention to this matter.  You're scheduled to

be here the first week in January."

1          So, again, written confirmation that we're on for the

2   first week in January.  No push back or disagreement from PRC.

3          Mr. Davis writes back on December 5th, saying that the

4   lift plan normally comes from the crane company.  No

5   disagreement with the schedule for the first week in January.

6          Mr. Davis says he was pretty much out all last week

7   with the flu.  He knew about the OSHA requirements at bid time.

8   This is the first he is seeing of the AHA documents.  He says,

9   "I will review them and get them filled out."

10          December 11th there is another request, "Where is the

11   AHA document.  These items are past due."  Again sent to Forde

12   Davis.  That's December 11th.

13          December 12th there is a formal letter written, it

14   says that on September 19th, 2019, more than almost three months

15   ago, "The superintendent made all subcontractors aware for the

16   need of these documents.  Where are they?"

17          On December 16th, Mr. Crehore writes Forde Davis,

18   "When we talked to you on Friday you were going to get your OSHA

19   certs in by the end of the day, contact information for the

20   crane company in by noon on Monday.  We got the certificates for

21   only two individuals, not the rest of them.  We need those.

22   We're going to have to have the 30 hour certification.  We need

23   the lift plan."  And then he ends, "Are we going to do this

24   project?  Are you committed to being on site Monday,

25   January 6th, 2020?"  It's now 21 days out, and you can tell from

1   the correspondence that Oelrich is becoming concerned about

2   whether PRC is going to do that they're obligated to do.

3          The same day then, that four hours later, at 9:36 at

4   night, Mr. Davis writes back to Mr. Crehore and says, "There

5   were other things that came up that required my immediate

6   attention on another project.  When I have to choose between an

7   issue on a job that's actively shipping and one that's a few

8   weeks out I have to choose the one that's active.  I will give

9   you the same urgency when your precast is being installed."

10         Then he says, for the first time, "January 6th isn't

11  going to work."  That he has been in touch with their crane

12  operator.  He had been telling them January, "they say they are

13  still a couple weeks out from that date."  The crane operator

14  not January 6th, couple weeks out, that would be January 20th.

15  He says, "I hope to have this shored up before the holidays."

16  So, here he is on December 16, saying essentially before

17  Christmas, "I want to get the date nailed down.  I can't do

18  January 6th."

19         December 18, there is an email back to Mr. Forde Davis

20  that says, "Tried to get a hold of you.  We need to get this

21  ironed out.  Please call me back."

22         Same day there is an email saying, "We need photos of

23  the product."  Oelrich is trying to see are we -- like the

24  earlier email said, "Are we going to do this job?  Are you

25  working on it?  Where are photos of the product?"  No response.

1          December 18, there is another email to Forde Davis

2     that says, "The start date of Monday, January 6th, has got to

3     happen.  I need you to call me so that he can discuss this."

4          December 24th, there is an email saying, "I need your

5     information on the production tickets."

6          Forde Davis says, "We don't like to give out the

7     production tickets to cause extra scrutiny."  Well, there's a

8     red flag.  I don't want to give you the information because I

9     don't want anybody looking at my product.

10          Then he says, "As for the start date, we didn't know

11     the exact date until just last week.  We were notifying our

12     erector that it would potentially be in January, based on

13     previous discussions, but that wasn't set in stone.  We're

14     trying to get our best -- get on site for installation as soon

15     as possible now but it's a work in progress."  So December 23rd,

16     "working on it," says, "we just found out the date."

17          December 27th, another email to Forde Davis saying,

18     "Where is your lift plan and your OSHA certificates?  These

19     could already be submitted even if you are waiting to confirm

20     with your erector."

21          Then December 30th, Mr. Noyes goes up there.  Looks

22     for product.  Sees part of the product.  Randall Davis makes a

23     handwritten note that's been produced and it gives some window

24     into where things stand.  "Drop in visit from David Noyes with

25     Oelrich Construction.  Says we do not communicate with them" and

1    the record makes very clear that that's correct.  That PRC is

2    not communicating again and again and again.

3              Mr. Randall Davis' note says, "I said bullshit."

4              My take on it is this: Randall Davis did not know how

5    poorly PRC was communicating.  So, Randall Davis didn't know

6    that what Mr. Noyes was saying was true.

7              And then he says, "Your idiot's robo dial" -- I am not

8    sure what that means -- "robo dial through our phone system" and

9    that's consistent with what the Oelrich people said: they call,

10   they get the numbers, they do the numbers, they don't get a

11   human being.

12             Mr. Davis says, "Additionally your job does not

13   warrant daily communication."  That's true.  It didn't warrant

14   daily communication, but it did warrant communication.  And at

15   some point at some of these points along here it probably

16   warranted daily communication.  "Showed him around and his

17   product."  Does not say, showed him part of his product.  It

18   says, "Showed his product."  Wanted a schedule.  Says, "I will

19   send one tomorrow."  That's completely consistent with what

20   Mr. Noyes said.  I saw -- he showed me our product.  Said he

21   would send a schedule.  And he did send a schedule.  And he did

22   it by email dated December 31st, the next day, as he had

23   promised.

24             And the email says, "According to our current

25   production schedule, and when you guys contacted us about

1   rescheduling this project, November 2019, we anticipate a start

2   erection date of February 1, 2020.  This date is based on

3   remaining production."

4          So the February 27 date, that's not Oelrich's date.

5   That's PRC's date.  PRC selects February 17th to do the

6   installation.

7          And, the email also says, "You guys contacted us in

8   November 2019."  That's what I said earlier, and there was

9   documentation of that.  November 2019.  So not as Forde Davis

10  said in late December a week ago.  This has been in the works

11  going back to November.

12         And Mr. Davis says, "We understand you had an erector

13  available."  And that's what Oelrich had said.  When Forde Davis

14  said the problem is "our erector is not available on

15  January 6th", Oelrich found an erector to solve that problem.

16         And, Mr. Randall Davis' email, on December 31st,

17  confirms that indeed Oelrich had found an erector.

18         That makes it a little unclear why this couldn't go

19  forward on January 6th.  Of course the answer is because PRC had

20  not done the product, even though it had billed for a hundred

21  percent of the product in mid-December, it did not do the

22  production.

23         January 6th there is an email back to both of the

24  Davises, "If we are going to start erecting on February 17, when

25  are we going to be done with production.  We will have to verify

1   the material before the joint venture will release payment."  So

2   they are going to want to verify that the material has been done

3   and he again asks the OSHA certificates and the crane lift plan.

4          So now we've got emails on both sides saying

5   February 17th.

6          On January 9th, Mr. Oelrich sends a letter to Randall

7   Davis -- I may have in questioning referred to it as

8   January 12th.  It's apparently January 9th.  Saying, "I am

9   trying to contact you go to understand what I can do to help get

10  this project completed.  If we have treated you poorly, I want

11  to understand what happened and make it right.  If there is

12  already a plan in place please just let me know what it is.

13  Please let me know what I can do to help resolve whatever issues

14  we may have."  Give him an office and a cell number.  A very

15  professional effort to sort out any problems and get this thing

16  going back to the right direction.

17         Randall Davis testified that he did get this

18  communication and I think I can quote it, "My attitude got the

19  best of me."

20         So, Mr. Oelrich reached out to solve the problem.

21  Randall Davis became aware of the communication.  Voluntarily

22  chose not to respond.

23         On January 14th, there is more communication about the

24  status of payment.  And Mr. Wilson, at Oelrich, sends a

25  communication back to Ms. Taylor, who is the accounts receivable

1    person, the financial person at PRC, and to Forde Davis, and

2    says, "Applications 9 and 10 have been rejected because when our

3    inspector visited your facility he reported back that only

4    53 percent of the precast material we need for the VA has been

5    produced." I am not quite sure where the 53 percent comes from.

6           And says he, "Also provided pictures to verify this

7    amount.  The last legitimate pay application you have is eight,

8    which is billed at 53 percent production."

9           Well, if those two 53 percent numbers were right it

10   would make my job easier because you'd be able to look at it and

11   say both sides say we are at 53 percent, which is going to

12   become an important amount.

13          But I am not sure where the 53 percent of production

14   came from.  Probably 55 divided by 105.  I haven't redone the

15   math.  I think we talked about 51 in argument, but go back and

16   check.  Mr. Noyes may have said -- Oelrich may have said when

17   they counted it up it was 55.  I don't remember.  But the

18   reference to pay application eight at 53 percent I think is

19   wrong.  I think pay application eight was at 63 percent.

20          As I said, I am going to take damages under

21   advisement.  I am going to have to get back and deal with some

22   issues, but also with some numbers and facts.

23          And then Mr. Wilson goes on says, "I tried to call you

24   several times last month to discuss all of this and never

25   received a call back", and so forth.

1              So, where it is as of that point is that this is

2    scheduled for February 17th.  There is another circulation of a

3    schedule on January 23rd.  It's Plaintiff's Exhibit 28.  And

4    it's not the schedule with precast as at February 17th.  So

5    that's the schedule.

6              On January 24th, there is a letter from the law firm,

7    Mr. Butts' law, from Mr. Hipworth, one of the attorneys of

8    record here in the courtroom, to Forde Davis, and it is not what

9    Mr. Darr has referred to as a shot across the bow.  It's more of

10   a, I guess I'd call it halfway between a carrot and a stick, but

11   it's a letter from a lawyer saying we need to get this on track.

12   It's also emailed to Mr. Davis.  And the record includes

13   certified mail receipt so it may have been sent certified.

14             Then the first indication that there is a problem with

15   February 17th is an email from Mr. Davis on February the 4th.

16   And he says, "Right now, we have 19 of 53 total panels made.

17   The remaining 34; 12 can be made simply with rebar cages.

18   Should go pretty quickly.  But, 22 must be made using

19   post-tensioned strands.  These will go slower.  With that our

20   best estimate at a production timeline is 22 days."  And plainly

21   that's 22 work days, so that's four weeks.

22             Now Mr. Randall Davis has testified here that they

23   were not that nearly that far out.  But, at this point, Forde

24   Davis is saying we need 22 days.

25             Obviously not going to make it on February 17th.  And

1    he says, "I know this is further out than what we originally

2    said but this is where we stand today based on workload and

3    complexity of the remaining pieces.  We still want to do the

4    project and I am actively looking to see if there can be some

5    overlap.  I will have you the paperwork for OSHA certs and crane

6    plans a minimum of two weeks before mobilizing."

7             So, I am still not sending you the stuff you have

8    asked for and I am not going to be there on February 17th.  I

9    need a minimum of 22 days.

10            On February 26th, Mr. Crehore sends an email

11   confirming that he has talked with Mr. Davis, "Per our

12   conversation, you are finishing up the last piece from the other

13   project this week.  22 days" -- that's Mr. Davis' number -- "22

14   days to finish casting the VA pieces takes us through the end of

15   March, but we can start earlier with the pieces already cast.

16   Please provide us a list of the panels that have already been

17   cast per an earlier request.  Your erector will be available

18   after March 16, but hasn't started his OSHA so he will be using

19   his time after the 16th to take the 30 hour.  One week to take

20   the class would give us a target start date of March 23rd, but

21   no later than April 6th."

22            So based on Mr. Davis' statement that we need 22 days,

23   and given some slack to take the 30 day course, that could have

24   been done months ago but still hasn't been done, let's do it no

25   later than April 6th.  "Please confirm.  Also what's the ETA on

528

1    the lift plan and operator certificates so we can go ahead and

2    get in."

3            That was February 26th.  Still no photos.  Still no

4    confirmation.  You can see to this point Oelrich has every

5    reason to be very nervous about whether this is going to happen,

6    whether PRC is going to perform, whether April 6th is the good

7    date.

8            Mr. Crehore manages to get Forde Davis on the

9    telephone.  I credit Mr. Crehore's testimony about that

10   conversation.

11           Mr. Crehore says, essentially, "Where are we?  Are you

12   going to be able to start this no later than April 6th?"

13           Forde Davis says, "We're not making any panels,

14   currently.  We don't know when we're going to make any panels.

15   Essentially we're not going to start on April 6th.  We can't

16   tell you when we will."

17           I said, in one of my questions, essentially what Forde

18   Davis says -- not in these terms, but the gist of it --

19   expressed colloquially is, "Go pound salt.  We're not telling

20   you."

21           At that point, Oelrich didn't have any reasonable

22   alternative to calling it off.  They have no reason to think

23   that PRC did is going to do this job in the foreseeable future.

24           Mr. Crehore tells Forde Davis, "We are terminating

25   you." And, he sends him an email and confirm it.  Mr. Davis

1   acknowledges that he opened the email and read it at least in

2   part.

3          The whole thing is two paragraphs.  The first is five

4   lines, the second is four lines.  There is a third paragraph

5   that says, "lease notify me immediately if my understanding is

6   not correct."

7          Mr. Davis never responded.  All communication between

8   the two sides ends.

9          From Oelrich's standpoint, the end of the

10  communication is reasonable.  They've said, "We're finished.

11  The contract is terminated.  If you have any different

12  understanding let us know", and they hear nothing.  They think

13  they're done and that essentially PRC has acquiesced.

14         Oelrich sends up the chain, in the construction

15  hierarchy, sends it to SAW contracting, the part of the joint

16  venture, and says, "I've terminated PRC."

17         My conclusion is that the termination was proper.  The

18  contract required 24 hours -- 24 hours notice.

19         This should have been structured differently.  Instead

20  of saying, "You are terminated", and sending an email saying,

21  "You are here by terminated", what Mr. Crehore should have said

22  is, "Effective 24 hours from now you are terminated."

23         It would have made absolutely no difference.  It

24  wouldn't have mattered if he sent a certified letter.  Wouldn't

25  have mattered how he did it.  My finding is that Forde Davis

1    knew that Oelrich's position was that PRC was terminated and

2    Mr. Davis chose to go ahead and ignore the indication.

3            My finding is that the termination was proper.  That

4    the failure to word it -- give 24 hours' notice made absolutely

5    no difference.  We were where we were.

6            Let me note this also.  If I were to take Forde Davis'

7    testimony about this, that he didn't realize the email said

8    "termination", and he hadn't been told termination, which I

9    don't credit, but if I did at the very least this is what it

10   would show; it would confirm the astonishing lack of

11   communication by PRC.

12           On that view, on Forde Davis' view, he has a

13   conversation on March 17th, where he is asked, "Do you want to

14   go forward or not."  He knows that the scheduled date was

15   April 6th.  He says "Yes, I want to go forward", but then he

16   says not a word to Oelrich for the next couple of months.

17   Doesn't say, "Not going to make April 6th."  Doesn't say, "Don't

18   know when I am going to do it."  Doesn't say when I am going to

19   get it on there, what else I am working on, what else I have to

20   do, what date I am shooting for.

21           Ramps back up production and doesn't tell Oelrich that

22   he is back doing production.  No communication at all.  What a

23   remarkable lack of communication.

24           So at the very least what all that shows is that PRC

25   was -- couldn't be counted on to perform, wasn't reliable,

1    wasn't going to communicate.

2            Even by May, on PRC's own view of this, they were

3    well-short of a hundred percent production.  So having been told

4    in November, "We are ready to go."  Having been given a date of

5    January 6th, and an email saying it has to happen on January

6    6th; Oelrich having found an erector to solve the only problem

7    with going forward on January 6th, that PRC had invoked.  Then

8    having moved it to February 17 at PRC's request, and again to

9    April 6th, when PRC said it couldn't do it.

10           With all of that background, in May, six6th months

11   after it geared back up in November, PRC still hadn't produced

12   the product.  The product that Randall Davis says, "We can do in

13   a couple of weeks.  We can knock it right out."

14           So the ruling is for Oelrich on its claim and against

15   PRC on its counter claim.  That's the ruling on liability.

16           I need some time with damages.  I think a close

17   question is whether PRC is entitled to be paid for the product

18   it produced.  And that turns on whether it was feasible and

19   reasonable for Oelrich to do no more than Oelrich did to try to

20   get that product.

21           I say it's close because Oelrich filed a replevin

22   action.  Somebody must have thought this product had value.  I

23   know it's difficult to match things, but we put people on the

24   moon in 1969 and got them home safely.

25           I'm going to go back over the record and think harder

1    about whether I credit the testimony on Oelrich's side that this

2    is just not feasible, or Mr. Davis' testimony, Mr. Randall

3    Davis' testimony, that this can be done, and is done, not

4    uncommonly in this field.

5            A complicating factor is what to do with the

6    difficulty; for one thing, Mr. Butts makes a very good point in

7    rebuttal when he says, the logistics of this would be a

8    nightmare.  Somebody has to go look at it and get on there and

9    you got to figure out logistically how we are going to match

10   this.  That's a problem.  And aside from the logistics that

11   would attend an effort among cooperating individuals to get this

12   matched.  Oelrich certainly cannot rely on PRC to cooperate.

13           Maybe with the right letter across the bow -- I don't

14   know that the letter needed to be different.  What needed to

15   happen was somebody needed to take the letter to Mr. Darr,

16   because Mr. Darr could have read some of these communications

17   and known what they said even if Forde Davis didn't.  And so

18   maybe, if it got to that, PRC would say, "I don't like it, but

19   we are off the job and we at least want to get value out of our

20   product."  Maybe not, but I do understand how Oelrich would be

21   concerned about whether they get that cooperation.

22           So for me that's a difficult and close question, and I

23   am going to think more about it.  That affects the calculation

24   of damages quite substantially.  I got have a few little things

25   about how the damages are calculated.  I think I said during the

```
 1   argument, I don't think you get more profit on the additional
 2   work.  I understand this didn't work out very well for either
 3   side.  I am confident that both sides would have been better off
 4   had they had not gotten this contract to begin with.  That's
 5   what happens when things come off the rail and -- but Oelrich is
 6   entitled to recover their properly calculated damages.
 7              There are some minor things in there when you start
 8   taking a monthly salary and convert it into weeks you don't
 9   divide by four, you divide by four and a third, and there are
10   things like that.  There are one or two of those items that
11   defense makes a good point maybe shouldn't be on there.  That's
12   all very minor.
13              The major question on damages is what to do about that
14   product that's on the yard at PRC.
15              We've tried this case.  I will get you a ruling.  I
16   think I told you before I know as much about the case as I am
17   ever going to know about it.  I hope I get this written ruling
18   out very, very promptly.  I am going to do my best.
19              I am just like PRC, scheduling the work, or the
20   erector scheduling the work, this is not the only thing on the
21   list, but I hope it get to it right a way because otherwise it
22   takes more time than it should.
23              I don't bang people's heads together and say, "You
24   ought to settle this case", and you've tried it and the side
25   doesn't like it -- both sides, if you don't like part of the
```

1   ruling, you are entitled to appeal.  And we have tried to

2   preserve the record so you can do that.

3           I will tell you two things about that: First, if there

4   is an appeal in the case the Eleventh Circuit has a pretty good

5   mediation program.  They will make you talk to each other as

6   part of that process.  I generally commend people to try to talk

7   to each other before you go through all of that because I am not

8   going to give away the lawyers' trade secrets, but briefs are

9   expensive.  So by the time they have written the brief you will

10  have invested more money in the case.  So you might, just as a

11  practical matter, now that you have heard that much of the

12  ruling, and when you get the rest of it, you might want to think

13  about where we stand and what makes sense.

14          More importantly, the reason I bring it up, if I have

15  it right that product is still sitting on the yard up there.

16  The lawyers ought to talk to each other and decide what to do

17  with that product and quit taking up space and wasting effort.

18  You ought to at least be able to agree at this point there is no

19  reason to keep the product; let's get rid of it in the most

20  efficient way we can.

21          I have given you a partial ruling, not the whole

22  thing.  Is there anything either side would like me to address

23  on the liability issue that I have not addressed?

24          I guess I should say, I credited Mr. Oelrich's

25  testimony and Mr. Crehore's completely.  I thought they were

1   both very candid and both testified very truthfully as best they

2   understood it.  Don't mean I agree with all of it, and as said,

3   I am still thinking about Mr. Oelrich's testimony that you

4   couldn't match this up, but that's a different question.  On

5   what he saw and heard I credit his testimony.  And I credit Mr.

6   Crehore's testimony.  I thought he was extraordinarily

7   straightforward.  Not argumentive.  Answered the questions very

8   much.

9            Anything else you would like me to address before we

10  break?

11           MR. BUTTS:  Your Honor, I don't know if it's

12  appropriate, but will the Court rule on who the prevailing party

13  is, or is that part of this decision?

14           THE COURT:  I will rule on the merits of the case and

15  then one thing I do try to tell people when a verdict comes

16  back, and it applies to a bench trial as well, the time limits

17  that run from the entry of a judgment are among the most

18  stringent time limits known to the law.  So, the question

19  prevailing party goes to the fee requests.  There is a strict

20  time limit there.  Notice of appeal, there is a strict time

21  limit.  Don't miss any time limits.  Make sure you do all this.

22           I appreciate the good effort on both sides.  I said

23  earlier, I think both sides did an excellent job of presenting

24  your positions.  I think I got the facts well-presented, so I

25  appreciate the good effort on both sides.

1          The local rule has a two part provision.  So after I

2     rule on the merits if it's a fee request you need to submit the

3     request for determination that you are a prevailing party.

4          MR. BUTTS:  Thank you.

5          THE COURT:  And let me tell you, also, you should go

6     ahead and do that, but my practice almost a hundred percent of

7     the time is when there is an appeal I don't determine amounts of

8     fees until the appeal is over.

9          MR. BUTTS:  Your Honor --

10         THE COURT:  Sometimes the appellate court doesn't

11    think I got it right.

12         MR. BUTTS:  Do I understand correctly from your ruling

13    so far in the case that PRC's counterclaim is --

14         THE COURT:  They lost.

15         MR. BUTTS:  Pardon me?

16         THE COURT:  They lost.

17         MR. BUTTS:  Okay.  Thank you, Your Honor.

18         Oh, I have one more question, please.

19         About how much time do you think may lapse -- not

20    rushing you -- but before you determine the damages in the case

21    as it pertains to the part that you mentioned regarding the

22    panels?  I'm only asking that question in case there is an

23    opportunity for discussion among the attorneys.

24         THE COURT:  It's a fair question.  I'm going to do it

25    as quickly as I can.  You have all had the same experience I

1   have had.  I recall a judge telling me, "You will have a ruling

2   by the end of the month."  It was October and he did have a

3   ruling by the end of October, it was just the next year.  It

4   won't be that long.  I hope I get right to it.  So there is a

5   good chance I will do it this weekend, but I also have other

6   things, and I don't know what emergencies have come in this

7   morning, so do it quickly.

8           And, look, I've got plenty to do, so if you talk to

9   each other and something is going to work out, somebody file

10  something and say, "give us a week" and I can put it back a

11  week.  If it gets much longer than the week I have to learn it

12  over again.  You know, it's like exams in college.  You how it

13  is, you get it and then it's gone.

14          MR. BUTTS:  I understand.

15          And do I understand correctly, Your Honor, the amount

16  of money that you are contemplating debating is the 109 that

17  Oelrich Construction paid, or is it a different amount of money?

18  I am just trying to understand the order of magnitude of the

19  money at issue.

20          THE COURT:  I just unplugged my computer.  If it will

21  come back up.  Let me -- before I tell you let me look at my

22  note.

23          If I say you failed to mitigate by not matching what

24  PRC had done -- so let's say I resolve that issue, and I am not

25  suggesting I will.  That's what has stopped me from making a

1    ruling this morning.  I need to think about it -- if that's the

2    ruling, here is what I think you would get.

3           Let's make one more assumption -- this, too, is maybe

4    not right -- but let's assume that the production at March 17

5    was 53 percent.  Then I think what you get might be this: you

6    might get the price paid to Spring Precast times 47 percent.

7    The precast they would have had to -- the product they would

8    have had to make.

9           Now I understand that doesn't work because the

10   price -- some of that gets incurred to make the cast, and you

11   got to make the cast whether you are making twice as much

12   product.  I get it.  But maybe some change to deal with that,

13   but roughly the price paid to Spring times 47 percent, plus any

14   out-of-pocket expense incurred to enter that contract.  And I am

15   not sure the record has any of that.

16          MR. BUTTS:  I don't believe it does.

17          THE COURT:  You believe it does not?

18          MR. BUTTS:  I do not believe that it does.

19          THE COURT:  Maybe not the extra 6th or $7,000 to match

20   the rock, because PRC says, "We had the rock."  Subtract out

21   maybe the -- any unpaid amount to PRC for the work PRC actually

22   did.

23          So, the assumption here, the hypothetical assumption

24   was PRC did the work and its product reusable, so PRC gets paid

25   for making the product it made.  So if some of that price is

1    unpaid you got to pay for it.  And maybe reduced by the amount

2    that PRC is going to incur to get rid of the product because the

3    assumption here was the product should have gone down here to

4    the VA hospital.

5           Probably without an adjustment for the cost PRC says

6    it incurred to store the product.  I would have to think about

7    that, but frankly that product should have been destroyed a long

8    time ago.  That's one of those the lawyers should have talked at

9    the beginning and said, "Okay, take some pictures and then

10   destroy the stuff", because the whole time the lawsuit has been

11   going everybody has known that product isn't ever going to be

12   used.  So that's rough.

13          Now, on the other hand, if I decide that Oelrich

14   reasonably dealt with this, that it was too much of a hassle

15   that they weren't getting answer and they were fair to go to

16   Spring for the whole deal, then some of those deductions don't

17   come off and you don't multiply the Spring contract times

18   47 percent, and you do pay them the $6800, or whatever it was,

19   to go to Georgia and find rocks that work.  It's a big ticket

20   item.  And I'm going to think about it some more.

21          So there you go.  If that's provides -- if that's

22   enough uncertainty to provide both sides a reason to talk to

23   each other --

24          MR. BUTTS:  Thank you for sharing that with us.

25          THE COURT:  -- talk to each other.

1              All right.  Anything else?

2              Thank you.  We're adjourned.

3         (Proceedings concluded at 12:53 on Wednesday, October 27,
   2021.)

4

5                         * * * * * * * *

6         I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter.

7   Any redaction of personal data identifiers pursuant to the
   Judicial Conference Policy on Privacy are noted within the

8   transcript.

9


10  /s/ Lisa C. Snyder                    3/13/2022

11  Lisa C. Snyder, RPR, CRR                  Date
    Official U.S Court Reporter

12

13                       I N D E X

14  OTHER RECORD MADE                            PAGE

15  Closing Argument By Mr. Butts                 417
    Closing Argument By Mr. Darr                  452
16  Rebuttal Closing Argument By  Mr. Butts       505
    Findings of Fact and Conclusions of Law the Court  512
17

18

19

20

21

22

23

24

25